# Exhibit D



## Dear Business Owner or Manager,

We are writing to provide you with important policy updates that affect your American Express Merchant Account. The topics to review in this mailing are featured in the following sections and will give you the latest information about your Merchant Account:

### News for Merchants
Highlights of recent and/or upcoming policy updates that may affect your Merchant Account.

### Card Acceptance Agreement
Enclosed is a copy of your new **American Express® Card Acceptance Agreement**. It officially amends and replaces your current agreement and becomes effective as of November 30, 2013.

### Frequently Asked Questions
Find answers to common questions about the included policy updates.

These updates are a part of our overall commitment to providing you with the tools, services and resources you need to help you manage your business even more effectively.

Thank you for accepting American Express Cards. We value and appreciate your business.

Sincerely,

**Ramón Martín**
President, Merchant Services Americas
American Express

AMERICANEXPRESS.COM/MERCHANT



# Important Alerts

Below are some important changes that may relate to your business. Reviewing them will help you stay informed and also make the most of your Merchant Account. For more information about any of these updates, please refer to the included frequently asked questions. You can also contact your client manager, or an American Express Representative at 1-800-528-5200, available Monday – Friday, 8 am – 8 pm Eastern Time.

## American Express Merchant Regulations – U.S. Updates

**The Merchant Regulations – U.S. are part of your Card Acceptance Agreement and provide detailed policies and procedures governing your acceptance of the American Express® Card.**

Every April and October we publish updates to our policies. You can access the documents listed below on our secure website at americanexpress.com/merchantpolicy using your American Express Merchant Number.

- **American Express Merchant Regulations – U.S.** This document provides policies and procedures governing your acceptance of the American Express Card. For more information visit americanexpress.com/merchantpolicy.
- **American Express Notification of Changes – U.S.** This document is a summary of upcoming changes to the Merchant Regulations – U.S. Go to americanexpress.com/merchantpolicy for the latest information.

## U.S. Chargeback Policy

**Our updated Chargeback policy takes effect on October 18, 2013.**

In response to Merchant feedback, we are changing our Chargeback policy to more closely align with other payment networks. This new process is designed to help reduce your back office work and expedite the disputes process.

**Here's what you need to know:**

- We will first review all information available to us about a Disputed Charge to determine if a decision can be reached without contacting you.
- For certain cases, we will still need to request supporting documentation, but in many cases we will process the Chargeback immediately.
- If we issue an upfront Chargeback, you do not need to take any additional action.
- If you disagree with a Chargeback, you can request a Chargeback reversal within 20 days after the date of the Chargeback, by mail, fax, or online. The documents required to request a Chargeback reversal will be outlined in your Chargeback notification.

To learn more about the new Chargeback policy, refer to the included frequently asked questions and watch the video at americanexpress.com/chargebackvideo.

(over, please)



## Tax Code Requirements and 1099-K Reporting

**Update your Merchant Account if your business' Legal Name and Taxpayer Identification Number changes.**

It is important that you are aware of Section 6050W of the Internal Revenue Code (IRC). It is an IRS requirement in which merchant acquiring entities, like American Express, must report the annual gross (and monthly) amount of payment card transactions submitted for each Merchant. Every January, we will provide each Merchant with a Form 1099-K reporting the prior year's transactions. A copy of the same is filed with the Internal Revenue Service (IRS) every March.

The law requires that you provide us with your **Legal Name and Taxpayer Identification Number**. Please make sure your information is up to date. If not, your Merchant Account could potentially be subject to 28% Federal backup withholding tax and state withholding tax on the gross dollar amount of future American Express Card Transactions settled for your Merchant Account. All withheld funds will be sent directly to the IRS.

Log in to your Merchant Account at americanexpress.com/merchant and go to "Add/Edit Locations" to update your information.

## Chip Card Technology

**Prepare for chip card and chip-enabled terminal technology, coming 2015.**

Chip-enabled terminals and chip cards are a new technology developed by the payment card industry to help provide more secure payments. Chip cards have an embedded chip that is recognized by a chip-enabled terminal, which creates a stronger and safer verification environment. American Express supports this initiative to increase security and decrease point-of-sale fraud for Merchants.

**Here's what you need to know:**

- As you plan for terminal upgrades, we recommend you consider chip card technology.
- By October 2015, your business may be liable for fraud if your point-of-sale terminals are not certified to process American Express Chip Card Transactions.

For more information on upgrading to chip card technology, please contact your terminal provider. You can also refer to the included frequently asked questions.



# Agreement for
## American Express® Card Acceptance

The Agreement is by and between **American Express Travel Related Services Company, Inc.**, a New York corporation, and **you, the Merchant**. By accepting the American Express® Card, you agree to be bound by the Agreement.

### General Provisions

**1. SCOPE AND OTHER PARTS OF AGREEMENT; DEFINITIONS**

**a.** Scope of the Agreement. The Agreement governs your acceptance of American Express Cards in the United States, Puerto Rico, the U.S. Virgin Islands, and other U.S. territories and possessions. You must notify us if you have any Establishments outside of the United States, Puerto Rico, the U.S. Virgin Islands, and other U.S. territories and possessions and cause them to comply with the terms of an agreement with our Affiliate governing Card acceptance there. You will be notified of those terms. The Agreement covers you *alone*. You must not obtain Authorizations, submit Charges or Credits, or receive payments on behalf of any other party, except as otherwise expressly permitted in the Merchant Regulations.

**b.** Merchant Regulations. The Merchant Regulations set forth the policies and procedures governing your acceptance of the Card. You shall ensure that your personnel interacting with customers are fully familiar with the Merchant Regulations. The Merchant Regulations are a part of, and are hereby incorporated by reference into, the Agreement. You agree to be bound by and accept all provisions in the Merchant Regulations (as changed from time to time) as if fully set out herein and as a condition of your agreement to accept the Card. We have the right to make changes to the Merchant Regulations in scheduled changes and at any time in unscheduled changes as set forth in section 8.j of the General Provisions. The Merchant Regulations and releases of scheduled changes therein are provided only in electronic form, existing at the website specified below in the definition of "Merchant Regulations" or its successor website. However, we shall provide you a paper copy of or a CD-ROM containing the Merchant Regulations or releases of scheduled changes therein upon your request. To order a copy, please call our Merchant Services representatives (telephone: 1-800-528-5200). We may charge you a fee for each copy that you request.

**c.** Definitions. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Merchant Regulations. Some definitions are repeated here for ease of reference.

*Affiliate* means any Entity that controls, is controlled by, or is under common control with either party, including its subsidiaries. As used in this definition, *control* means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an Entity, whether through ownership of voting securities, by contract, or otherwise. For the avoidance of doubt, but not by way of limitation, the direct or indirect ownership of more than 50% of (i) the voting securities or (ii) an interest in the assets, profits, or earnings of an Entity shall be deemed to constitute "control" of the Entity.

*Agreement* means the General Provisions, the Merchant Regulations, and any accompanying schedules and exhibits, collectively.

*American Express Card* or *Cards* mean (i) any card, account access device, or payment device or service bearing our or our Affiliates' Marks and issued by an Issuer or (ii) a Card Number.

*Cardmember* means an individual or Entity (i) that has entered into an agreement establishing a Card account with an Issuer or (ii) whose name appears on the Card.

*Charge* means a payment or purchase made on the Card.

*Chargeback* (sometimes called "full recourse" or "Full Recourse" in our materials), when used as a verb, means (i) our reimbursement from you for the amount of a Charge subject to such right or (ii) our reversal of a Charge for which we have not paid you; when used as a noun, means the amount of a Charge subject to reimbursement from you or reversal.

*Claim* means any claim (including initial claims, counterclaims, cross-claims, and third party claims), dispute, or controversy between you and us arising from or relating to the Agreement or prior Card acceptance agreements, or the relationship resulting therefrom, whether based in contract, tort (including negligence, strict liability, fraud, or otherwise), statutes, regulations, or any other theory,

including any question relating to the existence, validity, performance, construction, interpretation, enforcement, or termination of the Agreement or prior Card acceptance agreements, or the relationship resulting therefrom, except for the validity, enforceability, or scope of section 7.c of the General Provisions.

*Credit* means the amount of the Charge that you refund to Cardmembers for purchases or payments made on the Card.

*Discount* means an amount that we charge you for accepting the Card, which amount is: (i) a percentage (Discount Rate) of the face amount of the Charge that you submit, or a flat per-Transaction fee, or a combination of both; and/or (ii) a Monthly Flat Fee (if you meet our requirements).

*Disputed Charge* means a Charge about which a claim, complaint, or question has been brought.

*Entity* means a corporation, partnership, sole proprietorship, trust, association, or any other legally recognized entity or organization.

*Establishments* means any or all of your and your Affiliates' locations, outlets, websites, online networks, and all other methods for selling goods and services, including methods that you adopt in the future.

*General Provisions* means the provisions set out in the Agreement other than the provisions in the Merchant Regulations or any accompanying schedule or exhibit hereto.

*Marks* mean names, logos, service marks, trademarks, trade names, taglines, or other proprietary designs or designations.

*Merchant Number* (sometimes called the "Merchant ID" or "Establishment" or "SE" number in our materials) means a unique number we assign to your Establishment.

*Merchant Regulations* means the American Express Merchant Regulations – U.S., which are available at www.americanexpress.com/merchantpolicy and can be accessed by entering your Merchant Number.

*Other Agreement* means any agreement, other than the Agreement, between (i) you or any of your Affiliates and (ii) us or any of our Affiliates.

*Other Payment Products* mean any charge, credit, debit, stored value, prepaid, or smart cards, account access devices, or other payment cards, services, or products other than the Card.

*Reserve* means a fund established and/or collateral held by us as security for your or any of your Affiliates' obligations to us or any of our Affiliates under the Agreement or any Other Agreements.

*We, our,* and *us* mean American Express Travel Related Services Company, Inc.

*You* and *your* (sometimes called the "Merchant", "Service Establishment," or "SE" in our materials) mean the individual or Entity accepting the Card under the Agreement and (as applicable) its Affiliates conducting business in the same industry.

**d.** List of Affiliates. You must provide to us a complete list of your Affiliates in the region specified in section 1.a of the General Provisions that conduct business in your industry and notify us promptly of any subsequent changes in the list. You must notify us promptly if you have any Establishments in Puerto Rico, the U.S. Virgin Islands, or any other U.S. territory or possession, as our Discount, fees, and payment terms for Card acceptance may be different in those regions. We shall notify you of those terms after you have notified us that you have any such Establishments.

## 2. ACCEPTING THE CARD

**a.** Acceptance. You must accept the Card as payment for all goods and services sold at all of your Establishments, except as otherwise expressly specified in the Merchant Regulations. You agree that the provisions of Chapter 3 (Card Acceptance) of the Merchant Regulations are reasonable and necessary to protect the Cardmember's choice of which Card to use. You are responsible and jointly and severally liable for the performance by your Establishments of all provisions of the Agreement and all obligations of your Establishments under the Agreement.

**b.** Transaction Processing and Payments Our Card acceptance, processing, and payment requirements are set forth in the Merchant Regulations. Some requirements are summarized here for ease of reference, but do not supersede the provisions in the Merchant Regulations.

> i. Format. You must create a Charge Record for every Charge, and a Credit Record for every Credit, that must comply with our Technical Specifications, as described in the Merchant Regulations. If the Cardmember wants to use different Cards for payment of a purchase, you may create a separate Charge Record for each Card used. However, if the Cardmember wants to use a single Card for payment of a purchase, you shall not divide the purchase into more than one Charge nor shall you create more than one Charge Record unless the purchase qualifies for a Delayed Delivery Charge.

> ii. Authorization. For every Charge, you must obtain from and submit to us an Authorization Approval code. An Authorization Approval does not guarantee that (i) the person making the Charge is the Cardmember, (ii) the Charge is in fact valid or bona fide, (iii) you will be paid for the Charge, or (iv) you will not be subject to Chargeback.

iii. <u>Submitting Charges and Credits</u>. Your Establishments must submit Charges and Credits only in U.S. dollars. You must not issue a Credit when there is no corresponding Charge. You must issue Credits to the Card used to make the original purchase, except as otherwise expressly specified in the Merchant Regulations.

iv. <u>Payment for Charges.</u> We will pay you according to your payment plan in U.S. dollars for the face amount of Charges submitted from your Establishments less all applicable deductions, rejections, and withholdings, which include: (i) the Discount, (ii) any amounts you owe us or our Affiliates, (iii) any amounts for which we have Chargebacks, and (iv) any Credits you submit. Your initial Discount is indicated in the Agreement or otherwise provided to you in writing by us. In addition to your Discount we may charge you additional fees and assessments, as listed in the Merchant Regulations or as otherwise provided to you in writing by us. We may adjust any of these amounts and may change any other amount we charge you for accepting the Card.

v. <u>Chargeback</u>. We have Chargeback rights, as described in the Merchant Regulations. We may Chargeback by (i) deducting, withholding, recouping from, or offsetting against our payments to you or debiting your Bank Account, or we may notify you of your obligation to pay us, which you must do so promptly and fully; or (ii) reversing a Charge for which we have not paid you. Our failure to demand payment does not waive our Chargeback rights.

vi. <u>Protecting Cardmember Information</u>. You must protect Cardmember Information, as described in the Merchant Regulations. You have additional obligations based on your Transaction volume, including providing to us documentation validating your compliance with the PCI DSS.

## 3. PROTECTIVE ACTIONS

**a.** <u>Creating a Reserve</u>. Regardless of any contrary provision in the Agreement, we have the right in our sole discretion to determine that it is necessary to establish a Reserve. If we believe that we need to create a Reserve, we may immediately establish a Reserve or terminate the Agreement. We shall inform you if we establish a Reserve or terminate the Agreement. We may establish a Reserve by (i) withholding amounts from payment we otherwise would make to you under the Agreement or (ii) requiring you to deposit funds or other collateral with us. Any collateral provided pursuant to this section 3 of the General Provisions is subject to our prior written approval. We may increase the amount of the Reserve at any time so long as the amount of the Reserve does not exceed an amount sufficient, in our reasonable judgment, to satisfy any financial exposure or risk to us under the Agreement (including Charges submitted by you for goods or services not yet received by Cardmembers and our costs of handling Disputed Charges) or to us or our Affiliates under any Other Agreement, or to Cardmembers. Upon the occurrence of an event described in section 3.b.viii of the General Provisions, and during any continuation of such event, we may take immediate action to establish or increase the amount of any Reserve to an amount, in our reasonable judgment, proportional to the risk to us and our Affiliates arising from such event.

**b.** <u>Trigger Events for Reserve</u>. Some of the events that may cause us to establish a Reserve include: (i) your ceasing a substantial portion of or adversely altering your operations; (ii) your selling all or substantially all of your assets or any party acquiring 25% or more of the equity interests issued by you (other than parties owning 25% or more of such interests as of the effective date of the Agreement), whether through acquisition of new equity interests, previously outstanding interests, or otherwise; (iii) your suffering a material adverse change in your business or a material adverse change occurs in your industry; (iv) your breach of section 3.e of the General Provisions; (v) your becoming insolvent; (vi) our receiving a disproportionate number or amount of Disputed Charges at your Establishments; (vii) our reasonable belief that you will not be able to perform your obligations under the Agreement, any Other Agreement, or to Cardmembers; or (viii) the establishment of a reserve or other protective action taken by any Entity with whom you have entered into an arrangement for the acceptance or processing (or both) of Other Payment Products that (A) results in the withholding of funds that would otherwise have been payable to you, (B) requires you to make a direct payment into a reserve account or similar device, or (C) requires you to provide such Entity with a letter of credit or other third-party guaranty of payment.

**c.** <u>Application of Reserve</u>. We may deduct and withhold from, and recoup and set-off against, the Reserve (i) any amounts you or any of your Affiliates owe us or any of our Affiliates under the Agreement or any Other Agreement; (ii) any costs incurred by us in connection with the administration of the Reserve, including attorneys' fees; and (iii) any costs incurred by us as a result of your failure to fulfill any obligations to us, any of our Affiliates, or to Cardmembers, including attorneys' fees and our costs of handling Disputed Charges.

**d.** <u>Other Protections</u>. We may take other reasonable actions to protect our rights and the rights of any of our Affiliates, including changing the speed or method of payment for Charges, exercising Chargeback under any of our Chargeback programs, offsetting any amounts due to you under the Agreement against amounts that you owe us or our Affiliates under the Agreement or any Other Agreement, or charging you fees for Disputed Charges.

e. Providing Information. You must provide to us promptly, upon request, information about your and your Affiliates' finances, creditworthiness, and operations, including the most recent certified financial statements. You must notify us immediately of the occurrence of any event described in section 3.b.viii of the General Provisions.

**4. NOTICES**

a. Delivery and Receipt. Unless otherwise explicitly provided for herein, all notices hereunder must be in writing and sent by hand delivery; or by U.S. postal service, such as first class mail or third class mail, postage prepaid; or by expedited mail courier service; or by electronic mail (e-mail); or by facsimile transmission, to the addresses set out below. Notices are deemed received and effective as follows: If hand-delivered, upon delivery; if sent by e-mail or facsimile transmission, upon sending; if mailed, upon the earlier of (i) receipt or (ii) three days after being deposited in the mail if mailed by first class postage or ten days after being deposited in the mail if mailed by third class postage. If the addressee provided for below rejects or otherwise refuses to accept the notice, or if the notice cannot be delivered because of a change in address for which no notice was appropriately given, then notice is effective upon the rejection, refusal or inability to deliver.

b. Our Notice Address. Unless we notify you otherwise, you shall send notices to us at:

American Express Travel Related Services Company, Inc. P.O. Box 299051 Fort Lauderdale, FL 33329 Attn: Department 87 E-mail: American.Express.Contract.Keying@aexp.com Fax: (602) 744-8413 Tel: (800) 528-5200

c. Your Notice Address. We shall send notices to you at the address, e-mail address, or facsimile number you indicated on your application to accept the Card. You must notify us immediately of any change in your notice address.

**5. INDEMNIFICATION AND LIMITATION OF LIABILITY**

a. Indemnity. You shall indemnify, defend, and hold harmless us and our Affiliates, successors, and assigns from and against all damages, liabilities, losses, costs, and expenses, including legal fees, arising or alleged to have arisen from your breach, negligent or wrongful act or omission, failure to perform under the Agreement, or failure in the provision of your goods or services.

b. Limitation of Liability. IN NO EVENT SHALL WE OR OUR AFFILIATES, SUCCESSORS, OR ASSIGNS BE LIABLE TO YOU FOR ANY INCIDENTAL, INDIRECT, SPECULATIVE, CONSEQUENTIAL, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES OF ANY KIND (WHETHER BASED IN CONTRACT, TORT, INCLUDING NEGLIGENCE, STRICT LIABILITY, FRAUD, OR OTHERWISE, OR STATUTES, REGULATIONS, OR ANY OTHER THEORY) ARISING OUT OF OR IN CONNECTION WITH THE AGREEMENT, EVEN IF ADVISED OF SUCH POTENTIAL DAMAGES. NEITHER YOU NOR WE WILL BE RESPONSIBLE TO THE OTHER FOR DAMAGES ARISING FROM DELAYS OR PROBLEMS CAUSED BY TELECOMMUNICATIONS CARRIERS OR THE BANKING SYSTEM, EXCEPT THAT OUR RIGHTS TO CREATE RESERVES AND EXERCISE CHARGEBACKS WILL NOT BE IMPAIRED BY SUCH EVENTS.

**6. TERM AND TERMINATION**

a. Effective Date/Termination Date. The Agreement begins as of the date (i) you first accept the Card after receipt of the Agreement or otherwise indicate your intention to be bound by the Agreement or (ii) we approve your application to accept the Card, whichever occurs first. Either party can terminate the Agreement without cause (and notwithstanding any other rights established under the Agreement) at any time by notifying the other party. Termination will take effect according to the notice period specified in section 4.a of the General Provisions.

b. Grounds for Termination. In addition to our rights in sections 3.a and 6.a of the General Provisions, we may terminate the Agreement at any time without notice to you and without waiving our other rights and remedies if you have not submitted a Charge within any twelve month period. The Agreement is a contract to extend financial accommodations, and if bankruptcy or similar proceedings are filed with respect to your business, then the Agreement will terminate automatically.

c. Post-Termination. If the Agreement terminates, without waiving our other rights and remedies, we may withhold from you any payments until we have fully recovered all amounts owing to us and our Affiliates. If any amounts remain unpaid, then you and your successors and permitted assigns remain liable for such amounts and shall pay us within thirty days of our request. You must also remove all displays of our Marks, return our materials and equipment immediately, and submit to us any Charges and Credits incurred prior to termination.

d. Effect of Termination. Termination of the Agreement for any reason does not relieve the parties of their respective rights and duties arising prior to the effective date of termination that by their nature are intended to survive termination, including the provisions of sections 1, 3, 5, 6, 7, and 8 of these General Provisions, our Chargeback rights, and your duties set forth in the Merchant Regulations to protect Cardmember Information, indemnify us, retain documents evidencing Transactions, and notify your Recurring Billing customers of such termination. Our right of direct access to the Bank Account will also survive until such time as all credits and debits permitted by the Agreement, and relating to Transactions prior to the effective date of termination, have been made.

**7. DISPUTE RESOLUTION**

We value our merchant relationships. Most merchant concerns can be resolved by contacting our Merchant Services representatives at tel: 1-800-528-5200 or by e-mail: American.Express.Contract.Keying@aexp.com. Please be prepared to provide them with any information you have about the matter, including any efforts you may have made to address or resolve the matter. In the event Merchant Services is unable to resolve a complaint to your satisfaction, this section explains how Claims can be resolved through mediation, arbitration or litigation. It includes an arbitration provision. Your agreement to this Dispute Resolution provision does not preclude you from bringing your concerns to the attention of any appropriate governmental agencies.

**a.** Notice of Claim. Before filing a lawsuit or beginning a mediation or arbitration regarding a Claim, you and we agree to send a written notice *(Claim notice)* to each party against whom the Claim is asserted. This provides the parties an opportunity to resolve the Claim informally or through mediation. The Claim notice must describe the nature and basis of the Claim and state the specific amount or other relief demanded. Notice to us must include your name, your Merchant name, address, and Merchant Number and be sent to our notice address set forth in section 4.b of the General Provisions. If the Claim proceeds to arbitration, the amount of any relief demanded by you or us in a Claim notice shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or we are entitled on the Claim.

**b.** Mediation. In mediation, a neutral mediator helps parties resolve a claim. The mediator does not decide the claim but helps parties reach agreement.

**i.** Initiation of Mediation. Before beginning a mediation, you or we must first provide the Claim notice described above. Within thirty days after sending or receiving a Claim notice, you or we may submit the Claim to JAMS (1-800-352-5267, jamsadr.com) or the American Arbitration Association ("AAA") (1-800-778-7879, adr org) for mediation, or to an alternative mediator mutually agreed upon in writing by you and us.

**ii.** Conduct of Mediation. You and we agree to cooperate in selecting a mediator from a panel of neutrals and in scheduling the mediation proceedings. We will pay the fees of the mediator.

**iii.** Confidentiality/Tolling. All communications made for the purpose of, in the course of, or pursuant to the mediation shall be confidential, and no evidence of any such communication shall be admissible for any purpose or subject to discovery. All applicable statutes of limitation and defenses based upon the passage of time shall be tolled from thirty days following the sending of the Claim notice for sixty days or until termination of the mediation, whichever is earlier.

**iv.** Termination. Either you or we may terminate the mediation at any time following the first mediation proceeding. Your or our submission or failure to submit a Claim to mediation shall not affect your or our right to elect to resolve a Claim through arbitration.

**c.** Arbitration. You or we may elect to resolve any Claim by individual arbitration. Claims are decided by a neutral arbitrator.

If arbitration is chosen by any party, neither you nor we will have the right to litigate that Claim in court or have a jury trial on that Claim. Further, you and we will not have the right to participate in a representative capacity or as a member of any class pertaining to any Claim subject to arbitration. Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court. Except as set forth below, the arbitrator's decision will be final and binding. Other rights you or we would have in court may also not be available in arbitration.

**i.** Initiation of Arbitration. Before beginning an arbitration, you or we must first provide the Claimnotice described above. Claims will be referred to either JAMS or AAA, as selected by the party electing arbitration. Claims will be resolved pursuant to this Arbitration provision and the selected organization's rules in effect when the Claim is filed, except where those rules conflict with this Agreement. If we choose the organization, you may select the other within 30 days after receiving notice of our selection. Contact JAMS or AAA to begin an arbitration or for other information. Claims also may be referred to another arbitration organization if you and we agree in writing or to an arbitrator appointed pursuant to section 5 of the Federal Arbitration Act, 9 U.S.C. §§ 1-16 *(FAA)*. Any arbitration hearing that you attend shall take place in the federal judicial district where your headquarters is located or New York, NY, at your election.

**ii.** Limitations on Arbitration. **If either party elects to resolve a Claim by arbitration, that Claim will be arbitrated on an individual basis. There will be no right or authority for any Claims to be arbitrated on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other Merchants or other persons similarly situated.** The arbitrator's authority is limited to Claims between you and us alone. Claims may not be joined or consolidated unless you and we agree in writing. An arbitration award and any

judgment confirming it will apply only to the specific case and cannot be used in any other case except to enforce the award. This prohibition is intended to, and does, preclude you from participating in any action by any trade association or other organization against us. Notwithstanding any other provision and without waiving the right to appeal such decision, if any portion of these *Limitations on Arbitration* is deemed invalid or unenforceable, then the entire Arbitration provision (other than this sentence) will not apply.

**iii.** Previously Filed Claims/No Waiver. You or we may elect to arbitrate any Claim that has been filed in court at any time before trial has begun or final judgment has been entered on the Claim. Either you or we may choose to delay enforcing or to not exercise rights under this arbitration provision, including the right to elect to arbitrate a Claim, without waiving the right to exercise or enforce those rights on any other occasion. For the avoidance of any confusion, and not to limit its scope, this section applies to any class-action lawsuit relating to the "Honor All Cards," "non-discrimination," or "no steering" provisions of the Merchant Regulations, or any similar provisions of any prior Card acceptance agreement, that was filed against us prior to the effective date of the Agreement.

**iv.** Arbitrator's Authority. The arbitrator shall have the power and authority to award any relief that would have been available in court, including equitable relief (e.g., injunction, specific performance) and, cumulative with all other remedies, shall grant specific performance whenever possible. The arbitrator shall have no power or authority to alter the Agreement or any of its separate provisions, including this section, nor to determine any matter or make any award except as provided in this section.

**v.** Split Proceedings for Equitable Relief. Either you or we may seek equitable relief in aid of arbitration prior to arbitration on the merits to preserve the status quo pending completion of such process. This section shall be enforced by any court of competent jurisdiction, and the party seeking enforcement shall be entitled to an award of all costs, including legal fees, to be paid by the party against whom enforcement is ordered.

**vi.** Small-Claims Court; Injunctive Relief. We shall not elect to use arbitration under this section for any Claim you properly file in a small claims court so long as the Claim seeks individual relief only and is pending only in that court. Injunctive relief sought to enforce the provisions of sections 8.a and 8.b of the General Provisions is not subject to the requirements of this section. This section is not intended to, and does not, substitute for our ordinary business practices, policies, and procedures, including our rights to Chargeback and to create Reserves.

**vii.** Governing Law/Arbitration Procedures/Entry of Judgment. This section is made pursuant to a transaction involving interstate commerce and is governed by the FAA. The arbitrator shall apply New York law and applicable statutes of limitations and shall honor claims of privilege recognized by law. The arbitrator shall apply the rules of the arbitration organization selected, as applicable to matters relating to evidence and discovery, not the federal or any state rules of civil procedure or rules of evidence, provided that any party may request that the arbitrator expand the scope of discovery by doing so in writing and copying any other parties, who shall have fifteen days to make objections, and the arbitrator shall notify the parties of his/her decision within twenty days of any objecting party's submission. If your Claim is for $10,000 or less, you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the rules of the selected arbitration organization. At the timely request of a party, the arbitrator shall provide a written and reasoned opinion explaining his/her award. The arbitrator's decision shall be final and binding, except for any rights of appeal provided by the FAA. If the amount of the award exceeds $100,000, either party can appeal that award to a three-arbitrator panel administered by the selected arbitration organization, which shall reconsider de novo any aspect of the initial award requested and whose decision shall be final and binding. The decision of that three-person panel may be appealed as provided by the FAA. Judgment upon an award rendered by the arbitrator or by a panel of arbitrators on appeal may be entered in any state or federal court in the federal judicial district where your headquarters or your assets are located.

**viii.** Confidential Proceedings. The arbitration proceeding and all testimony, filings, documents, and any information relating to or presented during the proceedings shall be deemed to be confidential information not to be disclosed to any other party. All offers, promises, conduct, and statements, whether written or oral, made in the course of the Claim resolution, negotiations, mediations, arbitration, and proceedings to confirm arbitration awards by either party, its agents, employees, experts or attorneys, or by the mediator or arbitrator, including any arbitration award or judgment related thereto, are confidential, privileged, and inadmissible for

any purpose, including impeachment or estoppel, in any other litigation or proceeding involving any of the parties or non-parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the negotiation, mediation, or arbitration.

ix. Costs of Arbitration Proceedings. You will be responsible for paying your share of any arbitration fees (including filing, administrative, hearing or other fees) but only up to the amount of the filing fees you would have incurred if you had brought a Claim in court. We will be responsible for any additional arbitration fees. At your written request, we will consider in good faith making a temporary advance of your share of any arbitration fees or paying for the reasonable fees of an expert appointed by the arbitrator for good cause.

x. Additional Arbitration Awards. If the arbitrator rules in your favor for an amount greater than any final offer we made before arbitration, the arbitrator's award will include: (1) any money to which you are entitled, but in no case less than $5,000; and (2) any reasonable attorneys' fees, costs and expert and other witness fees.

d. Definitions. For purposes of section 7 of the General Provisions only, (i) *we*, *our*, and *us* include any of our Affiliates, licensees, predecessors, successors, or assigns, any purchasers of any receivables, and all agents, directors, and representatives of any of the foregoing, and (ii) *you* and *your* include any of your Affiliates, licensees, predecessors, successors, or assigns, any purchasers of any receivables and all agents, directors, and representatives of any of the foregoing.

e. Continuation. This section will survive termination of this Agreement, any legal proceeding to collect a debt, any bankruptcy and any sale of you or your assets (in the case of a sale, its terms will apply to the buyer). If any portion of this Dispute Resolution section, except as otherwise provided in the *Limitations on Arbitration* subsection, is deemed invalid or unenforceable, it will not invalidate the remaining portions of this Dispute Resolution section, the Agreement or any predecessor agreement you may have had with us, each of which shall be enforceable regardless of such invalidity.

**8. MISCELLANEOUS**

a. Confidentiality. You must keep confidential and not disclose to any third party the provisions of the Agreement and any information that you receive from us that is not publicly available.

b. Proprietary Rights and Permitted Uses. Neither party has any rights in the other party's Marks, except as otherwise expressly specified in the Merchant Regulations, nor shall one party use the other party's Marks without its prior written consent, except that we may use your name, address (including your website addresses or URLs), and customer service telephone numbers in any media at any time.

c. Your Representations and Warranties. You represent and warrant to us that: (i) you are duly organized, validly existing, and in good standing under the laws of the jurisdiction in which you are organized; (ii) you are duly qualified and licensed to do business in all jurisdictions in which you conduct business; (iii) you have full authority to enter into the Agreement and all necessary assets and liquidity to perform your obligations and pay your debts hereunder as they become due; (iv) there is no circumstance threatened or pending that might have a material adverse effect on your business or your ability to perform your obligations or pay your debts hereunder; (v) you are authorized to enter into the Agreement on behalf of your Establishments and Affiliates, including those indicated in the Agreement, and the individual who signs the Agreement or otherwise enters into it has authority to bind you and them to it; (vi) you are not (1) listed on the U.S. Department of Treasury, Office of Foreign Assets Control, Specially Designated Nationals and Blocked Persons List (available at www.treas.gov/ofac), (2) listed on the U.S. Department of State's Terrorist Exclusion List (available at www.state.gov), or (3) located in or operating under license issued by a jurisdiction identified by the U.S. Department of State as a sponsor of international terrorism, by the U.S. Secretary of the Treasury as warranting special measures due to money laundering concerns, or as noncooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization of which the United States is a member; (vii) you have not assigned to any third party any payments due to you under the Agreement and all indebtedness arising from Charges are for bona fide sales of goods or services (or both) at your Establishments and free of any liens, claims, or encumbrances other than ordinary sales taxes; (viii) all information that you provided in connection with the Agreement is true, accurate, and complete; and (ix) you have read the Agreement and kept a copy for your file. If any of your representations or warranties in the Agreement become untrue, inaccurate, or incomplete at any time, we may immediately terminate the Agreement in our discretion.

d. Compliance with Laws. You shall comply with all Applicable Laws and governmental regulations and rules.

e. Governing Law; Jurisdiction; Venue. The Agreement and all Claims are governed by and shall be construed and enforced according to the laws of the State of New York without regard to internal principles of conflicts of law. Subject to section 7, any action by either party

hereunder shall be brought only in the appropriate federal or state court located in the County and State of New York. Each party consents to the exclusive jurisdiction of such court and waives any Claim of lack of jurisdiction or forum non conveniens.

**f.** Interpretation. In construing the Agreement, unless the context requires otherwise: (i) the singular includes the plural and vice versa; (ii) the term "or" is not exclusive; (iii) the term "including" means "including, but not limited to;" (iv) the term "day" means "calendar day;" (v) all amounts are stated in U.S. dollars; (vi) references to a "party" means us, on the one hand, and you, on the other hand; (vii) the term "may" (unless followed by "not") means "has the right, but not the obligation, to"; (viii) any reference to any agreement (including the Agreement), instrument, contract, policy, procedure, or other document refers to it as amended, supplemented, modified, suspended, replaced, restated, or novated from time to time; (ix) any reference to a website or a URL (or both) refers to its successor website or URL; (x) all captions, headings, and similar terms are for reference only; and (xi) where specific language is used to illustrate by example or clarify a general statement, such specific language shall not be interpreted to modify, limit, or restrict the construction of the general statement. To the extent possible, these General Provisions, the provisions of the Merchant Regulations, and the provisions of any accompanying schedules or exhibits shall be interpreted to give each their full effect. However, if a conflict is deemed to exist between them, then that conflict shall be resolved in the following order of precedence: any accompanying schedules or exhibits shall control over these General Provisions or the Merchant Regulations (or both) and the Merchant Regulations shall control over these General Provisions.

**g.** Assignment. You shall not assign the Agreement, or any of your rights, interests, or obligations hereunder, whether voluntarily or by operation of law (including by way of sale of assets, merger, or consolidation), without our prior written consent. Any purported assignment by operation of law is voidable in our sole discretion. We may assign the Agreement, or any of our rights, interests, or obligations hereunder, without your consent. Except as otherwise specified herein, the Agreement binds, and inures to the benefit of, the parties and their respective successors and permitted assigns.

**h.** Waiver; Cumulative Rights. Either party's failure to exercise any of its rights under the Agreement, its delay in enforcing any right, or its waiver of its rights on any occasion, shall not constitute a waiver of such rights on any other occasion. No course of dealing by either party in exercising any of its rights shall constitute a waiver

thereof. No waiver of any provision of the Agreement shall be effective unless it is in writing and signed by the party against whom the waiver is sought to be enforced. All rights and remedies of the parties are cumulative, not alternative.

**i.** Savings Clause. Other than as set forth in the last sentence of section 7.c.ii of these General Provisions, if any provision of the Agreement is held by a court of competent jurisdiction to be illegal or unenforceable, that provision shall be replaced by an enforceable provision most closely reflecting the parties' intentions, with the balance of the Agreement remaining unaffected.

**j.** Amendments. We reserve the right to change the Agreement at any time (including by amending any of its provisions, adding new provisions, or deleting or modifying existing provisions) on at least ten days' prior notice to you, provided that we shall change the Merchant Regulations pursuant to the following provisions. You agree to accept all changes (and further to abide by the changed provisions in the Merchant Regulations) as a condition of your agreement to accept the Card. We are not bound by any changes that you propose in the Agreement, unless we expressly agree in a writing signed by our authorized representative. An e-mail or other electronic communication does not constitute such a signed writing.

**(1)** Scheduled Changes. The Merchant Regulations are published twice each year, in April and October. We have the right to, and hereby notify you that we may, change the provisions of the Merchant Regulations in scheduled releases (sometimes called "Notification of Changes" in our materials) as follows:

• a release of scheduled changes, to be published every April, which changes shall take effect in the following October (or in a later) edition of the Merchant Regulations or during the period between two editions of the Merchant Regulations, and

• a release of scheduled changes, to be published every October, which changes shall take effect in the following April (or in a later) edition of the Merchant Regulations or during the period between two editions of the Merchant Regulations.

Where a change is to take effect during the period between two editions of the Merchant Regulations, we shall also include the change in the edition of the Merchant Regulations covering the period during which the change shall take effect, noting the effective date of the change therein.

**(2)** Unscheduled Changes. We also have the right to, and hereby notify you that we may, change the provisions of the Merchant Regulations in separate unscheduled

releases, which generally shall take effect ten days after notice to you (unless another effective date is specified in the notice).

k. <u>Entire Agreement</u>. The Agreement is the complete and exclusive expression of the agreement between you and us regarding the subject matter hereof and supersedes any prior or contemporaneous agreements, understandings, or courses of dealing regarding the subject matter hereof.

l. <u>Disclaimer of Warranties</u>. WE DO NOT MAKE AND HEREBY DISCLAIM ANY AND ALL REPRESENTATIONS, WARRANTIES, AND LIABILITIES, WHETHER EXPRESS, IMPLIED, OR ARISING BY LAW OR FROM A COURSE OF DEALING OR USAGE OF TRADE, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY WARRANTY OF TITLE OR NON-INFRINGEMENT.

m. <u>No Third-Party Beneficiaries</u>. Except for the indemnitees specified in section 5.a of the General Provisions, the Agreement does not and is not intended to confer any rights or benefits on any person that is not a party hereto and none of the provisions of the Agreement shall be enforceable by any person other than the parties hereto, their successors and permitted assigns. The parties reserve the right to amend or terminate the Agreement without the consent of those indemnitees.

n. <u>Press Releases</u>. You shall not issue any press release or make any public announcement (or both) in respect of the Agreement or us without our prior written consent.

o. <u>Independent Contractors</u>. You and we are independent contractors. No agency, partnership, joint-venture, or employment relationship is created between the parties by the Agreement. Each party is solely responsible for its own acts and omissions and those of its respective agents, employees, representatives, and subcontractors in connection with the Agreement.

**AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.**

By: *[signature]*

Ramón Martin
President
Merchant Services Americas



# Frequently Asked Questions

### Questions Related to the U.S. Chargeback Policy

**Q: How long do I have to respond to an Inquiry or Chargeback?**

A: Merchants have 20 days to respond to an Inquiry and 20 days after the date of the Chargeback to request a Chargeback reversal.

**Q: What documentation is needed for a Chargeback reversal?**

A: Documentation required to support your claim will be outlined in your Chargeback notification. For more specific details, you can also refer to the Merchant Regulations – U.S., chapter 11 at **americanexpress.com/merchantpolicy.**

**Q: How does this process change if I am on the Immediate Chargeback Program, Partial Immediate Chargeback Program or Fraud Full Recourse Program?**

A: Existing Immediate Chargeback Program, Partial Immediate Chargeback Program, and Fraud Full Recourse Program policies will not change.

### Questions Related to Tax Code Requirements and Form 1099-K

**Q: What information is being provided to the IRS and why?**

A: Section 6050W of the Internal Revenue Code is an IRS requirement in which U.S. Merchant-acquiring entities, like American Express, must report the following to the IRS for each of their Merchants:

- Gross dollar amount of payment card transactions settled, both monthly and annually.
- Legal name. Your legal name is typically the name you provided to the IRS if you filed a Form SS-4, Application for Employer Identification Number, and it is used to file Federal tax returns.
- Federal Taxpayer Identification Number (TIN). In most cases your TIN is either your Social Security Number or Employer Identification Number.

**Q: How is this information provided to the IRS?**

A: Every January, we must provide an information return called IRS Form 1099-K to each Merchant reporting the prior year's Transactions. Every March, we must file a copy of the same form to the IRS.

**Q: What happens if I do not provide this information to American Express?**

A: The law requires that American Express begin withholding 28% of the gross dollar amount of your American Express Transactions. The law also requires that American Express send the withheld funds directly to the IRS. Additionally, if the Legal Name and TIN combination provided to American Express does not match the information on record with the IRS, American Express may be required to impose backup withholding if we receive notification from the IRS.

**Q: What steps do I need to take to help avoid automatic backup withholding?**

A: To avoid the potential of having backup withholding imposed on your Merchant Account, you should ensure the Legal Name and TIN on file with American Express matches the IRS records. You can verify your Merchant Account information online, at any time.  Just log in to access your Merchant Account at **americanexpress.com/merchant**.

**Q: Is American Express the only Merchant-acquiring company requiring this information?**

A: No. This is an IRS requirement that applies to all U.S. merchant acquirers that make payment to merchants in settlement of payment card transactions. For additional information, please refer to **americanexpress.com/1099k**.

(over, please)



### Questions Related to Chip Card Technology

**Q: How does chip card technology help reduce fraud and chargebacks?**

A: Chip cards have an embedded microchip that can be read by a chip-enabled terminal. This provides both cardholders and merchants with enhanced security helping to reduce fraud and potentially the number of Chargebacks.

**Q: What are the benefits of chip-enabled terminals for merchants?**

A: Utilizing chip card technology for payments can help you optimize your business operations by delivering:

- Greater security for card-present transactions with increased card authentication
- Deterring counterfeiting and fraud at your point-of-sale
- A more secure payment infrastructure to support new payment technologies, such as mobile payments
- Stronger customer relations with a more convenient purchase experience

**Q: What is the cost to upgrade to chip-enabled terminals?**

A: Costs associated with upgrading to chip-enabled terminals vary greatly by merchant. Some of the variables influencing the costs include which terminals are chosen; the level of external support required; and the tasks that have to be completed to integrate chip card technology into the merchant network and terminals. We recommend that you include chip card technology in your terminal upgrade plans.

**Q: What is the certification process and requirements to move to chip card technology?**

A: To confirm the certification process and requirements, you will need to work with your processor or terminal provider. If you authorize or submit Card Transactions directly to American Express, please contact your American Express representative.

**Q: Is there a deadline to upgrade your terminals to chip card technology?**

A: No, there's no requirement to upgrade your terminals to chip card technology; however, starting October 2015, your business may be liable for fraud if your point of sale terminals are not certified to process American Express Chip Card Transactions. We recommend you consider chip card technology in your terminal upgrade plans.

### Question Related to the Card Acceptance Agreement

**Q: The "Dispute Resolution" section of the General Provisions, has been replaced. What has changed?**

A: The Dispute Resolution section has been changed to provide for greater readability and to include a provision stating that if a Merchant prevails on a claim described in the claim notice and receives an award more favorable than a pre-arbitration settlement offer, the Merchant is entitled to (1) at least $5,000, and (2) reasonable attorneys' fees, costs and expert and other witness fees. As always, please read this provision carefully, as it affects your Card acceptance obligations.

Thank you for accepting American Express® Cards at your business. Your success is very important to us and we value your input. If you have any additional questions, please call **1-800-528-5200**.