1  Kenneth A. Gallo (admitted *pro hac vice*)
   KGallo@paulweiss.com
2  Craig A. Benson (admitted *pro hac vice*)
   CBenson@paulweiss.com
3  PAUL, WEISS, RIFKIND, WHARTON &
      GARRISON LLP
4  2001 K Street, NW
5  Washington, DC 20006-1047
   Tel. (202) 223-7300
6  Fax. (202) 223-7420

7
   Stephen E. Taylor (SBN 058452)
8  staylor@tcolaw.com
   Cheryl A. Galvin (SBN 252262)
9  cgalvin@tcolaw.com
   TAYLOR & COMPANY LAW OFFICES, LLP
10 One Ferry Building, Suite 355
   San Francisco, CA 94111
11 Tel. (415) 788-8200
12 Fax. (415) 788-8208

13
   Attorneys for Defendant
14 MASTERCARD INTERNATIONAL
   INCORPORATED
15

16 *[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGES]*

17            **UNITED STATES DISTRICT COURT**

18          **NORTHERN DISTRICT OF CALIFORNIA**

19             **SAN FRANCISCO DIVISION**

20

21 B & R SUPERMARKET, INC., d/b/a        Case No.: 3:16-cv-01150-WHA
22 MILAM'S MARKET;
   and GROVE LIQUORS LLC, Individually and on   **MEMORANDUM OF LAW IN**
23 Behalf of All Others Similarly Situated,      **SUPPORT OF CERTAIN**
                                                  **DEFENDANTS' JOINT MOTION**
24                    Plaintiffs,                 **TO DISMISS**
25           vs.
                                                  Date:  June 2, 2016
26 *[CAPTION CONTINUED ON NEXT PAGE]*            Time: 8:00 a.m.
                                                  Place: Courtroom 8, 19th Floor
27
                                                  Honorable William H. Alsup
28

VISA, INC.; VISA USA, INC.; MASTERCARD INTERNATIONAL INCORPORATED; AMERICAN EXPRESS COMPANY; DISCOVER FINANCIAL SERVICES; BANK OF AMERICA, N.A.; BARCLAYS BANK DELAWARE; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, NATIONAL ASSOCIATION; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK, N.A.; PNC BANK, NATIONAL ASSOCIATION; USAA SAVINGS BANK; U.S. BANCORP NATIONAL ASSOCIATION; WELLS FARGO BANK, N.A.; EMVCo, LLC; JCB CO. LTD; and UNIONPAY,

Defendants.

1

## <u>TABLE OF CONTENTS</u>

2

PRELIMINARY STATEMENT ................................................................................................1

3

PLAINTIFFS' ALLEGATIONS ............................................................................................4

4

ARGUMENT ...........................................................................................................................6

5

I.     PLAINTIFFS DO NOT ALLEGE SUFFICIENT FACTS TO
       ESTABLISH A CONSPIRACY TO RESTRAIN TRADE IN

6
       VIOLATION OF THE SHERMAN ACT. ...................................................................6

7
       A.     The Complaint Lacks Any Factual Allegations Indicating an
              Agreement Among Defendants...................................................................7

8

9      B.     The Complaint Lacks Allegations Providing Plausible Grounds on
              Which To Infer an Agreement Among Defendants................................10

10
II.    PLAINTIFFS LACK STANDING TO SEEK DAMAGES BASED ON
       ALLEGED INDIRECT INJURIES FROM NETWORK CHARGEBACK
11     POLICIES. .................................................................................................................16

12
III.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE
       CARTWRIGHT ACT..................................................................................................18
13

14     IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST
              ENRICHMENT. .....................................................................................................21

15
CONCLUSION...........................................................................................................................22

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ADT Sec. Servs., Inc. v. Sec. One Int'l, Inc.*,
   No. 11-CV-05149 YGR, 2013 WL 594298 (N.D. Cal. Feb. 14, 2013)...............................................22

*Apple Inc. v. Psystar Corp.*,
   586 F. Supp. 2d 1190 (N.D. Cal. 2008)...............................................................................19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .........................................................................................................6

*In re ATM Fee Antitrust Litig.*,
   686 F.3d 741 (9th Cir. 2012)......................................................................................16, 17

*AT&T Mobility LLC v. AU Optronics Corp.*,
   707 F.3d 1106 (9th Cir. 2013) ...........................................................................................20

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
   No. 15-cv-01416, 2015 WL 10457212 (N.D. Cal. Sept. 21, 2015)......................................18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...............................................................................................*passim*

*In re Cal. Title Ins. Antitrust Litig.*,
   No. C 08-01341, 2009 WL 1458025 (N.D. Cal. May 21, 2009).....................................6, 13

*In re Citric Acid Litig.*,
   191 F.3d 1090 (9th Cir. 1999) .....................................................................................11, 13

*Cty. of Tuolumne v. Sonora Cmty. Hosp.*,
   236 F.3d 1148 (9th Cir. 2001) .............................................................................................6

*In re Ditropan XL Antitrust Litig.*,
   529 F. Supp. 2d 1098 (N.D. Cal. 2007)...........................................................................20, 21

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
   751 F.3d 990 (9th Cir. 2014) .............................................................................................12

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) ...............................................................................................14

*Falk v. Gen. Motors Corp.*,
   496 F. Supp. 2d 1088 (N.D. Cal. 2007)...............................................................................22

*Fisherman's Wharf Bay Cruise Corp. v. Superior Court*,
   7 Cal. Rptr. 3d 628 (Ct. App. 2003) ...................................................................................19

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007)............................................................*passim*

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ................................................................................... 16

*ILWU-PMA Welfare Plan Bd. of Trustees v. Conn. Gen. Life Ins. Co.*,
No. C 15-02965 WHA, 2015 WL 9300519
(N.D. Cal. Dec. 22, 2015)........................................................................... 21

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) .......................................................... 7, 10, 17

*Kline v. Coldwell Banker & Co.*,
508 F.2d 226 (9th Cir. 1974) ...................................................................... 10

*In re Late Fee & Over-Limit Fee Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007)........................................................... 8

*Matsushita Elec. Indus. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................................... 10

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015).................................................................*passim*

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
795 F.3d 1124 (9th Cir. 2015)...................................................................... 6

*In re Nat'l Ass'n of Music Mechs.*,
MDL No. 2121, 2012 WL 3637291 (S.D. Cal. Aug. 20, 2012) ....................... 15

*In re Packaged Ice Antitrust Litig.*,
779 F. Supp. 2d 642 (E.D. Mich. 2011) ...................................................... 20

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*,
467 F.3d 283 (2d Cir. 2006) ....................................................................... 17

*PharmaRx Pharm., Inc. v. GE Healthcare, Inc.*,
596 F. App'x 580 (9th Cir. 2015)................................................................... 7

*Romero v. Flowers Bakeries, LLC*,
No. 14-CV-05189-BLF, 2016 WL 469370 (N.D. Cal. Feb. 8, 2016) ................ 21

*Song Fi v. Google, Inc.*,
No. 14-5080 SC, 2015 WL 6552377 (N.D. Cal. Oct. 29, 2015) .................. 18, 19

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001)........................................................................ 6

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
580 F. Supp. 2d 896 (N.D. Cal. 2008).......................................................... 21

- iii -
MEMORANDUM OF LAW IN SUPPORT OF CERTAIN
DEFENDANTS' JOINT MOTION TO DISMISS: Case No. 3:16-cv-01150 (WHA)

*Stubhub, Inc. v. Golden State Warriors, LLC*,
   No. C 15-1436, 2015 WL 6755594 (N.D. Cal. Nov. 5, 2015) ............................................................ 18

*In re Terazosin Hydrochloride Antitrust Litig.*,
   160 F. Supp. 2d 1365 (S.D. Fla. 2001)................................................................................................ 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   781 F. Supp. 2d 955 (N.D. Cal. 2011)................................................................................................. 21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   MDL No. 1827, 2012 WL 12377752 (N.D. Cal. Jan. 18, 2012)........................................................ 19

**Statutes**

Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.* ...................................................................... *passim*

Sherman Antitrust Act, 15 U.S.C. § 1.................................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 12................................................................................................................................................. 6

Order Denying Motion for Preliminary Injunction and Advancing Date for Case
   Management Conference (Dkt. No. 36),
   *B&R Supermarket, Inc. v. Visa Inc.*,
   No. C 16-01150 WHA (N.D. Cal. Mar. 16, 2016) ............................................................................. 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## PRELIMINARY STATEMENT

Plaintiffs' Complaint falls far short of the requirements for pleading a conspiracy claim under federal or state antitrust law. The Complaint alleges no direct evidence of a conspiracy. Instead, it asks the Court to accept as true a slew of conclusory allegations, and to infer the existence of a conspiracy from the types of circumstantial allegations that courts consistently have rejected. Plaintiffs also seek redress under California law even though, based on the Complaint, neither Plaintiff is a California company, neither does business in California, and neither suffered injury in California. And they tack on an "unjust enrichment" claim that does not exist under California law, all the while conceding that many Defendants retained no financial "benefit" from the alleged conduct underlying the Complaint.

Plaintiffs are two merchants from Florida. They bring this case against payment card networks, a joint venture entity owned by those networks that develops and manages technical specifications for anti-fraud credit card technology, and nine card-issuing banks. According to Plaintiffs, these parties—each differently situated, with its own role and interest in the credit card payment system—conspired to make an unidentified subset of merchants bear the cost of fraudulent payment card transactions in their businesses after October 1, 2015. Absent a conspiracy, Plaintiffs suggest, the "chargebacks" for these fraudulent transactions occurring at their places of business would have been borne by some Defendants. Plaintiffs claim that Defendants violated Section 1 of the Sherman Act and the Cartwright Act, and that Defendants were unjustly enriched.

Plaintiffs have one central gripe: It used to be that card-issuing banks bore the cost for many fraudulent credit card transactions, but now, in certain cases of fraudulent transactions, merchants who have not timely adopted fraud-reducing technology in the form of EMV-chip-reading point-of-sale (POS) systems allegedly bear that cost until compliance. Plaintiffs blame this on decisions by the payment card networks—American Express, Discover, MasterCard, and Visa—each to impose an October 1, 2015 deadline for merchants' adoption of that fraud-reducing technology.

Plaintiffs claim that, because they allegedly purchased and installed POS systems that had hardware capable of reading chip-enabled cards in their stores by the October 1, 2015 deadline, they should not have been subjected to liability for fraudulent transactions involving those cards. Plaintiffs admit they failed to secure "certification" of their new systems before the deadline, but claim that this occurred because of a conspiracy among Defendants, who allegedly control the certification process. Nevertheless, Plaintiffs concede that some merchants were, in fact, able to complete their conversion and certification in a timely manner and thus avoided assuming liability for fraudulent charges.

Plaintiffs' Complaint cannot withstand scrutiny under Rule 12. To begin with, it fails plausibly to establish an "agreement" as required to state a claim for relief under either Section 1 of the Sherman Act or the Cartwright Act. The Complaint never once alleges evidentiary facts showing an antitrust conspiracy. It fails to identify any specific agreement or agreements among the variously situated Defendants to impose any deadline after which certain merchants would assume liability for fraud-related losses. It fails to identify any conspiratorial meetings or communications among those Defendants. It fails to identify when (or even approximately when) the alleged conspiracy was devised, or by whom, or when various Defendants joined. Instead, the Complaint merely alleges in conclusory fashion that collective decisions to shift liability were made and that Defendants have various relationships with one another: that American Express, Discover, MasterCard, Visa, JCB, and UnionPay are co-owners of the EMVCo, LLC ("EMVCo") joint venture that sets the EMV chip technical specifications; that the Issuing Banks "control" the decision-making at Visa and MasterCard, even though Visa and MasterCard are publicly-traded corporations with independent boards; that certain Issuing Banks sit on advisory committees of EMVCo; and that EMVCo is the means through which the alleged conspiracy was effectuated. These are the types of generalized allegations courts consistently find insufficient to plead an unlawful conspiracy.

Conspiracy also cannot plausibly be inferred from the allegations of this Complaint. Nothing that Plaintiffs allege reflects conduct that is inconsistent with rational, independent

MEMORANDUM OF LAW IN SUPPORT OF CERTAIN
DEFENDANTS' JOINT MOTION TO DISMISS: Case No. 3:16-cv-01150 (WHA)

action by separate actors with similar economic incentives.  The Complaint shows, in fact, that the Networks each had independent and lawful motivations for implementing a liability shift and for doing so on common schedules:  EMV chips are superior to existing technology for preventing fraudulent transactions on payment cards, and the Networks want to protect their brands by using that technology.  Successfully transitioning to EMV chips required Issuing Banks to invest in issuing chip-enabled cards and merchants to switch to EMV-compliant POS systems.  These allegations show that each Network had independent incentives to facilitate this process.  Moreover, while Plaintiffs allege that the Networks set a common deadline for transitioning to EMV-compliant POS systems, Plaintiffs conspicuously fail to allege *facts* regarding any joint announcement or decision by the Networks in that regard—as opposed to separate announcements and decisions that amount to no more than unilateral parallel conduct in light of each Network's independent interest in minimizing confusion and facilitating efficiency.

Plaintiffs' allegations also do not plausibly explain how a conspiracy could have functioned without the involvement of key entities that are not even alleged to be co-conspirators.  Plaintiffs fail to name any of the numerous technology manufacturers and other entities involved with the certification process that Plaintiffs claim is at the heart of the conspiracy—yet are not alleged to be co-conspirators.  For these reasons alone, Plaintiffs' federal and state antitrust claims should be dismissed in their entirety.

Plaintiffs' antitrust claims should be dismissed for several additional, independent reasons.  Any alleged injuries suffered by Plaintiffs from Discover, MasterCard, and Visa chargeback policies are indirect only.  Such alleged injuries run headlong into *Illinois Brick*'s indirect purchaser bar and cannot serve as a basis for recovering antitrust damages under the Sherman Act.  Moreover, as Florida businesses that have not alleged any direct nexus between California and the charges forming the basis of their Complaint, Plaintiffs cannot bring claims under the Cartwright Act, whether on behalf of themselves or a putative class.

1    Finally, Plaintiffs' unjust enrichment claim must also be dismissed.  Plaintiffs have failed

2    to identify the state law under which they purport to bring this claim, and in any event, California

3    does not recognize an independent cause of action for unjust enrichment.

4    **PLAINTIFFS' ALLEGATIONS**

5    Two Florida merchants filed the Complaint on behalf of a putative nationwide class

6    against payment card networks American Express, Discover, MasterCard, and Visa;[1] card-

7    issuing banks Bank of America, Barclays Bank Delaware, Capital One, Chase Bank U.S.A.,

8    Citibank, PNC, USAA Savings Bank, U.S. Bank, and Wells Fargo;[2] JCB and UnionPay; and the

9    standards-setting joint venture EMVCo.  This suit is an antitrust action concerning Defendants'

10    alleged joint imposition on merchants of a "Liability Shift" on October 1, 2015 that made

11    merchants liable for certain types of fraudulent credit card transactions if they failed to upgrade

12    their payment processing technology (and that can be avoided by upgrading to that technology).

13    EMV chip technology is "a more advanced form of electronic data storage than

14    magstrip," which had been the prevailing technology previously used to store electronic

15    information on credit cards in the United States.  (Compl. ¶¶ 55, 57.)  EMVCo, a joint venture

16    among American Express, Discover, MasterCard, Visa, JCB, and UnionPay, "develops and

17    manages the technical standards by which EM[V] chip transactions . . . are processed and

18    maintained."  (*Id.* ¶ 20.)  Because "EMV chips are 'dynamic'" and "create[] a unique electronic

19    signature for each transaction," they are superior in detecting and preventing fraud relative to

20    magstrips, which are "'static,' containing only the information with which they are initially

21    coded."  (*Id.* ¶ 57.)  "Lack of EMV-enabled cards – which are common elsewhere in the world –

22    has been blamed in part for the fact that more than half of the $14 billion in global annual credit

23    card fraud occurs within the United States."  (*Id.* ¶ 68.)  "Financial institutions in Europe, Latin

24    America, Asia/Pacific and Canada migrated to EMV over the past decade."  (*Id.* ¶ 63.)  By the

25

26

27    [1]    The "Networks."
      [2]    The "Issuing Banks."

28

1  end of 2015, approximately 400 million chip cards had been issued in the United States (*id.*

2  ¶ 88), at "substantial cost" to Issuing Banks (*id.* ¶ 161).

3       Issuing banks often accept liability for fraudulent use of magstrip credit cards, but

4  merchants sometimes bear that liability—including, for example, when "the merchant

5  improperly handled the transaction in some way, such as not obtaining a customer signature."[3]

6  (*Id.* ¶ 72.)  The Complaint alleges that Defendants conspired to use the rollout of EMV chip

7  technology to shift liability from issuing banks to merchants for fraudulent transactions where

8  EMV-enabled cards were used but the merchant did not have EMV-certified equipment in place

9  that would help prevent fraud.  (*Id.* ¶ 79.)  This "Liability Shift" is alleged to have occurred on

10  October 1, 2015.  (*Id.* ¶¶ 74–75.)

11       Approval of the EMV equipment requires certification, which Plaintiffs allege was "the

12  primary means through which defendants' illegal conduct has been able to flourish."  (*Id.* ¶ 82.)

13  Specifically, they contend that Defendants "engaged in a conspiracy among themselves to

14  institute the October 1, 2015 Liability Shift while knowing that, for [some number of[4]]

15  merchants, compliance with the . . . certification requirements [by the October deadline] would

16  be impossible."  (*Id.* ¶ 130(a).)  They acknowledge that the certification process "involves

17  numerous entities," none of which are Issuing Banks, and only some of which Plaintiffs allege

18  participated in any conspiracy.  (*Id.* ¶ 83.)  They also acknowledge that some retailers "quickly

19  had their EMV-processing systems 'certified.'"  (*Id.* ¶ 94.)

20       As a result of the Liability Shift, Plaintiffs contend that there is a class of merchants who

21  "purchased EMV-chip-compliant POS readers and . . . otherwise complied with the directives of

22  the Networks and Issuing Banks" but whose readers are not certified (*id.* ¶ 123), and "are now

23  assuming fraud-related losses" that were "previously incurred by the defendant Issuing Banks"

24

25

---

26  [3]  Merchants that accept cards online also "more frequently had to bear the cost of fraudulent charges."  (*Id.* ¶ 73.)

27  [4]  Plaintiffs concede that they "do not know the exact number of the members of the Class," but "believe there are (at least) hundreds of thousands of members."  (*Id.* ¶ 124.)

28

1    (*id.* ¶ 165).  Plaintiffs purport to bring claims under the Sherman Act and the Cartwright Act, as

2    well as a count labeled "Unjust Enrichment."

3    <u>**ARGUMENT**</u>

4    **I.    PLAINTIFFS DO NOT ALLEGE SUFFICIENT FACTS TO ESTABLISH A**
     **CONSPIRACY TO RESTRAIN TRADE IN VIOLATION OF THE SHERMAN**
5    **ACT.**

6           To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to

7    relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and

8    raise "more than a sheer possibility that a defendant has acted unlawfully," *Ashcroft v. Iqbal*, 556

9    U.S. 662, 678 (2009).  *See also* Fed. R. Civ. P. 12(b)(6).  Conclusory allegations need not be

10   accepted as true and cannot themselves state a claim.  *See Twombly*, 550 U.S. at 555–57;

11   *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  Rather, a plaintiff must

12   allege "evidentiary facts which, if true, will prove the elements" of the claim.  *In re Cal. Title*

13   *Ins. Antitrust Litig.*, No. C 08-01341, 2009 WL 1458025, at *4 (N.D. Cal. May 21, 2009)

14   (quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (internal quotation

15   marks omitted)).

16          "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but

17   only restraints effected by a contract, combination or conspiracy, the crucial question is whether

18   the challenged anticompetitive conduct stems from an independent decision or from an

19   agreement, tacit or express." *Twombly*, 550 U.S. at 553 (internal quotation marks and alterations

20   omitted); *see also Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d

21   1124, 1129–30 (9th Cir. 2015).  Accordingly, a plaintiff must assert either factual allegations of

22   "direct evidence" of an agreement, or else "circumstantial evidence" that would plausibly permit

23   inference of a conspiracy.  *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d

24   1186, 1193 (9th Cir. 2015); *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1155–56

25   (9th Cir. 2001) (in absence of direct evidence of conspiracy, court must determine whether

26   circumstantial evidence establishes a conspiracy); *see also Twombly*, 550 U.S. at 553 ("[T]he

27   crucial question is whether the challenged anticompetitive conduct stems from independent

28
                                            - 6 -

decision or from an agreement, tacit or express." (internal quotation marks and alterations omitted)).

Plaintiffs' Complaint fails in both respects—it alleges neither any direct evidence of an agreement among Defendants nor any circumstantial facts to support a reasonable inference that a conspiracy existed.

**A.    The Complaint Lacks Any Factual Allegations Indicating an Agreement Among Defendants.**

Plaintiffs allege no direct evidence of an illegal agreement.  The Complaint does nothing to "answer the basic questions" about supposed anticompetitive agreements among Defendants that conspiracy claims are expected to address:  "who, did what, to whom (or with whom), where, and when?"  *Kendall*, 518 F.3d at 1048; *see also PharmaRx Pharm., Inc. v. GE Healthcare, Inc.*, 596 F. App'x 580, 581 (9th Cir. 2015).  Plaintiffs provide no *factual* allegations, for example, regarding:

- Any agreement between or among the co-owners of EMVCo (American Express, Discover, MasterCard, Visa, JCB, and UnionPay) to establish or set a date for a liability shift, let alone an agreement to prevent Plaintiffs' certification by that date;

- Any agreement between or among the Issuing Banks to create a liability shift;

- Any agreement between the Issuing Banks and Visa, MasterCard, any other Network, or EMVCo to establish a liability shift;

- Any individual representative of a Defendant that is supposed to have played a role in reaching some illegal agreement;[5]

- Any meeting at which any Defendant reached some understanding with another;

---

[5]    Plaintiffs provide the names of individuals serving on EMVCo's boards on behalf of some Defendants.  (*See, e.g.*, Compl. ¶¶ 6–9.)  Identifying the names of Defendants' employees who are EMVCo board members is insufficient to create any inference of conspiracy.  *See Kendall*, 518 F.3d at 1048.

MEMORANDUM OF LAW IN SUPPORT OF CERTAIN
DEFENDANTS' JOINT MOTION TO DISMISS: Case No. 3:16-cv-01150 (WHA)

- Any discussion among Defendants regarding the rules for or timing of a liability shift;

- Any location where, or date when, any Defendant entered into an illegal agreement or understanding; or

- Any communications among Defendants establishing an illegal agreement or understanding.

Instead, the Complaint attempts to lump together differently situated Defendants using vague and conclusory allegations that are insufficient to state a claim against any Defendant. *See In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 956, 962 (N.D. Cal. 2007) (dismissing claims where "the complaint's substantive allegations refer to the defendants in collective terms and do not advance individualized allegations about particular defendants," and noting that "[i]n *Twombly*, the Supreme Court dismissed as insufficient similar 'stray statements' about agreements, when unsupported by concrete allegations about the content and circumstances of any actual agreement"). These failures are all the more glaring given the extraordinary coordination that would have been necessary to effectuate a conspiracy among the differently situated Defendants.

To highlight just a few differences among the Defendants evident from the face of the Complaint: Unlike Discover and American Express, Visa and MasterCard rely on two entities to serve as their link to cardholders and merchants, respectively—(1) issuing banks, which connect Visa and MasterCard to cardholders by issuing and maintaining the lines of credit associated with their credit cards; and (2) acquiring banks, which connect Visa and MasterCard to merchants by processing and transmitting to these Networks transaction information relayed by the merchants. (Compl. ¶¶ 41, 47–50.) Moreover, Visa and MasterCard never bore any financial liability for fraudulent transactions—Issuing Banks did. (*Id.* ¶ 71.) None of the Issuing Banks, meanwhile, is alleged to be a member of EMVCo, and many are not alleged to have any involvement with EMVCo or any role whatsoever in the EMV migration process. (*Id.* ¶ 58.) Though two Issuing Banks (out of nine) are alleged to be Business or Technical Associates of

- 8 -

EMVCo (*id.* ¶¶ 13, 18),[6] there are no allegations regarding when and how they were involved in any decision about the Liability Shift.[7]  Plaintiffs do not even allege that foreign Defendants JCB and UnionPay ever implemented a liability shift or that class members have been subject to chargebacks from JCB or UnionPay.  (*See id.* ¶¶ 74–75, 123.)  And EMVCo is a technology-focused, standards-setting body that, conclusory allegations aside, has no apparent involvement in or incentives with respect to the Liability Shift.  (*See id.* ¶¶ 20, 58.)  These points alone render the alleged conspiracy implausible.

Plaintiffs instead proffer a series of entirely conclusory assertions:

- "[T]he Networks decided that on October 1, 2015 – by fiat of Visa, MasterCard, American Express and the issuing banks . . . – the system for handling chargebacks . . . would change dramatically."  (*Id.* ¶ 74.)

- EMVCo—owned and/or managed by the Networks, JCB, and UnionPay—is the "means through which defendants here have been able to effectuate their conspiracy."  (*Id.* ¶ 20.)

- The Issuing Banks "control" Visa and MasterCard, notwithstanding initial public offerings that occurred long before any of the conduct at issue here.  (*Id.* ¶¶ 23, 24.)

- The Networks, JCB, and UnionPay have ownership interests in EMVCo and representatives on EMVCo's "Board of Managers" (*id.* ¶¶ 6–9, 21, 22); and some (but not all) Issuing Banks are members of EMVCo advisory committees (*see id.* ¶¶ 10, 13, 18).

---

6   The Complaint makes a vague allegation against Bank of America, N.A. ("BANA"), that Bank of America Merchant Services (a separate legal entity which is not alleged to issue credit cards) is a Business Associate of EMVCo, but does not allege that Defendant BANA is associated with EMVCo.  (*Id.* ¶ 10.)

7   Plaintiffs themselves appear to acknowledge that the Networks, and not the Issuing Banks, promulgate policies regarding liability for fraudulent transactions.  (*See id.* ¶ 74 ("[T]he Networks decided that . . . the system for handling chargebacks for card present transactions would change . . . .").)

1   None of these allegations details any agreement reached by any Defendant—much less all

2   Defendants—or contains any supporting evidentiary facts.  The Complaint conspicuously omits

3   several Defendants from its description of the "fiat" giving rise to the October 1, 2015 deadline

4   (*id.* ¶ 74); does not even attempt to allege control or other direct relationships between the

5   Issuing Banks and American Express, Discover, JCB, UnionPay, or EMVCo; and ultimately

6   rests on precisely the type of conclusory allegations that courts have found insufficient to

7   establish a conspiracy.  *See In re Musical Instruments*, 798 F.3d at 1194 n.6 ("Conspiracy is a

8   legal conclusion. . . . [P]laintiffs must plead evidentiary facts."); *see also Twombly*, 550 U.S. at

9   556 (plaintiffs must plead factual matter).  This Circuit has already rejected the claim that issuing

10  banks' membership in a network or organization subject to common control, accompanied by a

11  conclusory assertion of purported control, is sufficient to allege involvement in a conspiracy.[8]

12  *Kendall*, 518 F.3d at 1048 ("participation on [an] association's board of directors is not enough

13  by itself" to establish an antitrust conspiracy); *see also In re Musical Instruments*, 798 F.3d at

14  1196 (participation in an organization or association is not enough to suggest illegal agreement);

15  *Kline v. Coldwell Banker & Co.*, 508 F.2d 226, 231–32 (9th Cir. 1974) (same).

16           **B.      The Complaint Lacks Allegations Providing Plausible Grounds on Which To
                       Infer an Agreement Among Defendants.**
17

18           The circumstantial facts Plaintiffs allege are similarly insufficient to support any

19  plausible inference of a conspiracy.  "[C]onduct that is as consistent with permissible

20  competition as with illegal conspiracy does not, without more, support even an inference of

21  conspiracy."  *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 597 n.21 (1986); *see*

22  *also In re Musical Instruments*, 798 F.3d at 1193 ("*Twombly* takes into account the economic

23  reality that mere parallel conduct is as consistent with agreement among competitors as it is with

24  independent conduct in an interdependent market.").  Accordingly, "[a]llegations of facts that

25

26  _____
    [8]   Plaintiffs' vague allegations that network "restrictions that make it impossible for the
    member banks to lose control of the business of MasterCard," and "limits on stock purchases and
27  ret[ention of] certain veto powers" enable the banks to "maintain effective control" over
    MasterCard are similarly conclusory and thus unavailing.

28                                          - 10 -

could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a § 1 violation." *In re Musical Instruments*, 798 F.3d at 1193 (internal quotation marks omitted). That legal principle is fatal to Plaintiffs' claims.

Nothing in the Complaint supports an inference that the liability shifts stemmed from anything other than each Network's independent decisions relating to the adoption of EMV technology and each Issuing Bank's independent decision to itself be ready to comply with a Network's deadline and move to superior fraud protection technology. To the contrary, the Complaint demonstrates that each Defendant had its own independent incentives to implement a liability shift without concerted action with others. Indeed, the Complaint concedes that the Networks have independent and differentiated operations. (*See, e.g.*, Compl. ¶¶ 41–43, 47.) And because "[l]ack of EMV-enabled cards . . . has been blamed in part for the fact that more than half of the $14 billion in global annual credit card fraud occurs within the United States" (*id.* ¶ 68), each Network has a plausible motivation to prefer the shift to better technology that "reduce[s] fraud significantly" and is "less prone to illicit copying," in order to protect its payment card brand (*id.* ¶ 65). Plaintiffs' Complaint also acknowledges that the issuers (the Issuing Banks, American Express, and Discover[9]) have incurred "substantial costs" in rolling out the improved technology to protect their customers and want the benefit of that investment. (*Id.* ¶¶ 64, 65, 161.) At least some merchants, however, have allegedly demonstrated a "general reluctance" to switch to EMV technology. (*Id.* ¶ 89.) These allegations establish that all Defendants had independent reasons to motivate merchants to install EMV equipment.

**Parallel conduct.** At best, the Complaint outlines parallel business behavior by independent actors, which is not sufficient to establish agreement because it is just as consistent with a "wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554; *see also In re Citric Acid Litig.*,

---

[9]   Unlike Visa and MasterCard, American Express and Discover typically issue their own cards. (*Id.* ¶¶ 42–47.)

191 F.3d 1090, 1102 (9th Cir. 1999); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1021–23 (N.D. Cal. 2007) (Alsup, J.).

Plaintiffs ask the Court to infer the existence of a conspiratorial agreement from the allegation that the Liability Shift date was set at October 1, 2015 by various Defendants.[10]  But it is equally (if not more) plausible that the date was set by the first Network to move on EMV technology, and then followed by other similarly-situated Networks because each had an independent and procompetitive reason to incentivize the rollout of EMV technology.  In that regard, the Complaint conspicuously fails to allege even the most basic facts regarding when or how each Network announced changes in its fraud liability rules, as well as what was announced by whom and when regarding implementation dates.[11]

"When considering plausibility, courts must also consider an obvious alternative explanation for defendant's behavior."  *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (internal quotation marks omitted).  There are obvious alternative explanations here.  Networks operate in an interdependent market; if one Network determined it would shift liability on a date certain, it would have been completely rational for other Networks to decide to implement the shift on a similar timetable in order to increase efficiency and ease of administration for its stakeholders.  For merchants who accept multiple credit card brands— including Plaintiffs themselves (Compl. ¶¶ 105, 108 (showing that Milam's Market and Grove Liquors accept American Express, Discover, MasterCard, and Visa))—the independent decisions of Networks to shift liability effective at or around the same date would avoid the complications of multiple or conflicting deadlines by which to update their technology.  *See In re Musical Instruments*, 798 F.3d at 1193 ("In an interdependent market, companies base their actions in part on the anticipated reactions of their competitors.  And because of this mutual awareness, two

---

[10]    While Plaintiffs allege that certain Defendants implemented a liability shift starting after an October 1, 2015 deadline, Plaintiffs do not allege that JCB and UnionPay implemented a liability shift at that time or at any time.  (*See, e.g.*, Compl. ¶¶ 74–75.)  Therefore, the Complaint does not even allege parallel conduct as to all networks.

[11]    Indeed, Plaintiffs never allege that the Networks reached or announced their decisions regarding a liability shift at or even around the same time.

firms may arrive at identical decisions independently, as they are cognizant of—and reacting to—similar market pressures."); *In re Graphics Processing*, 527 F. Supp. 2d at 1020, 1022 (dismissing conspiracy claim based on defendants' releases of products at the same times, in light of "innocent reasons why [defendants] would release their like products at roughly the same times"); *see also Twombly*, 550 U.S. at 553–54 ("Even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful." (internal quotation marks and alterations omitted)).

**No plus factors.**  Plaintiffs do not adequately plead any of the "plus factors" the Ninth Circuit has required to distinguish "permissible parallel conduct from impermissible conspiracy." *In re Musical Instruments*, 798 F.3d at 1194.  For instance, they do not—and cannot—allege that the Liability Shift was a "*historically unprecedented change*[] in pricing structure made at the very same time by multiple competitors, and *made for no other discernible reason*."  *Twombly*, 550 U.S. at 556 n.4 (emphasis added).  To the contrary, Plaintiffs' Complaint reflects that EMV technology has already been adopted outside the United States (Compl. ¶ 68 ("EMV cards have already been widely adopted outside the United States."); *id.* ¶ 63 ("Financial institutions in Europe, Latin America, Asia/Pacific and Canada migrated to EMV over the past decade.")), and that, in at least some of these countries, a liability shift was used in the migration to this technology (*id.* ¶ 76(a) (acknowledging that liability shifts have been part of the transition to EMV in other countries)).

Nor can Plaintiffs rely on allegations of mere opportunity to conspire vis-à-vis EMVCo. (*See id.* ¶¶ 6–10, 13, 18, 20.)  As a matter of law, mere opportunity to conspire does not plausibly support the inference of an illegal agreement.  *See In re Citric Acid*, 191 F.3d at 1103 (meetings at which competitors had an opportunity to conspire do not tend to exclude the possibility of legitimate activity); *In re Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."); *In re Graphics Processing*, 527 F. Supp. 2d at 1023–24; *In re*

*Cal. Title*, 2009 WL 1458025, at *4–6, 8 (dismissing Section 1 claim where plaintiffs alleged only an opportunity to conspire because of membership in rate setting organizations, a motive to conspire, and a concentrated market with significant barriers to entry).

Plaintiffs' allegations regarding Defendants' supposed "history of anticompetitive conduct" also fail to make plausible that the conduct at issue here is more likely the result of a conspiracy than of parallel action. The prior litigations involved entirely different conduct and different parties—including conduct allegedly *adverse* to purported co-conspirators here. (*See, e.g.*, Compl. ¶¶ 132–33 (alleging Visa and MasterCard and member banks conspired against American Express and Discover); *id.* ¶ 135 (alleging Visa and MasterCard "tied" credit and debit offerings); *id.* ¶¶ 137–39, 141 (alleging Visa and MasterCard and member banks conspired to set default interchange fees); *id.* ¶ 140 (alleging American Express rules governing "swipe fees" violate antitrust laws).)[12] Accordingly, the outcomes in those unrelated cases make no more or less plausible the allegations as to the Liability Shift and certification process in *this* case. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) ("Without an adequate allegation of facts linking transactions in Europe to transactions and effects here, plaintiffs' conclusory allegations do not nudge[ their] claims across the line from conceivable to plausible." (internal quotation marks omitted; alteration in original)); *In re Graphics Processing*, 527 F. Supp. 2d at 1024 (Alsup, J.) (allegations of separate antitrust investigation "carr[y] no weight in pleading an antitrust conspiracy claim").

**Implausibility.** The conspiracy Plaintiffs allege is implausible because of still other pleading failures.[13] *See Twombly*, 550 U.S. at 570.

*First*, Discover, MasterCard, Visa, and the Issuing Banks are not alleged to have any direct or contractual relationship with merchants. Rather, in these transactions, "as many as five parties" are involved, and only the acquiring bank is alleged to be "the link between the Network

---

[12]    None of these prior litigations involved EMVCo, JCB, or UnionPay.

[13]    JCB and UnionPay have not yet been served. Nevertheless, the Complaint is silent on why or how JCB and UnionPay—two foreign companies—would have any interest in participating in the alleged conspiracy relating to a liability shift in the United States. This silence as to two purported co-conspirators further exposes the implausibility of the alleged conspiracy.

and the merchant that accepts the card for payment." (Compl. ¶¶ 47–48; *see also id.* ¶¶ 49–50, 108 & Exs. B, C (showing that Worldpay, an *acquiring bank*, was the entity that initially bore the chargebacks and processed them to merchant B & R Supermarket over the Visa network).) Similarly, although the Complaint implies that a "typical" American Express transaction involves a direct relationship with merchants, it does not go so far as to allege that relationship in *all* American Express transactions. (*Id.* ¶ 46.) Plaintiffs' Complaint, therefore, fails to explain how the alleged conspiracy could be effectuated without the involvement of other parties.

*Second*, the certification process that Plaintiffs describe as "the primary means through which defendants' illegal conduct has been able to flourish" (*id.* ¶ 82) involves "numerous entities," many of which are not alleged to be co-conspirators (*see id.* ¶ 83). Plaintiffs offer no plausible explanation for how a conspiracy relating to the certification process could have operated without the involvement or knowledge of these other entities. Moreover, Plaintiffs do not include Issuing Banks in the list of entities responsible for certification, much less allege how Issuing Banks could have affected the alleged delay in the certification process.

*Third*, Plaintiffs have not alleged facts regarding how the Issuing Banks plausibly played any role in any Network's decision to shift liability. The Complaint reflects on its face that the Issuing Banks are not members of EMVCo—the very entity through which Plaintiffs allege the conspiracy was effected. And to the extent Plaintiffs allege that some (but not all) Issuing Banks participated in "Associate" bodies, the Complaint also reflects that those bodies—which were advisory in nature[14]—were *open to merchants* as well as to banks. (*Id.* ¶¶ 13, 18 (naming participating merchants and stating that the role of Technical Associate is "[o]pen to any industry stakeholder with an interest in monitoring the EMV Specifications"); *cf. id.* ¶ 94 & n.1.) These allegations make it implausible that the "Associate" bodies could be used to facilitate an anti-merchant conspiracy. *See In re Nat'l Ass'n of Music Mechs.*, MDL No. 2121, 2012 WL

---

[14]    The Complaint also contains no facts about the topics any of these advisory bodies considered. Indeed, the fact that the committees are described as "advisory" suggests they are not assembled for the purpose of making decisions or binding commitments. In any event, there is no allegation these committees played any role at all in decisions regarding who bears liability for fraudulent transactions. (*See id.* ¶¶ 10, 13, 18.)

3637291, at *2 (S.D. Cal. Aug. 20, 2012) (presence of numerous attendees at meetings, including

observers, tends to dispel specter of illegality), *aff'd sub nom. In re Musical Instruments &*

*Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015).

Moreover, the allegations that the Issuing Banks "controlled" Visa and MasterCard in

unspecified ways after those Networks each became a public company are themselves

conclusory assertions, unsupported by any pleaded facts, and also fail for the reasons discussed

above. *See supra* at 9–10. The Complaint contains no factual allegations of any actual exercise

of "control" by the Issuing Banks with respect to Visa's or MasterCard's decisions to adopt

liability shifts as a mechanism for encouraging the shift to EMV technology.

*Fourth*, the Complaint admits that some retailers were able to complete the certification

process by the deadline. (Compl. ¶ 94.) But there is no explanation of how or why certain

merchants were and continue to be approved in the first place. Nor have Plaintiffs explained

when, how, or why the alleged conspirators would have decided the complicated questions of

approving some retailers, but not others, and on what timeline. Plaintiffs' hint that Walmart and

Target may have had some illicit role in the certification process through their participation as

EMVCo associates (*id.* at n.1) is both inadequately pled and insufficient to support an inference

of conspiracy involving Walmart and Target.

## II.     PLAINTIFFS LACK STANDING TO SEEK DAMAGES BASED ON ALLEGED INDIRECT INJURIES FROM NETWORK CHARGEBACK POLICIES.

Plaintiffs also have a standing problem. The United States Supreme Court established a

bright-line rule in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728–48 (1977), that federal antitrust

plaintiffs may not seek damages for overcharges that they did not pay directly, even if those

alleged overcharges were passed on to them by the direct payer or through one or more

intermediaries. *See also In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 748 (9th Cir. 2012) (only

direct purchasers have standing to seek damages for federal antitrust violations). The *Illinois*

*Brick* rule applies with full force to bar damages claims by merchants accepting payment cards

who pay chargebacks or associated fines that their acquiring banks have passed on to them from

issuing banks or payment card networks.  *See Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 291–92 (2d Cir. 2006).  Plaintiffs therefore lack standing to bring damages claims for transactions arising from chargebacks that were passed on to a merchant through an intermediary.

In *Paycom*, a merchant-plaintiff sued MasterCard claiming that its policies for imposing chargebacks and fines violated the Sherman Act.  467 F.3d at 285, 288.  Issuing banks and MasterCard assessed the chargebacks and fines against acquiring banks, which passed on those charges to merchants, including the plaintiff.  *Id.* at 291–92.  Affirming dismissal under Rule 12(b)(6), the Second Circuit held that the merchant-plaintiff's injury could not confer antitrust standing.  *Id.*  Because the chargebacks and fines were not assessed directly against merchants, but rather against their acquiring banks, the court reasoned that the merchants were "in a position analogous to the indirect purchasers in *Illinois Brick*."  *Id.* at 291.  Therefore, "even if one hundred percent of the chargebacks, fines and penalties were passed-on" to the merchants by their acquiring banks, the merchant, "as an indirect payor of [those charges], would still lack antitrust standing."  *Id.* at 291–92.

Faced with similar payment structures, the Ninth Circuit affirmed dismissal of merchants' antitrust claims against Visa and MasterCard.  *Kendall*, 518 F.3d at 1049–50.  In *Kendall*, merchants sued those networks and their pre-IPO member banks for allegedly colluding to set inflated interchange fees.  *Id.* at 1045–46.  The court held that the merchants did not have antitrust standing to assert claims for the allegedly inflated interchange fees because they "have no contractual relationship with the [networks] directly, nor are they charged the interchange fee directly."  *Id.* at 1049; *see also In re ATM Fee*, 686 F.3d at 750 (despite allegation that they paid ATM interchange fee as a part of foreign ATM fee, plaintiffs could not recover damages for allegedly unlawfully inflated interchange fee "because they do not directly pay the fixed interchange fee" to a member of the alleged conspiracy).

Likewise here, Plaintiffs lack standing as to damages claims against any Defendant arising from chargebacks under Discover's, MasterCard's, and Visa's chargeback policies, as

well as from chargebacks for transactions on American Express cards accepted via a third-party acquirer.  Plaintiffs allege that they have been improperly "made liable" or "assessed final responsibility" by the Networks and Issuing Banks for chargebacks and chargeback fees.  (*Id.* ¶¶ 105, 108, 112.)  The Complaint reflects, however, that for chargebacks on Discover, MasterCard, and Visa transactions, the chargebacks and fees about which Plaintiffs complain are assessed on acquiring banks—such as Worldpay for Plaintiffs here—and not on merchants like Plaintiffs themselves.  Specifically, Plaintiffs allege that "[t]he acquiring bank *is the link between* the Network and the merchant that accepts the card for payment."  (*Id.* ¶ 48 (emphasis added).)  And in the only examples Plaintiffs allege of merchants paying chargebacks for transactions over these Networks, it was the acquiring bank, Worldpay, that "processed" the "chargeback debit" "to [the merchant's] account."  (*See id.* ¶¶ 102, 105, 108 & Exs. B, C.)

In short, Plaintiffs' federal antitrust damages claims grounded in any transaction in which a chargeback was assessed on a merchant by any party other than a Network can show only indirect injuries and must be dismissed.[15]

## III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE CARTWRIGHT ACT.

Plaintiffs' claim under the Cartwright Act should also be dismissed for failing adequately to allege a conspiracy.  The state law claim is based on the same allegations as the Sherman Act claim, and allegations of conspiracy are interpreted in a similar manner under the Cartwright Act and its federal counterpart.  *See Song Fi v. Google, Inc.*, No. 14-5080 SC, 2015 WL 6552377, at *3 (N.D. Cal. Oct. 29, 2015) ("The Cartwright Act is analogous to Section I of the Sherman Act, and thus decisions interpreting that federal statute may be instructive for the Court in considering Cartwright Act claims."); *Stubhub, Inc. v. Golden State Warriors, LLC*, No. C 15-1436, 2015 WL 6755594, at *4 (N.D. Cal. Nov. 5, 2015) (dismissing Cartwright Act claim "based entirely on the same conduct alleged in support of [defendant's] Sherman Act claims" for the same reasons as the Sherman Act claims); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, No.

---

[15]    Plaintiffs have not alleged that any exception to the *Illinois Brick* doctrine applies here, and none does.

MEMORANDUM OF LAW IN SUPPORT OF CERTAIN
DEFENDANTS' JOINT MOTION TO DISMISS: Case No. 3:16-cv-01150 (WHA)

1   15-cv-01416, 2015 WL 10457212, at *7 (N.D. Cal. Sept. 21, 2015) (same); *Apple Inc. v. Psystar*

2   *Corp.*, 586 F. Supp. 2d 1190, 1203 (N.D. Cal. 2008) (Alsup, J.) ("[T]he pleading requirements

3   under the two statutes are similar."); *see also Fisherman's Wharf Bay Cruise Corp. v. Superior*

4   *Court*, 7 Cal. Rptr. 3d 628, 649 (Ct. App. 2003) ("Since the Cartwright Act and the federal

5   Sherman Act share similar language and objectives, California courts often look to federal

6   precedents under the Sherman Act for guidance."). Cartwright Act allegations require "a high

7   degree of particularity in the pleading[s]," and "[g]eneral allegations of a conspiracy

8   unaccompanied by a statement of facts constituting the conspiracy and explaining its objectives

9   and impact in restraint of trade will not suffice." *Song Fi*, 2015 WL 6552377, at *3 (quoting

10  *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 265 (Ct. App. 1983)). Plaintiffs fall far short of this

11  standard.

12          Moreover, Plaintiffs cannot bring a Cartwright Act claim on their own behalf or on behalf

13  of a putative class. This presents an independent basis for dismissal of their state law claim.

14          This Court has already questioned whether Plaintiffs can bring a claim under the

15  Cartwright Act. *See* Order Denying Motion for Preliminary Injunction and Advancing Date for

16  Case Management Conference at 3, *B&R Supermarket, Inc. v. Visa Inc.*, No. C 16-01150 WHA

17  (N.D. Cal. Mar. 16, 2016) (Dkt. No. 36) (noting that "a Florida business is unlikely to have any

18  claim for relief under California's Cartwright Act."). They cannot. Plaintiffs have alleged

19  virtually no contacts with the state of California. Plaintiffs do not reside in California, are not

20  alleged to have suffered any injury in the state of California, and have not alleged that California

21  has any direct relevance to the charges or alleged conspiracy that are the basis of Plaintiffs'

22  Complaint. Plaintiffs therefore cannot assert a Cartwright Act claim. *See In re Graphics*

23  *Processing*, 527 F. Supp. 2d at 1026–27 (Alsup, J.) (dismissing non-California state antitrust

24  claims brought under laws of states in which class representatives did not reside and in which an

25  injury did not occur); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827, 2012

26  WL 12377752, at *5 (N.D. Cal. Jan. 18, 2012) (precluding Florida plaintiff from bringing

27  Cartwright Act claim where plaintiff was headquartered in Florida and purchased allegedly

28

1    price-fixed goods in Florida, and did not allege that it dealt with defendants in California or that

2    California had any direct relevance to the purchases forming basis of the complaint);[16] *In re*

3    *Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 657 (E.D. Mich. 2011) (plaintiffs lacked

4    standing to assert claims under the laws of states in which they did not reside and in which they

5    suffered no injury); *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1370–

6    72 (S.D. Fla. 2001) (dismissing state law claims where no named plaintiff resided in the state or

7    alleged that it had made purchases or suffered antitrust injury in those states).

8          Furthermore, permitting Plaintiffs to maintain a nationwide class action under the

9    Cartwright Act would violate due process.[17]  In order for a nationwide class to invoke the law of

10    a particular state, that state's law (1) must not conflict with the law of another jurisdiction with

11    an interest in the case; and (2) must have a significant contact or aggregation of contacts to

12    claims asserted by each member of the plaintiff class "to insure that the choice of the forum

13    state's law is not arbitrary or unfair."  *In re Graphics Processing*, 527 F. Supp. 2d at 1027

14    (Alsup, J.) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–22 (1985).)  In *In re*

15    *Graphics Processing*, this Court found that it was inappropriate to apply California law in an

16    antitrust case in which non-California plaintiffs failed to allege sufficient acts or injuries in

17    California that might justify application of California law to non-residents.  *See id.* at 1028.

18    Here, Plaintiffs have not met the standard for alleging significant contacts to California.

19    Plaintiffs have failed to assert non-conclusory allegations regarding conspiratorial conduct or

20    injuries in California.[18]  This falls far short of what is required.  Additionally, a nationwide class

21

22    [16]    *Cf. AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1112–14 (9th Cir. 2013)
(finding sufficient contacts with California to allow both California and out-of-state plaintiffs to
23    bring Cartwright Act claim in light of detailed factual allegations of conspiratorial conduct and
overt acts in furtherance of the conspiracy that occurred in California).

24    [17]    It is appropriate to consider class certification issues at this time, because standing is a
threshold question to be addressed prior to class certification.  To represent a class, Plaintiffs
25    must allege and show that they personally have been injured and not that an injury has been
suffered by other members of the class they purport to represent.  *See In re Ditropan XL Antitrust*
26    *Litig.*, 529 F. Supp. 2d 1098, 1106–07 (N.D. Cal. 2007).

27    [18]    Plaintiffs rely on allegations that unspecified "agreements" occurred in California, some
unknown "purchasers" (but not the named plaintiffs) may reside in California, some (but not all)

28          - 20 -

asserting claims under the Cartwright Act should not be permitted because of the variations in states' antitrust laws (including regarding whether indirect purchasers, such as Plaintiffs here, are entitled to bring an antitrust claim).

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT.

Plaintiffs' unjust enrichment claim also fails.  As a threshold matter, Plaintiffs failed to identify which state's common law supports their claim.  When a plaintiff brings an unjust enrichment claim on behalf of a nationwide class but fails to identify the state law underlying the claim, a court "cannot assess whether the claim has been adequately pled."  *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 910 (N.D. Cal. 2008).  Other courts have dismissed claims in similar circumstances.  *See In re Ditropan*, 529 F. Supp. 2d at 1101 (dismissing unjust enrichment claim and stating that plaintiff's "ability to plead a claim for unjust enrichment may vary from state to state, and unless and until Direct Purchaser Plaintiff clarifies under what state law it is moving, neither Defendants nor the Court can address whether the claim or claims have been adequately plead [sic].");  *Romero v. Flowers Bakeries, LLC*, No. 14-CV-05189-BLF, 2016 WL 469370, at *12 (N.D. Cal. Feb. 8, 2016) ("Defendant is correct that courts in this district have held that, due to variances among state laws, failure to allege which state law governs a common law claim is grounds for dismissal.  In order for the Court to determine whether a claim has been adequately pled, Plaintiff must allege the applicable law." (internal citations omitted));  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F. Supp. 2d 955, 966 (N.D. Cal. 2011) ("Several other courts in this district have similarly held that a plaintiff must specify the state under which it brings an unjust enrichment claim.").  This deficiency alone is fatal to the unjust enrichment claim.

Applying California law, Plaintiffs' claim fails as to all Defendants because there is no independent unjust enrichment claim in California.  *See ILWU-PMA Welfare Plan Bd. of Trustees v. Conn. Gen. Life Ins. Co.*, No. C 15-02965 WHA, 2015 WL 9300519, at *11–12

---

Defendants are based in California, and unspecified "overt acts" allegedly occurred in California. (*See* Compl. ¶ 153.)

1  (N.D. Cal. Dec. 22, 2015) (Alsup, J.) ("Unjust enrichment is 'not a cause of action . . . or even a

2  remedy, but rather a general principle, underlying various legal doctrines and remedies.  It is

3  synonymous with restitution.'") (quoting *McBride v. Boughton*, 123 Cal. App. 4th 379, 387

4  (2004)); *see also Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1099 (N.D. Cal. 2007)

5  (Alsup, J.) (finding that "the sole remedies available for the violations alleged [under the CLRA

6  and UCL]" were discussed earlier in the opinion "so there will be no occasion for resort to unjust

7  enrichment").

8      And even if such a claim did exist, Plaintiffs have failed to plead it.  Plaintiffs have

9  alleged only that "the defendant Issuing Banks" were "unjustly enriched by the Class members,"

10  because it is those banks that would otherwise have incurred fraud-related losses.  (Compl.

11  ¶ 165.)  They have not alleged any "enrichment" of American Express, Discover, MasterCard,

12  Visa, JCB, UnionPay, or EMVCo.  Additionally, other than the wholly insufficient allegations of

13  conspiracy discussed above, the Complaint fails to allege that the Issuing Banks engaged in any

14  wrongful conduct to bring about the Liability Shift or the alleged delay in certification for some

15  merchants.  This dooms the unjust enrichment claim against the Issuing Banks as well.  *See ADT*

16  *Sec. Servs., Inc. v. Sec. One Int'l, Inc.*, No. 11-CV-05149 YGR, 2013 WL 594298, at *1 (N.D.

17  Cal. Feb. 14, 2013) ("Fundamental to a claim for unjust enrichment is the basic notion that a

18  'person is not permitted to profit by his *own* wrong.'" (quoting Restatement (Third) of

19  Restitution & Unjust Enrichment § 3) (emphasis in original)).  As such, under any standard, the

20  "unjust enrichment" claim must be dismissed.

## CONCLUSION

22      For the foregoing reasons, Defendants respectfully request that the Court dismiss

23  Plaintiffs' Class Action Complaint.

MEMORANDUM OF LAW IN SUPPORT OF CERTAIN
DEFENDANTS' JOINT MOTION TO DISMISS: Case No. 3:16-cv-01150 (WHA)

1

2 Dated:  April 18, 2016                         Respectfully submitted,

3
                                               PAUL, WEISS, RIFKIND, WHARTON &
4                                                GARRISON LLP

5
                                               By:  */s/ Kenneth A. Gallo*
6                                                  Kenneth A. Gallo (admitted *pro hac vice*)
7                                                  Craig A. Benson (admitted *pro hac vice*)
                                                   William Y. Durbin (admitted *pro hac vice*)
8
                                                   2001 K Street, NW
9                                                  Washington, DC 20006-1047
                                                   Telephone: 202.223.7300
10                                                 Facsimile: 202.223.7420
                                                   KGallo@paulweiss.com
11                                                 CBenson@paulweiss.com
12                                                 WDurbin@paulweiss.com

13                                                 Stephen E. Taylor (SBN 058452)
                                                   Cheryl A. Galvin (SBN 252262)
14                                                 TAYLOR & COMPANY LAW
15                                                 OFFICES, LLP
                                                   One Ferry Building, Suite 355
16                                                 San Francisco, CA 94111
                                                   Telephone: 415.788.8200
17                                                 Facsimile: 415.788.8208
                                                   staylor@tcolaw.com
18                                                 cgalvin@tcolaw.com

19                                                 Attorneys for Defendant
20                                                 MASTERCARD INTERNATIONAL
                                                   INCORPORATED
21

22 Dated:  April 18, 2016                         ARNOLD & PORTER LLP
23
                                               By:  */s/ Robert J. Vizas*
24                                                 Robert J. Vizas
                                                   robert.vizas@aporter.com
25                                                 Sharon D. Mayo
                                                   sharon.mayo@aporter.com
26                                                 Erica M. Connolly
27                                                 erica.connolly@aporter.com

28                                               - 23 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Three Embarcadero Center, Tenth Floor
San Francisco, CA 94111-4024
Telephone: 415.471.3100
Facsimile: 415.471.3400

Mark R. Merley (admitted *pro hac vice*)
mark.merley@aporter.com
Karen C. Otto (admitted *pro hac vice*)
karen.otto@aporter.com
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Telephone: 202.942.5000
Facsimile: 202.942.5999

Attorneys for Defendants
VISA INC. and VISA U.S.A. INC.

Dated:  April 18, 2016

CRAVATH, SWAINE & MOORE LLP

By:   */s/ Rowan D. Wilson*
Rowan D. Wilson
Lauren K. Ross
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: 212.474.1000
Facsimile: 212.474.3700
Email: rwilson@cravath.com
Email: lross@cravath.com

Attorneys for Defendant
AMERICAN EXPRESS COMPANY

Dated:  April 18, 2016

WINSTON & STRAWN LLP

By:   */s/ Elizabeth P. Papez*
Elizabeth P. Papez (admitted *pro hac vice*)
1700 K Street, N.W.
Washington, DC 20006
Telephone: 202.282.5000
Facsimile: 202-282-5100
epapez@winston.com

Sean D. Meenan
Jeanifer E. Parsigian

- 24 -
MEMORANDUM OF LAW IN SUPPORT OF CERTAIN
DEFENDANTS' JOINT MOTION TO DISMISS: Case No. 3:16-cv-01150 (WHA)

101 California Street
San Francisco, CA 94111
Telephone: 415.591.1000
Facsimile: 415.591.1400
smeenan@winston.com
jparsigian@winston.com

Robert Y. Sperling (admitted *pro hac vice*)
Joseph L. Motto (admitted *pro hac vice*)
35 West Wacker Drive
Chicago, IL 60601
Telephone: 312.558.5600
Facsimile: 312.558.5700
rsperling@winston.com
jmotto@winston.com

Attorneys for Defendant
DISCOVER FINANCIAL SERVICES

Dated:  April 18, 2016                MORRISON & FOERSTER LLP

By:    */s/ Penelope A. Preovolos*
Penelope A. Preovolos
425 Market Street
San Francisco, CA 94105
Telephone: 415.268.7000
Facsimile: 415.276.7187
Email: PPreovolos@mofo.com

Mark. P. Ladner (admitted *pro hac vice*)
Michael B. Miller (admitted *pro hac vice*)
Natalie Fleming Nolen (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: 212.468.8000
Facsimile: 212.468.7900
mladner@mofo.com
mbmiller@mofo.com
nflemingnolen@mofo.com

Attorneys for Defendant
BANK OF AMERICA, N.A.

MEMORANDUM OF LAW IN SUPPORT OF CERTAIN
DEFENDANTS' JOINT MOTION TO DISMISS: Case No. 3:16-cv-01150 (WHA)

1

Dated:  April 18, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

2

3

By:  ___/s/ Raoul D. Kennedy_____
Raoul D. Kennedy
525 University Avenue
Palo Alto, CA 94301
Telephone: 650.470.4500
Facsimile: 650.470.4570
Email: raoul.kennedy@skadden.com

4

5

6

7

Peter E. Greene (admitted *pro hac vice*)
Boris Bershteyn (admitted *pro hac vice*)
Evan R. Kreiner (admitted *pro hac vice*)
Harry P. Koulos (admitted *pro hac vice*)
4 Times Square
New York, New York 10036
Telephone: 212.735.3000
Facsimile: 212.735.2000

8

9

10

11

12

Attorneys for Defendant
CHASE BANK USA, NATIONAL ASSOCIATION

13

14

15

Dated:  April 18, 2016

DORSEY & WHITNEY LLP

16

By:  ___/s/ F. Matthew Ralph_____
F. Matthew Ralph (admitted *pro hac vice*)
Email: ralph.matthew@dorsey.com
Andrew Brantingham (admitted *pro hac vice*)
Email: brantingham.andrew@dorsey.com
Angela Porter (admitted *pro hac vice*)
Email: porter.angela@dorsey.com
Richard Q. Liu
Email: liu.richard@dorsey.com
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone: 612.340.2600
Facsimile: 612.340.2868

17

18

19

20

21

22

23

24

Martha C. Luemers
Email: luemers.martha@dorsey.com
305 Lytton Avenue
Palo Alto, CA 94301
Telephone: 650.857.1717
Facsimile: 650.857.1288

25

26

27

28

MEMORANDUM OF LAW IN SUPPORT OF CERTAIN
DEFENDANTS' JOINT MOTION TO DISMISS: Case No. 3:16-cv-01150 (WHA)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Attorneys for Defendant
U.S. BANK NATIONAL ASSOCIATION
sued herein as U.S. BANCORP NATIONAL
ASSOCIATION

Dated:  April 18, 2016                    SEDGWICK LLP

                                  By:  ___/s/ Paul Riehle_____
                                       Paul Riehle (SBN 115119)
                                       paul.riehle@sedgwicklaw.com
                                       333 Bush Street, 30th Floor
                                       San Francisco, CA 94104
                                       Telephone: 415.781.7900
                                       Facsimile: 415.781.2635

                                       Attorneys for Defendant
                                       EMVCo, LLC

1

**<u>ATTESTATION</u>**

2

       I, Kenneth A. Gallo, am the ECF user whose ID and password are being used to

3

file the above MEMORANDUM OF LAW IN SUPPORT OF CERTAIN DEFENDANTS'

4

JOINT MOTION TO DISMISS.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest

5

that each listed counsel above has concurred in this filing.

6

7

                               */s/ Kenneth A. Gallo*
                        _____

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28