Kenneth A. Gallo (admitted *pro hac vice*)
KGallo@paulweiss.com
Craig A. Benson (admitted *pro hac vice*)
CBenson@paulweiss.com
Michelle K. Parikh (admitted *pro hac vice*)
MParikh@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel. (202) 223-7300
Fax. (202) 223-7420

Stephen E. Taylor (SBN 058452)
staylor@taylorpatchen.com
Cheryl A. Cauley (SBN 252262)
ccauley@taylorpatchen.com
TAYLOR & PATCHEN, LLP
One Ferry Building, Suite 355
San Francisco, CA 94111
Tel. (415) 788-8200
Fax. (415) 788-8208

Attorneys for Defendant
MASTERCARD INTERNATIONAL
INCORPORATED

*[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGES]*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| B & R SUPERMARKET, INC., d/b/a MILAM'S MARKET; GROVE LIQUORS LLC; STROUK GROUP LLC d/b/a MONSIEUR MARCEL; and PALERO FOOD CORP. AND CAGUEYES FOOD CORP. d/b/a FINE FARE SUPERMARKET, Individually and on Behalf of All Others Similarly Situated, | Case No.: 3:16-cv-01150 (WHA) **DEFENDANTS MASTERCARD, VISA, AND DISCOVER'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| Plaintiffs, | |

*[CAPTION CONTINUED ON NEXT PAGE]*

vs.

VISA, INC.; VISA USA, INC.; MASTERCARD
INTERNATIONAL INCORPORATED;
AMERICAN EXPRESS COMPANY; and
DISCOVER FINANCIAL SERVICES,

                      Defendants.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ III

STATEMENT OF ISSUES TO BE DECIDED ........................................................................1

INTRODUCTION AND STATEMENT OF RELEVANT FACTS ...........................................1

ARGUMENT ......................................................................................................................4

I.     PLAINTIFFS' MOTION RESTS ON AN ANTITRUST IMPACT AND
DAMAGES MODEL THAT VIOLATES *COMCAST* AND RULE 23. ...........................5

    A.     Plaintiffs Now Assert That the Large Merchants They Previously
Called Co-Conspirators Are Class Members. ............................................5

    B.     Plaintiffs Now Assert That in the But-For World There Would
Have Been No Liability Shifts at All. ........................................................6

II.     CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFFS DO
NOT SHOW THAT COMMON ISSUES PREDOMINATE AS
REQUIRED BY RULE 23. ...........................................................................................7

    A.     Plaintiffs Do Not Even Purport to Show with Predominately
Common Proof  That Putative Class Members Were Injured by
Paying Chargebacks. ................................................................................9

    B.     Many Class Members Incurred Fraud Liability for Business
Reasons Not Proximately Caused by the Allegedly Unlawful
Conduct. ................................................................................................10

        1.     Proof of Liability Is Not Common Because Merchants
Made Independent Business Decisions Not to Seek
Certification Before the Deadline. .............................................11

        2.     Proof of Liability Is Not Common Because Other
Independent Intervening Causes, Including the Conduct of
Third Parties Who Are Not Alleged to be Part of the
Conspiracy, Impacted Certification Timing. .............................13

        3.     Proof of Liability Is Not Common Because Some
Chargebacks in Plaintiffs' Model Would Have Occurred
Regardless of the Liability Shift. ..............................................15

    C.     Many Class Members Have Arbitration Agreements with Discover
That Raise Further Individual Questions. .................................................17

III.     CLASS CERTIFICATION SHOULD BE DENIED BECAUSE
PLAINTIFFS' BUT-FOR WORLD IS UNSUPPORTED BY FACTS OR
ECONOMIC ANALYSIS. ............................................................................................17

- i -

DEFENDANTS MASTERCARD, VISA, AND DISCOVER'S OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION: Case No. 3:16-cv-01150 (WHA)

A. The But-For World Plaintiffs Assume Is Refuted by the Case Record. ................................................................................................ 18

B. There Is No Support for Plaintiffs' Assertion That the Liability Shifts Would Be Substantially Delayed in the But-For World. ............................ 19

IV. DR. OFFICER'S REPORT IS INADMISSIBLE AND THEREFORE INCAPABLE OF SHOWING INJURY AND DAMAGES ON A CLASS-WIDE BASIS. ............................................................................................... 22

A. Dr. Officer's Methodology Must Be Excluded as Unreliable Because It Assumes a But-For World Contrary to the Case Record and Plaintiffs' Liability Theory. ........................................................ 23

B. Dr. Officer's Methodology Is Also Inadmissible Because It Cannot Assist the Trier of Fact in Determining Class-Wide Antitrust Injury or Damages. ..................................................................................... 24

V. PLAINTIFFS' PROPOSED CLASS DEFINITION IS IMPROPER. ............................ 25

CONCLUSION ............................................................................................................. 27

- ii -

DEFENDANTS MASTERCARD, VISA, AND DISCOVER'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION: Case No. 3:16-cv-01150 (WHA)

### CASES

Allied Orthopedic Appliances v. Tyco Healthcare Grp.,
    247 F.R.D. 156 (C.D. Cal. 2007) ...........................................................................17

Amchem Prods., Inc. v. Windsor,
    521 U.S. 591 (1997)...................................................................................................8, 22

Axis, S.p.A. v. Micafil, Inc.,
    870 F.2d 1105 (6th Cir.), cert. denied, 493 U.S. 823 (1989)...................................11

Backhaut v. Apple Inc.,
    No. 14-CV-02285-LHK, 2015 WL 4776427 (N.D. Cal. Aug. 13, 2015).................4

Comcast Corp. v. Behrend,
    133 S. Ct. 1426 (2013) ...................................................................................... passim

Concord Boat Corp. v. Brunswick Corp.,
    207 F.3d 1039 (8th Cir. 2000) .......................................................................... passim

Daniel F. v. Blue Shield of California,
    305 F.R.D. 115 (N.D. Cal. 2014) .......................................................................4, 26

Daubert v. Merrell Dow Pharms.,
    509 U.S. 579 (1993)...................................................................................4, 22, 23, 24

DSU Medical Corp. v. JMS Co., Ltd.,
    296 F.Supp.2d 1140 (N.D. Cal. 2003) ...................................................................24

Ellis v. Costco Wholesale Corp.,
    657 F.3d 970 (9th Cir. 2011) .............................................................................4, 17

Gen. Elec. Co. v. Joiner,
    522 U.S. 136 (1997)...........................................................................................22, 24

Glen Holly Entm't, Inc. v. Tektronix Inc.,
    343 F.3d 1000 (9th Cir. 2003) ...........................................................10, 11, 15, 24

GSI Tech. v. United Memories Inc.,
    No. 5:13-cv-01081, 2014 WL 1572358 (N.D. Cal. Apr. 18, 2014)...................11, 25

In re Facebook, Inc., PPC Advert. Litig.,
    282 F.R.D. 446 (N.D. Cal. 2012), aff'd sub nom.
    Fox Test Prep v. Facebook, Inc., 588 F. App'x 733 (9th Cir. 2014).......................10

In re Graphics Processing Units Antitrust Litig.,
    253 F.R.D. 478 (N.D. Cal. 2008)............................................................................8

In re High-Tech Emp. Antitrust Litig.,
    289 F.R.D. 555 (N.D. Cal. 2013)............................................................................8

- iii -

DEFENDANTS MASTERCARD, VISA, AND DISCOVER'S OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION: Case No. 3:16-cv-01150 (WHA)

*In re Hotel Tel. Charges*,
   500 F.2d 86 (9th Cir. 1974) ..................................................................................23

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008)....................................................................................4

*In re Optical Disk Drive Antitrust Litig.*,
   303 F.R.D. 311 (N.D. Cal. 2014)............................................................................8

*In re Titanium Dioxide Antitrust Litig.*,
   962 F. Supp. 2d 840 (D. Md. 2013)......................................................................17

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
   571 F.3d 953 (9th Cir. 2009) ..................................................................................8

*Kamar v. RadioShack Corp.*,
   375 F. App'x 734 (9th Cir. 2010) ..........................................................................26

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
   571 F.3d 672 (7th Cir. 2009) ................................................................................16

*Lloyd v. Conseco Fin. Corp.*,
   No. CV 00-10452, 2001 WL 36097624 (C.D. Cal. Oct. 19, 2001) ..................23, 24

*Lozano v. AT&T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) ................................................................................17

*Moore v. Apple Inc.*,
   No.14-CV-02269–LHK, 2015 WL 7351464 (N.D. Cal. Nov. 20, 2015) ...............16

*NACS v. Bd. of Governors of the Fed. Reserve Sys.*,
   746 F.3d 474 (D.C. Cir. 2014)..............................................................................14

*Ollier v. Sweetwater Union High Sch. Dist.*,
   267 F.R.D. 339 (S.D. Cal. 2010) .....................................................................23, 25

*Pablo v. ServiceMaster Glob. Holdings Inc.*,
   No. C 08-03894 SI, 2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) ........................17

*Richie v. Blue Shield of Cali.*,
   No. C-13-2693 EMC, 2014 WL 6982943 (N.D. Cal. Dec. 9, 2014)......................25

*Thomas v. FAG Bearings Corp.*,
   50 F.3d 502 (8th Cir. 1995) ..................................................................................26

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016)............................................................................................8

*United Indus., Inc. v. Eimco Process Equip. Co.*,
   61 F.3d 445 (5th Cir. 1995) ..................................................................................11

*United States v. Am. Express Co.*,
   838 F.3d 179 (2d Cir. 2016)..................................................................................18

DEFENDANTS MASTERCARD, VISA, AND DISCOVER'S OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION: Case No. 3:16-cv-01150 (WHA)

*Vernon v. S. Cal. Edison Co.*,
  955 F.2d 1361 (9th Cir. 1992) .............................................................................................10

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)........................................................................................................4, 17

*Werdebaugh v. Blue Diamond Growers*,
  No. 12-CV-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ...............................18

*Woods v. Vector Mktg. Corp.*,
  No. C-14-0264 EMC, 2015 WL 5188682 (N.D. Cal. Sept. 4, 2015) ....................................17

*Wu v. Pearson Educ., Inc.*,
  277 F.R.D. 255 (S.D.N.Y. 2011) .........................................................................................17

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 .................................................................................................... *passim*

Fed. R. Evid. 702 ......................................................................................1, 4, 22, 24

## STATEMENT OF ISSUES TO BE DECIDED

Defendants Visa Inc., Visa U.S.A., Inc. (together, "Visa"), Mastercard International Incorporated ("Mastercard"), and Discover Financial Services ("Discover") oppose Plaintiffs' motion for class certification. The issues to be decided are:

1.      Whether Plaintiffs have met their burden of showing through evidentiary proof that the requirements of Rule 23 of the Federal Rules of Civil Procedure have been met.

2.      Whether the Report of Dr. Micah S. Officer is admissible under Federal Rule of Evidence 702 and *Daubert*.

## INTRODUCTION AND STATEMENT OF RELEVANT FACTS

Plaintiffs' motion for class certification should be denied because, contrary to Plaintiffs' suggestion, this is not a *per se* price fixing case where all members of the putative class are overcharged on the same product in the same manner.

As an initial matter, contrary to the requirements of *Comcast*, Plaintiffs' liability theory and their class certification injury and damages theory contradict one another in two important ways. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). First, for purposes of liability, Plaintiffs assert that many "large" merchants conspired with Defendants on a fraud liability shift that injured smaller merchants. But their class motion now asserts, contrary to *Comcast* and their own complaint, that those same large merchants are injured members of the putative class.

The Amended Complaint claims that Defendants conspired to shift the costs of certain fraud liability from issuers to *certain* merchants—namely those who could not accept secure EMV chip card transactions by a certain date. *See* Dkt. 291 ¶¶ 2, 65, 76–77, 89, 209. According to Plaintiffs, the reason this alleged scheme targeted only certain (mostly smaller) merchants to "be hit with massive [liability shift] chargebacks" is that Defendants supposedly knew that only those "merchants would not be ready in time for the Liability Shift." *Id.* ¶ 92; *see also id.* ¶ 209; Dkt. 258 at 8 n.6 ("The Complaint alleges a proposed class of merchants who tried, but have been unable, to obtain the needed certification."). Consistent with this theory, the Amended

Complaint claims that numerous large merchants, including Target, Walmart, The Home Depot, and many others, were part of the conspiracy with Defendants and "were immediately able to get certified." Dkt. 291 ¶ 141; *see also id.* ¶¶ 209, 212; Ex. 2, Sept. 22, 2016 Hr'g Tr. 20:2–16.[1] The Court relied on these allegations in its order denying Defendants' motion to dismiss. Dkt. 346 at 11:6–9.

Now, having avoided dismissal, Plaintiffs reverse course to try to get a class certified. Their impact and damages model treats the large "co-conspirator" merchants and the smaller merchants who were unable to get timely certified exactly the same. This is not a minor or curable issue. Chargebacks related to the largest merchants in the country—who Plaintiffs allege generally participated in collusive conduct—make up as much as 80% of Plaintiffs' claimed class-wide damages. *See* Pls.' Mot. for Class Certification ("Br.") Ex. 29, Expert Report of Micah S. Officer ("Officer Rep."), Sch. 2.

Second, and relatedly, Plaintiffs' so-called but-for world assumes—without any explanation—that *no* Defendant would have implemented a liability shift in the absence of a conspiracy or that the liability shifts would have been substantially delayed. This contradicts Plaintiffs' liability theory, accepted by the Court at the motion to dismiss stage, that one or more networks *would* have instituted a liability shift and other networks would have followed on later dates in the hopes that merchants would steer consumers to them in the interim. Dkt. 346 at 10–11. Plaintiffs successfully argued to the Court that the networks implemented liability shifts in other regions of the world and they would have done so here on a staggered basis but for the alleged conspiracy. *Id.* at 11; *see also* Dkt. 291 ¶¶ 101–102.

These tactical departures from Plaintiffs' own pleadings run afoul of *Comcast*, which requires that "at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'" 133 S. Ct. at 1433 (quoting Am. Bar Ass'n, Section of

---

[1] All citations in the format "Ex. ___" refer to exhibits to the Declaration of Michelle K. Parikh in Support of Defendants Mastercard, Visa, and Discover's Opposition to Plaintiffs' Motion for Class Certification, dated April 7, 2017.

Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 57, 62 (2d ed. 2010)).

This defect is fatal to certification because Plaintiffs' expert admitted in deposition that the injury and damages associated with the liability theory Plaintiffs actually plead are not capable of common proof.

Beyond these inconsistencies, Plaintiffs do not come close to showing that antitrust injury and damages can be established by predominately common proof for other reasons. First, they do not proffer common proof that merchant class members actually paid any, let alone all or most, of the chargebacks at issue. They show only that issuing banks shifted those chargebacks to *acquirers*. There is no record proof that acquiring banks passed those chargebacks on to all merchants. Plaintiffs and their expert, Dr. Officer, simply assume so. But the record evidence actually shows that certain acquirers (e.g., Chase, Bank of America) and other processors and point-of-sale providers absorbed chargebacks for many merchants, meaning certain putative class members have no injury-in-fact. This evidence demonstrates the need for individualized inquiries on the core issue of impact.

Second, the record establishes that many merchants chose not to upgrade to EMV before the certification date, and that some chose not to get certified at all because they experience little fraud, and absorbing the cost of the liability shift was more economical for them than the cost of converting to EMV. Such merchants cannot claim that Defendants ***caused*** them not to be certified. Only individualized inquiries can determine which merchants sought to be certified (and thus have a potential claim for antitrust injury associated with any certification-related chargebacks they may have paid) and which did not (and thus cannot demonstrate impact or causation). These inquiries will be further complicated by the fact (also documented in undisputed record evidence) that some merchants who tried to get certified were not timely in their efforts, or were stymied by third parties who are not alleged to be conspirators and whose actions are not controlled by Defendants. Sifting through these causation issues cannot be done through a common method or by common proof.

In addition to these problems of class-wide proof, Plaintiffs' proposed class definition is improper. It inappropriately expands the "credit and charge card chargeback" class alleged in the Amended Complaint to add debit card chargebacks, *compare* Dkt. 291 ¶ 238, *with* Br. at 2, and it includes the term "unlawfully," which creates an improper "fail-safe" class. *See, e.g.*, *Daniel F. v. Blue Shield of Cali.*, 305 F.R.D. 115, 125 (N.D. Cal. 2014).

Finally, Plaintiffs' motion rests on Dr. Officer's report, which is conclusory, implausible, and unsupported by evidence. Of course, this Court could simply reject Dr. Officer's report as unpersuasive and deny the motion for class certification on that basis.[2] But, as explained more fully below, his report also is inadmissible under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and should be excluded.

## ARGUMENT

Class actions are "'an exception to the usual rule'" and, "[t]o come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Comcast*, 133 S. Ct. at 1432 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700 (1979); and *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011)). Certification is appropriate only if Plaintiffs' evidence withstands "rigorous analysis." *Id.* at 1432. Because "the merits of the class members' substantive claims are often highly relevant when determining whether to certify a class," *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011), "[f]requently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff[s'] underlying claim." *Wal-Mart*, 564 U.S. at 351 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). Moreover, to the extent that experts disagree about the evidence, the "rigorous analysis" prescribed by *Comcast* requires a court to consider not only the admissibility of the experts' statements, but also the "persuasiveness of the evidence presented." *Ellis*, 657 F.3d at 982; *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008).

---

[2] Plaintiffs' Rule 23(b)(2) injunctive relief class, relegated only to a footnote in Plaintiffs' filing, should likewise be denied. Injunctive relief is neither needed nor appropriate for the class as a whole because merchants who have been certified, such as the Named Plaintiffs, are no longer subject to allegedly unlawful liability shifts and thus require no injunctive relief. *Backhaut v. Apple Inc.*, No. 14-CV-02285-LHK, 2015 WL 4776427, at *8 (N.D. Cal. Aug. 13, 2015).

## I. PLAINTIFFS' MOTION RESTS ON AN ANTITRUST IMPACT AND DAMAGES MODEL THAT VIOLATES *COMCAST* AND RULE 23.

### A. Plaintiffs Now Assert That the Large Merchants They Previously Called Co-Conspirators Are Class Members.

Plaintiffs allege repeatedly that small- and medium-sized merchants were "at the mercy of Defendants." Dkt. 291 ¶ 209; *see also id.* ¶¶ 86, 141, 212, 267, 269. Specifically, they allege that retail "giants" such as "Target, Walmart and others quickly had their EMV-process systems 'certified,'" *id.* ¶¶ 209, 212, purportedly because "large merchants" were part of the supposed conspiracy, whereas "none of the Plaintiffs or the Class involved in this action were invited to . . . th[e] room" where Defendants purportedly colluded. *Id.* ¶ 141. Plaintiffs stated at the September 22, 2016 hearing on the motion to dismiss: "This case isn't being brought on behalf of some of the big merchants that got certified right away like the Targets of the world or Home Depots or things like that." Ex. 2 at 20:2–16. Thus, Plaintiffs have continually advocated for a "proposed class of merchants who tried, but have been unable, to obtain the needed certification." Dkt. 316 at 8 n.6.

Now, in an apparent attempt to make it seem as though common proof of injury predominates, Plaintiffs include in their putative class *every* merchant who paid a chargeback after the liability shift date. Br. at 2, 18–19. The class that Plaintiffs seek to certify thus includes precisely the large merchants they previously identified as outside of the class. *Id.* In all, Plaintiffs are seeking to collect over ▮▮▮▮▮▮▮▮▮▮ just on behalf of Walmart, Target and The Home Depot, all of whom are alleged co-conspirators. *See* Officer Rep., Sch. 2.1 at 8, 44, 69; Officer Rep., Sch. 3.1 at 194, 196.

Plaintiffs' putative class includes many additional "big merchants" with whom Plaintiffs allege Defendants conspired through industry organizations. Plaintiffs contend that merchants who participated in EMVCo, Smart Card Alliance, the EMV Migration Forum, and the Payments Security Taskforce acted "as conspirators in the conduct alleged in this litigation." Ex. 3, Pls.' Resp. to Def. Mastercard's First Set of Interrogs. for all Pls. at 4; *see also* Dkt. 291 ¶¶ 103–107, 151–164; Dkt. 316 at 8; Ex. 7, Officer Tr. at 227:14–230:25. Numerous merchants participated

in these groups. McDonald's, Kroger, Neiman Marcus, Publix, Target, Shell, and Subway were all large merchant representatives on the "cross-industry" Payments Security Taskforce.[3] Putative class member Walmart actively participated in EMVCo's efforts.[4] And putative class members Kroger, Publix, McDonald's, Walmart, and others were members of the EMV Migration Forum.[5] Chargebacks from just the foregoing "co-conspirator" merchants comprise more than ▮ of Visa's and Mastercard's chargebacks (some ▮) that Plaintiffs claim as damages. *See* Officer Rep., Sch. 2.1 at 6, 8, 10, 16, 70; Officer Rep., Sch. 3.1 at 194, 196, 200, 204. And merchants with more than $100,000 in Visa chargebacks included in Dr. Officer's model reveals large national merchants that represent more than ▮ of Visa's chargebacks. *See* Officer Rep., Sch. 2.1.

This class certification model should be rejected, as in *Comcast*, because it is inconsistent with "'the alleged anticompetitive effect of the violation'" and because individualized inquiries would be needed to segregate potential co-conspirator merchants from the putative class, and to identify co-conspirator liability at any trial. *Comcast*, 133 S. Ct. at 1433 (quoting Am. Bar Ass'n, at 62) (holding that class model purporting to show predominance of common proof as to damages fell "far short" because it measured injury that did not flow from Plaintiffs' operative theory of liability). Plaintiffs' model is even more deficient than the one in *Comcast*, because it affirmatively *contradicts* the liability theory in Plaintiffs' operative complaint.

**B.** **Plaintiffs Now Assert That in the But-For World There Would Have Been No Liability Shifts at All.**

Plaintiffs' motion for class certification reflects another reversal on a key point. The motion now asserts a but-for world in which *no* defendant would have implemented a liability

---

[3] *See* Ex. 4, VISA-BR1-00082576; Ex. 5, VISA-BR1-00702505 at 2506-2507; *EMV Migration Forum and Payments Security Task Force Launch CHIP IN, an Industry-wide EMV Chip Education Initiative*, EMV Connection (Aug. 19, 2015), http://www.emv-connection.com/emv-migration-forum-and-payments-security-task-force-launch-chip-in-an-industry-wide-emv-chip-education-initiative/.
[4] *See EMVCo Associates*, EMVCo, http://www.emvco.com/about_emvco.aspx?id=184 (last visited Apr. 6, 2017).
[5] *See* Ex. 6, VISA-BR1-01264326 at 4326; *Forum Members*, US Payments Forum, http://www.uspaymentsforum.org/membership/forum-members/ (last visited Apr. 6, 2017).

shift.  *E.g.*, Br. Ex. 29, Officer Rep. ¶ 33.  This contradicts the liability theory in their complaint, which repeatedly cites the Defendants' use of liability shifts around the world as evidence of what would have occurred in the United States without the claimed conspiracy.  *E.g.*, Dkt. 291 ¶¶ 7, 9–10, 100.  That is the very definition of a but-for world.  And Plaintiffs avoided dismissal by relying on it to argue that, absent the alleged conspiracy, Defendants *would* have adopted liability shifts, just on different dates, in keeping with foreign precedents and the perceived advantages of staggering.  *See* Order, Dkt. No. 346 at 9–11.  Plaintiffs cannot now certify a class by arguing exactly the opposite: that but for the alleged conspiracy, no Defendant would have adopted a shift.  *E.g.*, Br. Ex. 29, Officer Rep. ¶ 33.

This departure from their liability case would violate *Comcast* and permit Plaintiffs to gloss over key individualized issues by asserting that any chargeback with an EMV liability shift code was caused by the alleged conspiracy, and thus that any merchant assessed such a chargeback is a class member that suffered antitrust injury—irrespective of whether or why they were certified or if they are alleged co-conspirators.  That is wholly improper.

* * *

Plaintiffs' class motion must track the liability theory they actually plead—a class of smaller merchants and a but-for world of staggered liability shifts affecting different merchants at different times.  *See Comcast*, 133 S. Ct. at 1433.  This rule compels denial of Plaintiffs' class motion because their own expert admits that antitrust injury and damages from the liability theory in their complaint is not something he analyzed or could establish with common proof.  *See* Ex. 7 at 144:8–145:24 (████████████████████████████████████████ ████████████████████████ ); 209:5–12 (████████████████████████████████ ███████████ .

## II. CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFFS DO NOT SHOW THAT COMMON ISSUES PREDOMINATE AS REQUIRED BY RULE 23.

Rule 23(b)(3) requires Plaintiffs to show that "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating,

individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 William Rubenstein et al., *Newberg on Class Actions* § 4:49 (5th ed. 2012)). This predominance inquiry "trains on the legal or factual questions that qualify ***each*** class member's case as a genuine controversy . . . and tests whether proposed classes are sufficiently ***cohesive*** to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (both emphases added). *See also In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009) (requiring "close scrutiny of 'the relationship between the common and individual issues'" (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998))).

Antitrust plaintiffs "must satisfy the predominance requirement with respect to . . . the fact of plaintiffs' antitrust injury, or 'impact' of defendants' unlawful activity; and . . . the amount of damages sustained as a result of the antitrust violations." *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 318 (N.D. Cal. 2014).[6] Antitrust impact is often dispositive, "'because it is an element of the claim that may call for individual, as opposed to common, proof.'" *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 566 (N.D. Cal. 2013) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311). This Court has explained:

> On a motion for class certification, the issue confronting [a district] court is whether the proof necessary to demonstrate impact as to each class member is particular to that class member, in which case individual questions concerning impact would overwhelm the common questions concerning the existence and scope of the alleged conspiracy, or whether the necessary proof of impact would be common to all class members and sufficiently generalized that class treatment of their claims would be feasible.

*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 490 (N.D. Cal. 2008) (Alsup, J.) (quoting *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 382 (S.D.N.Y. 1996)).

---

[6] The Amended Complaint itself alleges both a *per se* price fixing claim and a rule of reason claim, *see* Dkt. 291, but Plaintiffs purport to seek certification only of the price fixing claim, *see* Br. 12, jettisoning the rule of reason claim right out of the box.

### A. Plaintiffs Do Not Even Purport to Show with Predominately Common Proof That Putative Class Members Were Injured by Paying Chargebacks.

Plaintiffs offer no common proof that putative class members were injured by paying chargebacks. Plaintiffs' analysis shows—at most—an impact on acquirers, not merchants. This is because Dr. Officer calculates chargebacks *to acquirers* and then *assumes* that all chargebacks to acquirers were ***passed on to merchants***. *See* Br. Ex. 29, Officer Rep. ¶ 42; Ex. 7 at 245:13–248:2. In Dr. Officer's words, ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ Ex. 7 at 248:12 to 251:8.

The record is undisputed that acquirers (e.g., Chase, Bank of America) and other processors and point-of-sale providers absorbed chargebacks for many merchants. *See* Ex. 1, Expert Report of David P. Kaplan ¶¶ 77–90. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ Ex. 8, CHASE NA_BR_00016426; Ex. 9, CHASE NA_BR_00019961; *see also* Ex. 1 ¶¶ 77. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ *See* Ex. 10, CHASE NA_BR_00001412 at 1430. ████████████████████████████████████

████████████████████████████████████████

████████████████████████ *See* Ex. 11, CHASE NA_BR_00000870. ████

████████████████████████████████████████

████████ *See* Ex. 12, BOFA_EMV_00004916; Ex. 13, ELAVON00011815; Ex. 14, WP_VISA-0000028; *see also* Ex. 1 ¶¶ 78, 88–89.

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Ex. 1 ¶¶ 79–80.  Individualized inquiry is thus needed to determine whether these merchants in fact experienced any adverse impact as a result of the alleged conspiracy.  *See, e.g.*, *id.*

Dr. Officer and Plaintiffs do not address these undisputed facts at all.  Dr. Officer's calculation does not show class-wide impact or class-wide damages **to merchants**.  His methodology generates many "false positives," finding merchant injury where none exists because a third party absorbed the liability.  *See In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 459 (N.D. Cal. 2012) (finding that without individualized proof, expert model produced "false positives"), *aff'd sub nom. Fox Test Prep v. Facebook, Inc.*, 588 F. App'x 733 (9th Cir. 2014).  Only individualized proof will determine whether a given merchant was impacted by the liability shift and, if so, the amount and cause of that merchant's chargebacks.

### B.  Many Class Members Incurred Fraud Liability for Business Reasons Not Proximately Caused by the Allegedly Unlawful Conduct.

Plaintiffs' impact and damages theory also does not distinguish between (a) chargebacks that flow from lawful conduct or independent causes, and (b) chargebacks that "'flow[] from that which makes defendants' acts unlawful.'"  *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1008 (9th Cir. 2003) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see also Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992).  Dr. Officer ██████████████████████████████████████████████████████████████████████████ Ex. 7 at 116:2–24; *see also id*. at 106:8–117:4.  This admission precludes class certification.

Plaintiffs allege that Defendants conspired to shift the costs of certain fraud liability to merchants.  *See* Dkt. 291 ¶ 2.  They allege that "merchants would be hit with massive chargebacks" because certain "merchants would not be ready in time."  *Id*. ¶ 92.[7]  Thus, the Plaintiffs' alleged injury does not "flow" from the mere existence of a liability shift but rather from the allegation that "compliance with . . . certification requirements would be impossible, thus subjecting the Class to charges which would not have been borne by the Class."  *Id*. ¶

---

[7] *See also* Dkt. 291 ¶¶ 3–5, 12–13, 16, 21, 23, 79, 84, 87–88, 90, 113, 204, 209, 221, 224, 246(a), 352–354 (inability to get certified subjected merchants to liability costs).

246(a). Likewise, the Named Plaintiffs each allege that they invested in "EMV-capable terminals" before the liability shift date, and that they are incurring costs because of an inability to get certified. *Id.* ¶¶ 12–13, 16, 21, 23, 215. But the record shows that many merchants did not get EMV certified for reasons independent of Defendants' alleged conduct, and the only way to identify them is with individualized proof.

1. Proof of Liability Is Not Common Because Merchants Made Independent Business Decisions Not to Seek Certification Before the Deadline.

Merchants who made "independent decision[s]" not to seek EMV certification did not suffer injury or damages from the alleged collusion, and thus have no place in the proposed class. Fraud liability chargebacks to those merchants, by definition, would not "flow[] from that which makes the defendants' acts unlawful." *See Glen Holly*, 343 F.3d at 1007; *see also GSI Tech. v. United Memories Inc.*, No. 5:13-cv-01081, 2014 WL 1572358, at *4 (N.D. Cal. Apr. 18, 2014).[8]

Here, merchant-by-merchant mini-trials will be required to determine whether a class member's independent business decision—as opposed to Defendants' alleged conduct obstructing certification—breaks the necessary proximate causal nexus. For example:

- Stephane Strouk, owner of Named Plaintiff Monsieur Marcel, was offered a "plug and play" EMV-compliant solution for his market and restaurants from his acquiring bank, Bank of America, before the liability shift went into effect, *but chose not to do so* until January 2016, months after the liability shift's effective date. *See* Ex. 15, Strouk Tr. at 62:23–63:2, 86:1–6, 89:1–2, 164:14–165:2, 187:9–19. Furthermore, Strouk decided not to upgrade his Santa Monica restaurant to EMV until February 2017 because it "didn't have a lot of chargeback[s]." *Id.* at 199:2–8, 249:19–250:13.

- Upgrading to EMV was not required and was, in fact, left to the independent business judgment of merchants. Acquirers and networks, such as Mastercard, recommended that merchants weigh the costs and benefits of upgrading. *See* Ex. 1 ¶ 69 ████████████████████████████████████████████████; *see also* Ex. 16, Balfany Tr. at 85:18–86:3.

---

[8] *See also Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1112 (6th Cir.), *cert. denied*, 493 U.S. 823 (1989) (assuming takeover violated Section 1, but holding that the harm of which plaintiff complained was a direct result of the plaintiff's inability to obtain patents and that this harm did not "flow from" the element of the takeover that created the antitrust problem (quoting *Brunswick*, 429 U.S. at 489); *United Indus., Inc. v. Eimco Process Equip. Co.*, 61 F.3d 445, 448–49 (5th Cir. 1995) (where alleged injury is based on seller's pessimistic belief that it was not worth attempting to compete for sale, claim is too speculative).

- A July 2015 Wells Fargo survey revealed that 21% of merchants "never plan to upgrade," and a 2016 Boston Retail Partners survey similarly found that 16% of merchants had no plans to upgrade. *See* Ex. 1 ¶ 66.

- Certain large merchants, such as Whole Foods ███████ in Visa and Mastercard chargebacks)[9] and Arby's ($158,414 in Visa and Mastercard chargebacks),[10] purposefully delayed their EMV upgrade until after the shift deadline to align that work with other technological upgrades, and other companies, such as Cheesecake Factory (██████ in Visa and Mastercard chargebacks),[11] prioritized other technological advancements over EMV. Ex. 1 ¶¶ 73–74.

- Plaintiffs' proposed class also includes merchants that were subject to chargebacks because—after having upgraded to EMV-compliant technology and having been certified—the merchants decided to disable EMV in order to speed up checkout during the holiday season. *See* Ex. 1 ¶¶ 75–76.

- Despite four years of notice, many merchants had not begun taking ***any*** concrete steps towards upgrading to EMV even five and six months after the liability shift's effective date, making the ease or difficulty of certification requirements irrelevant for those merchants. *See* Ex. 1 ¶¶ 71–72 (citing Ex. 54, BOFA_EMV_00005042; Ex. 55, AMEX00287142 at 1, 9, 32–39; Ex. 56, DISCOVER00002676 at 8).[12]

Further supporting the need for merchant-by-merchant mini-trials, Defendants' expert David Kaplan found that ████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████, with similar results for Visa. Ex. 1 ¶ 11.x, 63. Only individualized inquiry of merchants with very modest chargebacks will show whether they chose not to implement available EMV technology (such as that available to Stephane Strouk of Monsieur Marcel), perhaps because it was not worth it to them to do so, or disabled their certified EMV terminals.

---

[9] Officer Rep., Sch. 2.1 at 10; Officer Rep., Sch. 3.1 at 198.
[10] Officer Rep., Sch. 2.1 at 36; Officer Rep., Sch. 3.1 at 218.
[11] Officer Rep., Sch. 2.1 at 26; Officer Rep., Sch. 3.1 at 204.
[12] ████████████████████████████████████████████ ██████████ *See* Ex. 7 at 115:6–121:16.

2. <u>Proof of Liability Is Not Common Because Other Independent Intervening Causes, Including the Conduct of Third Parties Who Are Not Alleged to be Part of the Conspiracy, Impacted Certification Timing.</u>

The actions—and inactions—of numerous third parties, none of which Plaintiffs allege were part of the conspiracy, also compel denial of Plaintiffs' certification motion. Plaintiffs acknowledge that they must exclude intervening causes to establish by common proof that Defendants' alleged conduct caused injury, Br. Ex. 29, Officer Rep. ¶ 22, but they fail to do so because they ignore undisputed record evidence that some merchants were not timely certified due to conduct by third parties not controlled by Defendants. The actions of these third parties—not alleged to be part of the conspiracy—raise numerous individualized issues of proof of injury. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055–57 (8th Cir. 2000) (rejecting expert's antitrust liability model of the but-for world because the expert "ignored inconvenient evidence").

In 2011, Visa was the first network to announce that after a certain date, "if a contact chip card is presented to a merchant that has not adopted, at minimum, contact chip terminals, liability for counterfeit fraud may shift to the merchants' acquirer." Ex. 47, VISA-BR1-00124226. Thereafter, Mastercard, American Express, and Discover each adopted their own frameworks where the U.S. party—issuer, acquirer, or merchant—offering the least secure payment method would be held liable for a fraudulent transaction. *See, e.g.*, Ex. 17, MC-BR-00077859. Each network had its own technical specifications for determining whether EMV terminals and software were properly configured to accept chip transactions, adopted liability shifts that covered different types of fraud, and established different rules for avoiding liability. *See* Ex. 52, MC-BR-00485597; Ex. 53, MC-BR-00470683; Ex. 1 ¶ 44. Critically, however, the networks did not install the EMV-chip hardware and software and did not actually certify merchants as EMV-compliant. *See* Ex. 48, AMEX00208528. The United States is a massive economy with millions of merchants, *see, e.g.*, Ex. 18, MC-BR-00016268, and the job of getting each one EMV-ready fell to numerous commercial third parties, who operate independently of the networks.

Hundreds of third party acquirers, processors, terminal manufacturers, independent software vendors, and value added resellers ("VARs") were responsible for educating merchants, and selling, installing, and certifying EMV upgrades. *See* Ex. 24, MC-BR-00114366 at 12–20. Many VARs—not alleged to be co-conspirators—had custom EMV software that had to be integrated on top of network requirements. *See* Ex. 4 at 47. Further, "acquirer/acquirer processors each have their own unique requirements to ensure that the merchant terminals communicate correctly to their host platform." Ex. 25, VISA-BR1-00083655 at 14.

Implementing these systems took time.[13] And though thousands of merchants were able to do so before the certification deadline, *see, e.g.*, Ex. 26, MC-BRN-00004481, many were not timely certified due to actions (or inaction) by third parties:

- Stephane Strouk, owner of Monsieur Marcel, a Named Plaintiff in this case, testified that, "[w]e rel[ied] on our supplier [Revel and Rapid POS] to give us the equipment on time and to make sure everything work[ed] on time, but they did not." Ex. 15 at 180:12–181:6.

- Monsieur Marcel could have purchased a certified "plug and play" option from Bank of America before the liability shift deadline but did not because it believed Revel and Rapid POS's representation that it would have a solution "soon." Ex. 15 at 180:12–181:6, 274:23–275:3.

- Similarly, Named Plaintiff B&R Supermarket, Inc. was given assurances by third parties Worldpay and Datatek that their certification would be complete by the liability shift dates but it was not. Ex. 27, Milam Tr. at 223:9–225:2.

- Certain acquirers prioritized the certification of certain types of merchants over others, leading to delays in certification for those who were not prioritized. *See, e.g.*, Ex. 27 at 233:13–234:23 ████████████████████████ ████████████████████████████████████████████████████████

- Some merchants experienced delays when an acquirer/processor was unable to certify a particular brand or model of terminal purchased by the merchant from a third party. *See, e.g.*, Ex. 27 at 189:12–190: 5.

---

[13] This complex task was further complicated when the National Association of Convenience Stores sued over federal regulations related to debit cards and obtained an initial ruling striking down the regulations with which the debit networks had been working to comply in the upgrade to EMV. This decision significantly affected the industry's ability to make meaningful progress towards the global EMV standard for about nine months due to regulatory uncertainty regarding debit processing standards. *See NACS v. Bd. of Governors of the Fed. Reserve Sys.*, 746 F.3d 474, 477 (D.C. Cir. 2014); *see also* Ex. 19, VISA-BR1-01322420.

- Named Plaintiff B&R Supermarket Inc. says it was told by both its acquirer and its information technology consultant that it needed chip-enabled equipment, but was not told about the certification requirement until after the fraud liability shifts went into effect and thus did not prepare to be certified. Ex. 27 at 175:3–179:6.

- Named Plaintiffs B&R Supermarket, Inc. and Monsieur Marcel admit that they had no basis to believe that the certification delays they experienced were caused by a conspiracy between the Defendants and third parties. *See, e.g.*, Ex. 27 at 182:25–184:7, 194:18–195:12; Ex. 15 at 197:24–198:5.

Plaintiffs do not identify common proof to establish that the Defendants, as part of an alleged conspiracy, somehow orchestrated the failure of scores of third parties to install EMV-compliant hardware and software and to certify that equipment for a particular merchant class member in a timely manner. Accordingly, they have not met their Rule 23 burden on the proximate cause liability question presented by each merchant's claim, which is whether the Defendants *caused* that *particular* merchant to be injured. *See Glen Holly*, 343 F.3d at 1007.

### 3. Proof of Liability Is Not Common Because Some Chargebacks in Plaintiffs' Model Would Have Occurred Regardless of the Liability Shift.

Plaintiffs concede the possibility "that some of the liability shift chargebacks in October 2015 (and later) would have been charged back to merchants under non-liability shift reason codes even if the Defendants had not changed their chargeback policies." Br. Ex. 29, Officer Rep. ¶ 42. Yet Plaintiffs provide no common method for distinguishing these chargebacks from those that "flow from" Defendants' supposed collusion. *Glen Holly*, 343 F.3d at 1007. Undisputed evidence shows that Plaintiffs' impact and damages theory improperly sweeps in chargebacks that would have been assessed regardless of the liability shifts.

Individual inquiry is needed to determine whether merchant locations with one, or only a few, apparent chargebacks would be liable for those chargebacks regardless of the alleged anticompetitive conduct. For example, Fine Fare's representative Mr. Collado testified that it experienced a number of chargebacks for Visa transactions for mismatched signatures that would have been charged back even in the absence of liability shifts, and that there were alternative reasons, unrelated to EMV, for which his stores might incur liability shift chargebacks. Ex. 1 ¶

105.  Monsieur Marcel's representative Mr. Strouk similarly identified a liability shift chargeback that did not include a signature—a defect he agreed would have resulted in a chargeback regardless of the liability shifts.  *Id.*

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████  Ex. 7, Officer Tr. at 145:8–15; *see also* Br. Ex. 29, Officer Rep. ¶ 46 ("[N]ot all the [liability shift] chargebacks . . . may be truly incremental chargebacks that would not otherwise have occurred.").  Plaintiffs try to address this problem through Dr. Officer's "substitution method."  But this analysis does not eliminate the need for individualized inquiry into each merchant's chargebacks.  Dr. Officer's "substitution method," because it is based on broad averages calculated across thousands of merchants, *see* Ex. 1 ¶ 108, does not even attempt to address transactions that issuers can charge back for alternative reasons, such as those Fine Fare and Monsieur Marcel identified in their depositions.  In fact, Dr. Officer testified that ██

███████████████████████████████████████████████████████████████████████████

████████████████  Ex. 7 at 20:22–21:4, 22:21–24:10.

Similarly, Dr. Officer's proposal to exclude ██████████████  in post-liability shift Mastercard chargebacks that could have been assessed without the liability shifts, Br. Ex. 29, Officer Rep. ¶ 80, is insufficient.  Dr. Officer conceded that "██████████████████████

████████████████████████████████████████████████  Ex. 7 at 24:9–

15; *see also id.* at 20:21–21:11 ██████████████████████████████████████

Accordingly, it does not solve the problem of determining how these excluded chargebacks

███████████████████████████████████████████████████████  would affect who is in or out of the class.  *See Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) ("A class should not be certified if it is apparent that it contains a great many persons who have suffered no injury"); *Moore v. Apple Inc.*, No.14-CV-02269–LHK , 2015 WL 7351464, at *4 (N.D. Cal. Nov. 20, 2015) (denying certification where "determining the fact of injury would require examining each individual class member's contract").

## C. Many Class Members Have Arbitration Agreements with Discover That Raise Further Individual Questions.

Plaintiffs concede that their proposed class encompasses merchants who have agreed to arbitrate their claims against Discover. Dkt. 309-3 at 5; Dkt. 309-2. These merchants cannot recover any damages for Discover chargebacks in this action, because those amounts must be determined in mandatory arbitration. As a result, many merchants who accepted Discover are in a different legal position from other merchants and the Named Plaintiffs. Their contractual positions would require litigation of claims and defenses that would overwhelm any common issues and defeat predominance and superiority. *See Pablo v. ServiceMaster Glob. Holdings Inc.*, No. C 08-03894 SI, 2011 WL 3476473, at *2 n. 2 (N.D. Cal. Aug. 9, 2011); *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 862 (D. Md. 2013) (relying on *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718 (9th Cir. 2007)).[14]

## III. CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFFS' BUT-FOR WORLD IS UNSUPPORTED BY FACTS OR ECONOMIC ANALYSIS.

There is another independent problem with Plaintiffs' alleged proof of predominance. Dr. Officer's conclusion of common impact depends on his unsupported assumption that, but for the alleged conspiracy, no network would have instituted a liability shift during the putative class period.[15] *See* Br. Ex 29, Officer Rep. ¶ 33; *see also* Br. at 20. ██████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████ Ex. 7 at 201:16–202:11; 211:4–13; 213:12–17; 223:9–14. A but-for world used to determine common injury must be plausible, account for the factual complexities of the marketplace, and be based on sound economic analysis. *Allied Orthopedic Appliances v. Tyco Healthcare Grp.*, 247 F.R.D. 156, 165–66 (C.D. Cal. 2007); *see also Ellis*, 657 F.3d at 981 (court

---

[14] In addition, the arbitration clauses create individual issues warranting exclusion of these merchants' claims for Discover chargebacks. *See Woods v. Vector Mktg. Corp.*, No. C-14-0264 EMC, 2015 WL 5188682, at *16 (N.D. Cal. Sept. 4, 2015); *Wu v. Pearson Educ., Inc.*, 277 F.R.D. 255, 265–66 (S.D.N.Y. 2011) (same).

[15] Plaintiffs' allegations in their Amended Complaint are meaningless at this stage as Plaintiffs must show through "evidentiary proof" that the requirements of Rule 23 have been met. *Comcast*, 133 S. Ct. at 1432; *see also Wal-Mart*, 564 U.S. at 350.

failed to "judg[e] the persuasiveness" of plaintiffs' class certification evidence); *Concord Boat*, 207 F.3d at 1057 (rejecting expert's antitrust liability model because "it did not incorporate all aspects of the economic reality of the [relevant] market"). Dr. Officer's but-for world fails to satisfy these standards as explained below.[16]

### A. The But-For World Plaintiffs Assume Is Refuted by the Case Record.

The record evidence shows that, in a but-for world, the networks would have done precisely what they did in the real world: each implement a liability shift in the United States to incentivize merchant adoption of the more secure, EMV-compliant technology. It is undisputed that the payment networks have used liability shifts to incentivize the adoption of EMV technology throughout most of the world. Dkt. 291 at 100.[17]

As Discover's corporate representative testified, a liability shift is "actually the strongest incentive [in the two-sided payment card industry]. We have seen it work time and time again in moving not just one side of the equation, but both sides of the equation to the higher technology standards." Ex. 28, Parsons Tr. at 238:17–23, 239:18–23. American Express's corporate representative testified that American Express's previous attempt to transition a market *without* using a liability shift was an utter failure: "there wasn't an EMV migration on the merchant side because without the fraud liability shift, we saw there was not . . . sufficient merchant uptake" to consider the market to have migrated. Ex. 29, Villaraos Tr. at 170:23–171:2.[18] *See also* Ex. 28

---

[16] The Court should also reject any attempt by Plaintiffs to offer factual support or economic analysis for the first time under the guise of a "reply expert report." *See* Dkt. 251 at 1 ("Reply reports must be limited to true rebuttal and should be very brief."); *see also Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724-LHK, 2014 WL 7148923, at *7 (N.D. Cal. Dec. 15, 2014) (prohibiting Plaintiffs' expert from introducing new opinions in the "guise of a 'supplement'" after the disclosure deadline had passed).

[17] Visa implemented liability shifts relating to EMV technology in the Asia Pacific region, the Latin American and Caribbean region, Australia, New Zealand, Canada, Brazil, Mexico, and Europe. Dkt. 353 ¶ 100. Mastercard implemented liability shifts relating to EMV technology in the Asia Pacific region, the Latin American and Caribbean region, the Middle East/Africa region, Australia, New Zealand, Canada, Brazil, Mexico, Colombia, Argentina, Uruguay, Venezuela, South Africa, and Europe, among others. Dkt. 355 ¶ 100. American Express implemented liability shifts relating to EMV technology in Australia, Bangladesh, Canada, India, Brazil, Colombia, Uruguay, Venezuela, New Zealand, Sri Lanka, South Africa, Argentina, and Mexico. Dkt. 354 ¶ 100. Discover implemented liability shifts in the other markets in which it operates: Mexico and Canada. Dkt. 356 ¶ 100.

[18] An economic analysis of the payment card industry that fails to address the issuer side of the market is improper. *See United States v. Am. Express Co.*, 838 F.3d 179, 197, 200 (2d Cir. 2016)

at 232:24–234:04 (noting that when Discover's Brazil franchise did not implement a liability shift in line with the other networks, Discover cards in Brazil were "targeted by fraudsters").

It was not just the networks who recognized the necessity of employing a liability shift in the EMV rollout. The Merchant Advisory Group ("MAG"), which represents "a broad cross-section of the merchant community that accounts for the majority of payment card transactions in the U.S.," endorsed the shift at issue here. Ex. 30, MC-BR-00009826. In its proposed "recommendations for an electronic payments roadmap," MAG suggested "a coordinated migration to dynamic EMV" and that "[a]ll liability for fraudulent transactions should shift to the party (issuer, acquirer, or merchant) which fails to employ EMV technology." *Id. See also* Ex. 31, MC-BR-01004604; Ex. 28 at 229:07–231:12 (Discover originally considered a 2016 liability shift date but changed course due to feedback from merchants and acquirers that they wanted the industry to "centralize [the liability shift] dates").

Dr. Officer's report does not address any of these facts. *See* Br. Ex. 29, Officer Rep. ¶ 112, Tab 5 (materials considered). Although he purports to have considered the Discover testimony, he does not explain his conclusion that the networks would nonetheless depart from "one of the best incentive structures" known to the industry. Dr. Officer's but-for world, therefore, is unsupported by fact or economic analysis of relevant market considerations.

### B. There Is No Support for Plaintiffs' Assertion That the Liability Shifts Would Be Substantially Delayed in the But-For World.

Plaintiffs likewise provide no support for a but-for world in which all the networks would have significantly delayed their respective liability shifts. Nor could they, because the record evidences powerful market forces—having nothing to do with any alleged coordination—that informed the networks' independent decisions on the timing of their respective liability shifts. A but-for world that ignores marketplace realities cannot support a finding of common impact or injury. *See Concord Boat*, 207 F.3d at 1057.

---

(district court erred in defining the market for the credit-card industry where it "exclud[ed] the market for cardholders from its relevant market definition" and "declined to define the relevant product market to encompass the entire multi-sided platform").

Plaintiffs claim that EMV technology is better than magstripe technology at preventing counterfeit fraud in card-present transactions, which make up the vast majority of fraud in the U.S. payments system. *See* Ex. 32, Collado Tr. at 131:5–7; Ex. 27 at 134:12–135:2; Ex. 15 at 169:19–170:6. Max Milam of B&R Supermarkets testified that after a competitor became certified and started accepting chip cards while his stores did not, his stores "got hit even more" with "fraudulent cards." Ex. 27 at 188:11–18. That is not surprising, because the record shows that in markets where EMV technology has been adopted, fraud rates for counterfeit transactions have dropped dramatically. *See, e.g.*, Ex. 28 at 200:5–9, 232:11–17; Ex. 16 at 250:6–10; Ex. 33, MC-BR-00442591. The United States was the last major financial market to adopt EMV technology, which meant that fraud stymied by EMV abroad was rapidly relocating to the United States. *See, e.g.*, Ex. 16 at 250:20–22, 280:25–281:7; Ex. 28 at 237:24–238:3.

Against this backdrop, there was intense pressure on the Defendants from both government and the merchant community to move to a more secure system. Ex. 29 at 163:14–163:24 ("[A]t the time . . . we were receiving a lot of pressure from regulators, merchants, issuers, international issuers, etc., to implement EMV in the United States."); Ex. 31 (MAG's Payments Roadmap stating, "In today's U.S. magnetic stripe based payments system, MAG members continue to spend millions of dollars to protect against security breaches."); Ex. 34, MC-BR-00045410. In fact, Discover's experience in foreign markets demonstrated that if it delayed its EMV rollout, it would "get left out" of the conversion. Ex. 28 at 234:06–235:12. Further, long before October 2015, the U.S. payment industry's concern for data security had been "reignited" by a string of data security breaches at large U.S. retailers. *See, e.g.*, Ex. 35, VISA-BR1-00165197.

Notably, in late 2013—nearly two years before the liability shifts were to take effect—Target announced a "massive cybersecurity breach," Ex. 36, MC-BR-00002116, which gave each network another strong, independent reason not to delay their respective liability shift dates. Ex. 28 at 232:4–10. The breach affected 40 million credit and debit card customers, Ex. 37, VISA-BR1-00022976, with an estimated cost to banks and retailers of over $18 billion, *see* Ex.

36.  The Target breach was "a major turning point," Ex. 28 at 232:19; it was "a clear demonstration of the threat" that lurked in a magstripe payment system, Ex. 16 at 298:10–11, and prompted "a very significant shift in how the industry was viewing EMV," Ex. 28 at 231:20–21. For Mastercard, it "just validated the urgency we felt" to make the transition to EMV. Ex. 16 at 297:19, 298:4–5. *See also* Ex. 37 ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
███████████, *see* Ex. 20, VISA-BR1-00579671; Ex. 21, VISA-BR1-00921015—████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████  *See, e.g.*, Ex. 22, VISA-BR1-00960113; Ex. 23, VISA-BR1-00960109.

The Target breach also ignited a public policy maelstrom, with legislators, regulators, and even the President putting pressure on the payments industry to demonstrate its commitment to eliminating fraud, including with accelerated EMV implementation. *See, e.g.*, Ex. 16 at 296:3–11 ("[W]e were saying that [the option to delay the US migration] isn't a practical option.").  In January 2014, Senator Franken sent a letter to the Defendants encouraging the adoption of EMV, which was "used in most other industrialized countries" and "help[s] prevent the breach of usable cardholder data." *See, e.g.*, Ex. 38, VISA-BR1-00212359; Ex. 39, AMEX00246091; Ex. 40, BOFA_EMV_00023990.  He demanded to know how the networks and banks would speed up, not slow down, EMV implementation. *See id*.  Record evidence reflects that in the but-for world, each network would have independently concluded that it could not delay implementation of the liability shift. *See, e.g.*, Ex. 41, MC-BR-00495212; Ex. 42, MC-BR-00493478; Ex. 43, MC-BR-00667843; Ex. 23; Ex. 22; Ex. 44, VISA-BR1-00094783; Ex. 45, DISCOVER00002816; Ex. 46, DISCOVER00143901; Ex. 49, AMEX00059795; Ex. 50, AMEX00058950; Ex. 51, AMEX00008994.

Dr. Officer and the Plaintiffs do not address any of this evidence in their report or brief. They simply assert—contrary to the record and their own complaint—that all Defendants would have abandoned or substantially delayed their EMV-related liability shifts but for the claimed conspiracy. Such *ipse dixit* does not satisfy the requirements for certifying a class. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Comcast*, 133 S. Ct. 1426; *Concord Boat*, 207 F.3d at 1055.[19]

## IV. DR. OFFICER'S REPORT IS INADMISSIBLE AND THEREFORE INCAPABLE OF SHOWING INJURY AND DAMAGES ON A CLASS-WIDE BASIS.

Expert testimony proffered in support of class certification must be assessed not only for sufficiency under Rule 23, but also for admissibility under Rule 702, which requires the evidence to be "based on sufficient facts or data" and to be the product of "reliable principles and methods." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592–93. Dr. Officer's testimony fails both standards.

The flaws in Dr. Officer's testimony are not technicalities or issues that can properly be deferred to merits or damages litigation. Rule 23 requires class evidence to track Plaintiffs' liability case and record for a reason. The class device is a procedural expedient that cannot be used to "'abridge'" or "'modify any substantive right,'" including the right to litigate defenses against individual class members. *Amchem*, 521 U.S. at 613 (quoting 28 U.S.C. § 2072(b)). Admitting Dr. Officer's testimony would do precisely that, in violation of basic due process principles and the Rules Enabling Act. In a suit by an individual merchant, a network could

---

[19] Dr. Officer also hypothesizes that one or more of the networks would not have implemented liability shifts because merchants would steer customers from a network insisting on a liability shift to one that either did not insist on such a liability shift or provided additional incentives. *See* Dkt. 291 ¶¶ 9–10; Br. Ex. 29, Officer Rep. ¶ 18. But Plaintiffs and Dr. Officer do not identify any evidentiary support for their assertions. Because there is none. Plaintiffs' own expert stated ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Ex. 7 at 155:2–156:3. Further, each of the Named Plaintiffs testified that it had never steered and had no intention to ever steer its customers to one credit card over another. Ex. 32 at 265:21–266:3, 267:4–8; Ex. 15 at 77:8–13; Ex. 27 at 67:10–68:4. Plaintiffs' steering allegation is not only unsupported and contrary to the facts; it is inconsistent with the but-for world ultimately proffered by Dr. Officer in which no network implemented a liability shift.

defend against liability by arguing that the merchant's chargebacks occurred at a point when that network would have unilaterally adopted its liability shift, or that the chargebacks reflected conduct that would have resulted in liability regardless of EMV readiness.  Admitting Dr. Officer's testimony would allow Plaintiffs to handicap (if not preclude) such defenses by papering over these and other documented record differences among class members.  That is exactly what the law has never allowed.  *See, e.g.*, *In re Hotel Tel. Charges*, 500 F.2d 86, 90 (9th Cir. 1974) ("[A]llowing gross damages by treating unsubstantiated claims of class members collectively significantly alters substantive rights under the antitrust statutes . . . .").

### A. Dr. Officer's Methodology Must Be Excluded as Unreliable Because It Assumes a But-For World Contrary to the Case Record and Plaintiffs' Liability Theory.

Class certification should be denied for all the reasons above even if Dr. Officer's proffered testimony is admitted.  That said, his opinions should be excluded because they cannot be reconciled with Plaintiffs' theory of liability or the factual record before the Court.  *See Comcast*, 133 S. Ct. at 1433; *see also Ollier v. Sweetwater Union High Sch. Dist.*, 267 F.R.D. 339, 341–42  (S.D. Cal. 2010).  Specifically, Dr. Officer's impact and damages study rests on the fanciful assumption that but-for the alleged conspiracy, no Defendant would have employed a liability shift in the United States at any time during the putative class period.  Br. Ex. 29, Officer Rep. ¶ 33.  As discussed above, this assumption contradicts Plaintiffs' liability theory, which alleges that but-for the claimed conspiracy, each network would have adopted a liability shift— just at different times.  Dkt. 291 ¶ 11; Ex. 2 at 56:22–57:2 (absent a conspiracy, some networks would have "broken ranks" on the October 2015 date).  Expert studies must be rejected where, as here, they "fail[] to measure damages resulting from the particular antitrust injury on which [defendants' alleged] liability in th[e] action is premised." *Comcast*, 133 S. Ct. at 1433–34.

Dr. Officer's testimony must also be stricken because the but-for world he assumes is contradicted by the evidentiary record, and thus does not "fit" the facts of the case.  *See Daubert*, 509 U.S. at 591–92; *Concord Boat*, 207 F.3d at 1056; *Lloyd v. Conseco Fin. Corp.*, No. CV 00-

10452, 2001 WL 36097624, at *5 (C.D. Cal. Oct. 19, 2001). As discussed above, *supra* pp. 18–19 (and as Plaintiffs themselves assert, Dkt. 291 ¶¶ 99–100), the networks have unilaterally used fraud liability shifts to incentivize EMV chip conversion the world over. That is why Plaintiffs' liability theory has always assumed that but for the alleged conspiracy, liability shifts would still have occurred—just at different times by different defendants. *See supra.* Dr. Officer's decision to ignore this record and make up his own but-for world in which liability shifts were "not implemented," Br. Ex. 29, Officer Rep. ¶ 33, does not satisfy the requirements for admissible testimony on common impact and damages. *See, e.g.*, *Lloyd*, 2001 WL 36097624, at *5–*6.

To appreciate the unreliability and inadmissibility of Dr. Officer's study, one need only recall the but-for world that Plaintiffs (and the Court) addressed on the pleadings: namely, a world in which different networks adopted a liability shift at different times. In that world, many class members would register as "false positives" under Dr. Officer's sweeping damages analysis (which counts as antitrust damages all liability shift-coded chargebacks after October 2015), because they would have chargebacks only during points in time when one or more networks would have unilaterally adopted a shift. Ex. 1 ¶¶ 111–113. By closing his eyes to these and other consequences of the but-for world Plaintiffs plead and the case record establishes, Dr. Officer has rendered his entire report inadmissible. *See, e.g.*, Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592–93; *DSU Medical Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1146–47 (N.D. Cal. 2003) (quoting *Joiner*, 522 U.S. at 147) (excluding plaintiff's damages expert's calculation of profits in the but-for world where "analytical gap between the data used and the opinion offered [wa]s far too great to permit the opinion to be introduced").

### B. Dr. Officer's Methodology Is Also Inadmissible Because It Cannot Assist the Trier of Fact in Determining Class-Wide Antitrust Injury or Damages.

Dr. Officer's testimony also must be excluded because it would not assist the trier of fact in assessing or reliably identifying any harm traceable to the alleged collusion that "makes the [defendants'] conduct unlawful." *Glen Holly*, 343 F.3d at 1008 (quotation omitted). As noted, Dr. Officer simply assumes that all liability shift-coded chargebacks are proximately caused by

the alleged collusion because he assumes that absent a conspiracy, there would have been no liability shift for all or most of the class period. But he provides no principled methodology for distinguishing liability shift-coded chargebacks attributable to the alleged conspiracy from chargebacks that the record shows were liability shift-coded but involved conduct unrelated to EMV readiness or any alleged collusion.

As noted, the undisputed record evidence shows that many merchants decided not to upgrade to EMV technology at all. Ex. 1 ¶¶ 63–70. Other merchants did not timely invest in EMV terminals, *id*. ¶¶ 71–74, while still others were unable to get certified only because of conduct by non-conspirator third party vendors, *see supra* pp. 11–15. Any liability shift-coded chargebacks to any of these merchants would not "flow[] from that which makes the defendants' acts unlawful"—namely, alleged collusion on the October 2015 deadline. *GSI Tech.*, 2014 WL 1572358, at *3–*4. The same is true of chargebacks that the record shows were assessed for conduct unrelated to EMV certification, and that would therefore have been assessed regardless of the challenged liability shift. For example, some of the chargebacks Dr. Officer classifies as antitrust damages are associated with conduct—such as a merchant's failure to obtain a valid cardholder signature, *see* Br. Ex. 29, Officer Rep. ¶¶ 105–109—that would have resulted in a chargeback regardless of the liability shifts or any conspiracy. Dr. Officer provides no methodology for identifying and excluding such chargebacks (and derivatively uninjured class members) from his model. For this reason as well, his testimony must be excluded. *See Ollier*, 267 F.R.D. at 341–42 (citing *United States* v. *Freeman*, 489 F.3d 893, 901 (9th Cir. 2007)).

## V. PLAINTIFFS' PROPOSED CLASS DEFINITION IS IMPROPER.

Apart from the issues identified above, Plaintiffs' proposed class definition is also improper. *First*, it improperly expands the "credit and charge card chargeback" class alleged in the Amended Complaint, Dkt. 291, to add debit card chargebacks by using the term "payment card chargebacks," Br. at 2. *See Richie v. Blue Shield of Cali.*, No. C-13-2693 EMC, 2014 WL 6982943, at *13 (N.D. Cal. Dec. 9, 2014) ("[A] plaintiff may only seek to certify a class as defined in a complaint."). *Second*, the inclusion of "unlawfully" in the definition creates an

improper "fail-safe" class in which class membership depends on a final decision on the merits and success by defendants on the merits means there are no class members subject to *res judicata. See, e.g.*, *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010) ("fail-safe" class "palpably unfair to the defendant, and . . . unmanageable"); *Daniel F.*, 305 F.R.D. at 125 (holding that an "unlawfully" requirement "by itself renders the class action unmanageable virtually by definition, . . . and makes plaintiffs' class definition unworkable." (internal quotation marks omitted)). ***Third***, the proposed class definition fails to exclude government entities as required by the Eleventh Amendment. *See Thomas v. FAG Bearings Corp.*, 50 F.3d 502, 505 (8th Cir. 1995).

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

# CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs'

Motion for Class Certification.


Dated: April 7, 2017                          Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER          PAUL, WEISS, RIFKIND, WHARTON &
LLP                                             GARRISON LLP

By: */s/ Robert J. Vizas*                    By:   */s/ Kenneth A. Gallo*
    Robert J. Vizas                              Kenneth A. Gallo (admitted *pro hac vice*)
    Sharon D. Mayo                               Craig A. Benson (admitted *pro hac vice*)
    Stephanie I. Fine                            Michelle K. Parikh (admitted *pro hac vice*)
    Three Embarcadero Center, Tenth
    Floor                                        2001 K Street, NW
    San Francisco, CA 94111-4024                 Washington, DC 20006-1047
    Telephone: 415.471.3100                      Telephone: 202.223.7300
    Facsimile: 415.471.3400                      Facsimile: 202.223.7420
    robert.vizas@apks.com                        KGallo@paulweiss.com
    sharon.mayo@apks.com                         CBenson@paulweiss.com
    stephanie.fine@apks.com                      MParikh@paulweiss.com

    Mark R. Merley (admitted *pro hac             Stephen E. Taylor (SBN 058452)
    vice*)                                        Cheryl A. Cauley (SBN 252262)
    Karen C. Otto (admitted *pro hac vice*)       TAYLOR & PATCHEN, LLP
    601 Massachusetts Avenue, NW                  One Ferry Building, Suite 355
    Washington, DC 20001-3743                     San Francisco, CA 94111
    Telephone: 202.942.5000                       Telephone: 415.788.8200
    Facsimile: 202.942.5999                       Facsimile: 415.788.8208
    mark.merley@apks.com                          staylor@taylorpatchen.com
    karen.otto@apks.com                           ccauley@taylorpatchen.com

    Attorneys for Defendants                      Attorneys for Defendant
    VISA INC. and VISA U.S.A. INC**.**            MASTERCARD INTERNATIONAL
                                                  INCORPORATED

Dated: April 7, 2017                    WINSTON & STRAWN LLP

                                        By:    /s/ Elizabeth P. Papez
                                        Elizabeth P. Papez (admitted *pro hac vice*)
                                        1700 K Street, N.W.
                                        Washington, DC 20006
                                        Telephone: 202.282.5000
                                        Facsimile: 202-282.5100
                                        epapez@winston.com

                                        Jeffrey L. Kessler (admitted *pro hac vice*)
                                        Eva W. Cole (admitted *pro hac vice*)
                                        200 Park Avenue
                                        New York, NY 10166-4193
                                        Telephone: 212.294.6700
                                        Facsimile: 212.294.4700
                                        jkessler@winston.com
                                        ewcole@winston.com

                                        Sean D. Meenan (SBN: 260466)
                                        Jeanifer E. Parsigian (SBN: 289001)
                                        101 California Street
                                        San Francisco, CA 94111
                                        Telephone: 415.591.1000
                                        Facsimile: 415.591.1400
                                        smeenan@winston.com
                                        jparsigian@winston.com

                                        Attorneys for Defendant
                                        DISCOVER FINANCIAL SERVICES


                                  **ATTESTATION**

        I, Kenneth A. Gallo, am the ECF user whose ID and password are being used to

file the above DEFENDANTS MASTERCARD, VISA, AND DISCOVER FINANCIAL

SERVICES'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION.  In

compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each listed counsel above has

concurred in this filing.


        /s/ Kenneth A. Gallo