No. 16-1454

# In the Supreme Court of the United States

———

STATE OF OHIO, ET AL., PETITIONERS

*v.*

AMERICAN EXPRESS COMPANY, ET AL.

———

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SECOND CIRCUIT*

———

**BRIEF FOR THE UNITED STATES**
**AS RESPONDENT SUPPORTING PETITIONERS**

———

NOEL J. FRANCISCO
  *Solicitor General*
    *Counsel of Record*
MAKAN DELRAHIM
  *Assistant Attorney General*
MALCOLM L. STEWART
  *Deputy Solicitor General*
BRIAN H. FLETCHER
  *Assistant to the Solicitor*
  *General*
WILLIAM J. RINNER
  *Counsel to the Assistant*
  *Attorney General*
KRISTEN C. LIMARZI
ROBERT B. NICHOLSON
JAMES J. FREDRICKS
CRAIG W. CONRATH
JOHN R. READ
NICKOLAI G. LEVIN
ANDREW J. EWALT
  *Attorneys*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## QUESTION PRESENTED

In this antitrust enforcement action, the United States and a group of States challenged "anti-steering" rules that American Express imposes on the merchants that accept its credit cards.  The rules prohibit merchants from encouraging their customers to use other credit cards that charge the merchants lower fees, or even truthfully disclosing to customers the relative cost of different cards.  Applying the rule of reason, the district court held that the anti-steering rules violate Section 1 of the Sherman Act, 15 U.S.C. 1 *et seq.*  The court found that the rules stifle price competition among credit-card networks, allowing all major networks to raise their merchant fees, blocking low-fee rivals, and inflating retail prices.  The question presented is as follows:

Whether the district court's findings that the anti-steering rules stifle price competition, block low-fee rivals, raise merchant fees, and inflate retail prices were sufficient to establish a prima facie case that the rules unreasonably restrain trade.

(I)

**TABLE OF CONTENTS**

Page

Opinions below ............................................................. 1

Jurisdiction ................................................................. 1

Statutory provision involved....................................... 2

Statement:

    A.   Credit-card networks compete for both
         cardholders and merchants ............................ 2

    B.   Amex strengthens its anti-steering rules in
         response to price competition from Visa and
         MasterCard ...................................................... 5

    C.   The district court holds that Amex's anti-
         steering rules unreasonably restrain trade ................. 7

    D.   The court of appeals reverses...................................... 12

Summary of argument ................................................ 14

Argument:

    The facts found by the district court establish a prima
    facie case that the anti-steering rules unreasonably
    restrain trade ......................................................... 18

    A.   A plaintiff may carry its initial burden in a
         rule-of-reason case with direct evidence that a
         restraint has an actual adverse effect on
         competition ................................................... 20

    B.   The facts found by the district court establish
         that the anti-steering rules have severely
         impaired competition among credit-card
         networks ....................................................... 23

        1.   The anti-steering rules stifle price
            competition........................................... 23

        2.   The anti-steering rules raise merchant fees
            and inflate retail prices ....................... 30

        3.   The anti-steering rules block low-fee rivals
            and suppress the development of innovative
            payment models................................... 32

(III)

IV

Table of Contents—Continued:                    Page

   C.   The court of appeals' alternative market
definition departed from established antitrust
principles and provided no sound basis for
reversal in any event .................................................. 35

      1.   Services to merchants and services to
cardholders do not belong in the same
antitrust market because they are not
substitutes.......................................................... 35

      2.   The facts found by the district court
established a prima facie case even under
the court of appeals' market definition ............ 40

   D.   The additional showings demanded by the court
of appeals were not required ................................... 43

      1.   The United States and the States were not
required to negate the anti-steering rules'
potential benefits for cardholders in order
to establish a prima facie case.......................... 43

      2.   The United States and the States were not
required to calculate Amex's "two-sided"
price in order to establish a prima facie
case..................................................................... 47

   E.   The district court properly considered and
rejected, at the second step of the burden-
shifting inquiry, Amex's arguments about the
benefits of the anti-steering rules for
cardholders ............................................................... 50

Conclusion ................................................................................ 55

V

## TABLE OF AUTHORITIES

Cases:                                                          Page

*American Needle, Inc.* v. *NFL*, 560 U.S. 183 (2010).......... 20

*Board of Trade of Chicago* v. *United States*,
246 U.S. 231 (1918)............................................................... 21

*Broadcast Music, Inc.* v. *CBS, Inc.*, 441 U.S. 1 (1979) ...... 34

*Brown Shoe Co.* v. *United States*, 370 U.S. 294 (1962) ...... 38

*California Dental Ass'n* v. *FTC*, 526 U.S. 756
(1999)..............................................................8, 14, 21, 22, 44

*Catalano, Inc.* v. *Target Sales, Inc.*, 446 U.S. 643
(1980)..................................................................................... 41

*Clamp-All Corp.* v. *Cast Iron Soil Pipe Inst.*,
851 F.2d 478 (1st Cir. 1988), cert. denied,
488 U.S. 1007 (1989)............................................................. 45

*Continental T.V., Inc.* v. *GTE Sylvania, Inc.*,
433 U.S. 36 (1977) ........................................................ 24, 25

*Eastman Kodak Co.* v. *Image Technical Servs., Inc.*,
504 U.S. 451 (1992).................................... 21, 22, 36, 38

*FTC* v. *Actavis, Inc.*, 133 S. Ct. 2223 (2013).................. 22, 44

*FTC* v. *Indiana Fed'n of Dentists*, 476 U.S. 447
(1986)............................................................14, 16, 22, 23, 41

*Geneva Pharms. Tech. Corp.* v. *Barr Labs. Inc.*,
386 F.3d 485 (2d Cir. 2004) ................................................ 46

*K.M.B. Warehouse Distribs., Inc.* v. *Walker Mfg.
Co.*, 61 F.3d 123 (2d Cir. 1995)........................................... 46

*Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*,
551 U.S. 877 (2007)..................................................... *passim*

*Major League Baseball Props., Inc.* v. *Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) ................................................ 53

*National Soc'y of Prof'l Eng'rs* v. *United States*,
435 U.S. 679 (1978)...................................................... 12, 21

*NCAA* v. *Board of Regents*, 468 U.S. 85 (1984)...... 21, 49, 51

VI

Cases—Continued:                                                Page

*North Carolina State Bd. of Dental Exam'rs* v. *FTC*,
135 S. Ct. 1101 (2015) .......................................................... 20

*Northern Pac. Ry. Co.* v. *United States*, 356 U.S. 1
(1958) ................................................................................. 20

*NYNEX Corp.* v. *Discon, Inc.*, 525 U.S. 128 (1998) ..... 46, 49

*O'Bannon* v. *NCAA*, 802 F.3d 1049 (9th Cir. 2015),
cert. denied, 137 S. Ct. 277 (2016) ......................... 41, 49, 52

*Reiter* v. *Sonotone Corp.*, 442 U.S. 330 (1979) .................... 45

*Rothery Storage & Van Co.* v. *Atlas Van Lines, Inc.*,
792 F.2d 210 (D.C. Cir. 1986), cert. denied, 479 U.S.
1033 (1987) .................................................................. 36, 53

*Schering-Plough Corp.* v. *FTC*, 402 F.3d 1056
(11th Cir. 2005), cert. denied, 548 U.S. 919 (2006).......... 53

*Smith* v. *United States*, 568 U.S. 106 (2013)...................... 22

*State Oil Co.* v. *Khan*, 522 U.S. 3 (1997)................. 24, 25, 34

*Sullivan* v. *NFL*, 34 F.3d 1091 (1st Cir. 1994),
cert. denied, 513 U.S. 1190 (1995) ..................................... 51

*Times-Picayune Publ'g Co.* v. *United States*,
345 U.S. 594 (1953)...................................................... 36, 39

*Texaco, Inc.* v. *Dagher*, 547 U.S. 1 (2006) .......................... 52

*Todd* v. *Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ............. 22

*Toys "R" Us, Inc.* v. *FTC*, 221 F.3d 928 (7th Cir.
2000) ................................................................................. 22

*United States* v. *Continental Can Co.*, 378 U.S. 441
(1964) .......................................................................... 36, 37

*United States* v. *E. I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956)...................................................... 8, 36

*United States* v. *E. I. du Pont de Nemours & Co.*,
353 U.S. 586 (1957)........................................................... 36

*United States* v. *Grinnell Corp.*, 384 U.S. 563 (1966) ........ 40

*United States* v. *Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940)...................................................... 34, 41

VII

Case—Continued:                                               Page

   *Verizon Commc'ns Inc.* v. *Law Offices of Curtis V.*
     *Trinko, LLP*, 540 U.S. 398 (2004) ................................... 52

Statutes:

   Clayton Act, 15 U.S.C. 18 ................................................. 36
   Sherman Act, 15 U.S.C. 1 *et seq.*:
     15 U.S.C. 1 ............................................................ *passim*
     15 U.S.C. 2 .................................................................... 36

Miscellaneous:

   Philip E. Areeda & Herbert Hovenkamp,
     *Antitrust Law:  An Analysis of Antitrust*
     *Principles and Their Application*:
     Vol. 2B (4th ed. 2014) .................................................. 36
     Vol. 7 (4th ed. 2017) ............................................... 21, 22
     (Supp. 2017) ................................................. 22, 38, 44, 46
   Robert H. Bork, *The Antitrust Paradox:  A Policy at*
     *War with Itself* (1978) ........................................... 45
   Kate Collyer et al., *Measuring Market Power in*
     *Multi-Sided Markets*, Antitrust Chronicle
     (Sept. 2017), https://www.competitionpolicy
     international.com/wp-content/uploads/2017/09/
     CPI-Collyer-Mullan-Timan.pdf ......................................... 50
   Robert H. Jackson, *Should the Antitrust Laws Be*
     *Revised?*, 71 U.S. L. Rev. 575 (1937) ............................... 45
   Jean-Charles Rochet & Jean Tirole, *Two-Sided*
     *Markets: A Progress Report*, 37 RAND J. Econ.
     645 (2006) .......................................................... 50

# In the Supreme Court of the United States

———————

No. 16-1454

STATE OF OHIO, ET AL., PETITIONERS

*v.*

AMERICAN EXPRESS COMPANY, ET AL.

———————

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SECOND CIRCUIT*

———————

**BRIEF FOR THE UNITED STATES**
**AS RESPONDENT SUPPORTING PETITIONERS**

———————

### OPINIONS BELOW

The opinion of the court of appeals (Pet. App. 1a-58a) is reported at 838 F.3d 179.  The decision of the district court (Pet. App. 63a-259a) is reported at 88 F. Supp. 3d 143.

### JURISDICTION

The judgment of the court of appeals was entered on September 26, 2016.  A petition for rehearing was denied on January 5, 2017 (Pet. App. 324a-326a).  On March 24, 2017, Justice Ginsburg extended the time within which to file a petition for a writ of certiorari to and including May 5, 2017.  On April 24, 2017, Justice Ginsburg further extended the time within which to file a petition to and including June 2, 2017, and the petition was filed on that date.  The petition was granted on October 16, 2017.  The jurisdiction of this Court rests on 28 U.S.C. 1254(1).

(1)

2

**STATUTORY PROVISION INVOLVED**

Section 1 of the Sherman Act, 15 U.S.C. 1 *et seq.*, provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

**STATEMENT**

This case is an antitrust enforcement action brought by the United States and a group of States against American Express (Amex). The suit challenges "anti-steering" rules that Amex imposes on merchants that accept its credit cards. Those rules bar merchants from encouraging their customers to use other credit cards that charge the merchants lower fees—by, for example, offering a discount, stating a preference, or even truthfully disclosing the relative costs of different cards. The district court found that the anti-steering rules have stifled price competition among the major credit-card networks, blocked low-fee rivals, raised merchant fees, and inflated retail prices. The question presented is whether those undisturbed factual findings suffice to make out a prima facie case that the anti-steering rules unreasonably restrain trade.

**A. Credit-Card Networks Compete For Both Cardholders And Merchants**

1. Amex and other credit-card networks provide different bundles of services to "two distinct sets of consumers," cardholders and merchants. Pet. App. 69a. Cardholders receive the convenience of making purchases without cash and deferring payment until their monthly bills are due. *Id.* at 75a. They may also receive other benefits, such as access to a line of credit, fraud protection, and frequent-flier miles or other rewards

3

based on their spending. *Id.* at 74a-75a, 89a-90a. In exchange, cardholders may pay annual or other fees, as well as interest on any balance that is carried past their monthly billing cycle. *Ibid.*

Merchants that accept Amex cards receive a guarantee of payment from Amex, as well as related payment-processing services. Pet. App. 82a-84a. In exchange, merchants pay Amex a "merchant discount fee" based on a percentage of each transaction. *Id.* at 82a-83a. For example, a drugstore that accepts an Amex card for a $100 purchase might receive only $97 from Amex—the purchase price less a three percent fee.

Amex operates a vertically integrated system and usually provides services directly to both cardholders and merchants. Pet. App. 83a-84a. Visa and MasterCard, in contrast, deal with cardholders and merchants through third-party banks known as issuers and acquirers. *Id.* at 81a-83a. Issuers like Citibank, Chase, and Capital One issue cards and provide services to cardholders; acquirers serve merchants. *Id.* at 81a-84a. Visa and MasterCard facilitate the interaction between issuers and acquirers and set the rules for the system. *Ibid.* In that role, they "establish nearly all elements of the price charged to merchants" by Visa- and MasterCard-affiliated acquirers. *Id.* at 82a.[1]

The credit-card business involves a "two-sided" platform, in which the value of a network to customers on each side depends in part on the number of customers on the other. Pet. App. 77a (citation omitted). A card

_____

[1] Amex has begun to rely on third-party issuers and acquirers, but those entities still account for only a small fraction of its business. Pet. App. 84a-86a. The fourth major network, Discover, has a hybrid system. It issues cards directly to cardholders, but deals with merchants through acquirers. *Id.* at 86a.

4

"is more valuable to the cardholder when there are more merchants willing to accept that card." *Id.* at 79a. Conversely, "the value to merchants of accepting [a network's] cards increases with the number of cards on that network in circulation." *Ibid.* Other familiar businesses with the same feature include "[n]ewspapers and other advertising-based forms of media," which "sell distinct products and services to subscribers and advertisers," as well as "a seemingly endless array of Internet companies like eBay, OpenTable, eHarmony, and Groupon," all of which serve to "facilitate some form of value-generating interaction between distinct sets of consumers." *Id.* at 77a-78a.

2. Credit cards "have become a principal means by which consumers in the United States purchase goods and services." Pet. App. 73a-74a. In 2013, the four major networks charged merchants more than $50 billion in fees to process nearly $2.4 trillion in transactions. *Id.* at 74a. Amex was the second-largest network, capturing 26.4% of that volume. *Id.* at 151a. The rest was divided among Visa (45%), MasterCard (23.3%), and Discover (5.3%). *Ibid.*

Because of Amex's business model, including its direct merchant relationships and its "premium pricing," its cards are accepted by fewer merchants than are the cards of its competitors. Pet. App. 186a. Roughly 6.4 million merchant locations accept Amex cards, in comparison to more than 9 million locations for Visa, MasterCard, and Discover. *Id.* at 184a-185a. But Amex cards are accepted by virtually all of the Nation's largest merchants, and the merchants that accept Amex cards account for more than 90% of credit-card transactions by dollar volume. *Id.* at 188a, 224a & n.48; C.A. App. 1457-1458, 1475, 1728.

5

### B. Amex Strengthens Its Anti-Steering Rules In Response To Price Competition From Visa And MasterCard

Amex has long charged merchants higher fees than its competitors. Pet. App. 174a-177a. In the 1990s, Visa launched a marketing campaign that highlighted Amex's "significantly higher" fees and urged merchants to save money by encouraging their customers to pay with Visa cards instead. *Id.* at 91a-92a. Visa suggested that merchants could use "'inoffensive, yet effective'" methods to steer their customers to use lower-fee Visa cards—by, for example, displaying "We Prefer Visa" signs. *Id.* at 199a (citation omitted); see *id.* at 92a. Visa also distributed a "profit improvement calculator" that allowed merchants to determine exactly how much they would save by shifting transactions from Amex to Visa. J.A. 101-104, 207-210. MasterCard engaged in a similar campaign. Pet. App. 92a. Those efforts "were remarkably effective" and caused a substantial shift in transaction volume from Amex to Visa and MasterCard. *Ibid.*

Amex considered responding to this price competition by "reducing [its] discount rate" or "better communicat[ing] to merchants the value they received for the premium price charged." Pet. App. 200a. But rather than relying on those strategies, Amex chose to "stifle any further steering or preference campaigns" by strengthening the anti-steering rules in its merchant contracts. *Ibid.*; see *id.* at 93a. As modified, Amex's anti-steering rules prohibit merchants from offering customers discounts or other incentives to use other cards, expressing a preference for another card, or even truthfully disclosing the relative costs of different cards. *Id.* at 95a-96a.

6

Under the anti-steering rules, a merchant may not, for example:

- Offer "free shipping," "free checked bags," or "any other monetary incentive for using [a] Discover card."

- Offer a "designated checkout lane," "priority boarding," or "any other non-monetary incentive [for] using a MasterCard."

- Post a sign disclosing "the merchant's actual cost of accepting each network's cards."

- Inform customers that its "retail prices might be lower if it were better able to control its credit card costs."

- Respond to "a customer's inquiry into its credit card costs."

Pet. App. 100a-101a.  The anti-steering rules prohibit merchants from taking any of these actions "even when American Express is not mentioned," and even when the affected customer does not have an Amex card.  *Id.* at 101a-102a.[2]

The "vast majority" of merchants are bound by Amex's "standard card acceptance agreement," including its standard anti-steering rules.  Pet. App. 94a-95a. Some large merchants—fewer than 1000—have negoti-

---

[2]  The United States and the States have not challenged provisions of the anti-steering rules that prohibit merchants from imposing special fees on customers paying with Amex cards, mischaracterizing Amex, or otherwise harming Amex's brand.  Pet. App. 96a-97a.

ated contracts that depart from the standard agreement. *Id.* at 95a. Even within that group, the anti-steering rules "are only rarely subject to negotiation." *Id.* at 97a. Although "many" large merchants have asked Amex to remove the rules from their contracts, Amex has granted only a few, limited exceptions, such as temporary promotions and "co-brand[ed]" cards like the Southwest Airlines Visa card. *Id.* at 97a-98a. Amex "actively monitors" compliance with the anti-steering rules and "vigorously enforces" the rules to prevent merchants from encouraging their consumers to use less-expensive cards. *Id.* at 102a-103a; see *id.* at 104a & n.6.

### C. The District Court Holds That Amex's Anti-Steering Rules Unreasonably Restrain Trade

In 2010, the United States and a group of States sued Amex, as well as Visa and MasterCard, which had adopted their own anti-steering rules. The suit alleged that the anti-steering rules unreasonably restrained trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. 1 *et seq.* Pet. App. 21a-22a. Visa and Master-Card entered into consent judgments and rescinded their anti-steering rules. *Id.* at 22a. Amex proceeded to trial.

The district court held a seven-week bench trial, which included testimony from four experts, "nearly twenty merchant witnesses representing a selection of the nation's largest retailers, airlines, and hotels," and executives from Amex, Visa, MasterCard, and Discover. Pet. App. 72a. The trial record included nearly 7000 transcript pages and more than 1000 exhibits. *Ibid.* Based on that record, the court held that the anti-steering rules violate Section 1 because they have "short-circuit[ed] the ordinary price-setting mechanism" in the

8

credit-card industry, causing "an absence of price competition" and "dramatically" higher merchant fees. *Id.* at 71a; see *id.* at 63a-259a.

1. The district court analyzed the anti-steering rules under the rule of reason, "the most searching form of antitrust analysis." Pet. App. 107a. The rule of reason requires the factfinder to "weigh all of the circumstances of a case" in order to determine "whether the challenged agreement is one that promotes competition or one that suppresses competition." *Id.* at 107a-108a (brackets and citation omitted). Courts applying the rule of reason follow "a three-step burden shifting framework." *Id.* at 108a. The plaintiff bears the initial burden to show that the challenged restraint is "*prima facie* anticompetitive." *California Dental Ass'n* v. *FTC*, 526 U.S. 756, 771 (1999). If the plaintiff makes that showing, the burden shifts to the defendant to establish a "procompetitive justification." *Ibid.*; see Pet. App. 110a. If the defendant does so, the burden shifts back to the plaintiff to show that the "'legitimate competitive benefits' proffered by [the defendant] could have been achieved through less restrictive means." Pet. App. 110a (citation omitted).

2. The district court began its rule-of-reason analysis by defining the relevant market. Pet. App. 111a-148a. An antitrust market consists of products "that have reasonable interchangeability for the purposes for which they are produced," such that customers would switch from one product to another if faced with a price increase. *United States* v. *E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). Here, the court concluded that the market restrained by the anti-steering rules is the market for "general purpose credit and charge card

9

network services" of the type that Amex provides to merchants.  Pet. App. 112a-113a.

The district court rejected Amex's contention that the market must be defined to include services to cardholders as well as merchants.  Pet. App. 114a-122a.  The court recognized that the credit-card industry is "two-sided," and that networks compete for both merchants and cardholders.  *Id.* at 121a-122a; see *id.* at 77a-78a.  The court explained, however, that the two markets are "distinct" because they involve "different sets of rivals and the sale of separate, though interrelated, products and services to separate groups of customers."  *Id.* at 119a.

Although the district court rejected Amex's proposed market definition, it noted that the "two-sided" nature of a credit-card platform is relevant to the Section 1 analysis because "the antitrust significance of a restraint that nominally affects conduct on only one side of [a credit-card] platform cannot be assessed without considering its impact on the other side of the platform."  Pet. App. 121a-122a.  The court thus recognized that standard antitrust principles "must be applied in a manner that carefully accounts for the competitive realities in multi-sided platforms."  *Id.* at 122a.

3.  The plaintiff in a rule-of-reason case may establish a prima facie case either indirectly or directly.  Pet. App. 108a-109a.  Under the indirect method, the court infers the existence of anticompetitive effects from proof that the defendant has "sufficient market power to cause an adverse effect on competition" and the existence of "grounds to believe that the defendant's behavior will harm competition market-wide."  *Id*. at 109a (citations omitted).  The direct method requires proof of an actual "adverse effect on competition."  *Id.* at 108a (citation omitted).  The district court held that the

10

United States and the States had established a prima facie case under both methods. *Id.* at 148a-228a.

a. The district court first held that Amex has market power. Pet. App. 148a-191a. The court explained that Amex captures 26.4% of a concentrated market with significant barriers to entry. *Id.* at 150a-156a. The court noted that Amex's market power is magnified by "cardholder insistence," the term Amex uses to describe the fact that many merchants cannot realistically refuse to accept Amex cards because too many of their customers would shop elsewhere if they did. *Id.* at 156a-165a. The court also relied on Amex's demonstrated ability to significantly increase its fees without causing merchants to stop accepting its cards. *Id.* at 165a-180a. The court further found that the anti-steering rules were likely to harm competition market-wide. *Id.* at 193a-194a.

b. The district court separately held that the anti-steering rules have caused "actual, sustained adverse effects on competition." Pet. App. 193a (citation omitted); see *id.* at 191a-228a. The court found that "[p]rice competition is a critical avenue of horizontal interbrand competition, and yet it is frustrated to the point of near irrelevance" by the anti-steering rules. *Id.* at 195a. The court explained that, once a merchant identifies the set of networks from which it will accept cards, the cardholder decides which of those cards to use for a particular transaction. *Id.* at 196a. By barring merchants from encouraging cardholders to use lower-fee cards, the rules impede merchants' ability to control their consumption of a network's services in response to changes in the network's price. *Ibid.* As a result, "there is virtually no check on the networks' incentive or ability to

charge higher prices to merchants, so long as the network's pricing is below the level at which a rational merchant would drop acceptance entirely." *Id.* at 197a.

The district court also found that the anti-steering rules "render it nearly impossible" for a new network to enter the market "by offering merchants a low-cost alternative to the existing networks." Pet. App. 203a. The court observed that Discover had tried to pursue that strategy in the 1990s and had been thwarted by the anti-steering rules, which "denied merchants the ability to * * * steer share to Discover's lower-priced network." *Id.* at 205a. Discover therefore had "abandoned its low-price business model" and had "radically increase[d]" its merchant fees to align with those charged by Visa and MasterCard. *Id.* at 206a, 210a.

The district court further found that, by stifling price competition, the anti-steering rules "allowed all four networks to raise their [merchant] fees more easily and more profitably." Pet. App. 207a. For example, the rules were "integral" to Amex's ability to increase its fees repeatedly between 2005 and 2010 in order to restore its premium over its rivals' elevated rates. *Id.* at 208a-209a. Starting from fees "already at or above the competitive level," Amex had imposed at least twenty "Value Recapture" price increases on more than a million merchants, "without any meaningful merchant attrition." *Id.* at 150a, 167a.

The district court found that the higher merchant fees made possible by the anti-steering rules had "resulted in increased prices for consumers" because merchants "pass most, if not all, of their additional costs along to their consumers in the form of higher retail prices." Pet. App. 210a-211a. Those higher prices "af-

12

fect not only those customers who use American Express cards, but also shoppers who instead prefer to pay using a lower-rewards [credit] card, debit card, check, or cash." *Id.* at 211a.

4. Having concluded that the United States and the States had established a prima facie case under both the indirect and direct methods, the district court shifted the burden to Amex to show that its anti-steering rules had redeeming procompetitive effects. Pet. App. 228a. The court held that Amex had failed to make that showing. *Id.* at 228a-258a. *Inter alia*, the court rejected Amex's contention that the rules are justified because they protect its "differentiated business model," which relies on charging higher merchant fees to offer more generous cardholder rewards. *Id.* at 229a; see *id.* at 229a-236a. The court held that, to find the anti-steering rules reasonable "because they shield [Amex's] preferred business strategy from a legitimate form of interbrand competition, especially competition on the basis of price, would amount to 'nothing less than a frontal assault on the basic policy of the Sherman Act.'" *Id.* at 235a (quoting *National Soc'y of Prof'l Eng'rs* v. *United States*, 435 U.S. 679, 695 (1978)).

### D. The Court Of Appeals Reverses

The court of appeals reversed and directed entry of judgment for Amex. Pet. App. 1a-58a. The court did not overturn any of the district court's factual findings as clearly erroneous. Instead, it held that those findings were legally insufficient to establish a prima facie case that the anti-steering rules unreasonably restrain trade.

1. The court of appeals first held that the district court had "erred in excluding the market for cardholders from its relevant market definition." Pet. App. 32a;

13

see *id.* at 31a-40a. The court emphasized the "interdependence" of credit-card networks' competition for merchants and their competition for cardholders, and it stated that separating those two avenues of competition into different antitrust markets could allow "legitimate competitive activities in the market for [cardholders] to be penalized no matter how output-expanding such activities would be." *Id.* at 35a.

2. The court of appeals next held that the district court had erred in holding that Amex has market power. Pet. App. 40a-48a. It concluded that the district court should not have focused on increases in Amex's merchant fees because Amex uses a portion of those fees to provide cardholder rewards (which are functionally equivalent to reduced prices for cardholders). *Id.* at 43a-44a. The court stated that the district court should have calculated Amex's "two-sided price"—that is, the aggregate amount charged to both merchants and cardholders. *Id.* at 44a (citation omitted). The court also held that the district court had erred in relying on "cardholder insistence" as evidence of market power. *Id.* at 45a-48a. The court reasoned that, "so long as Amex's market share is derived from cardholder satisfaction, there is no reason to intervene." *Id.* at 48a.

3. Finally, the court of appeals overturned the district court's holding that the United States and the States had made a prima facie case that the anti-steering rules have an actual adverse effect on competition. Pet. App. 49a-53a. The court did not question the district court's findings that the anti-steering rules stifle price competition and thereby cause merchants (and their customers) to pay more. The court held, however, that those findings were insufficient to establish a prima fa-

14

cie case because the district court had "failed to con-
sider the two-sided net price accounting for the effects
of the [anti-steering rules] on both merchants and card-
holders." *Id.* at 49a.  To prove anticompetitive effects
using higher prices, the court stated, the United States
and the States were required to provide at minimum a
"reliable measure of American Express's two-sided
price that appropriately account[ed] for the value or
cost of the rewards paid to cardholders." *Id.* at 53a
(citation omitted).  The court also stated that the United
States and the States bore the "initial burden" to show
that the anti-steering rules "made *all* Amex consumers
on both sides of the platform—*i.e.*, both merchants and
cardholders—worse off overall." *Id.* at 51a.

### SUMMARY OF ARGUMENT

   The district court found that Amex's anti-steering
rules have stifled price competition among credit-card
networks, blocked low-fee rivals, raised fees for millions
of merchants, and inflated the retail prices paid by hun-
dreds of millions of consumers.  Those undisturbed find-
ings established a prima facie case that the anti-
steering rules unreasonably restrain trade.

   A. The plaintiff in a rule-of-reason case bears the in-
itial burden to show that the challenged restraint is
"*prima facie* anticompetitive." *California Dental Ass'n*
v. *FTC*, 526 U.S. 756, 771 (1999).  If it does so, "the bur-
den of procompetitive justification" shifts to the defend-
ant.  *Ibid.*  A plaintiff may establish a prima facie case
with direct evidence that the restraint has "actual det-
rimental effects" on competition. *FTC* v. *Indiana Fed'n
of Dentists*, 476 U.S. 447, 460 (1986) (*Indiana Dentists*).

   B. The United States and the States carried their in-
itial burden by introducing overwhelming proof that the
anti-steering rules impose "actual, sustained adverse

15

effects on competition." *Indiana Dentists*, 476 U.S. at 461. As the district court found, steering is an essential prerequisite for meaningful competition on merchant fees because it is the way merchants control their consumption of—and expenditures on—a network's services. The purpose and effect of the anti-steering rules is to prevent merchants from altering their consumption of Amex's services in response to changes in price by Amex *or by other networks*—and thus to suppress interbrand price competition between Amex and its rivals. Indeed, the district court found that the anti-steering rules "create a competitive environment in which there is virtually no check on the networks' incentive or ability to charge higher prices to merchants, so long as the network's pricing is below the level at which a rational merchant would drop acceptance entirely." Pet. App. 197a.

The district court thus found that the rules have "allowed all four networks to raise their swipe fees more easily and more profitably," Pet. App. 207a, leading to higher merchant fees—and, ultimately, to higher retail prices for all consumers. The court also found that the anti-steering rules make it "nearly impossible" for a new firm to enter the concentrated network-services market by offering merchants a low-cost alternative—a point that was vividly illustrated by the failure of Discover's low-cost strategy in the late 1990s. *Id.* at 203a.

C. The court of appeals did not purport to overturn any of those factual findings as clearly erroneous. Nonetheless, it held that the district court had fatally erred by defining the relevant market to include only services to merchants, not services to cardholders. That is incorrect for two reasons.

16

First, this Court has repeatedly instructed that an antitrust market should be defined to include only products that are reasonable substitutes for each other. The court of appeals acknowledged that standard, but it never explained how the services that Amex provides to merchants are reasonably interchangeable with the services it provides to cardholders. In fact, they are not. Those two sets of services are undoubtedly related, and both are used when an Amex cardholder makes a purchase from an Amex-accepting merchant. But the two bundles of services are not substitutes in any sense.

Second, and in any event, the district court's findings that the anti-steering rules stifle price competition, inflate merchant fees, and block low-fee rivals were sufficient to establish a prima facie case even under the court of appeals' definition of the market. Indeed, when a court finds that a restraint has had "actual, sustained adverse effects on competition," "specific findings * * * concerning the definition of the market" are unnecessary. *Indiana Dentists*, 476 U.S. at 460-461. This Court thus need not resolve the market-definition question in order to hold that the United States and the States carried their initial burden.

D. The court of appeals deemed the district court's findings legally insufficient to establish even a prima facie case because—in the court of appeals' view—the district court did not adequately account for the anti-steering rules' purported benefits to Amex cardholders. At times, the court appeared to fault the United States and the States for failing to identify and negate *all* possible benefits of the anti-steering rules at the first step of the burden-shifting framework. To treat such a showing as an essential element of a Section 1 plaintiff's prima facie case would seriously distort the applicable burden-

17

shifting framework.  It is the defendant's burden to establish a challenged restraint's procompetitive benefits, not the plaintiff's initial burden to anticipate and refute them.

At other times, the court of appeals appeared to hold that the United States and the States were required to provide a precise calculation of Amex's "two-sided" price, taking into account both its merchant fees and its cardholder rewards.  That is incorrect for at least three reasons.  First, restraints that prevent market forces from determining pricing in a two-sided business reflect a serious distortion of the competitive process even if the *sum* of the prices on both sides of the business does not increase.  Second, and in any event, the district court found that the anti-steering rules *did* allow Amex to increase its two-sided, net price.  Under the circumstances, a precise calculation of that price—something that Amex itself was not able to provide—was not necessary.  Third, the court of appeals erred in focusing exclusively on *Amex's* pricing.  The district court found that the anti-steering rules have allowed *all* networks to charge higher merchant fees and blocked low-fee rivals.  Restraints that enable such unfettered price increases would properly be deemed prima facie anti-competitive even if (counterfactually) they had not increased *Amex's* two-sided price.

E. The court of appeals' approach to this case appears to have been driven in part by its recognition that antitrust analysis of the anti-steering rules should take account of the "two-sided" nature of Amex's platform. The court's concern about the interdependence of the two sides of Amex's platform was appropriate.  But the court erred in requiring the United States and the States to negate Amex's claim that the anti-steering

18

rules have procompetitive benefits in the market for cardholders at the first (*i.e.*, prima facie case) step of the rule-of-reason analysis.  Instead, Amex's asserted procompetitive justifications are properly considered (as the district court considered them) at the second step of the burden-shifting inquiry.  This Court should thus vacate the judgment below, which held that the United States and the States failed to establish a prima facie case.  On remand, the court of appeals can consider any challenges that Amex has properly preserved to the district court's holding that Amex had failed to establish sufficient procompetitive justifications for the anti-steering rules.

## ARGUMENT

### THE FACTS FOUND BY THE DISTRICT COURT ESTABLISH A PRIMA FACIE CASE THAT THE ANTI-STEERING RULES UNREASONABLY RESTRAIN TRADE

The district court found that Amex's anti-steering rules have stifled price competition among the major credit-card networks, blocked low-fee rivals, raised fees for millions of merchants, and inflated the retail prices paid by hundreds of millions of consumers.  Those findings were based on an unusually robust evidentiary record, and the court of appeals did not purport to overturn any of them as clearly erroneous.  The question presented in this Court is whether the district court's undisturbed factual findings established a prima facie case that the anti-steering rules unreasonably restrain trade.

The answer to that question is yes.  This Court has instructed time and again that the central concern of the antitrust laws is the preservation of interbrand price competition.  Restraints that stifle that competition and disrupt the free market's price-setting mechanism are

19

properly deemed (at least) prima facie anticompetitive—
especially where, as here, they have demonstrably in-
flated prices and blocked low-priced rivals.

The court of appeals believed that Amex's use of a
portion of its inflated fees to fund rewards for its card-
holders justifies its suppression of interbrand competi-
tion on merchant fees.  That is not so.  Amex is free to
pursue a strategy that relies on charging high merchant
fees to fund especially generous cardholder rewards.
Under the Sherman Act, however, Amex is not entitled
to protect its preferred business model through re-
straints that effectively force the *entire industry* to
forgo competition on merchant fees in favor of competi-
tion on cardholder rewards.

In any event, the court of appeals erred by requiring
the United States and the States to prove, as an element
of their prima facie case, that the harms to competition
in the network-services market caused by Amex's anti-
steering rules outweigh any benefits to cardholders that
those rules may produce.  The court was correct to rec-
ognize that the two-sided nature of the credit-card busi-
ness affects the appropriate rule-of-reason analysis,
and that benefits to cardholders should be considered in
determining whether the anti-steering rules are lawful.
In light of the abundant evidence that the rules harmed
competition in the network-services market, however,
the court of appeals should have affirmed the district
court's holding that the United States and the States
had established a prima facie case.  This Court should
vacate the Second Circuit's contrary holding, and
should remand the case to allow the court of appeals to
consider, at the second step of the three-step frame-
work, any challenges that Amex has properly preserved
to the district court's holding that it failed to establish

20

sufficient procompetitive justifications for the anti-steering rules.

### A. A Plaintiff May Carry Its Initial Burden In A Rule-Of-Reason Case With Direct Evidence That A Restraint Has An Actual Adverse Effect On Competition

1. "Federal antitrust law is a central safeguard for the Nation's free market structures." *North Carolina State Bd. of Dental Exam'rs* v. *FTC*, 135 S. Ct. 1101, 1109 (2015). "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *Northern Pac. Ry.* v. *United States*, 356 U.S. 1, 4 (1958). "It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress." *Ibid.*

Section 1 of the Sherman Act implements that fundamental policy by prohibiting unreasonable restraints of trade. *Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 885 (2007) (*Leegin*). Some restraints, such as "horizontal agreements among competitors to fix prices," are deemed *per se* unreasonable because of their "'manifestly anticompetitive'" character. *Id.* at 886 (citation omitted). Most restraints are analyzed under "[t]he rule of reason," which is "the accepted standard for testing whether a practice restrains trade in violation of [Section] 1." *Id.* at 885.

The "classic formulation" of the rule of reason, *American Needle, Inc.* v. *NFL*, 560 U.S. 183, 203 n.10 (2010), was articulated by Justice Brandeis nearly a century ago: "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is

21

such as may suppress or even destroy competition." *Board of Trade of Chicago* v. *United States*, 246 U.S. 231, 238 (1918). The trier of fact ordinarily must consider all relevant circumstances, including "the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; [and] the nature of the restraint and its effect." *Ibid.*; see *Leegin*, 551 U.S. at 885-886. In analyzing those circumstances, however, the "inquiry is confined to a consideration of [the restraint's] impact on competitive conditions." *National Soc'y of Prof'l Eng'rs* v. *United States*, 435 U.S. 679, 690 (1978). "[T]he criterion to be used in judging the validity of a restraint on trade is its impact *on competition*." *NCAA* v. *Board of Regents*, 468 U.S. 85, 104 (1984) (emphasis added).

2. The plaintiff in a rule-of-reason case bears the initial burden to show that the challenged restraint is "*prima facie* anticompetitive." *California Dental Ass'n* v. *FTC*, 526 U.S. 756, 771 (1999); see 7 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1502, at 398-399 (4th ed. 2017) (Areeda & Hovenkamp). A plaintiff can make that showing indirectly, by establishing that the defendant has "[m]arket power"—that is, "the power 'to force a purchaser to do something that he would not do in a competitive market.'" *Eastman Kodak Co.* v. *Image Technical Servs., Inc.*, 504 U.S. 451, 464 (1992) (*Kodak*) (citation omitted). Market power is typically inferred from the defendant's market share and other relevant market conditions. *Ibid.*

Alternatively, a plaintiff may discharge its initial burden with *direct* evidence of the challenged restraint's anticompetitive effects. "[T]he purpose of the inquir[y] into * * * market power is to determine

Case 1:17-cv-02738-MKB-JO Document 625-1 Filed 01/08/18 Page 29 of 62 PageID #: 18001

whether an arrangement has the potential for genuine adverse effects on competition." *FTC* v. *Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986). Accordingly, "'proof of *actual* detrimental effects' * * * can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" *Id.* at 460-461 (citation omitted).[3]

A prima facie showing that the challenged restraint adversely affects competition "place[s] the burden of procompetitive justification on [the defendant]." *California Dental*, 526 U.S. at 771; accord *FTC* v. *Actavis, Inc.*, 133 S. Ct. 2223, 2236 (2013). That allocation follows the familiar rule that, "'where the facts with regard to an issue lie peculiarly in the knowledge of a party,' that party is best situated to bear the burden of proof." *Smith* v. *United States*, 568 U.S. 106, 112 (2013) (citation omitted). "The defendant, being the author of the restraints, is in a better position to explain why they are profitable and in consumers' best interests." Areeda & Hovenkamp ¶ 1505, at 171 (Supp. 2017).

If the defendant carries its burden, the plaintiff may prevail if it establishes that the restraint's objective "can be achieved by a substantially less restrictive alternative." 7 Areeda & Hovenkamp ¶ 1502, at 398-399. If the plaintiff fails to make that showing, the court must determine whether "the challenged behavior is, on balance, unreasonable." *Id.* at 399.

---

[3] Indeed, proof "that a defendant's conduct exerted an actual adverse effect on competition * * * arguably is more direct evidence of market power than calculations of elusive market share figures." *Todd* v. *Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001) (Sotomayor, J.); see, *e.g.*, *Kodak*, 504 U.S. at 477; *Toys "R" Us, Inc.* v. *FTC*, 221 F.3d 928, 937 (7th Cir. 2000).

23

### B. The Facts Found By The District Court Establish That The Anti-Steering Rules Have Severely Impaired Competition Among Credit-Card Networks

By introducing overwhelming proof that Amex's anti-steering rules impose "actual, sustained adverse effects on competition," *Indiana Dentists*, 476 U.S. at 461, the United States and the States carried their initial burden to establish a prima facie case that the rules unreasonably restrain trade. Indeed, few rule-of-reason cases have involved such extensive direct evidence of anticompetitive effects. That evidence was contained in a voluminous documentary record and thousands of pages of testimony from economists and market participants, including some of the Nation's leading merchants. Pet. App. 72a. And it was confirmed by the district court's findings that the anti-steering rules have stifled price competition in the network-services market, induced all networks to raise their merchant fees, blocked low-fee rivals, and inflated retail prices.[4]

#### 1. *The anti-steering rules stifle price competition*

The anti-steering rules are subject to the rule of reason, rather than to the *per se* rule, because they are "vertical restraints between firms at different levels of production—namely, between [Amex] and its merchant-consumers." Pet. App. 105a. But the rules are significantly different from the vertical restraints this Court has considered in other recent cases. The anti-steering

---

[4] The United States and the States made prima facie showings that Amex's anti-steering rules harm competition using both the indirect and direct methods. Pet. App. 148a-221a. We address only the direct proof of anticompetitive effects because the States did not seek further review of the court of appeals' holding that the United States and the States had failed to establish a prima facie case under the indirect method. Pet. i, 18-25.

24

rules do not limit *intra*brand competition among retailers selling a manufacturer's products in order to enhance *inter*brand competition between the manufacturer and its rivals. Instead, the natural and demonstrated effect of the rules is to block *inter*brand merchant-fee (*i.e.*, price) competition among Amex and its rival networks. Indeed, the district court found that the rules have "frustrated" that "critical avenue of horizontal interbrand competition * * * to the point of near irrelevance." *Id.* at 195a.[5]

a. In recent decades, this Court has held that a variety of "vertical restraints a manufacturer imposes on its distributors," including restraints on the prices that distributors may charge, should be evaluated under the rule of reason rather than declared *per se* unlawful. *Leegin*, 551 U.S. at 882 (minimum prices); see, *e.g.*, *State Oil Co.* v. *Khan*, 522 U.S. 3, 7-8 (1997) (maximum prices); *Continental T. V., Inc.* v. *GTE Sylvania, Inc.*, 433 U.S. 36, 58-59 (1977) (*Sylvania*) (exclusive territories). Each time, the Court has emphasized that the type of vertical restraint at issue was potentially procompetitive because it could "stimulate *inter*brand competition—the competition among manufacturers

---

[5] During much of the period that Amex's anti-steering rules were in place, Visa and MasterCard had anti-steering rules as well. As a result of this suit, Visa and MasterCard have now rescinded their rules. Pet. App. 21a-22a. But the district court found that, because Amex's anti-steering rules prohibit *all* steering by Amex-accepting merchants, which account for more than 90% of credit-card transactions by dollar volume, the effect of Amex's rules by themselves is essentially the same as the previous combined effect of the three networks' rules. *Id.* at 180a, 206a-207a n.43. Thus, "Amex has been able to perpetuate" the "absence of inter-network competition on the basis of price * * * even after Visa and MasterCard abandoned their anti-steering rules." *Id.* at 180a.

25

selling different brands of the same type of product—by reducing *intra*brand competition—the competition among retailers selling the same brand." *Leegin*, 551 U.S. at 890 (emphasis added); see, *e.g.*, *State Oil*, 522 U.S. at 14-15; *Sylvania*, 433 U.S. at 51-55.

For example, a manufacturer may set minimum retail prices for its products in order to "encourage[] retailers to invest in tangible or intangible services or promotional efforts that aid the manufacturer's position as against rival manufacturers." *Leegin*, 551 U.S. at 890. Without manufacturer-set minimum prices, a retailer might be reluctant to make those investments for fear of being undersold by rivals who free-ride on its efforts by selling the same manufacturer's goods at lower prices. *Ibid.* A manufacturer's use of vertical restraints to limit competition among its own retailers thus has "the potential to give consumers more options," allowing them to "choose among low-price, low-service brands; high-price, high-service brands, and brands that fall in between." *Ibid.* Restraints that limit intrabrand competition to promote interbrand competition are generally lawful because "the primary purpose of the antitrust laws is to protect interbrand competition." *State Oil*, 522 U.S. at 15; accord *Leegin*, 551 U.S. at 890.

b. Unlike the types of vertical restraints this Court addressed in *Leegin*, *State Oil*, and *Sylvania*, the anti-steering rules "do not purport to restrain intrabrand competition in favor of greater interbrand competition." Pet. App. 107a. That is, they do not limit competition among distributors of Amex's services to enhance competition among Amex and its rival networks. The merchants restrained by the anti-steering rules are Amex's

26

consumers, not its distributors (at least in any traditional sense). *Id.* at 74a n.4. The purpose and effect of the rules is to prevent those consumers from altering their consumption of Amex's services in responses to changes in price by Amex *or by other networks*—and thus to suppress *inter*brand price competition among and its rivals.

The ability of merchants to engage in steering is an essential prerequisite for meaningful competition on merchant fees because it is the way that merchants control their consumption of—and expenditures on—a network's services. In other contexts, "merchants routinely seek lower prices for necessary goods and services by promoting competition among multiple suppliers, often by rewarding competitive bidders with increased purchase volume." Pet. App. 216a. Merchants cannot *directly* control their consumption of a particular credit-card network's services in response to changes in the network's price, because the cardholder chooses (from among the cards that a particular merchant has chosen to accept) the card to be used for any given transaction. But just as merchants often "attempt to influence customers' purchasing decisions" through product placement, discounts, or other inducements, merchants could attempt to reduce their credit-card costs by encouraging their customers to use cards that charge the merchants lower fees. *Id.* at 67a.

Merchants have strong economic incentives to take that step because credit-card fees are a significant cost. Pet. App. 216a, 221a-222a. In 2013, for example, Hilton paid "[b]etween a half a billion and a billion dollars" in fees. Tr. 1608. Home Depot paid "roughly half a billion dollars." Tr. 1222. Alaska Airlines' credit-card costs are roughly double the cost of wages for its U.S. airport

27

employees.  Tr. 192.  And the credit-card costs for the Solitude ski resort exceed its costs for fuel to groom its slopes and power to run its lifts.  Tr. 2523.

The district court's findings confirm that, if allowed to do so, merchants would seek to minimize those substantial costs by steering their customers towards less-expensive cards.  In the 1990s, merchants participating in the "We Prefer Visa" campaign were "markedly successful at shifting spend to Visa's [lower-cost] network." Pet. App. 200a.  And numerous merchants—including Enterprise, Sears, Home Depot, IKEA, Crate & Barrel, and Hilton—"testified that they would, in fact, steer if given the opportunity." *Id.* at 222a.; see *id.* at 208a, 219a; see also Tr. 408-409, 2328-2329 (describing specific steering proposals).

Amex does not deny that it imposed its current anti-steering rules to "stifle any further steering or preference campaigns" after the success of the "We Prefer Visa" initiative.  Pet. App. 200a.  To be sure, Amex's anti-steering rules do not *preclude* other networks from charging merchant fees that are substantially lower than Amex's own.  But by preventing merchants from shifting transactions to lower-cost (or otherwise preferred) networks, the rules largely eliminate any economic incentive for other networks to take that step.  And the evidence before the district court amply demonstrated that the rules have stifled price competition among the networks and increased the merchant fees charged by all four of them.

As the district court found, "[s]teering is a lynchpin to inter-network competition on the basis of price," because a credit-card network "cannot increase sales or gain market share by offering merchants a more attractive price

28

than its competitors" unless merchants are capable of responding by "shift[ing] share in response to pricing differentials." Pet. App. 196a. The anti-steering rules therefore "create a competitive environment in which there is virtually no check on the networks' incentive or ability to charge higher prices to merchants, so long as the network's pricing is below the level at which a rational merchant would drop acceptance entirely." *Id.* at 197a.

c. The anti-steering rules' suppression of price competition would be mitigated if merchants could feasibly escape Amex's prohibition on steering by "refus[ing] to accept Amex cards altogether." Pet. App. 196a. But often that is not a realistic option, especially for large merchants. Many Amex cardholders are, to use Amex's term, "insistent" on using their Amex cards, and will shop elsewhere if a merchant stops accepting Amex. *Id.* at 156a-157a. Some Amex cardholders—10% to 20%—hold or regularly carry *only* Amex cards. *Id.* at 157a-158a. Others prefer to "consolidate their credit card spending on their American Express cards" to take advantage of Amex's rewards. *Id.* at 158a. And still others are required by their employers "to use Amex cards for business expenses." *Ibid.*

The district court found that this cardholder insistence "effectively prevents merchants from dropping American Express." Pet. App. 158a; see *id.* at 129a. Enterprise, for example, "determined it could not drop Amex because its 'corporate customers were not interested in paying for their rental [cars] with a different method of payment.'" *Id.* at 159a n.27 (quoting Tr. 492) (brackets omitted). IKEA, Best Buy, and Sprint likewise "analyzed the issue in detail" and concluded that they could not stop accepting Amex. *Id.* at 158a-159a; see *id.* at 159a n.27. Other merchants, including Alaska Airlines, Sears, Crate & Barrel,

29

and Hilton, have never seriously considered dropping Amex because it would obviously be unprofitable to do so. *Id.* at 158a & n.26. And at least two large merchants that tried to stop accepting Amex cards were "forced to retreat" in the face of resistance from their customers. *Id.* at 163a; see *id.* at 162a-163a (describing attempts by Walgreens and Murphy Oil).[6]

d. Because the anti-steering rules apply "even when American Express is not mentioned" or the customer being steered does not have an Amex card, the effect of the rules is "inflicted across the [credit-card] industry." Pet. App. 101a-102a. The 6.4 million merchant locations that accept Amex cards cannot engage in steering efforts with respect to *any* brand of credit cards. Those locations account for more than 90% of all credit-card spending. See p. 4, *supra*.

The participants in the market "recognize the dysfunction" caused by the anti-steering rules. Pet. App. 198a. As a Southwest Airlines executive put it, "the market is broken" because the rules allow the networks to avoid competing on price. *Ibid.* (quoting Tr. 2440). Amex, too, "recognizes the absence of competition on the basis of merchant pricing." *Id.* at 197a. In developing its pricing strategy, Amex "does not account for any downward pressure associated with its competitors'

---

[6] The court of appeals held that this "cardholder insistence" could not establish Amex's market power under the indirect method of proving harm to competition. Pet. App. 45a-49a. Whatever the merits of that legal holding, the court did not question the district court's factual finding that merchants' theoretical ability to stop accepting Amex cards has not practically constrained Amex's ability to raise merchant fees. That undisturbed factual finding confirms, under the direct method, the actual anticompetitive effects of the anti-steering rules.

30

swipe fees." *Ibid.*   And an Amex executive acknowledged at trial that, when it comes to merchant fees, it is not "anybody's business strategy" to be "cheaper than the next guy." *Ibid.* (quoting Tr. 2667-2668).

### 2. The anti-steering rules raise merchant fees and inflate retail prices

The district court's findings confirm that Amex's anti-steering rules have "allowed all four networks to raise their swipe fees more easily and more profitably than would have been possible were merchants permitted to influence their customers' payment decisions," leading to "higher all-in merchant prices across the network services market." Pet. App. 207a.   Because merchants pass those higher fees on to their customers, the economic burden is ultimately borne by all Americans in the form of higher retail prices.

a.   Between 1997 and 2009, Visa and MasterCard increased their average merchant rates "by more than 20%." Pet. App. 210a.   Because of the anti-steering rules, they did so "without fear of other networks undercutting their prices." *Ibid.*   Between 2000 and 2007, Discover "was able to radically increase its merchant pricing," raising its average fee by nearly 24%. *Ibid.*; see *id.* at 206a.   It, too, did so "with virtual impunity, relying on the restraining effect of anti-steering rules to ensure that it would not be undercut by a competitor offering a lower price." *Id.* at 210a.

In the early 2000s, price increases by Visa and MasterCard had reduced Amex's premium over the rates charged by its rivals. Pet. App. 166a.   Although Amex's merchant fees "were already at or above the competitive level," Amex responded by further increasing its prices through the "Value Recapture" initiative. *Id.* at 167a.   Between 2005 and 2010, Amex "repeatedly and

31

profitably raised its discount rates to millions of merchants across the United States * * * without losing a single large merchant and losing relatively few small merchants." *Id.* at 165a. The initiative included "at least twenty separate price increases," with several merchant segments "targeted for multiple rounds of price hikes." *Id.* at 167a.

Between 2007 and 2010, for example, Amex increased the discount rate charged to airlines "between 7% and 15%," which produced "over $90 million in additional pre-tax income." Pet. App. 167a; see *id.* at 167a-168a (describing similar increases imposed on restaurants). The Value Recapture initiative led to "a 9 basis point improvement to Amex's weighted average discount rate" and "$1.3 billion in incremental pre-tax income for Amex." *Id.* at 170a. The district court found that the anti-steering rules were "integral" to those price increases because they prevented merchants from responding to Amex's higher rates by steering transactions to other networks, or by using their ability to steer to negotiate lower rates from Amex. *Id.* at 208a-209a.

b. Retail consumers bear the ultimate economic burden of the anti-steering rules. The district court found that "[m]erchants facing increased credit card acceptance costs will pass most, if not all, of their additional costs along to their customers in the form of higher retail prices." Pet. App. 210a-211a. Those higher prices "affect not only those customers who use American Express cards, but also shoppers who instead prefer to pay using a lower-rewards [credit] card, debit card, check, or cash." *Id.* at 211a. Those other customers bear a portion of the cost of Amex's high-fees, high-rewards business model, "but do not receive any of the premium

32

rewards or other benefits conferred by American Express on the cardholder side of its platform." *Ibid.*

### 3. The anti-steering rules block low-fee rivals and suppress the development of innovative payment models

The district court further found that, by blocking price competition, the anti-steering rules make it "nearly impossible" for a new firm to enter the concentrated network-services market "by offering merchants a low-cost alternative to the existing networks" or an innovative alternative payment system. Pet. App. 203a.

a. Discover's experience vividly illustrates that point. Discover "launched in 1985 by offering a combination of breakthrough value propositions" for both cardholders and merchants. Pet. App. 203a. It charged no annual fee and was the first network to offer cardholder rewards, yet its merchant fees were "significantly below those of its competitors." *Id.* at 203a-204a; see *id.* at 154a n.24.

In 1999, "Discover saw an opportunity to leverage its position as the lowest-price network to gain share" from merchants who were dissatisfied because of "a series of price increases by its competitors." Pet. App. 204a. Discover launched "a 'major campaign' aimed at highlighting the pricing disparity between it and its competitors in order to persuade merchants to 'shift their business to Discover's lower-priced network.'" *Ibid.* (quoting Tr. 833) (brackets omitted). It "sent a letter to every merchant on its network, alerting them to their competitors' recent price increases and inviting the merchants to save money by shifting volume to Discover." *Ibid.* And Discover representatives "met with a number of larger merchants to offer discounts from the network's already lower prices if they would steer customers to Discover." *Ibid.*

33

The other networks' anti-steering rules thwarted Discover's attempt to translate its lower fees into greater market share. "In its conversations with a number of merchants, Discover learned that the [anti-steering rules] denied merchants the ability to express a preference for Discover or to employ any other tool by which they might steer share to Discover's lower-priced network." Pet. App. 205a. As a result, Discover's "major campaign" and significantly lower fees "failed to produce 'any significant movement in share.'" *Ibid.* (quoting Tr. 848).

In 2000, once it recognized the competitive environment created by the other networks' anti-steering rules, Discover "abandoned its low-price business model" and "began raising discount rates in order to more closely align its merchant pricing with that of Visa and MasterCard." Pet. App. 206a. As a Discover executive explained, the company had been "leaving money on the table" because "offering a lower price was not going to give Discover any business benefits." *Ibid.* (brackets and citation omitted). Discover thus increased its rates to match Visa's and MasterCard's—a correspondence that remains in effect today. *Ibid.*

b. More broadly, the district court found that the anti-steering rules have "stunted innovation" by blocking new payment models. Pet. App. 213a. In the early 2000s, Discover proposed a new network venture in which "merchants would receive equity in the network and be able to directly control their payment costs by influencing future pricing decisions." *Ibid.* But Discover abandoned the project "when it became clear that merchant-investors would be unable to encourage customers to use the preferred cards by traditional forms of steering." *Ibid.* Similarly, a group of large retailers

34

recently created a joint venture to develop a new mobile-device based payment platform that would "significantly reduce the participating merchants' payment processing costs." *Ibid.* But the venture's "capacity to develop a viable brand as the low-cost alternative to traditional [credit] cards is endangered by merchants' inability to 'compare and contrast' [the venture's] payment services with those offered by American Express." *Id.* at 214a (quoting Tr. 2436) (brackets omitted). The same would be true of other innovative alternative payment platforms. The district court thus found that the anti-steering rules "are responsible for impeding development of novel payment solutions that would have injected or potentially may inject greater diversification into the network services industry." *Ibid.*

\* \* \* \* \*

Far from "stimulat[ing] interbrand competition," *Leegin*, 551 U.S. at 890, Amex's anti-steering rules have had the opposite effect. After carefully examining "the relevant business," "its condition before and after the restraint was imposed," and "the restraint's history, nature, and effect," *State Oil*, 522 U.S. at 10, the district court found that the anti-steering rules have stifled interbrand price competition among networks, increased merchant fees, blocked low-fee rivals, and inflated the retail prices paid by all Americans. Those are particularly serious anticompetitive effects because price is the "central nervous system of the economy," *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150, 226 n.59 (1940), and "competitive pricing [is] the free market's means of allocating resources," *Broadcast Music, Inc.* v. *CBS, Inc.*, 441 U.S. 1, 23 (1979). The rules therefore are (at least) prima facie anticompetitive.

35

### C. The Court Of Appeals' Alternative Market Definition Departed From Established Antitrust Principles And Provided No Sound Basis For Reversal In Any Event

The district court defined the relevant market in this case as the "market for general purpose credit and charge card network services" of the type that Amex provides to merchants. Pet. App. 112a. The court of appeals disagreed, holding that the market should include services to cardholders as well as services to merchants. *Id.* at 32a-33a. The court then held that the district court's market definition was "fatal to its conclusion that Amex violated [Section] 1." *Id.* at 31a. The court of appeals was mistaken on both counts.

As we explain below (see pp. 50-55, *infra),* the effects of the anti-steering rules on the related cardholder-services market are relevant to the ultimate determination whether the rules violate Section 1. Those effects are properly considered, however, not in deciding whether the United States and the States established a prima facie case, but in deciding whether Amex rebutted that case by proving sufficient procompetitive impact in an interdependent market. Maintaining that distinction is important, both because different parties bear the burden at the first two steps of the rule-of-reason analysis, and because the principles governing identification of the relevant market must be applied in a variety of antitrust contexts.

#### 1. Services to merchants and services to cardholders do not belong in the same antitrust market because they are not substitutes

a. In many antitrust cases, courts define the "market" affected by the challenged action. In a merger case, for example, courts define the market in which the

36

challenged merger could "substantially lessen competition" in violation of the Clayton Act, 15 U.S.C. 18. *United States* v. *E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957). Defining the relevant market and measuring the defendant's market share is also the usual means of assessing market power under both Section 1 and Section 2 of the Sherman Act. See, *e.g.*, *Kodak*, 504 U.S. at 464 (Sections 1 and 2); *United States* v. *E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956) (*du Pont*) (Section 2).

In all of those contexts, the purpose of defining the market is to identify the products that compete with the defendant's products. Consistent with that purpose, an antitrust market consists of those products "that have reasonable interchangeability for the purposes for which they are produced," such that customers would switch from one to another if faced with a price increase. *du Pont*, 351 U.S. at 404; see, *e.g.*, *Kodak*, 504 U.S. at 482; *United States* v. *Continental Can Co.*, 378 U.S. 441, 449 (1964); *Times-Picayune Publ'g Co.* v. *United States*, 345 U.S. 594, 612 n.31 (1953) (*Times-Picayune*). In other words, "a relevant market consists only of goods that are reasonably close *substitutes* for one another." 2B Areeda & Hovenkamp ¶ 565a, at 430 (4th ed. 2014); accord *Rothery Storage & Van Co.* v. *Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986) (Bork, J.) ("[T]he definition of the 'relevant market' rests on a determination of available substitutes."), cert. denied, 479 U.S. 1033 (1987).

This Court's decision in *Continental Can* illustrates the application of the rule that market definition turns on the identification of substitutes. The United States challenged a merger between "the Nation's second largest producer of metal containers" and its "third largest

37

producer of glass containers." 378 U.S. at 443. The district court rejected the challenge, concluding that the merger would not substantially lessen competition in any market because metal and glass containers were, with one exception, separate markets. *Id.* at 448-449. This Court reversed, holding that metal and glass containers belonged in the same market because of the pervasive "competition between them for the same end uses" and evidence that many customers regarded them as "interchangeable." *Id.* at 453-456.

b. In this case, the court of appeals articulated the correct legal standard, stating that the market should be defined to include "products 'reasonably interchangeable by consumers for the same purposes.'" Pet. App. 32a (citation omitted). But the court never explained how the services that Amex provides to merchants are "reasonably interchangeable" with the services it provides to cardholders. In fact, they are not.

Amex enables cardholders to make purchases without cash and to defer payment, and it provides cardholders with related services such as credit, fraud protection, and rewards. Pet. App. 74a-75a, 89a-90a. In contrast, Amex provides merchants with guaranteed payment and related payment-processing services. *Id.* at 82a-84a. Those two sets of services are undoubtedly related, and both sets are used when an Amex cardholder makes a purchase from an Amex-accepting merchant. But the two bundles of services are not substitutes in any sense. A beverage company facing an increase in the price of glass bottles could switch to metal cans, but a merchant facing an increase in Amex's fees could not become an Amex cardholder instead.

38

Rather than faithfully applying the "reasonably interchangeable" standard, the court of appeals emphasized that Amex's competition for merchants and its competition for cardholders are interdependent. Thus, the court observed that "the price charged to merchants necessarily affects cardholder demand, which in turn has a feedback effect on merchant demand." Pet. App. 39a. But it is common for prices in one market to affect prices in another. That sort of indirect effect does not mean that the relevant products should be collapsed into a single market for purposes of antitrust analysis. See, *e.g.*, *Kodak*, 504 U.S. at 463, 481-482 (distinguishing the markets for photocopier replacement parts and services from the market for photocopiers). The leading antitrust treatise thus specifically disapproves of the court of appeals' approach in this case, emphasizing that "the fact that a firm obtains its profits from two different, non-substitutable groups does not serve to place the two groups into the same market." Areeda & Hovenkamp ¶ 565, at 104 (Supp. 2017).[7]

The court of appeals also placed great weight on the fact that the credit-card industry is two-sided. Pet. App. 39a-40a. But distinct competitions on different sides of a two-sided platform are properly analyzed as separate, albeit interdependent, antitrust markets. That point is well illustrated by this Court's decision in

---

[7] An antitrust case may implicate multiple, separate markets composed of products that are not substitutes. For example, a merger in the shoe industry could affect separate markets for "men's, women's, and children's shoes." *Brown Shoe Co.* v. *United States*, 370 U.S. 294, 326 (1962). But the proper course in such a circumstance is not to depart from settled market-definition principles by collapsing the affected markets; it is to consider the impact of the challenged action in each of the relevant markets. *Id.* at 325-326.

39

*Times-Picayune*, which involved a newspaper publisher's requirement that advertisements appear in both its morning and evening papers.  The Court explained that "every newspaper is a dual trader in separate though interdependent markets" serving advertisers and readers.  345 U.S. at 610.  But because the challenged restraint "concern[ed] solely one of these markets," the Court limited the relevant market to reasonable substitutes for newspaper advertising; it did not treat the two sides of the platform taken together as a single market.  *Ibid.*; see *id.* at 612 & n.31.[8]

Like the markets for newspaper advertisers and readers, the markets for merchants and cardholders are distinct spheres of competition, "involving different sets of rivals and the sale of separate, though interrelated, products and services to separate groups of consumers." Pet. App. 119a.  In the market for merchants, Amex competes with the acquirers affiliated with Visa, MasterCard, and Discover (which offer merchants terms that are largely dictated by the networks).  *Id.* at 81a-82a.  In the market for cardholders, in contrast, Amex competes with Discover and with Citibank, Chase, and the thousands of other banks that issue cards on the Visa and MasterCard networks.  *Id.* at 84a.  By collapsing those

---

[8]  The court of appeals stated that the district court, in assessing the extent to which an increase in merchant fees would cause a shift to other forms of payment, had failed adequately to consider "feedback effect[s]" between the merchant and cardholder markets.  Pet. App. 39a.  In fact, the district court *did* consider the possibility of such "cross-platform feedback effects."  *Id.* at 126a.  And in any event, the analysis at issue was relevant only to Amex's argument that the relevant market should be defined to include debit-card services as well as credit-card services—a contention that Amex "abandoned" on appeal.  *Id.* at 5a n.1.

40

very different avenues of competition into a single market, the court of appeals severed market definition from its purpose and "prevent[ed] the relevant-market inquiry from accurately answering the questions for which it is asked." Antitrust Law Professors' Cert. Amicus Br. 5.

c. Amex concedes (Br. in Opp. 16) that services to merchants and services to cardholders "cannot [be] substitute[d]" for one another. Instead, it asserts (*ibid.*) that those two sets of services are, in reality, "*part of the same product*," akin to "[m]atching left and right shoes." The court of appeals did not adopt that argument, and it is incorrect. Amex relies on this Court's observation that it may be appropriate "to combin[e] in a single market a number of different products or services where that combination reflects commercial realities." *United States* v. *Grinnell Corp.*, 384 U.S. 563, 572 (1966) (brackets omitted). But that principle applies to related products and services that are offered *to the same consumers*—in *Grinnell*, centrally monitored "burglar alarm" and "fire alarm" services. *Ibid.* Here, in contrast, services to merchants and services to cardholders are sold separately to distinct groups of consumers. Amex cites no precedent placing such services in a single antitrust market.

### 2. *The facts found by the district court established a prima facie case even under the court of appeals' market definition*

In any event, the district court's findings that the anti-steering rules stifle price competition, inflate merchant fees, and block low-fee rivals were sufficient to establish a prima facie case even under the court of appeals' definition of the relevant market. When a court finds that a restraint has had "actual, sustained adverse

41

effects on competition," "specific findings * * * concerning the definition of the market" are unnecessary. *Indiana Dentists*, 476 U.S. at 460-461. The Court thus need not resolve the market-definition question in order to hold that the United States and the States carried their initial burden.

The district court found that Amex's anti-steering rules have "frustrated [interbrand price competition] to the point of near irrelevance," inflating the merchant fees charged by all four networks. Pet. App. 195a. That distortion of competitive pricing, the "central nervous system of the economy," *Socony-Vacuum Oil*, 310 U.S. at 226 n.59, would be a matter of serious antitrust concern even if the networks competed for cardholders by expending all of their merchant fees on more generous cardholder rewards.

This Court made a version of the same point in *Catalano, Inc.* v. *Target Sales, Inc.*, 446 U.S. 643 (1980) (per curiam). There, a group of wholesalers had agreed among themselves to demand immediate payment from retailers, eliminating the practice of affording "short-term trade credit" on negotiated terms. *Id.* at 643. The Court acknowledged that, "in a competitive market," the elimination of trade credit would, in theory, "ultimately lead * * * to corresponding decreases in the invoice price." *Id.* at 649. The Court nonetheless held that the agreement was *per se* unlawful because credit terms are "an inseparable part of the price," *id.* at 648, and the agreement "extinguish[ed] one form of competition among the sellers," *id.* at 649.

Although *Catalano* was a *per se* case, it illustrates that a restraint that extinguishes price competition can be anticompetitive even if "the agreement relates only to one component of an overall price." *O'Bannon* v.

42

*NCAA*, 802 F.3d 1049, 1071 (9th Cir. 2015), cert. denied, 137 S. Ct. 277 (2016). "By effectively suppressing competition on merchant pricing," Amex's anti-steering rules "shift the bulk of interbrand competition in the credit and charge card industry to the cardholder side of the platform." Pet. App. 238a. The anti-steering rules are analogous to "a decision made by [Amex] on behalf of all participants in the network services market that networks will not compete * * * by lowering their merchant pricing" and will instead "focus their competitive efforts on cardholders." *Id.* at 240a.

Even with respect to the cardholder side of the platform, the anti-steering rules have the additional effect of limiting the *bases* on which the various networks can compete for cardholders. If steering were permitted, and if merchants adopted a widespread practice of offering more favorable terms of sale to cardholders who used lower-cost cards, the card issuers could compete for cardholder business by emphasizing that potential advantage. Amex's preferred strategy is to charge high merchant fees and offer premium cardholder rewards. Pet. App. 238a-239a. But other networks might choose instead to compete for cardholders by encouraging merchant steering practices that will make their own cards more desirable. The anti-steering rules effectively preclude that form of competition.

There is, of course, nothing improper about Amex's strategy of pairing high merchant fees with premium cardholder rewards. But the range of options available to both merchants and cardholders will be increased if other networks remain free to pursue a different strategy. Cf. *Leegin*, 551 U.S. at 890 (identifying, as one procompetitive effect of vertical resale price maintenance, that such price maintenance "has the potential to give

43

consumers more options so that they can choose among low-cost, low-service brands; high-price, high-service brands; and brands that fall in between"). As the district court correctly recognized, Amex may not "decide on behalf of the entire market which legitimate forms of interbrand competition should be available and which should not." Pet. App. 240a.

### D. The Additional Showings Demanded By The Court Of Appeals Were Not Required

The court of appeals deemed the district court's findings legally insufficient to establish even a prima facie case because—in the court of appeals' view—the district court did not adequately account for the anti-steering rules' purported benefits to Amex cardholders. At times, the court appeared to fault the United States and the States for failing to identify and negate *all* possible benefits of the anti-steering rules at the first step of the burden-shifting framework. At other times, the court appeared to hold that the United States and the States were required to provide a precise calculation of Amex's "two-sided" price, taking into account both its merchant fees and its cardholder rewards—something that even Amex itself could not reliably do. Neither of those showings was required.

### 1. The United States and the States were not required to negate the anti-steering rules' potential benefits for cardholders in order to establish a prima facie case

The court of appeals stated that the United States and the States bore the "initial burden" of "show[ing] that the [anti-steering rules] made *all* Amex consumers on both sides of the platform—*i.e.*, both merchants and cardholders—worse off overall." Pet. App. 51a. The

44

court also stated that, in order to carry their initial burden, the United States and the States were required "to take into account offsetting benefits to cardholders" and "to prove net harm" to cardholders and merchants. *Id*. at 49a n.52, 54a.  To treat such showings as essential elements of a Section 1 plaintiff's prima facie case would seriously distort the applicable burden-shifting framework and subvert fundamental antitrust principles.

a.  A plaintiff's initial burden in a rule-of-reason case is to show that the challenged restraint is "*prima facie* anticompetitive."  *California Dental*, 526 U.S. at 771. Such a showing "place[s] the burden of procompetitive justification on [the defendant]," *ibid*., which is responsible for establishing any "legitimate justifications," *Actavis*, 133 S. Ct. at 2236; see Areeda & Hovenkamp ¶ 1505, at 171 (Supp. 2017).  Whatever the merits of Amex's claim that the anti-steering rules have "offsetting benefits to cardholders," Pet. App. 49a n.52, that argument is not relevant at the first step of the burden-shifting inquiry.  It is the defendant's burden to establish a challenged restraint's procompetitive benefits, not the plaintiff's initial burden to anticipate and refute them.[9]

---

[9]  In one sentence of its opinion, the court of appeals acknowledged that "[w]hether the [anti-steering rules] had pro-competitive effects on cardholders—let alone whether any alleged procompetitive effects on cardholders outweigh 'anticompetitive' effects on merchants—has no bearing on whether [the United States and the States] carried their initial burden."  Pet. App. 51a.  That statement, however, came only two sentences after the court's assertion that the United States and the States bore the "initial burden" of "show[ing] that the [anti-steering rules] made *all* Amex consumers on both sides of the platform * * * worse off overall."  *Ibid*.

45

b. The court of appeals' analysis also reflected a misunderstanding of the nature of the harm that the Sherman Act seeks to prevent. Although the Sherman Act is a "consumer welfare prescription," *Reiter* v. *Sonotone Corp.*, 442 U.S. 330, 343 (1979) (quoting Robert H. Bork, *The Antitrust Paradox: A Policy at War With Itself* 66 (1978)), courts do not enforce that prescription by making their own judgments about the allocation of resources that would best serve consumers' interests. Instead, consistent with the Sherman Act's fundamental policy of market competition, courts protect consumers by protecting *the competitive process*. As Robert H. (later Justice) Jackson explained while serving as the head of the Antitrust Division, "[t]he antitrust laws represent an effort to avoid detailed government regulation of business by keeping competition in control of prices." Robert H. Jackson, *Should the Antitrust Laws Be Revised?*, 71 U.S. L. Rev. 575, 576 (1937). Accordingly, antitrust law "assesses both harms and benefits in light of the [Sherman] Act's basic objective, the protection of a competitive process." *Clamp-All Corp.* v. *Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 486 (1st Cir. 1988) (Breyer, J.), cert. denied, 488 U.S. 1007 (1989).

The court of appeals' reasoning reflects a serious departure from that fundamental principle. The court stated, for example, that the lower merchant fees that would result from eliminating the anti-steering rules could harm Amex cardholders by decreasing Amex's "optimal level of cardholder benefits." Pet. App. 50a. Under the Sherman Act, however, the optimal mix of goods and services is set through market competition, and the courts' role is to protect the competitive process. As the leading treatise explains, the Second Circuit erred in this case by failing to recognize that "under

46

antitrust policy *competition* should choose the optimal mix of revenue as between the two sides" of Amex's platform. Areeda & Hovenkamp ¶ 562e, at 101 (Supp. 2017).

c.  The court of appeals appeared to base its contrary approach on circuit precedent stating that a rule-of-reason plaintiff must establish that the challenged restraints have "an actual adverse effect on competition *as a whole* in the relevant market." Pet. App. 49a-50a (quoting *K.M.B. Warehouse Distribs., Inc.* v. *Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995)). But the court misunderstood the principle on which it relied. The statement that an antitrust plaintiff must demonstrate harm to competition "as a whole" simply means that a plaintiff "must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself." *NYNEX Corp.* v. *Discon, Inc.*, 525 U.S. 128, 135 (1998). That requirement follows from the axiom that "[t]he purpose of the antitrust laws * * * is 'the protection of *competition*, not *competitors*.'" *Leegin*, 551 U.S. at 906 (citation omitted). This Court has never suggested, however, that the Sherman Act requires a showing of "net harm" to all consumers in the market.[10] Instead, what is required is proof of harm "to the competitive process." *NYNEX*, 525 U.S. at 135. A showing that a restraint disrupts the market's price-setting mechanism, stifles interbrand price competition, and raises fees amply satisfies that standard.

---

[10] Until this case, the Second Circuit had interpreted the requirement of a showing of harm to competition "as a whole" to mean simply that "evidence that plaintiffs have been harmed as individual competitors will not suffice." *Geneva Pharms. Tech. Corp.* v. *Barr Labs. Inc.*, 386 F.3d 485, 507 (2004); see *K.M.B. Warehouse Distribs.*, 61 F.3d at 127-128.

47

### 2. The United States and the States were not required to calculate Amex's "two-sided" price in order to establish a prima facie case

The court of appeals also deemed the district court's findings insufficient to establish a prima facie case because the United States and the States had not provided "a reliable measure of [Amex's] two-sided price that appropriately accounts for the value or cost of the rewards paid to cardholders." Pet. App. 53a (citation omitted). That is incorrect for at least three reasons.

First, proof of an increase in Amex's "two-sided price" was not necessary to establish a prima facie case of anticompetitive effects. "Two-sided platforms compete, in part, via the prices offered by each platform to the two sides. For example, one hotel booking service may charge a high price to hotels and a relatively low price to travelers," while others may do the reverse. Economists Cert. Amicus Br. 11. "Competition is likely to result in competing platforms offering different price pairs, and those offering the price pairs that best satisfy consumer preferences will thrive." *Ibid.* The court of appeals committed "a fundamental economic error" by holding that the metric of competitive effects in such an industry is "whether the *sum* of the two prices increased." *Ibid.* Where, as here, restraints "prevent[] competitive market forces from determining the price pairs offered by the competing platforms," "anticompetitive harm" exists "regardless of whether the sum of the prices increases, decreases, or remains unchanged." *Id.* at 11-12. The harm is the distortion of the market process.

Second, and in any event, the district court's findings *did* establish that Amex's "two-sided" price was inflated above competitive levels. During the Value Recapture

48

initiative, Amex increased fees that were "already at or above the competitive level" to re-establish its price premium over its rivals' elevated rates. Pet. App. 167a; see *id.* at 167a-170a, 174a-176a. Because those increased fees "were not paired with offsetting adjustments on the cardholder side of the platform, the resulting increases in merchant pricing are properly viewed as changes to the net price charged across Amex's integrated platform." *Id.* at 166a-167a. The court of appeals recognized, and "Amex conceded," that "not all of Amex's gains from increased merchant fees are passed along to cardholders in the form of rewards." *Id.* at 51a. In fact, Amex spends less than half of its merchant fees on cardholder rewards. *Id.* at 210a-211a; see Tr. 3853.

The court of appeals did not question the district court's conclusion that the anti-steering rules increased Amex's two-sided price. Instead, the court faulted the United States and the States for failing to calculate "a reliable *measure* of [Amex's] two-sided price." Pet. App. 51a (quoting *id.* at 174a n.30) (emphasis added). But the district court found that, because of the complexity of Amex's system of cardholder rewards and the difficulty of quantifying some of those rewards, "neither party" had provided a reliable measure of that two-sided price. *Id.* at 209a; see *id.* at 182a-186a. The United States and the States should not be faulted for failing to calculate with precision a measure of Amex's pricing that Amex itself could not reliably provide. To the contrary, because any procompetitive effects on the cardholder market are properly considered at the *second* step of the rule-of-reason analysis, at which Amex bore the burden of rebutting the prima facie case, uncertainty as to the scope of those benefits must be resolved against Amex.

49

Third, the court of appeals erred in focusing exclusively on *Amex's* pricing. The district court also found that the anti-steering rules have "enabled [Amex's] competitors to charge higher * * * fees" and have blocked low-cost rivals. Pet. App. 210a. Most obviously, the rules thwarted Discover's low-fee strategy and then allowed Discover "to radically increase its merchant pricing over a relatively short period of time," *ibid.*, to avoid "'leaving money on the table,'" *id.* at 206a (citation omitted). Restraints that enable such unfettered price increases would properly be deemed prima facie anticompetitive even if (counterfactually) they had not increased *Amex's* two-sided price.

That is particularly true because supracompetitive prices are merely one means of establishing anticompetitive effects. The ultimate question is whether the challenged restraint has harmed "the competitive process." *NYNEX*, 525 U.S. at 135; accord *NCAA*, 468 U.S. at 104. The district court's findings were more than sufficient to establish that the anti-steering rules have harmed the competitive process in the credit-card industry.[11]

---

[11] In addition to its focus on Amex's two-sided price, the court of appeals deemed it significant that output in the credit-card industry, as measured by the dollar value of credit-card transactions, has increased. Pet. App. 52a. "[O]utput reductions are one common kind of anticompetitive effect in antitrust cases," but "a 'reduction in output is not the *only* measure of anticompetitive effect.'" *O'Bannon*, 802 F.3d at 1070 (citation omitted). Transaction volume is a particularly unilluminating metric here, because the anti-steering rules have severed the normal link between "merchants' demand for network services and the price charged," and thus have prevented volume from responding normally to price changes. Pet. App. 195a.

50

### E. The District Court Properly Considered And Rejected, At The Second Step Of The Burden-Shifting Inquiry, Amex's Arguments About The Benefits Of The Anti-Steering Rules For Cardholders

The court of appeals' approach to this case appears to have been driven in part by its recognition that antitrust analysis of the anti-steering rules should take account of the "two-sided" nature of Amex's platform. "In a two-sided platform, a single firm or collection of firms sells different products or services to two separate yet interrelated groups of customers who, in turn, rely on the platform to intermediate some type of interaction between them." Pet. App. 77a. Such two-sided platforms are not new, but their importance has grown in recent years as "a seemingly endless array of Internet companies" have developed to "facilitate some form of value-generating interaction between distinct sets of consumers." *Id.* at 77a-78a; see generally Jean-Charles Rochet & Jean Tirole, *Two-Sided Markets: A Progress Report*, 37 RAND J. Econ. 645 (2006); Kate Collyer et al., *Measuring Market Power in Multi-Sided Markets*, Antitrust Chronicle (Sept. 2017).

The court of appeals believed that excluding services to cardholders from the relevant market would allow "legitimate competitive activities in the market for [cardholders] to be penalized no matter how output-expanding such activities may be," so long as those activities had some anticompetitive effects in the market for merchants. *Id.* at 35a. The court's concern about the interdependence of the two sides of the credit-card platform was appropriate. As we explain above (see pp. 43-46, *supra*), however, the court erred in requiring the United States and the States to negate Amex's claim

51

that the anti-steering rules have procompetitive bene-fits in the market for cardholders at the first (*i.e.*, prima facie case) step of the rule-of-reason analysis.  Instead, Amex's asserted procompetitive justifications are properly considered (as the district court considered them) at the second step of the burden-shifting inquiry.  This Court should vacate the judgment below, which held that the United States and the States failed to es-tablish a prima facie case.  On remand, the court of ap-peals can consider any challenges that Amex has properly preserved to the district court's holding that Amex failed to establish sufficient procompetitive justi-fications for the anti-steering rules.

1.  Although courts applying the rule of reason ordi-narily confine their analysis of procompetitive benefits to the market in which the challenged restraint oper-ates, this Court has not rigidly adhered to that limita-tion.  In *NCAA*, for example, the Court recognized that "most of the regulatory controls of the NCAA are justi-fiable means of fostering competition among amateur athletic teams and therefore procompetitive because they enhance public interest in intercollegiate athlet-ics," a product that competes with other forms of enter-tainment in markets that are distinct from the markets restrained by the NCAA's rules governing "the eligibil-ity of participants" and other similar matters.  *NCAA*, 468 U.S. at 117.  The Court rejected the NCAA's de-fense of the restraint at issue—limits on televised foot-ball games—only because that restraint was "not even arguably tailored to serve such an interest" in competi-tive balance.  *Id.* at 119.  Other courts have likewise "balance[d] the anticompetitive effects on competition in one market with certain procompetitive benefits in other markets."  *Sullivan* v. *NFL*, 34 F.3d 1091, 1112

52

(1st Cir. 1994), cert. denied, 513 U.S. 1190 (1995); see, *e.g.*, *O'Bannon*, 802 F.3d at 1057-1058, 1072-1074 (considering procompetitive justifications in other markets in assessing the reasonableness of an NCAA rule restricting the markets for "college education" and "group licensing" of the rights to use athletes' names, images, and likenesses).

2. A rigid rule holding that a court analyzing a restraint on one side of a two-sided platform is always barred from considering asserted procompetitive benefits on the other side of the platform would risk condemning as unlawful business practices that actually serve valid procompetitive purposes. Cf. *Leegin*, 551 U.S. at 875 (explaining that *per se* rules "can increase the total cost of the antitrust system by prohibiting procompetitive conduct the antitrust laws should encourage"); *Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) ("Mistaken inferences and the resulting false condemnations 'are especially costly, because they chill the very conduct the antitrust laws are designed to protect.'") (citation omitted). Instead, a court should consider out-of-market effects at the second step of its rule-of-reason analysis if, but only if, the defendant shows that the challenged restraint is reasonably necessary to achieve legitimate procompetitive benefits in a closely related and interdependent market.

That standard is in some respects analogous to the ancillary-restraints doctrine, which "governs the validity of restrictions imposed by a legitimate business collaboration, such as a  * * *  joint venture, on nonventure activities." *Texaco, Inc.* v. *Dagher*, 547 U.S. 1, 7 (2006). When a restraint is ancillary to a legitimate collaboration, both are "typically evaluated as a whole under the

53

rule of reason." *Major League Baseball Props., Inc.* v. *Salvino, Inc.*, 542 F.3d 290, 338 (2d Cir. 2008) (Sotomayor, J., concurring in the judgment). "To be ancillary," a restraint must be "subordinate and collateral to a separate, legitimate transaction," and *reasonably necessary* to "make the main transaction more effective in accomplishing its purpose." *Rothery Storage*, 792 F.2d at 224, 227. "Ancillary restraints are generally permitted if they are 'reasonably necessary' toward the contract's objective of utility and efficiency." *Schering-Plough Corp.* v. *FTC*, 402 F.3d 1056, 1072 (11th Cir. 2005), cert. denied, 548 U.S. 919 (2006). But when a restraint is "not reasonably necessary to achieve any of the efficiency-enhancing purposes of a joint venture, it will be evaluated apart from the rest of the venture." *Salvino*, 542 F.3d at 338 (Sotomayor, J., concurring in the judgment).

3. The district court's analysis in this case was consistent with those principles. The court recognized the interdependence between the two sides of Amex's platform. Pet. App. 121a-122a. And at the second step of the burden-shifting framework, the district court considered all of Amex's proffered procompetitive justifications for its anti-steering rules, including those in "the interrelated but distinct [card-]issuing market." *Id.* at 239a. The court concluded, however, that Amex had failed to carry its burden to show that the anti-steering rules were "reasonably necessary to robust competition on the cardholder side," or that "any such gains offset the harm done in the network services market." *Id.* at 240a. The court found Amex's procompetitive justifications to be legally invalid, factually unsupported, or both. *Id.* at 228a-258a.

54

The district court considered in particular Amex's argument that, if steering were permitted, Amex's revenues would decline and the company would be less able to compete in the cardholder market.  See Pet. App. 229a-233a.  The court viewed it as inconsistent with the policies of the Sherman Act "[t]o find the [anti-steering rules] to be reasonable restraints on trade because they shield American Express's preferred business strategy from a legitimate form of interbrand competition." *Id*. at 235a.  The court also stated that, assuming that benefits to competition in the cardholder market could be balanced against a loss of competition in the network-services market, Amex had "failed to establish that [anti-steering rules] are reasonably necessary to robust competition on the cardholder side of the * * * platform, or that any such gains offset the harm done in the network services market." *Id*. at 239a-240a.  And the court also noted, at an earlier stage of its opinion, that the retail price increases caused by Amex's anti-steering rules are borne by many consumers who are not Amex cardholders and therefore derive no benefit from Amex's more generous rewards program. *Id*. at 210a-212a.

4. With one exception not relevant here, all of Amex's arguments on appeal focused on the first step of the burden-shifting process.  Amex C.A. Br. 37-79.  The court of appeals agreed with Amex that the United States and the States had failed to establish a prima facie case under Section 1.  For the reasons set forth above, that holding was erroneous.  Although benefits to cardholders are potentially relevant to the rule-of-reason analysis in this case, they are appropriately considered at the second rather than the first step of the burden-shifting framework. This Court therefore should vacate the court of appeals' judgment holding that the

Case 1:17-cv-02738-MKB-JO Document 625-1 Filed 01/08/18 Page 62 of 62 PageID #: 18034

55

United States and the States failed to establish a prima facie case.  On remand, the court of appeals may consider any properly preserved challenges to the district court's holdings concerning procompetitive justifications.

## CONCLUSION

The judgment of the court of appeals should be vacated, and the case should be remanded to the court of appeals for further proceedings.

Respectfully submitted.

NOEL J. FRANCISCO
  *Solicitor General*
MAKAN DELRAHIM
  *Assistant Attorney General*
MALCOLM L. STEWART
  *Deputy Solicitor General*
BRIAN H. FLETCHER
  *Assistant to the Solicitor*
  *General*
WILLIAM J. RINNER
  *Counsel to the Assistant*
  *Attorney General*
KRISTEN C. LIMARZI
ROBERT B. NICHOLSON
JAMES J. FREDRICKS
CRAIG W. CONRATH
JOHN R. READ
NICKOLAI G. LEVIN
ANDREW J. EWALT
  *Attorneys*

DECEMBER 2017