UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

B & R SUPERMARKET, INC., d/b/a Milam's
Market, GROVE LIQUORS LLC, STROUK
GROUP LLC, d/b/a Monsieur Marcel, PALERO
FOOD CORP. and CAGUEYES FOOD CORP.,
d/b/a Fine Fare Supermarket,

                    Plaintiffs,

        v.

MASTERCARD INTERNATIONAL INC., VISA
INC., VISA U.S.A. INC., DISCOVER
FINANCIAL SERVICES and AMERICAN
EXPRESS,

                    Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
17-CV-02738 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiffs B & R Supermarket, Inc., doing business as Milam's Market, ("B & R

Supermarket"), Grove Liquors LLC, Strouk Group LLC, doing business as Monsieur Marcel,

("Monsieur Marcel"), and Palero Food Corp. and Cagueyes Food Corp., doing business as Fine

Fare Supermarket ("Fine Fare Supermarket"), commenced this class action against Defendants

MasterCard International Inc. ("MasterCard"), Visa Inc., and Visa U.S.A. Inc. (collectively

"Visa"), Discover Financial Services ("Discover") and American Express, alleging violations of

the Sherman Act, 15 U.S.C. §§ 1 and 3, and state antitrust and consumer protection laws of

California, Florida, and New York.  Plaintiffs' claims arose out of Defendants' process for

adopting EMV technology for card transactions in the United States.[1]  Plaintiffs allege that

Defendants violated antitrust laws by entering into a conspiracy: (1) adopting the same policy for

shifting liability from banks to merchants ("Liability Shift") for fraudulent charges

("chargebacks"); and (2) making the Liability Shift effective on the same day for all four

networks to prevent merchants from steering customers to use cards with more lenient terms.[2]

(Memorandum & Order dated Sept. 30, 2016, ("September 2016 Order") 4, Docket Entry No.

346.)

Currently before the Court is Plaintiffs' motion to certify a nationwide class to include

merchants who were injured as a result of Defendants' alleged violations of the Sherman Act,

and three subclasses to include impacted merchants located in California, Florida, and New

York, for the violations of the respective state antitrust and consumer protection laws.  (Pls. Mot.

for Class Certification ("Pls. Mot."), Docket Entry No. 425.)  Defendants oppose the motion for

class certification on several grounds, including that Plaintiffs cannot satisfy: (1) ascertainability,

impliedly required by Rule 23(a); and (2) predominance as required by Rule (23)(b)(3).  (Defs.

Opp'n to Pls. Mot. for Class Certification ("Defs. Opp'n"), Docket Entry No. 460 (citing Fed. R.

Civ. P. 23(a) and 23(b))).  For the reasons explained below, because Plaintiffs have not satisfied

---

[1]  EMV technology is a global standard for credit cards that uses computer chips and chip readers to authenticate (and secure) chip-card transactions.  (Am. Compl. ¶ 61, Docket Entry No. 291.)  It allows for secure transmittance of "dynamic" card information by creating a unique electronic signature for each transaction.  Prior to the adoption of EMV technology, payment cards relied entirely on magnetic stripes, which can only communicate "static" information such as the card number and expiration date.  (*Id.*)

[2]  Plaintiffs allege that had Defendants not conspired to impose the Liability Shift at the same time, at least one Defendant would have offered more lenient terms such as no "Liability Shift component, an exten[sion of the] Liability Shift date, a break on fees, equipment or other more favorable terms."  (Am. Compl. ¶ 9.)

the ascertainability requirement, the Court denies, without prejudice, Plaintiffs' motion for certification of the nationwide class and the state law subclasses.

## I. Background

### a. Procedural history

Plaintiffs commenced this action in March of 2016 in the Northern District of California, before Judge William Alsup. (Compl., Docket Entry No. 1.) On July 15, 2016, Plaintiffs filed an Amended Complaint,[3] (Am. Compl., Docket Entry No. 291), and Defendants moved to dismiss it.[4] (Defs. Mot. to Dismiss, Docket Entry No. 303.) On September 30, 2016, Judge Alsup granted in part and denied in part Defendants' motions to dismiss the Amended Complaint. Judge Alsup dismissed the claims against all Defendants other than against MasterCard, Visa, Discover and American Express. (September 2016 Order.)

By the same order, based on the forum selection provisions in American Express' Card Acceptance Agreements ("CAA") with merchants, Judge Alsup severed and transferred the claims by B & R Supermarket and Monsieur Marcel against American Express to the United States District Court for the Southern District of New York. (*Id.*) Judge Alsup also granted

---

[3] The Amended Complaint named the following additional Defendants: Bank of America, N.A., Barclays Bank Delaware, Capital One Financial Corporation, Chase Bank USA, National Association, Citibank, N.A., Citibank, N.A., PNC Bank, National Association, USAA Savings Bank, U.S. Bancorp National Association and Wells Fargo Bank, N.A. (collectively, the "Issuing Banks"), and EMVCo. (Am. Compl.)

[4] Discover and the Issuing Banks, together with EMVCo, filed separate motions to dismiss Plaintiffs' Amended Complaint. (Bank Defs. Mot. to Dismiss, Docket Entry No. 301; Discover's Mot. to Dismiss, Docket Entry No. 305.)

Plaintiff Fine Fare Supermarket's motion to intervene against the above-named Defendants, including American Express.[5]  (*Id.*)

On March 10, 2017, Plaintiffs moved for class certification.  The parties completed briefing the class certification motion on April 28, 2017, based on Ninth Circuit authority.  (*See* Pls. Reply, Docket Entry No. 503.)

By order dated May 4, 2017, Judge Alsup transferred the case to this Court pursuant to 28 U.S.C. 1404(a), citing judicial efficiency and Discover's concerns with regard to potential inconsistent liability theories alleged by putative class members in this case and the cases consolidated in the Multi-District-Litigation, *In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. 05-MD-01720, pending before this Court.  (Order Granting Mot. to Transfer dated May 4, 2017, Docket Entry No. 518.)

In September of 2017, the parties filed their supplemental briefing identifying Second Circuit authority where different from Ninth Circuit, in support of their respective class certification positions.  (Pls. Supplemental Br. in Supp. of Mot. for Class Certification ("Pls. Suppl. Br."), Docket Entry No. 589; Defs. Supplemental Br. in Supp. of Opp'n to Mot. for Class Certification ("Defs. Suppl. Br."), Docket Entry No. 588.)  The Court held a hearing on the motion on November 29, 2017.

---

[5]  Fine Fare Supermarket is not a party to a CAA with American Express and does not accept its cards.  (Pls. Letter dated Oct. 20, 2017, Docket Entry No. 604.)  Because Judge Alsup transferred B & R Supermarket's and Monsieur Marcel's direct claims against American Express to the Southern District of New York pursuant to the CAA, Fine Fare Supermarket is the only named Plaintiff with claims against American Express.  However, because Fine Fare Supermarket does not accept American Express and has no agreement with American Express, it seeks only joint and several liability against American Express based on chargebacks by Visa, MasterCard, and Discover.  (*Id.*)

### b. Plaintiffs' motion for class certification

Pursuant to Rule 23(b)(3), Plaintiffs seek to certify a damages class of "Merchants who have been unlawfully subjected to the Liability Shift for the assessment of MasterCard, Visa, Discover and/or American Express payment card chargebacks, from October 2015 until the anticompetitive conduct ceases."[6] (Pls. Mot. 2.) Plaintiffs also seek to certify three subclasses of merchants from California, Florida, and New York, each of whom brings claims under their respective state's antitrust and consumer protection laws.[7] (*Id.*)

### c. Plaintiffs' claims

Plaintiffs allege that Defendants conspired by entering into an agreement: (1) adopting the same policy for Liability Shift for fraudulent charges; and (2) making it effective on the same day for all four networks to prevent merchants from steering customers to use cards with more lenient terms. (September 2016 Order 4.)

Prior to the adoption of EMV technology, credit cards used magnetic stripes to communicate relevant information such as the card number and expiration date. In contrast,

---

[6] In their moving papers, Plaintiffs proposed two classes — an injunctive relief class pursuant to Rule 23(b)(2) and a damages class pursuant to Rule 23(b)(3), (Pls. Mot. 2) — but now seek certification of a damages class only. (Pls. Supplemental Br. in Supp. of Mot. for Class Certification ("Pls. Suppl. Br.") 1, Docket Entry No. 589.)

[7] Although Plaintiffs purport to move to certify subclasses, Plaintiffs have not shown if or how these subclasses satisfy the Rule 23 requirements. When establishing subclasses, each subclass must meet the Rule 23 class certification requirements. *See Williams v. Wallace Silversmiths, Inc.*, 566 F.2d 364, 365 (2d Cir. 1977) (denying subclass certification for failing to meet Rule 23 requirements of commonality, typicality, and adequate representation); *Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 362 (S.D.N.Y. 2014). The movant bears the burden of constructing the subclasses based on the requirements of Rule 23. *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 408 (1980); *Fincher ex rel. Fincher v. Prudential Prop. & Cas. Ins. Co.*, 374 F. App'x 833, 847 (10th Cir. 2010). Plaintiffs have not made any arguments in support of subclass certifications based on state antitrust and consumer protection laws. The Court therefore summarily denies the request for subclass certification.

EMV technology transmits card information by creating a unique electronic signature for each transaction, and is believed to be more secure than the magnetic stripe. (Am. Compl. ¶ 61.)

Prior to October 1, 2015, issuing banks generally absorbed liability for fraudulent transactions. (*Id.* ¶¶ 3, 84–85.) According to Plaintiffs, to facilitate the transition process from using magnetic stripe to EMV technology, Defendants conspired to establish October 1, 2015, as an artificial date by which merchants had to have installed and certified[8] the EMV technology, otherwise merchants, rather than the banks, would be responsible for any chargebacks. (Am. Compl. ¶¶ 286–92.) Thus, if on or after October 1, 2015, a customer presented an EMV chip card to a merchant but the merchant failed to use a certified EMV chip card reader to process the transaction (and instead used a magnetic stripe), the merchant became liable for any fraudulent charges incurred.

Plaintiffs contend that merchants had to wait lengthy periods for Defendants to certify their EMV technology. Thus, even if a merchant installed the EMV technology, the merchant could still be subject to liability for fraudulent transactions if Defendants failed to timely certify the merchant's equipment. (*Id.*)

Plaintiffs further contend that imposing the Liability Shift on the same date was not necessary for transition to EMV technology. Plaintiffs allege that in other countries where Defendants introduced the EMV technology prior to its introduction in the United States, Defendants implemented liability shifts and transitioned to EMV technology at staggered times

_____

[8] The certification of the EMV payment system consists of multiple steps and involves "numerous entities," such as PIN pad manufacturers, EMVCo, bank-acquirers, and others. (Am. Compl. ¶ 85.) In addition, Defendants imposed their own certification requirement on the merchants, including "an end-to-end testing" to ensure proper data transmission between the merchants and Defendants. (*See* Document titled "Product Bulletin" annexed to Bernay Decl. as Ex. 21, GP-0000022, Docket Entry No. 433-22; Pls. Expert Rebuttal in Supp. of Pls. Mot. 14 ("Pls. Expert Rebuttal") annexed to Bernay Decl. as Ex. 33, Docket Entry No. 502-7.)

rather than on the same day. (*Id.* ¶ 107.) For example, in Canada, some Defendants gave merchants a six-month extension to upgrade to EMV technology. (*Id.* ¶ 112.) In other countries, Defendants offered merchants interchange fee concessions to help defray the costs of the liability shift or offered to cover certain costs of upgrading to EMV technology. (*Id.* ¶¶ 108, 109.) In contrast, in the United States, Defendants implemented the Liability Shift on the same day through their individual networks, and did not offer any concessions to the merchants to ease the transfer process. (*Id.* ¶¶ 71, n.6, 75–76 (MasterCard); ¶¶ 77–78 (Visa); ¶¶ 79–80 (Discover); ¶ 81 (American Express).)

In support of their claims, Plaintiffs rely on the expert report of Dr. Micah S. Officer, Professor of Finance at Loyola Marymount University. (*See* Expert Report of Micah S. Officer in Supp. of Pls. Mot. for Class Certification ("Pls. Expert Report"), annexed to Bernay Decl. as Ex. 29, Docket Entry No. 424-32.)

### i. Plaintiffs' world without the alleged conspiracy

In his initial report, Dr. Officer contends that in the but-for world,[9] without Defendants conspiring to shift liability for the chargebacks on the same date, Plaintiffs would have been able to avoid these chargebacks between October 1, 2015, when Defendants imposed the Liability Shift, and "the present day," (presumably the date of Dr. Officer's submission — March of 2017, (Pls. Expert Report 10.)). Dr. Officer asserts that had Defendants not colluded to establish October 1, 2015 as the Liability Shift date, there would have been a competitive market, which

---

[9] In price-fixing antitrust cases, injury and damages are typically determined by comparing prices resulting from the antitrust violation to prices in the world free of the defendants' antitrust violation. *See, e.g.*, *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 97 (2d Cir. 2007). This construct of the world without Defendants' antitrust violation is known as the "but-for world." *Id.*; *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 91 (S.D.N.Y. 2017).

would have triggered a competitive response from Defendants in reaction to each Defendants' implementation strategies. (Rebuttal Expert Report of Micah S. Officer in Support of Pls. Mot. for Class Certification 10 ("Pls. Expert Rebuttal"), annexed to Bernay Decl. as Ex. 33, Docket Entry No. 502-7.) Dr. Officer opines that such a response would have resulted in all Defendants delaying the October 1, 2015 Liability Shift date. (*Id.*)

In a subsequent report, Dr. Officer included a date by which Defendants would have introduced the Liability Shift in the but-for world.[10] Dr. Officer opines that Defendants would not have introduced the Liability Shift "at least" until the end of the period for which chargeback information was made available to him by Defendants, which is somewhere between thirteen to fifteen months after the October 1, 2015, depending on Defendant. (*Id.* at 10.)

Dr. Officer also suggests October of 2017 and August of 2018 as two alternative dates by which Defendants would have imposed the Liability Shift had Defendants not engaged in the alleged conspiracy.[11] (*Id.* at 12.)

### ii. Methodology for determining injury and damages

Dr. Officer relied on data provided by Defendants, to determine injury and damages to merchants based on the chargebacks assessed to each merchant over a period of time. (Pls. Expert Report 14.) According to Dr. Officer, Defendants created new codes specifically for tracking chargebacks assessed as a result of the Liability Shift ("chargeback codes"). (Pls. Mot.

---

[10] Although, Dr. Officer introduces this time period on rebuttal for the first time, he states that it was implied in his original report. (*See* Pls. Expert Rebuttal 11–12.)

[11] In support of these suggested dates, Dr. Officer relies on: (1) an email from an American Express executive stating that issuers "will benefit for *years* by shifting fraud to the merchants"; (2) internal documents from Visa's executives recommending delaying Liability Shift implementation until October 2017; and (3) the timeline for implementing the EMV technology in other countries. (*Id.* at 12.)

20; Pls. Expert Report 17.)  Dr. Officer concludes that, because the amounts are listed by merchant, the direct injury and damages for each putative class member can be determined by adding all chargebacks for each merchant-putative class member using the chargeback codes.  (*Id.*)

Defendants challenge Plaintiffs' methodology in three ways; Defendants argue: (1) the chargeback codes only track the chargebacks to bank-acquirers and do not identify whether they were passed on to merchants; (2) the chargebacks tracked by the chargeback codes include some chargebacks that are not related to the Liability Shift; and (3) the methodology does not account for the intervening causes that precluded merchants from timely installing and certifying their EMV technology.  (*See* Defs. Opp'n.)

### 1.    Tracking chargeback payments by merchants

Relying on their expert, Dr. Kaplan, Defendants argue that even though the data used by Dr. Officer identifies chargebacks by merchant, the data does not identify whether the merchants ultimately paid the chargebacks.  (Expert Report of David P. Kaplan ("Defs. Expert Report") 56, annexed to Parikh Decl. as Ex. 1, Docket Entry No. 460-1.)  Defendants assert, and Plaintiffs do not dispute, that the chargeback codes only track the chargebacks to the bank-acquirer, and do not identify whether the chargebacks were passed on to the merchants.[12]  (Defs. Opp'n 3.)  Dr. Kaplan challenges Dr. Officer's methodology as not accounting for the fact that some bank acquirers and other third parties offset the chargebacks by absorbing those chargebacks and

---

[12]  The process of assessing chargebacks begins with a complaint for a fraudulent charge from a cardholder to the issuing bank.  The chargeback is then traced from the issuing bank through the network to the acquiring bank.  Plaintiffs argue that the chargebacks are then passed on to the merchants, but Defendants' data does not show whether any of the chargebacks are actually passed on to the merchants.  (Nov. 29, 2017 Hr'g Tr. 36–38.)

therefore not passing them on to the merchants, or reimbursing the merchants for the chargebacks. Plaintiffs contend, however, that the Court should assume that bank acquirers passed on those chargebacks to merchants because many major bank acquirers made statements that merchants will be responsible for chargebacks following the Liability Shift.[13] (Nov. 29, 2017 Hr'g Tr. 14–15; Am. Compl. ¶¶ 185–97.)

### 2. Non-Liability Shift chargebacks

Defendants also argue that the chargeback codes that Plaintiffs rely on include chargebacks that are not related to the Liability Shift because some chargebacks would have been incurred regardless of the Liability Shift. (Defs. Opp'n 11–15.)

To refute Defendants' claim that the chargeback codes includes charges unrelated to the Liability Shift, Dr. Officer compares the pre- and post- Liability Shift chargeback data; Dr. Officer first identifies the monthly ratio of the non-Liability Shift chargebacks and compares it to monthly gross volume of sales transactions. (Pls. Expert Report 19–21.) Averaging this ratio for a twelve-month period to ensure that the data is representative of pre- and post-Liability Shift periods, he determines that the ratio of non-Liability Shift chargebacks to gross sales volume remained approximately the same before and after the Liability Shift was introduced. (*Id.*) Dr. Officer therefore concludes that, contrary to Defendants' claims, the chargeback codes do not include the non-Liability Shift chargebacks. (*Id.* at 21.)

---

[13] Plaintiffs quote statements made by the top ten acquirers recognizing merchants' responsibility for chargebacks, following the Liability Shift date by the networks. For example, Plaintiffs quote Bank of America, the fourth largest acquirer, stating: "All of the card organizations have chosen October 1, 2015, as the date when liability for counterfeit fraudulent transactions will shift to the merchant if the merchant has not adopted POS [(point of sale)] solutions that are capable of processing EMV chip cards." (Am. Compl. ¶ 189.)

### 3. Other intervening causes

Lastly, Defendants contend that Plaintiffs' methodology does not take into account the intervening causes that prevented timely certification of merchants' equipment, which in turn resulted in chargebacks to merchants. (Defs. Opp'n 10–11.) Defendants assert that the intervening causes that precluded timely certification were: (1) the independent business decisions by merchants not to seek certification before the deadline; and (2) conduct by other third parties (such as the equipment suppliers), who are not alleged to be a part of the conspiracy, which impacted the timing of the certification of the merchants. (*Id.* at 11–15.) Defendants argue that these alternative causes are particularly relevant because Plaintiffs' liability theory is based not only on the imposition of the Liability Shift by Defendants on the same date, but also on the certification requirement imposed by Defendants in the United States, and Defendants' failure to certify many merchants before the Liability Shift date in October of 2015. (*Id.*)

Plaintiffs contend that merchants' decision not to seek certification by October of 2015 was not an independent intervening cause because that decision was affected by the costs and difficulty of certification, which was the result of the premature and simultaneous certification requirement designed by Defendants as a result of the conspiracy.[14] (Pls. Reply 9; Am. Compl. ¶¶ 264–269.)

### II. Discussion

#### a. Standard of review

The purpose of the class action mechanism is to aggregate the numerous but relatively small potential recoveries associated with individual cases into a single action with a potential

---

[14] Plaintiffs do not address Defendants' second alleged intervening cause that prevented merchants' timely certification of their EMV equipment. (*See* Pls. Reply.)

recovery that is sufficiently large to warrant an attorney's labor. *See Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81–82 (2d Cir. 2015) (citing *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7th Cir. 1997)); *see also Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617 (1997). However, because class action "is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," to depart from the rule, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011).

"To obtain certification of a class action for money damages, a plaintiff must satisfy prerequisites of numerosity, commonality, typicality, and adequacy of representation," pursuant to Rule 23(a), and "must also establish that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," pursuant to Rule 23(b)(3). *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013); *Sykes*, 780 F.3d at 80.

In addition to the explicit requirements of Rule 23, the class must satisfy the implied requirement of ascertainability. *In re Petrobras Sec.*, 862 F.3d 250, 266 (2d Cir. 2017).

**b. Rule 23(a) explicit requirements**

The Court first addresses whether Plaintiffs have satisfied the Rule 23(a) explicit requirements of numerosity, commonality, typicality, and adequacy of representation for class certification. Except for the American Express' challenge to the adequacy of class representation, Defendants do not otherwise challenge the satisfaction of the Rule 23(a) explicit requirements.

### i.  Numerosity

In order to proceed as a class action, the class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "[N]umerosity is presumed at a level of [forty] members."  *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

Plaintiffs satisfy the numerosity requirement.  The putative class consists of thousands of merchants who have accepted Defendants' cards.  (Pls. Mot. 10–11.)

### ii.  Commonality

Under Rule 23(a)(2), there must be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) ("The commonality requirement is met if plaintiffs' grievances share a common question of law or fact.").  A question is common if it is "capable of classwide resolution — which means that determinations of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc.*, 564 U.S. at 350.  It is not enough to raise questions at such a high level of generality that they become common to the class.  *Id.*  Instead, plaintiffs must demonstrate "the capacity of a classwide proceeding to generate common answers apt to drive the resolution" of the case.  *Id.*  "Even a single common legal or factual question will suffice" to prove commonality.  *Id.* at 357; *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 140 (S.D.N.Y. 2006) (citing *In re Agent Orange Prod. Liab.*, 818 F.2d 145, 166–67 (2d Cir. 1987)).

Plaintiffs satisfy the Rule 23(a)(2) commonality requirement.  At a minimum, Plaintiffs share the common question of whether Defendants conspired to impose the same Liability Shift date on all merchants in violation of antitrust laws.  (Pls. Mot. 11.)

### iii.  Typicality

The typicality prong of Rule 23(a)(3) requires that "the claims or defenses of the

representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)); *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 35 (2d Cir. 2009). "The commonality and typicality requirements often 'tend to merge into one another, so that similar considerations animate analysis' of both." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (quoting *Marisol A.*, 126 F.3d at 376). "The purpose of typicality is to ensure that class representatives have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *Floyd v. City of New York,* 283 F.R.D. 153, 175 (S.D.N.Y. 2012) (citation and internal quotation marks omitted).

Here, Plaintiffs satisfy the typicality requirement. Plaintiffs allege that they were harmed by the same conduct — Defendants' contemporaneous imposition of Liability Shift, and in the same manner — incurring chargebacks as putative class members.

### iv. Adequacy of representation

Rule 23(a)(4) provides that a class action is only appropriate if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The purpose is to "uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* 521 U.S. at 625. "Determination of adequacy typically entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc.,* 502 F.3d at 99; *see also Robinson v. Metro-N. Commuter R.R. Co.*, 267

F.3d 147, 170–71 (2d Cir. 2001) ("A class representative must be part of the class and possess the same interest and suffer the same injury as the class members.") (internal citations and quotation marks omitted). "[C]onflicts which are merely speculative . . . should be disregarded at the class certification stage." *In re Vitamin C Antitrust Litig.,* 279 F.R.D. 90, 102 (E.D.N.Y. 2011) (internal citations and quotation marks omitted). The Court separately discusses the adequacy of the class representatives and class counsel.

### 1. Adequacy of class representatives

All named putative class representatives assert claims arising out of the same conduct and resulting in the same type of injuries — chargebacks imposed by Defendants as a result of the alleged conspiracy to impose the Liability Shift on the same date. Based on this alleged conduct, Plaintiffs claim that Defendants are jointly and severally liable. (Pls. Oct. 20, 2017 Letter, Docket Entry No. 604.)

American Express argues that there are two groups of Plaintiffs: (1) merchants who accept American Express cards and are asserting joint and several liability against Visa, MasterCard and Discover (because their claims against American Express have been severed and transferred to the Southern District of New York); and (2) merchants who do not accept American Express cards and are asserting joint and several liability against all Defendants — Visa, MasterCard, Discover, and American Express, represented by Fine Fare Supermarkets. (Defs. Letter dated Oct. 20, 2017, Docket Entry No. 603.)

American Express objects to the class (1) as "overbroad because it captures the claims of B & R Supermarket and Monsieur Marcel based on American Express' conduct, which cannot be brought in this Court"; and (2) because Fine Fare Supermarkets, as a merchant that does not accept American Express credit cards, cannot adequately represent those merchants who do

accept the cards. (*Id.*) Based on these objections, American Express contends that the certification should be denied, or alternatively, the class should be divided into two subclasses, one that accepts American Express cards, and one that does not.

### A. The class is not overbroad

American Express concedes that the case before the Court no longer includes any claims against American Express by those merchants who have signed CAAs with American Express and are bound by the forum-selection clause in those CAAs. (*Id.* at 2.) American Express appears to argue, without any legal authority or factual support, that because of the forum selection clause in the CAA, Plaintiffs who are signatories to the CAA cannot maintain an action in this Court against the non-American Express Defendants for American Express' conduct, based on joint and several liability, because of the CAA and the action pending in the Southern District of New York.

Determining the scope of a contract such as the CAA is fact-intensive and requires a court to review the scope of the clause at issue and its applicability to the facts of the particular case. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No 07- CV-5944, 2014 WL 2581581, at *3–4 (N.D. Cal. June 9, 2014) ("As a matter of contract interpretation involving a forum-selection clause, the Court's task is, first, to decide the clause's scope and applicability, and, second, to determine whether the clause applies to the behavior at issue." (citing *Peterson v. Boeing Co.,* 715 F.3d 276, 280 (9th Cir. 2013))). In *In re Cathode Ray Tube (CRT) Antitrust Litig.*, the court reviewed the contract clause in detail before determining that the forum-selection clause did not bar suits against the defendant based on joint and several liability outside of the agreed upon forum. *Id.* Similarly, in *Martinez v. Bloomberg LP*, 740 F.3d 211 (2d Cir. 2014), the Second Circuit engaged in a detailed analysis of the contractual language before determining

the scope of the forum-selection clause. *Martinez*, 740 F.3d at 224–26.

Here, Defendants have not cited to any specific provision of the CAA in support of their argument that Plaintiffs who are signatories to the CAA, and whose direct claims against American Express have been transferred to the Southern District of New York, cannot maintain their claims against MasterCard, Visa, and Discover outside of the forum agreed to in the CAA, based on joint and several liability, when MasterCard, Visa, and Discover are not parties to the CAA. Thus, in the absence of any authority to the contrary, the Court rejects American Express' argument that these claims are not properly before the Court.

## B. Fine Fare Supermarkets can adequately represent the class

American Express argues that Fine Fare Supermarkets, as a merchant who does not accept American Express credit cards, cannot adequately represent those merchants who do accept its cards, and, in any event, the American Express-accepting merchants are not properly in this Court. (American Express' Opp'n to Pls. Mot. for Class Certification ("Amex Opp'n") 2–3, Docket Entry No. 463.) American Express cites to a line of cases where courts either denied class certification or created multiple subclasses because the class representatives were not in a position to assert defenses that were otherwise available to the putative class members.[15]

In the absence of any factual or legal authority that prevents merchants that accept American Express cards from bringing claims in this forum against Visa, MasterCard, and Discover jointly and severally to include American Express' conduct, the Court understands American Express' argument to mean that there is a conflict of interest between the two groups

---

[15] American Express does not point to any defenses that the putative class members could assert against Defendants that could not be asserted by Fine Fare Supermarkets, and the Court is not aware of any.

of classes — those merchants who accept American Express cards and the merchants who do not, that warrants denial of certification or should be cured by subclassing.

Generally, "not every potential disagreement between a representative and the class members will stand in the way of a class suit." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (internal citations omitted). One way to deal with the conflicts is to create subclasses. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 819 (1999) (stating that creation of subclasses is a tool to deal with conflicts of interest among members of class); *Amchem Prod., Inc.*, 521 U.S. at 627 (discussing how subclassing can resolve the conflict between class members with current injuries and those with future claims). "Fundamental" conflicts that go "to the very heart of the litigation" may require separate representation of counsel for each subclass. *Charron v. Wiener*, 731 F.3d 241, 250 (2d Cir. 2013). For example, in this action the Second Circuit reversed the certification of the subclasses for injunctive and monetary relief in part because they were represented by the same counsel. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016). The first subclass included claimants with future harms, while the latter was limited to those with current damages. *Id.* at 231. The Second Circuit found that conflicts of interest between the two classes were fundamental, because they impacted the essential allocation decisions of plaintiffs' compensation and defendants' liability, *id.* at 234, with the damages class "want[ing] to maximize cash compensation for past harm, and the [injunctive subclass] want[ing] to maximize restraints on network rules to prevent harm in the future." *Id.*

There is no conflict, fundamental or otherwise, between the two groups in this case, as the claims of joint and several liability are based on a conspiracy in which all Defendants are alleged to have participated. The only material difference between the two groups is their ability

to recover against American Express if Plaintiffs obtain a favorable judgment. The success of the claims by the two groups of Plaintiffs is dependent on the same finding of liability against all Defendants. Accordingly, this difference does not defeat the adequacy of representation by named Plaintiffs. Neither does it warrant creation of subclasses.[16]

## 2. Adequacy of Counsel

In September of 2017, Plaintiffs informed the Court that Robbins Arroyo LLP ("Robbins Arroyo") is taking the lead position in the litigation, replacing Robbins Geller Rudman & Dowd LLP ("RGRD"). (Pls. Suppl. Br. at 1.) Upon the transfer of the case to the Eastern District of New York, RGRD withdrew from representation. (Order Granting Mot. for Leave to Withdraw as Counsel, dated July 11, 2017.) Robbins Arroyo had been involved in this litigation "for months" prior to taking on the lead role. (Mot. for Leave to Withdraw as Counsel, Docket Entry No. 567.) In addition, Robbins Arroyo's resume shows an extensive record of class action litigation. (*See* Robbins Arroyo's Resume annexed to Pls. Suppl. Br. as Ex. 1.) *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (Under Rule 23(a)(4) the Court reviews whether "the plaintiff's attorneys are qualified, experienced and able to conduct the litigation." (citing *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir.1992))). Moreover, no objections have been raised to the adequacy of the proposed lead counsel. The Court finds the representation to be adequate under Rule 23(a)(4).

---

[16] Although the Court is not convinced of the need for compulsory subclassing, it recognizes that it has discretion to create permissive subclasses for manageability and efficiency purposes. *Marisol A. v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997) (noting that subclassing may foster a "more orderly" trial); *Casale v. Kelly*, 257 F.R.D. 396, 408–09 (S.D. N.Y. 2009) (case-management subclasses are appropriate when "there is no actual conflict among class members in the underlying claims common to the entire class"). However, because the Court denies class certification on other grounds, it does not find it necessary to consider permissive subclassing at this stage.

### c. Rule 23(a) implied requirement of ascertainability

Plaintiffs' proposed class definition is: "Merchants who have been unlawfully subjected to the so-called Liability Shift for the assessment of MasterCard, Visa, Discover and/or American Express payment card chargebacks, from October 2015 until the anticompetitive conduct ceases." (Pls. Mot. 2.)

Defendants contend that Plaintiffs' class definition which describes the end date of the class period as "until the anticompetitive conduct ceases" makes the proposed class unascertainable because such a class period is not definitive and does not allow for a determination of which merchants fall within the class, and which merchants do not.[17] (Defs. Suppl. Br. 6.)

---

[17] Defendants also argue that the phrase "merchants who have been unlawfully subject" to Liability Shift makes class membership dependent on a finding that Defendants' actions were indeed unlawful and is therefore fail-safe. The implied requirement of ascertainability precludes certification of classes that are fail safe. *Mullins v. Direct Digital*, LLC, 795 F.3d 654, 657 (7th Cir. 2015) ("Class definitions have failed [the ascertainability] requirement when they were too vague or subjective, or when class membership was defined in terms of success on the merits (so-called 'fail-safe' classes)"); *see also Spread Enter., Inc. v. First Data Merch. Servs. Corp.*, 298 F.R.D. 54, 69 (E.D.N.Y. 2014). "A fail-safe class is one whose definition 'shields the putative class members from receiving an adverse judgment . . . .'" *Hicks v. T.L. Cannon Corp.*, 35 F. Supp. 3d 329, 356–57 (W.D.N.Y. 2014) ("In a fail-safe class, either the class members win or, by virtue of losing, they are not in the class, and therefore not bound by the judgment." (citing *Mazzei v. Money Store*, 288 F.R.D. 45, 55 (S.D.N.Y. 2012))). Such a class would therefore be unfair to Defendants. *Spread Enters., Inc.*, 298 F.R.D. at 69 (E.D.N.Y. 2014) (finding certification impermissible when the proposed class consisted of class members who were "charged excessive fees," because that made class membership dependent on the courts' finding that the defendants indeed "overcharged" plaintiffs.) Where a proposed class definition is "fail-safe . . . courts have the discretion 'to . . . redefine the class to bring it within the scope of Rule 23.'" *Spread Enters., Inc*., 298 F.R.D. at 70 (quoting *Mazzei*, 288 F.R.D. at 55).
Defendants are correct that "merchants who have been *unlawfully* subject" to Liability Shift makes class membership dependent on a finding that Defendants' actions were indeed unlawful. Plaintiffs conceded at the hearing that the definition is fail safe as proposed. (Nov. 29, 2017 Hr'g. Tr. 28:18–19.) The Court therefore modifies the class definition by excluding the word "unlawfully."

Rule 23(a) contains an implied requirement of ascertainability. *In re Petrobras Sec.*, 862 F.3d at 266 ("Most circuit courts of appeals have recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable, often characterized as an 'ascertainability' requirement."). The Second Circuit does not have a "heightened" requirement of ascertainability, it only requires that a "class be defined using objective criteria that establish a membership with definite boundaries," and does not require "administrative feasibility" of identifying each class member based on that objective criteria.[18] *Id.* (distinguishing the Second Circuit's approach to ascertainability from the circuits with a heightened ascertainability requirement); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014) ("The standard for ascertainability is 'not demanding' and is 'designed only to prevent the certification of a class whose membership is truly indeterminable.'" (quoting *Gortat v. Capala Bros., Inc.*, 2010 WL 1423018, at *2 (E.D.N.Y. Apr. 9, 2010))); *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) ("To be ascertainable, the class must be 'readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling.'" (quoting *McBean v. City of N.Y.*, 260 F.R.D. 120, 132–33 (S.D.N.Y. 2009))); *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002).

In *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221 (S.D.N.Y. 2010), tenants of rent-stabilized apartments brought a class action against the owner for wrongfully evicting tenants, in order to deregulate their apartments. The court found the class to be ascertainable and "defined by objective criteria," where the class membership was dependent on whether a given apartment

---

[18] The ascertainability requirement is more important in a Rule 23(b)(3) class than in a Rule 23(b)(2) class, because the former class members require notice, *see* Rule 23(c)(2), and the "chief objective of [Rule 23(b)(2)] is to provide broad injunctive relief to 'large and amorphous' classes not capable of certification under Rule 23(b)(3)," *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 116 (E.D.N.Y. 2012) (quoting *Marisol*, 126 F. 3d at 378).

[was] rent-regulated" and "owned by the [defendant corporation]; and whether the putative class member [was] a tenant on a fixed date."). Similarly, in *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002), private well owners brought actions against petroleum companies based on the alleged widespread contamination of groundwater as a result of the use of MTBE, a gasoline additive. The court found that the "plaintiffs' class definition refer[ed] only to objective criteria: Either a well has MTBE or it does not; either an individual has an ownership interest in a well or she does not; either her property is located in a class state or it is not." *Id.*

The lack of a defined class period in some circumstances can make the class "insufficiently definite as a matter of law." *Brecher v. Republic of Argentina*, 806 F.3d 22, 25–26 (2d Cir. 2015). ("A class . . . could hardly be called sufficiently definite and readily identifiable [if] it has no limitation on time or context."); *see also In re Petrobras Sec.*, 862 F.3d at 269 ("These criteria — securities purchases identified by subject matter, timing, and location — are clearly objective.");[19] Manual for Complex Litigation (Fourth) § 21.222, 2004 WL

---

[19] Some courts have stated that a class need not be ascertainable at the class certification stage, but must be ascertainable "at some point" in the case. *In re MTBE Prod. Liab. Litig.*, 209 F.R.D. at 337 ("Class members need not be ascertained prior to certification, but 'the exact membership of the class must be ascertainable at some point in the case.'" (quoting *Rios v. Marshall*, 100 F.R.D. 395, 403 (S.D.N.Y. 19830)); *see also In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 44–45 (2d Cir. 2006) (recognizing, without discussing, the possibility of establishing ascertainability after class certification); *cf. Bakalar v. Vavra*, 237 F.R.D. 59, 65–66 (S.D.N.Y. 2006) (necessity of inquiries into provenance of artwork made class insufficiently precise, objective and presently ascertainable (internal quotation marks omitted)). The Court understands these seemingly different views of ascertainability to suggest that even if class members cannot be ascertained at the class certification stage, the class can nevertheless be certified if class members can be ascertained at a later stage on the basis of "objective criteria" and "definite boundaries" proposed at the time of certification. *In re Petrobras Sec.*, 862 F.3d 250, 264–66 (2d Cir. 2017) (emphasizing the requirement for the class definition to be based on objective criteria that would make a class sufficiently definite without the requirement of "administrative feasib[ility]" of the class, at the class certification stage.).

258793, *2. ("The relevant time, often referred to as the "class period," is, for example, the period during which members of the proposed class incurred the claimed injury. . . [which] should be included in the class definition.").

In *Brecher*, creditors brought action against Argentina as a result of Argentina's default on its sovereign debt. *Brecher*, 806 F.3d at 25–26 (2d Cir. 2015). Initially, the class included bond holders "under a continuous holder requirement, i.e., the class contained only those individuals who . . . possessed beneficial interests in a particular bond series issued by the Republic of Argentina from the date of the complaint — December 19, 2006 — through the date of final judgment in the District Court." *Id.* Later, the District Court approved the removal of "continuous holder requirement" from the class definition "expanding the class to all holders of beneficial interests in the relevant bond series without limitation as to time held." *Id.* The Second Circuit reversed the modification of the class definition, because that the lack of a time period made the class unacsertainable. *Id.*

In addition, the class definition, including the class period, must be consistent with the alleged liability theory. *See, e.g., In re Petrobras Sec.*, 862 F.3d at 259[20] (discussing temporal limitation and its relationship to the plaintiffs' reliance on the defendants' statements, in the context of a securities action, where reliance is one of the liability elements); *Pinnacle Grp. N.Y. LLC*, 269 F.R.D. at 228 (modifying class definition to ensure sufficient relationship between the

---

[20] *In re Petrobras Sec.* was a securities class action brought by Petrobras shareholders alleging that Petrobus made misleading statements that impacted the price of shares. The Second Circuit noted that the class definition was temporally limited to securities purchases made "before Petrobras made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the offerings," and that such limitation was appropriate "given the absence of any allegation that Plaintiffs relied on any such earnings statement." *In re Petrobras Sec.,* 862 F.3d 250, 259–60 (2d Cir. 2017).

23

definition and the claims alleged); *see also Comcast Corp. v. Behrend,* 569 U.S. 27, 38 (2013) (requiring alignment of the proposed liability theory and the proposed methodology for damages.);[21] Manual for Complex Litigation (Fourth) § 21.222, 2004 WL 258793, *2 (suggesting the period of incurred injury as a basis for setting class period).

Plaintiffs' liability theory is based in part on the argument that had Defendants not conspired to set the Liability Shift for October 2015, each Defendant would have set its own date for Liability Shift for a later time period because there would have been competition between Defendants. (Pls. Expert Rebuttal 10.) Based on this theory, the logical end date for Plaintiffs' claims is the date by which Defendants would have imposed the Liability Shift, had they not conspired to set it for October 1, 2015.

Plaintiffs suggest several potential dates, including: (1) October of 2017, the date identified in Visa's plans for delaying the Liability Shift, (Pls. Expert Rebuttal 12); (2) a thirteen to fifteen month period after October of 2015 based on the timeframe for which the chargeback data was made available, (*id.* at 11); (3) August of 2018, by comparing Visa's implementation

---

[21] In *Comcast*, the plaintiffs presented four theories of antitrust liability, with a damages model that calculated damages for the entire class based on all four theories. *Comcast Corp. v. Behrend,* 569 U.S. 27, 32 (2013). The district court accepted only one of the liability theories, rejecting the other three. *Id.* However, Plaintiffs' calculation method for damages did not isolate damages for each of the four theories, and the district court refused to review the inconsistency between the sole liability theory and the damages methodology which was based on all four liability theories, on the grounds that doing so would require reaching the merits of the claims. *Id.* The Supreme Court held that because only one of the four antitrust liability theories was approved by the court, the plaintiffs could not rely on a model that included damages for all four antitrust theories. *Id.* at 37. Thus, the Court understands *Comcast* to require courts to ensure consistency between the liability theory and damages proposed by the putative class. Although *Comcast* did not focus on class definition, it is relevant to the question of class boundaries because the Supreme Court reasoned that only damages that can be attributed to the defendant's misconduct should be considered. *Id.* at 38 ("Prices whose level above what an expert deems 'competitive' has been caused by factors unrelated to an accepted theory of antitrust harm are not 'anticompetitive' in any sense relevant here.").

timeframe of the Liability Shift in the European Union (E.U.) and the United States from the date

Visa announced its plans to adopt EMV in the E.U. and the United States respectively, (*id.* at

12); and (4) October of 2019, based on the four-year statute of limitations under the Sherman

Act, which was proposed by Plaintiffs at the hearing.[22] (Nov. 29, 2017 Hr'g Tr. 20–22.) Any

one of these dates could be acceptable to make the class ascertainable, if sufficiently

substantiated.

Plaintiffs do not have to establish the Liabiltiy Shift date in the but-for world with

absolute certainty. *In re Elec. Books Antitrust Litig.*, No. 11-MD-2293, 2014 WL 1282293, at

*27 (S.D.N.Y. Mar. 28, 2014) ("It is unsurprising that [the expert] did not develop an opinion

about many of the issues that [the defendant] contends are important features of a but-for world.

After all, the but-for world does not exist."). However, to satisfy the ascertainability

requirement, Plaintiffs must propose a class period that bears a relationship to Plaintiffs'

---

[22] Defendants argue that Plaintiffs changed their construction of the but-for world, because in the Amended Complaint Plaintiffs argued that absent the Defendants' alleged conspiracy, Defendants would have shifted liability to merchants in a staggered manner, but in the class certification motion, Plaintiffs argue that Defendants would have never imposed Liability Shift. (Defs. Opp'n 6.) At the hearing, Defendants conceded that Plaintiffs' argument was that Defendants would have imposed the Liability Shift at a later date, rather than never. (*See* Nov. 29, 2017 Hr'g Tr. 54:1-8.) Nevertheless, Defendants argue that these changes violate the Supreme Court's ruling in *Comcast* because the methodology for determining injury and damages is inconsistent with the liability theory and the but-for world alleged in the Amended Complaint. (*Id.* at 5–6.) The Court disagrees with Defendants' characterization of Plaintiffs' proposed but-for world, as Plaintiffs' proposal of a single end date is not inconsistent with the but-for world where each Defendant would have had a different date of Liability Shift. The Court understands Plaintiffs' proposed "single end date" to mean the earliest date by which any Defendant would have imposed a Liability Shift.

Moreover, as discussed above, *Comcast* requires consistency between the liability theory and the damages methodology in order to ensure that the damages are calculated based on the liability theory that is before the court at the time of the certification. Here, any change in Plaintiffs' liability theory is taking place prior to certification, and therefore, any such change does not present an issue under *Comcast*.

proposed liability theory. Plaintiffs' proposal of four different class periods, some of which appear to be completely arbitrary, does not satisfy this requirement. Plaintiffs appear to lack the necessary information to satisfy this requirement at this stage of the litigation.[23] (Nov. 29, 2017 Hr'g Tr. 21–22.) The Court therefore denies Plaintiffs' motion for class certification without prejudice. The district court has authority to modify or consider a renewed motion for certification pursuant to Rule 23(c)(1)(C).[24] *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 (2d Cir. 2007) ("District courts have ample discretion to consider (or to decline to consider) a revised class certification motion after an initial denial . . . . Some district courts have explicitly reserved authority to revise a class certification ruling by denying certification without prejudice.") (internal quotation marks and citations omitted); *see Sicav v. James Jun Wang*, No. 12-CV- 6682, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) (inviting plaintiffs to renew their motion for certification for the second time after denial.)

---

[23] The Court notes that at the hearing, Plaintiffs argued that the class definition can be modified later based on additional information, suggesting that they may be able to obtain the necessary information to satisfy class ascertainability. (Nov. 29, 2017 Hr'g Tr. 21–22.)

[24] Because Plaintiffs have not met the implied requirements of ascertainability under Rule 23, the Court declines to determine whether the proposed class satisfies Rule 23(b)(3) requirements of predominance and superiority. However, if Plaintiffs choose to renew their motion for class certification, in addition to addressing the ascertainability requirement, Plaintiffs must also further address the predominance issues raised by Defendants and discussed at the hearing, in particular, the issues of commonality of injury and causation.

### III. Conclusion

Because the proposed class is not ascertainable, the Court denies Plaintiffs' motion for class certification without prejudice.

SO ORDERED:

\_\_\_\_\_s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 11, 2018
  Brooklyn, New York