UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

B & R SUPERMARKET, INC., d/b/a Milam's
Market, GROVE LIQUORS LLC, STROUK
GROUP LLC, d/b/a Monsieur Marcel, and
PALERO FOOD CORP. and CAGUEYES FOOD
CORP., d/b/a Fine Fare Supermarket, *Individually
and on Behalf of All Others Similarly Situated,*

                Plaintiffs,

           v.

VISA INC., VISA U.S.A., INC., MASTERCARD
INTERNATIONAL INC., AMERICAN EXPRESS
COMPANY, and DISCOVER FINANCIAL
SERVICES,

                Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
17-CV-2738 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiffs B & R Supermarket, Inc., doing business as Milam's Market ("B & R

Supermarket"), Grove Liquors LLC, Strouk Group LLC, doing business as Monsieur Marcel

("Monsieur Marcel"), and Palero Food Corp. and Cagueyes Food Corp., doing business as Fine

Fare Supermarket ("Fine Fare Supermarket"), commenced this action against Defendants Visa

Inc. and Visa U.S.A., Inc. (collectively "Visa"), Mastercard International Inc. ("Mastercard"),

Discover Financial Services ("Discover"), and American Express Co. ("Amex"), alleging

violations of the Sherman Act, 15 U.S.C. §§ 1, 3, and state antitrust and consumer protection

laws of California, Florida, and New York, and asserting unjust enrichment claims on behalf of a

class of merchants who paid chargebacks as a result of Defendants' alleged conspiracy (the

"Class"). (Compl., Docket Entry No. 1; Am. Compl., Docket Entry No. 291.) Plaintiffs' claims

arise out of Defendants' processes for adopting the "Europay, Mastercard & Visa" (EMV) standard for card transactions in the United States.[1]  Plaintiffs allege that Defendants violated antitrust laws by entering into a conspiracy to: (1) adopt the same policy via nearly identical rules for shifting billions of dollars in liability from banks to merchants ("Fraud Liability Shift," "Liability Shift," or "FLS") for fraudulent charges ("chargebacks"); and (2) make the Fraud Liability Shift effective on the same day and in the same manner for all four networks, to prevent merchants from steering customers to use cards with more lenient terms or concessions such as reduced interchange or merchant discount fees.[2]  (Am. Compl. ¶¶ 2, 4, 7, 9).

Currently before the Court are two motions: (1) Discover's motion to compel arbitration and stay the claims of merchants within the Class with whom Discover has direct contractual relationships ("Retained Merchants") pending the arbitration proceedings pursuant to Rules 12(b)(1) and 12(b)(3) of the Federal Rules of Civil Procedure;[3] and (2) Amex's motion to

---

[1]  EMV technology is a global standard for credit cards that uses computer chips and chip readers to authenticate (and secure) chip-card transactions.  (*See* Am. Compl. ¶¶ 65, 67.)  It allows for secure transmittance of "dynamic" card information by creating a unique electronic signature for each transaction.  (*Id.* ¶ 65.)  Prior to the adoption of EMV technology, payment cards relied entirely on magnetic stripes, which could only communicate "static" information such as the card number and expiration date.  (*Id.* ¶¶ 63, 65.)

[2]  Plaintiffs allege that if Defendants had not conspired to impose the Liability Shift at the same time, at least one Defendant would have offered more lenient terms such as no "Liability Shift component, an exten[sion of the] Liability Shift date, a break on fees, equipment or other more favorable terms."  (Am. Compl. ¶ 9.)  They allege that "[i]n a truly competitive environment, at least one of these entities would or should have broken ranks and offered merchants a break on any number of terms."  (*Id.*)

[3]  (*See* Discover's Renewed Mot. to Compel Arbitration ("Discover's Mot."), Docket Entry No. 793; Discover's Mem. in Supp. of Discover's Mot. ("Discover Mem."), Docket Entry No. 793-1; Pls.' Mem. in Opp'n to Discover's Mot. ("Pls.' Discover Opp'n"), Docket Entry No. 793-21; Discover's Reply in Supp. of Discover's Mot. ("Discover Reply"); Docket Entry No. 793-22.)

(i) compel arbitration and (ii) decertify the class as to claims against Amex.[4]

For the reasons set forth below, the Court denies Discover's motion to compel arbitration and grants in part and denies in part Amex's motion.  The Court grants Amex's motion to the extent that Amex seeks to compel arbitration against CAA-bound merchants, but declines to decertify the class.

**I.   Background**

The Court assumes familiarity with the facts and extensive procedural history as set forth in prior decisions.  *See B & R Supermarket, Inc. v. Visa, Inc.* (*B&R I*), No. 16-CV-1150, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016); *B & R Supermarket, Inc. v. MasterCard Int'l Inc.* (*B&R II*), No. 17-CV-2738, 2018 WL 1335355 (E.D.N.Y. Mar. 11, 2018); *B & R Supermarket, Inc. v. Mastercard Int'l Inc.* (*B&R III*), No. 17-CV-2738, 2021 WL 234550 (E.D.N.Y. Aug. 20, 2020). The Court therefore provides only a summary of the relevant facts and procedural history.

**a.   Factual background**

**i.   Plaintiffs' claims**

Plaintiffs allege that Defendants conspired to violate the antitrust laws by entering into an agreement to (1) adopt the same policy via nearly identical rules for shifting billions of dollars in liability from banks to merchants for fraudulent charges; and (2) make the Liability Shift effective on the same day and in the same manner for all four networks.  (Am. Compl. ¶¶ 2, 4, 7, 9.)  Plaintiffs allege that the conspiracy harmed competition by preventing merchants from

---

[4]  (*See* American Express's Mot. to Compel Arbitration ("Amex's Mot."), Docket Entry No. 844; American Express's Mem. in Supp. of Amex's Mot. ("Amex Mem."), Docket Entry No. 845; Pls.' Mem. in Opp'n to Amex's Mot. ("Pls.' Amex Opp'n"), Docket Entry No. 846; American Express's Reply in Supp. of Amex's Mot. ("Amex Reply"), Docket Entry No. 847.)

steering customers to use cards with more lenient terms or concessions, such as reduced interchange or merchant discount fees.  (*Id.*); *B&R I*, 2016 WL 5725010, at *2.

Prior to the adoption of EMV technology, credit cards used magnetic stripes to communicate relevant information such as the card number and expiration date.  (Am. Compl. ¶ 63.)  In contrast, EMV technology transmits card information by creating a unique electronic signature for each transaction that is believed to be more secure than the magnetic stripes.  (*Id.* ¶¶ 65, 67.)

Prior to October 1, 2015, issuing banks generally absorbed liability for fraudulent transactions.  (*Id.* ¶¶ 3, 71–72.)  According to Plaintiffs, to facilitate the transition process from magnetic stripes to EMV technology, Defendants conspired to establish October 1, 2015, as an artificial date by which merchants had to have installed and certified the EMV technology.[5]  On or after October 1, 2015, if a customer presented an EMV chip card to a merchant but the merchant failed to use a certified EMV chip card reader to process the transaction, the merchant became liable for any fraudulent charges incurred.  (*See id.* ¶¶ 2–3; 286–292.)

Plaintiffs contend that merchants had to wait lengthy periods for Defendants to certify their EMV technology.  (*Id.* ¶¶ 86–95.)  Thus, even if a merchant installed the EMV technology, the merchant could still be subject to liability for fraudulent transactions if Defendants failed to timely certify the merchant's equipment.  (*Id.* ¶¶ 82–84.)

Plaintiffs further contend that imposing the Liability Shift on the same date was not necessary for transition to EMV technology, and that in other countries where Defendants introduced the EMV technology prior to its introduction in the United States, Defendants

---

[5]  The certification of the EMV payment system consists of multiple steps and involves "numerous entities," such as PIN pad manufacturers, EMVCo, acquiring banks, and others. (Am. Compl. ¶ 85.)

implemented Liability Shifts and transitioned to EMV technology at staggered times rather than on the same day.  (*Id.* ¶¶ 100–107.)  For example, in Canada, some Defendants gave merchants a six-month extension to upgrade to EMV technology.  (*Id.* ¶¶ 111–112.)  In other countries, Defendants offered merchants interchange fee concessions to help defray the costs of the Liability Shift or offered to cover certain costs of upgrading to EMV technology.  (*Id.* ¶¶ 108–110.)  In contrast, in the United States, Defendants implemented the Liability Shift on the same day through their individual networks and did not offer any concessions to the merchants to ease the transfer process.  (*Id.* ¶¶ 73–76 (Mastercard), 77–78 (Visa), 79–80 (Discover), 81 (American Express).)

Plaintiffs allege that there was widespread knowledge, including among Defendants, that significant numbers of merchants would not be ready for the Liability Shift and would incur significant costs as a result.  (*Id.* ¶¶ 90–92, 113.)

### ii.  Discover's agreements with merchants

Discover moves to compel arbitration against merchants who have contracted directly with Discover to accept Discover-branded payment cards.  These merchants, referred to by Discover as "Retained Merchants," entered into Merchant Service Agreements ("MSAs") with Discover.  (Decl. of Amy L. Parsons in Supp. of Discover's Mot. ("Parsons Decl.") ¶¶ 6, 8, Docket Entry No. 755-2.)  There are two kinds of MSAs: standard MSAs and custom MSAs.  (*Id.* ¶ 8.)  A standard MSA is deemed accepted when the merchant first accepts a Discover-branded payment card.  (*Id.* ¶ 10.)  A custom MSA is deemed accepted "when it is signed by both parties and approved at Discover's home office."  (*Id.* ¶¶ 11–12.)  All of the MSAs incorporated Discover's Operating Regulations, (*id.* ¶ 13), and the disputed arbitration provision is found within the Operating Regulations, (*id.* ¶¶ 18–19).  As discussed below, the Operating

Regulations set forth provisions for resolutions of "Disagreement[s]," which require (1) an attempt by appropriate executives at the merchant and Discover to resolve the Disagreement mutually and informally; (2) to submit the Disagreement to mediation if the informal dispute resolution procedure fails to resolve the Disagreement; and (3) binding arbitration, if the parties fail to resolve the Disagreement through mediation.  (Operating Regulations Effective October 16, 2015 ("Operating Regs.") § 17.14, annexed to the Decl. of Dana L. Cook-Mulligan in Supp. of Discover's Mot. ("Cook Decl.") as Ex. A – Part 2, Docket Entry No. 793-4.)  The "Disagreement[s]" to which the dispute resolution procedures apply are defined in the glossary to the Operating Regulations as:

> Any dispute, claim, or controversy of any kind or nature between you (or any Person connected with you) and us (or any Person connected with us, including our Affiliates, employees, Agents, contractors, or service providers) arising out of or related to our relationship, the Agreement, any of the Program Documents, or respective obligations of the transactions contemplated hereby or thereby, including disputes as to the advertising, marketing, or promotion relating to, or the creation, validity, interpretation, breach, or termination of our relationship, the Agreement or the other Program Documents, but not including Disputes or claims relating to Card Transactions, including Chargebacks, represerment of Chargebacks, and arbitration of Card Transaction disputes.  Any Disagreement, regardless of whether it arose before, at the same time as, or after the date of the Agreement, shall be resolved as set forth in the Dispute Rules in effect at the time of the initiation of the procedures set forth in Section 17.14 of these Operating Regulations.

(*Id.* § 18.)

### iii.  Amex's agreements with merchants

Amex moves to compel arbitration of the claims against Amex brought by those class members who accepted Amex card products and were bound by Amex's standard Card Acceptance Agreements ("CAAs") during the class period of October 1, 2015, to September 30, 2017.  The CAAs provide the terms to which merchants must agree in order to accept Amex card

products.  (*See* Decl. of Radhika Nanda in Supp. of Amex's Mot. ("Nanda Decl.") ¶ 3, Docket

Entry No. 869.)  Amex updated the CAAs annually and communicated the annual updates to all

merchants subject to the CAAs.  (*Id.* ¶¶ 4–8.)  During the entire class period, each CAA included

a provision stating: "By accepting the American Express Card, you agree to be bound by the

Agreement."  (*Id.* ¶ 9.)  Merchants could decline to be bound by the CAAs (or any updated

versions thereof) by ceasing acceptance of all Amex products.  (*Id.*)  The CAAs also included

"Entire Agreement" provisions stating that the CAAs constituted "the complete and exclusive

expression" of any agreement between the merchants and Amex regarding card acceptance.  (*Id.*

¶ 10.)

     As relevant to Amex's motion, the CAAs provide that any "Claims" brought against

Amex are subject to arbitration if either party so chooses:

> If arbitration is chosen by any party, neither you nor we will have
> the right to litigate that Claim in court or have a jury trial on that
> Claim.  Further, you and we do not have the right to participate in a
> representative capacity or as a member of any class pertaining to any
> Claim subject to arbitration.  Arbitration procedures are generally
> simpler than the rules that apply in court, and discovery is more
> limited.  The arbitrator's authority is limited to Claims between you
> and us alone.  Claims may not be joined or consolidated unless you
> and we agree in writing.  An arbitration award and any judgment
> confirming it only applies to the specific case and cannot be used in
> any other case except to enforce the award.  Other rights you or we
> would have in court may also not be available in arbitration.  The
> arbitrator's decisions are as enforceable as any court order and are
> subject to very limited review by a court.  Except as set forth below,
> the arbitrator's decision will be final and binding.
>
>           \* \* \*
>
> If either party elects to resolve a Claim by arbitration, that Claim
> will be arbitrated on an individual basis.  There is no right or
> authority for any Claims to be arbitrated on a class basis or on bases
> involving Claims brought in a purported representative capacity on
> behalf of the general public, other Merchants or other persons
> similarly situated.

(*Id.* ¶¶ 14–15.)  The CAAs also included "Notice of Claim" provisions requiring merchants who are bound by CAAs to send Amex written notices identifying any damages sought under any "Claims" covered by the CAAs:

> Notice of Claim.   Before a party files a lawsuit or initiates a mediation or arbitration regarding a Claim, it agrees to send a written notice (*Claim notice*) to each party against whom the Claim is asserted.

> * * *

> The Claim notice must describe the nature and basis of the Claim and state the specific amount or other relief demanded.  Notice to us must include your name, your Merchant name, address, and Merchant Number and be sent to our notice address . . . .

(*Id.* ¶ 12.)

### b.  Procedural background

Plaintiffs commenced this action in March of 2016 in the Northern District of California, before District Judge William Alsup.  (Compl.)  On July 15, 2016, Plaintiffs filed an Amended Complaint,[6] (Am. Compl.), which Defendants moved to dismiss.[7]

On September 30, 2016, Judge Alsup granted in part and denied in part the motions to dismiss the Amended Complaint.  *B&R I*, 2016 WL 5725010, at *13.  Judge Alsup dismissed the claims against all Defendants other than Mastercard, Visa, Discover, and Amex.  *Id.* at *6–12.  Judge Alsup also granted Monsieur Marcel and Fine Fare Supermarket's motion to intervene

---

[6]  The Amended Complaint named the following additional Defendants: Bank of America, N.A., Capital One Financial Corporation, Chase Bank USA, National Association, Citibank (South Dakota), N.A., Citibank, N.A., PNC Bank, National Association, U.S. Bank National Association, and Wells Fargo Bank, N.A. (collectively, the "Bank Defendants"), and EMVCo.  (Am. Compl.)

[7]  (Bank Defs.' Mot. to Dismiss, Docket Entry No. 301; Amex, Mastercard, Visa, and EMVCo Mot. to Dismiss, Docket Entry No. 303; Discover Mot. to Dismiss, Docket Entry No. 305.)

against the above-named Defendants, including Amex.[8] *Id*. at *13.  In a separate order, Judge

Alsup severed the claims by B & R Supermarket and Monsieur Marcel against Amex and

transferred them to the United States District Court for the Southern District of New York based

on the forum selection provisions in Amex's CAAs with merchants.  (Order Granting Mot. to

Transfer, Docket Entry No. 282.)

On March 10, 2017, Plaintiffs moved for class certification.  (Pls.' Mot. for Class

Certification, Docket Entry No. 425.)  By Order dated May 4, 2017, Judge Alsup transferred the

case to this Court pursuant to 28 U.S.C. § 1404(a), citing judicial efficiency and Discover's

concerns with regard to potential inconsistent liability theories alleged by putative class members

in this case and the cases consolidated in the multi-district litigation, *In re Payment Card*

*Interchange Fee & Merchant Discount Antitrust Litigation*, No. 05-MD-1720 (E.D.N.Y.),

pending before this Court.  (Order dated May 4, 2017, Docket Entry No. 518.)

By Memorandum and Order dated March 11, 2018, the Court found that Plaintiffs had

satisfied the explicit requirements of Rule 23(a) — numerosity, commonality, typicality, and

adequacy of both class representatives and counsel.  *B&R II*, 2018 WL 1335355, at *7–10.

However, because Plaintiffs had failed to satisfy Rule 23(a)'s implied requirement of

ascertainability, the Court denied Plaintiffs' motion for class certification without prejudice.

*B&R II*, 2018 WL 1335355, at *10–14.

On July 9, 2019, Plaintiffs renewed their motion for class certification, (*see* Pls.'

---

[8]  Fine Fare Supermarket is not a party to a CAA with American Express and does not accept its cards.  (Pls.' Letter dated Oct. 20, 2017, at 2, Docket Entry No. 604.)  Because Judge Alsup transferred B & R Supermarket's and Monsieur Marcel's direct claims against Amex to the Southern District of New York pursuant to the CAAs, Fine Fare Supermarket is the only named Plaintiff with claims against Amex.  However, because Fine Fare Supermarket does not accept American Express and has no agreement with American Express, it seeks only joint and several liability against Amex based on chargebacks by Mastercard, Visa, and Discover.  (*Id.*)

Renewed Mot. for Class Certification, Docket Entry No. 706), and by Memorandum and Order dated August 28, 2020, the Court certified a class consisting of merchants who incurred one or more unreimbursed chargeback(s) between October 1, 2015, through and including September 30, 2017, pursuant to the Fraud Liability Shift for the assessment of Mastercard, Visa, Discover and/or Amex payment card chargebacks, and excluding from the Class members of the judiciary and government entities or agencies, *B&R III*, 2021 WL 234550, at *15, *36.  In September of 2020, Defendants Visa, Mastercard, and Discover petitioned the Second Circuit for permission to appeal the Court's class certification decision pursuant to Rule 23(f) of the Federal Rules of Civil Procedure.  (*See* Copy of 23(f) Pet. for Leave to Appeal, Docket Entry No. 727.)  In January of 2021, the Second Circuit denied the petition in a short order stating that "an immediate appeal is not warranted."  (USCA Mandate, Docket Entry No. 745.)

### i.   Discover's motion to compel arbitration

On October 30, 2020, while the appeal petition was pending before the Second Circuit, Discover served an initial motion to compel arbitration.  (*See* Letter dated Oct. 30, 2020, Docket Entry No. 737.)  In December of 2020, on consent, the parties agreed to stay the briefing on the motion to compel pending the Second Circuit's decision on the appeal petition.  (*See* Letter dated Dec. 2, 2020, Docket Entry No. 738; Order dated Dec. 9, 2020.)

In February of 2021, after the Second Circuit denied the petition, (*see* USCA Mandate), the parties resumed briefing Discover's motion to compel, (*see* Order dated Feb. 22, 2021; Order dated Mar. 26, 2021), and on March 29, 2021, the parties filed the fully briefed motion.  On September 27, 2021, the Court denied Discover's motion to compel as premature because the notice and opt-out period for the Class had not yet expired and "it [was] not yet known which Retained Merchants [would] opt out of the Class and therefore which Retained Merchants

[would] be included in the Class before the Court." *B & R Supermarket, Inc. v. Visa Inc.*, No. 17-CV-2738, 2021 WL 4408167, at *5 (E.D.N.Y. Sept. 27, 2021).

The deadline to opt out of the Class was August 31, 2022.  (Order Granting Unopposed Mot. for Approval of Proposed Class Notice & Notice Plan, Docket Entry No. 775.)  On July 27, 2023, Discover renewed its motion to compel arbitration, identifying 958 Retained Merchants that had not opted out of the Class against whom it seeks to compel arbitration.  (Discover's Mot.; Discover Mem. 2–3.)

### ii.   Amex's motion to compel arbitration and to decertify the Class

In June of 2016, Judge Alsup granted Amex's motion to sever and transfer to the Southern District of New York all claims against Amex by named plaintiffs who were bound by CAAs, but denied without prejudice Amex's motion to compel arbitration of those claims.[9] (Order Granting Mot. to Transfer 3–4.)  In explaining his reason for granting the motion to transfer, Judge Alsup found that Plaintiffs' claims were "Claims" as defined in the CAAs and

---

[9]  To the extent that any plaintiffs had any direct claims against Amex, separate from the conspiracy claims asserted against all four networks, those claims were transferred to the Southern District of New York in July of 2016.  Case Transferred In, *B & R Supermarket, Inc. v. Visa, Inc.*, No. 16-CV-5338 (S.D.N.Y. July 6, 2016), Docket Entry No. 284.  The case was stayed for nearly two years pending proceedings in the Northern District of California, and on February 23, 2018, the parties stipulated to dismissal of the action without prejudice.  Stipulation and Order of Dismissal, *B & R Supermarket*, No. 16-CV-5338 (S.D.N.Y. Feb. 23, 2018), Docket Entry No. 318.

The Class before the Court includes merchants who are not bound by CAAs, and those merchants can continue to pursue their conspiracy claims against all four Defendants, including Amex.  The Class also includes merchants who *are* bound by CAAs and, to the extent that CAA-bound merchants continue to assert any claims against Amex, those claims are considered under Amex's motion to compel arbitration, *infra* section II.c.  Even if CAA-bound merchants' conspiracy claims are sent to arbitration, however, the practical impact on this litigation would be minimal.  CAA-bound merchants can continue pursuing these claims against Visa, Mastercard, and Discover, while the remainder of the Class can pursue these claims against all Defendants, and "[t]he success of the claims by the two groups of Plaintiffs is dependent on the same finding of liability against all Defendants."  *B&R III*, 2021 WL 1335355, at *10.

were therefore governed by the CAAs' forum-selection and choice-of-law provisions.  (*Id.* at 2–3.)

In addition, in the decision granting Plaintiffs' renewed motion for class certification, this Court found that the class was ascertainable as to Amex in large part because of Plaintiffs' argument that all Defendants are jointly and severally liable for the alleged antitrust conspiracy. *B&R III*, 2021 WL 234550, at *18–20.  Specifically, the Court observed that Amex "provided no basis for its claim that 'Plaintiffs who are signatories to the CAA, and whose direct claims against American Express have been transferred to the Southern District of New York, cannot maintain their claims against Mastercard, Visa, and Discover outside of the forum agreed to in the CAA, based on joint and several liability, when Mastercard, Visa, and Discover are not parties to the CAA.'"  *Id.* at *19 (quoting *B&R II*, 2018 WL 1335355, at *9).  The Court further concluded that Amex had not plausibly argued that there was "no objective evidence to identify which merchants have a CAA with" Amex.  *Id.* at *20.

In July of 2023, Amex moved to compel arbitration of the claims against it by class members who are bound by CAAs, and also to decertify the Class as against Amex.  (Amex's Mot.; Amex Mem.)  On April 23, 2024, the Court requested supplemental briefing in light of the Second Circuit's decision in *Local Union 97, International Brotherhood of Electrical Workers v. Niagara Mohawk Power Co.*, 67 F.4th 107 (2d Cir. 2023) (per curiam), which was decided while the parties were briefing the motions to compel arbitration.  (Order dated Apr. 23, 2024.)  On May 7, 2024, Discover, Amex, and Plaintiffs filed their supplemental briefs with the Court.[10]

---

[10]  (Discover's Suppl. Mem. in Supp. of Discover's Mot. ("Discover Suppl. Mem."), Docket Entry No. 930; Amex's Suppl. Mem. in Supp. of Amex's Mot. ("Amex Suppl. Mem."), Docket Entry No. 931; Pls.' Consol. Suppl. Mem. in Opp'n to Defs.' Mots. ("Pls.' Suppl. Mem."), Docket Entry No. 933.)

## II.  Discussion

### a.  Standards of review

#### i.  Arbitration

The Federal Arbitration Act requires courts to compel arbitration of claims that the parties have agreed to arbitrate.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  "Arbitration is a matter of contract and consent," and the Supreme Court has "long held that disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes."  *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1191 (2024).  Thus, "[a]rbitration is 'a way to resolve those disputes — but only those disputes — that the parties have agreed to submit to arbitration.'  Consequently, the first question in any arbitration dispute must be: What have these parties agreed to?"  *Id.* at 1192 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)).  As Justice Ketanji Brown Jackson recently explained, the parties may agree to "send the merits of a dispute to an arbitrator," and, "[a] contest over 'the merits of the dispute' is a first-order disagreement."  *Id.* at 1192–93 (quoting *First Options*, 514 U.S. at 942).  In addition, "[t]he parties may also have a second-order dispute — 'whether they agreed to arbitrate the merits' — as well as a third-order dispute — 'who should have the primary power to decide the second matter.'"  *Id.* (quoting *First Options*, 514 U.S. at 942).  Regarding a third-order dispute, "[t]he question [of] whether the parties have submitted a particular dispute to arbitration, *i.e.*, the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise."  *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 153 (2d Cir. 2021) (second alteration in original) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).  Thus, "courts 'should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.'"  *Henry*

*Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 72 (2019) (quoting *First Options*, 514 U.S. at 944).

"In *Granite Rock*, the Supreme Court clarified 'the proper framework for deciding when disputes are arbitrable.'" *Local Union 97, Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Co.*, 67 F.4th 107, 112 (2d Cir. 2023) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010)). "The Court held that 'a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*.'" *Id.* at 112–13 (quoting *Granite Rock*, 561 U.S. at 297). According to the Second Circuit, "*Granite Rock* stands for the proposition that courts may invoke a presumption of arbitrability only where the parties' dispute concerns a valid and enforceable agreement to arbitrate that is ambiguous as to its scope." *Id.* at 113. Therefore, "[u]nder *Granite Rock*, the presumption of arbitrability is a court's last, rather than first, resort." *Id.* at 114. Because "arbitration is a matter of consent," applying a presumption in favor of arbitration "runs the risk of requiring parties to arbitrate disputes they did not consent to be arbitrated." *Id.*

In deciding a motion to compel arbitration, courts apply a similar standard to that applied to a motion for summary judgment and "draw all reasonable inferences in favor of the non-moving party." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016); *see also Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 833–34 (2d Cir. 2021) (first quoting *Nicosia*, 834 F.3d at 229; and then quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017)). "The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101–02 (2d Cir. 2022). "This burden does not require the moving party to show that the agreement would be enforceable — only that an agreement to arbitrate existed." *Id.* at 102. If

the existence of an agreement to arbitrate is established, the burden shifts to the party "seeking to avoid arbitration . . . [to show] the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000)); *see also Zachman*, 49 F.4th at 102 (quoting *Harrington*, 602 F.3d at 124). In addition, "[a] district court must stay proceedings once it is 'satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.'" *Nicosia*, 834 F.3d at 229 (quoting *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997)); *see also Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015) ("[A] stay of proceedings [is] necessary after all claims have been referred to arbitration and a stay requested.").

### ii. Class decertification

After a class is certified pursuant to Rule 23 of the Federal Rules of Civil Procedure, "a district court may decertify a class if it appears that the requirements of Rule 23 are not in fact met." *Mazzei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016) (quoting *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982)); *see also* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 261–62 (2d Cir. 2021) ("A district court is required to monitor class proceedings and 'reassess [its] class rulings as the case develops.' As a result, district courts have the authority to *sua sponte* decertify a class if they find that the class no longer meets the requirements of Rule 23 at any time before final judgment is entered." (alteration in original) (first quoting *Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999); then citing Fed. R. Civ. P. 23(c)(1)(C); and then citing *Sirota*, 673 F.2d at 572)). In adjudicating any class action, "district courts must ensure that a certified class satisfies Rule 23

throughout the litigation, and possess the authority to alter or decertify the class if that is no

longer the case." *Jin*, 990 F.3d at 262 (first citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147,

160 (1982); and then citing *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502

F.3d 91, 104 n.9 (2d Cir. 2007)).  Because "the results of class proceedings are binding on absent

class members, the district court has the affirmative 'duty of monitoring its class decisions in

light of the evidentiary development of the case.'" *Mazzei*, 829 F.3d at 266 (first citing Fed. R.

Civ. P. 23(c)(3); and then quoting *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983)).

Reevaluating class certification may be appropriate where there is a "significant intervening

event" or there are "compelling reasons" that the Rule 23 requirements are no longer satisfied.

*See, e.g.*, *Doe v. Karadzic*, 192 F.R.D. 133, 136–37 (S.D.N.Y. 2000) (citations omitted).

However, while "an 'intervening event' may often be the impetus for a district court to . . .

decide that the requirements of Rule 23 are no longer met," such an event need not be

"significan[t]," and a court "need only find that a previously satisfied requirement of Rule 23 is

now lacking." *Jin*, 990 F.3d at 262.  In opposing a motion to certify a class, the plaintiff

"retain[s] the burden to demonstrate that the[] requirements [of Rule 23 are] satisfied." *Mazzei*,

829 F.3d at 270 (citing *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 596–600 (2d Cir. 1986));

*Betances v. Fischer*, --- F. Supp. 3d ---, ---, 2023 WL 8699001, at *21 (S.D.N.Y. Dec. 15, 2023)

(quoting *Mazzei*, 829 F.3d at 270).

### b.   The Court denies Discover's motion to compel arbitration

Discover argues that its motion is now ripe and that the Court should "enforce Discover's

arbitration agreements with [the] Retained Merchants according to their terms."  (Discover Mem.

11.)  Discover first argues that their motion is both timely and ripe for resolution.  (*Id.* at 11–13.)

Second, Discover argues that the Retained Merchants "agreed to valid arbitration clauses, which

16

delegate questions of arbitrability to the arbitrator." (*Id.* at 11.)  In support, Discover contends

that their MSAs "incorporate [Discover's] Operating Regulations," which make the Operating

Regulations "part and parcel of the agreement under controlling Delaware law." (*Id.* at 13

(citing *State v. Black*, 46 Del. 295, 299 (Super. Ct. 1951)).)  Discover argues that "[t]he

Operating Regulations were expressly incorporated into the Retained Merchants' agreements,"

and that "[b]y the terms of the MSAs, Retained Merchants agreed to be bound by the arbitration

provision" in the Operating Regulations.  (*Id.* at 13–14.)  Discover further argues that "[t]he

parties have expressed their intent to send all issues to arbitration, including the question of

arbitrability," because the "Operating Regulations provide that all Disagreements 'shall be

resolved by binding arbitration administered by the [American Arbitration Association ("AAA")]

under its Commercial Arbitration Rules.'"  (*Id.* at 15–16 (ellipses omitted) (citing Operating

Regs. § 17.14.3).)  Discover thus contends that the parties "indicated clearly and unmistakably

that arbitrability issues must be decided in arbitration" because they agreed to be bound by the

AAA rules.  (*Id.* at 16; *see also id.* at 17 ("[W]hen, as here, parties explicitly incorporate rules

that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and

unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." (quoting

*Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005)).)  Third, Discover argues in

the alternative that even if the Court "were to decide the issue of . . . arbitrability, the breadth of

the arbitration clause unquestionably covers the class claims asserted by the Retained Merchants

in this case."  (*Id.* at 18.)  Discover contends that the arbitration provision covers "any dispute,

claim or controversy of any kind of nature" "*arising out of or related to* [the Retained

Merchants'] Agreement[s] or these Operating Regulations," and that Plaintiffs "directly

challenge [Discover's] rules as being the result of a four-network conspiracy."  (*Id.* at 18–19

(first quoting Operating Regs. § 17.14.1; and then citing Am. Compl. ¶ 73).)  Finally, Discover

argues that if there is any doubt as to the scope of the arbitration provision, "federal policy

dictates that [it] 'should be resolved in favor of arbitration.'"  (*Id.* at 20 (quoting *In re Currency*

*Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 400 (S.D.N.Y. 2003)).)

　　　　Plaintiffs argue that the Court should deny Discover's motion because "[t]he text of

Discover's arbitration clause, and the attendant regulations and definitions, make clear that

[their] claim[s] . . . fall[] outside the scope of Discover's arbitration provisions."  (Pls.' Discover

Opp'n 1.)  Specifically, Plaintiffs argue that the "chargebacks at issue in this case are explicitly

excluded from the reach of the arbitration clause."  (*Id.* at 4.)  In support, Plaintiffs quote the

operative paragraph from Discover's Operating Regulations and contend that their claims fall

within a specified exception to the arbitration provision because "Discover's rules . . . carve out

litigation related to chargebacks from arbitration."  (*Id.* at 5.)  As Plaintiffs explain:

> First, Discover's rules provide that "Disagreements" must be
> arbitrated.   In turn, Discover defines "Disagreement" to include
> "Any dispute, claim or controversy of any kind of nature between [a
> merchant] and [Discover] . . . *but not including . . . claims relating*
> *to . . . Chargebacks . . . .*

(*Id.* at 5–6 (emphasis in original).)  Plaintiffs argue "Discover is precluded from forcing its

merchants to arbitrate these claims," because "[t]he chargebacks imposed on merchants in the

class constitute the mechanism by which Defendants . . . violated antitrust laws, and thus form

the substantive basis for the Retained Merchants' claims against Discover."  (*Id.* at 6.)  In

addition, Plaintiffs argue that the "effective vindication" doctrine prohibits enforcement of the

arbitration provision.  (*Id.* at 9–11.)

　　　　The Court concludes that Plaintiffs' claims fall within the exception to the arbitration

provision in the Operating Regulations for two reasons: First, the Court finds that the parties did

not agree to arbitrate arbitrability with respect to this question (*i.e.*, whether Plaintiffs' claims are

covered by the arbitration provision of the Operating Regulations); and, second, the Court finds that Plaintiffs' claims are "claims relating to . . . Chargebacks," and thus outside the scope of the arbitration provision.  Because arbitration "is a matter of contract and consent," this result ensures that the Court sends to arbitration "only those disputes . . . that the parties have agreed to submit to arbitration."  *Coinbase*, 144 S. Ct. at 1191–92 (quoting *First Options*, 514 U.S. at 943).

### i. There is no "clear and unmistakable evidence" of intent to arbitrate arbitrability

"[T]he first question in any arbitration dispute must be: What have these parties agreed to?"  *Id.* at 1192.  Accordingly, the Court starts with the text of the Operating Regulations.[11] Section 17.14 of the Operating Regulations sets forth procedures for the "Resolution of Disagreements."  (Operating Regs. § 17.14.)  First, section 17.14 applies only to "Disagreements" as defined in the Glossary of the Operating Regulations.  (*See* Operating Regs. § 17.14.1 ("All Disagreements . . . shall be resolved in accordance with the procedures set forth in this Section 17.14.").)  Second, if the parties "are not successful in resolving the Disagreement [through mediation], the Disagreement shall be resolved through mandatory, final, and binding arbitration by giving written notice . . . within sixty (60) days after the termination or conclusion of mediation."[12]  (*Id.* § 17.14.3.)  Section 17.14.3 sets forth the rules governing arbitration.  (*See id.*)

Section 17.14 applies only to "Disagreements" as defined in the Glossary to the Operating Regulations:

---

[11]  Plaintiffs do not dispute that they are bound by the Operating Regulations as incorporated in their MSAs.  In addition, Plaintiffs do not dispute that Discover's motion is now timely and ripe for resolution.

[12]  Prior to binding arbitration, Section 17.14.1 provides that, "[t]o the extent any Disagreement cannot be resolved by discussions between the [appropriate personnel], such

> Any dispute, claim, or controversy of any kind or nature between you (or any Person connected with you) and us (or any Person connected with us, including our Affiliates, employees, Agents, contractors, or service providers) arising out of or related to our relationship, the Agreement, any of the Program Documents, or respective obligations of the transactions contemplated hereby or thereby, including disputes as to the advertising, marketing, or promotion relating to, or the creation, validity, interpretation, breach, or termination of our relationship, the Agreement or the other Program Documents, *but not including Disputes or claims relating to Card Transactions, including Chargebacks, representment of Chargebacks, and arbitration of Card Transaction disputes*. Any Disagreement, regardless of whether it arose before, at the same time as, or after the date of the Agreement, shall be resolved as set forth in the Dispute Rules in effect at the time of the initiation of the procedures set forth in Section 17.14 of these Operating Regulations.

(*Id.* § 18 (emphasis added).)

Contrary to Discover's argument that an arbitrator should decide whether Plaintiffs' claims are arbitrable (*i.e.*, whether they are "Disagreements"), the Court concludes that Discover has failed to show "clear and unmistakable evidence" of an agreement to arbitrate arbitrability. *See Henry Schein*, 586 U.S. at 72 ("[C]ourts 'should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.'" (quoting

---

Disagreement shall be referred to senior executives . . . [who] shall use good faith efforts to resolve the Disagreement . . . ." (Operating Regs. § 17.14.1.)  Next, if the "senior executives are unable to reach an agreement to resolve [the] Disagreement . . . the Disagreement shall be submitted to mandatory mediation."  (*Id.* § 17.14.2.)  Section 17.14.2 sets forth the rules governing mediation.  (*See id.*)  Although the Court finds that Plaintiffs' claims fall within an exception to the term "Disagreement" as defined in the Operating Regulations and thus declines to compel arbitration on that basis, the Court further notes that Discover has not satisfied a necessary antecedent condition to compelling arbitration of Plaintiffs' claims.  Because "arbitration is a matter of contract," "courts must 'rigorously enforce' arbitration agreements according to their terms."  *Am Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).  Discover's Operating Regulations provide that the parties may only resort to arbitration "by giving written notice . . . within sixty (60) days after the termination or conclusion of mediation."  (Operating Regs. § 17.14.3.)  Thus, in the absence of evidence that Discover sought to resolve Plaintiffs' claims through mediation, the Court cannot say that Plaintiffs' claims are ripe for arbitration pursuant to the terms of the parties' agreement.

*First Options*, 514 U.S. at 944)).  Similarly, the Court does not agree with Discover's argument that the Operating Regulations' incorporation of the AAA rules serves as the "clear and unmistakable evidence" necessary to permit an arbitrator to decide arbitrability, (Discover Mem. 17 (quoting *Contec*, 398 F.3d at 208)), because, as the Second Circuit has explained, incorporation of rules permitting an arbitrator to decide arbitrability is insufficient when there are doubts as to the scope of the arbitration provision's applicability to the instant dispute, *see DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318–19 (2d Cir. 2021).  In *DDK Hotels*, the Second Circuit held that "[i]ncorporation of such rules into an arbitration agreement does not, *per se*, demonstrate clear and unmistakable evidence of the parties' intent to delegate threshold questions of arbitrability to the arbitrator where other aspects of the contract create ambiguity as to the parties' intent."  *Id.* at 318.  Where an arbitration agreement "contains exclusionary language suggesting that the parties consented to arbitrate only a limited subset of disputes, incorporation of rules that empower an arbitrator to decide issues of arbitrability, standing alone, does not suffice to establish the requisite clear and unmistakable inference of intent to arbitrate arbitrability."  *Id.* at 319.  Discover's Operating Regulations, like the agreement at issue in *DDK Hotels*, exempts certain disputes from arbitration.  Thus, incorporation of the AAA rules into the Operating Regulations, without more, is insufficient to establish "clear and unmistakable evidence" of intent to permit an arbitrator to determine arbitrability.  *See id.*; *see also NASDAQ OMX Grp. v. UBS Sec., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014) (finding no "clear and unmistakable" evidence "where a broad arbitration clause [was] subject to a qualifying provision that at least arguably cover[ed] the present dispute").  Accordingly, the Court cannot say that "clear and unmistakable evidence" exists that the parties intended an arbitrator to decide whether Plaintiffs' claims are "Disagreements," because Discover has not offered any additional evidence

of the parties' intent to submit *this* dispute to arbitration.

### ii. Plaintiffs' claims do not fall within the scope of the arbitration provision

In the absence of clear and unmistakable evidence that the parties intended to delegate the threshold question of arbitrability to an arbitrator, the Court must decide whether Plaintiffs' claims fall within the scope of the arbitration provision. *See Coinbase*, 144 S. Ct. at 1191 ("[D]isputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes."); *Local Union 97*, 67 F.4th at 112–13 ("[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." (quoting *Granite Rock*, 561 U.S. at 297)). First, Plaintiffs' claims fall within the scope of the initial clause of the definition of a "Disagreement," because Plaintiffs' claims constitute a "dispute, claim, or controversy of any kind or nature." (Operating Regs. § 18.) Thus, the only question is whether an exception or exclusion applies to Plaintiffs' claims.

The definition of Disagreement specifies that "Disputes or claims relating to Card Transactions, including Chargebacks, representment of Chargebacks, and arbitration of Card Transaction disputes" are exempted from arbitration. (*Id.*) The Court agrees with Plaintiffs that their claims constitute "claims relating to . . . Chargebacks." Contrary to Discover's contention that this exception applies only to "Disputes" between cardholders and merchants that Discover mediates as a neutral third-party,[13] the Court finds that the clause also exempts "claims relating to . . . Chargebacks" from arbitration. For example, the term "claims" is used twice in the definition of "Disagreement": first in the general clause ("Any dispute, claim, or controversy of any kind or nature"), and second in the exceptions clause ("but not including Disputes or claims

---

[13] (*See* Discover Mem. 20 n.11 (contending that the exceptions clause applies to "disputes between a merchant and a cardholder, where Discover is acting as a mediator pursuant to the Dispute Rules").)

relating to . . . Chargebacks."). (*Id.*) Discover has not provided any credible evidence from which the Court could conclude that the meaning of "claims" in the exceptions clause is different from its meaning in the general clause. Plaintiffs' claims are thus "claims" for purposes of both the general clause and the exceptions clause.

Finally, the Court is unpersuaded by Discover's arguments that Plaintiffs' claims do not relate to chargebacks. Discover argues that Plaintiffs' claims "fall squarely within the arbitration clause [because] chargebacks are the alleged damages in this case, not the claim." (Discover Mem. 19.) However, the question is whether Plaintiffs' claims "relat[e] to . . . Chargebacks," (Operating Regs. § 18), and Plaintiffs' Amended Complaint makes clear that their claims relate to chargebacks, even though they allege a conspiracy with respect to Defendants' Fraud Liability Shift policies, (*see* Am. Compl. ¶¶ 2–9).

Accordingly, the Court finds that Plaintiffs' claims do not fall within the scope of the arbitration provision and thus denies Discover's motion to compel arbitration.

### c.   The Court grants Amex's motion to compel arbitration

Amex makes several arguments in support of its motion to compel arbitration. First, Amex contends that it has sufficiently established the existence of an arbitration agreement. In support, Amex argues that it has identified the merchants bound by the CAAs' arbitration provision because it has submitted declarations showing that "acceptance of Amex cards constitutes acceptance of the CAA." (Amex Reply 2.) Amex further argues that the CAAs are themselves the source of Plaintiffs' claims in this case because the CAAs are what require merchants accepting Amex cards to bear the cost of chargebacks, and that Plaintiffs "cannot simultaneously assert that they entered the CAA for purposes of their damages and deny that they entered the CAA for purposes of arbitration." (*Id.*) Second, Amex argues that the CAAs

23

apply to Plaintiffs' claims. (Amex Mem. 11–12.) In support, Amex argues that Judge Alsup already determined that Plaintiffs' claims are "Claims" subject to arbitration, as defined by the CAAs, and that this Court should therefore grant Amex's motion as having been already decided "under the law of the case doctrine." (*Id.* at 11–12.) In the alternative, Amex argues that the Court should find that Plaintiffs' claims are "Claims" subject to arbitration. (*Id.* at 12–13.) Amex notes that the CAAs define "Claims" as "any claim . . . between [a merchant] and [Amex] arising from or relating to the Agreement or prior Card acceptance agreements, or the relationship resulting therefrom, whether based in . . . in statutes, regulations, or any other theory." (*Id.* at 12.) Amex argues that Plaintiffs' claims against Amex are "of course" claims between merchants and Amex, "and that does not change merely because the [claims] . . . are based on a theory of joint and several liability." (*Id.*) Third, Amex argues that the arbitration provisions in the CAAs are valid. (*Id.* at 10–11.) In support, Amex notes that the Supreme Court, in *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 231 (2013), already held this same provision to be valid and applied it to Section 1 claims against Amex. (*Id.*) Amex also argues that the CAAs are neither substantively nor procedurally unconscionable. (*Id.*)

Plaintiffs first argue that Amex has failed to meet its initial burden of showing that a valid arbitration agreement exists. (Pls.' Amex Opp'n 5–9.) In support, Plaintiffs contend that Amex fails to "affirmatively identify for the Court which specific merchants it seeks to compel to arbitration, like Discover did." (*Id.* at 5.) Plaintiffs contend that by failing to identify which merchants have arbitration agreements with Amex, Amex is preventing the Court from "answering 'the threshold question' of 'whether the parties have indeed agreed to arbitrate.'" (*Id.* at 6 (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012)).) Plaintiffs

argue that all the cases relied on by Amex to justify its failure to name the class members with whom it has arbitration agreements are inapposite, because in those cases, the class members were either identified, or the deciding court had previously found that *all* class members had materially identical arbitration agreements.  (*Id.* at 6–9.)  Second, Plaintiffs argue that even if Amex had identified the class members bound by CAAs, the CAAs themselves are substantively and procedurally unconscionable.  (*Id.* at 10–11.)  In support, Plaintiffs point to the arguments made before Judge Alsup in opposition to Amex's motion for transfer of venue and to compel arbitration.  (*Id.* (citing Pls.' Transfer Opp'n 7–11).)  There, Plaintiffs argued first that the CAAs were procedurally unconscionable because of their "take-it-or-leave" nature, under which merchants were "faced with the Hobson's choice of either agreeing to arbitrate or giv[ing] up accepting Amex."  (Pls.' Transfer Opp'n at 8.)  Plaintiffs also argued that the CAA was substantively unconscionable because it (1) "impermissibly waives Plaintiffs' substantive rights under the Sherman Act, Clayton Act, and California's Cartwright Act" by requiring the application of New York law, and (2) "grants discovery only if a claim is for more than $100,000."  (*Id.* at 8–11.)

### i.   Amex has established the existence of an arbitration agreement

Amex has met its "initial burden of demonstrating that an agreement to arbitrate was made."  *Zachman*, 49 F.4th at 101–02.  In support of its motion, Amex "attached every operative version of the CAA applicable in this case and showed that the CAA has always contained an arbitration provision whose terms cover Plaintiffs' claims in this case."  (Amex Reply 2 (citing Nanda Decl. ¶¶ 9, 11, 14–15)); *see also Hastings v. Nifty Gateway, LLC*, --- F. Supp. 3d ---, ---, 2024 WL 1175196, at *3 (S.D.N.Y. Mar. 19, 2024) (observing that the burden to show the existence of an arbitration agreement "may be satisfied by the actual production of the arbitration

agreement" (quoting *Roller v. Centronics Corp.*, No. 87-CV-5715, 1989 WL 71200, at *2 (S.D.N.Y. June 22, 1989)).  The CAAs clearly state that "[b]y accepting the American Express Card, you agree to be bound by the [CAA]," and further specified that they constituted "the complete and exclusive expression" of any agreements between the merchants and Amex regarding card product acceptance.  (Nanda Decl. ¶¶ 9–10.)  Amex also submitted evidence of the office procedures through which Amex ensured that "all U.S. proprietary merchants who are subject to the standard Card Acceptance Agreement" received updated versions of the standard agreement annually.  (*Id.* ¶¶ 4–8); *see also Hastings*, 2024 WL 1175196, at *4 ("[C]ourts routinely rely on affidavits and declarations . . . describing and depicting how the affected individual manifested assent to the company's arbitration provision." (quoting *Mancilla v. ABM Indus., Inc.*, No. 20-CV-1330, 2020 WL 4432122, at *6 (S.D.N.Y. July 29, 2020))).

Plaintiffs do not appear to dispute that class members who accept Amex cards are parties to the CAAs, because the CAAs' chargeback provisions are the source of Plaintiffs' antitrust claims against Amex.  (*See* Nanda Decl. ¶¶ 16–17 (specifying that "[a]ll standard Card Acceptance Agreements since 2014 have contained a provision empowering American Express to exercise its operative chargeback rights against merchants").)  Plaintiffs claim only that by failing to specify which merchants are parties to the CAAs, Amex has failed to meet its initial burden to demonstrate the existence of an arbitration agreement.  (*See* Pls.' Amex Opp'n 5–9.) Plaintiffs, however, make conflicting arguments in support of their motion.  Plaintiffs concede that certain class members were parties to the CAAs for the purpose of alleging that Amex implemented the Fraud Liability Shift and therefore played a role in the alleged antitrust

violations at issue in this case,[14] but also simultaneously argue that the CAAs have not sufficiently been shown to "exist" for arbitration purposes simply because Amex never named the class members bound by the CAAs — both of these arguments cannot be true. At least one court has noted under similar circumstances, "[i]t would be inconsistent for Plaintiffs to rest on these contracts as a basis for their claims while also asserting that there are no contracts at all." *In re Checking Acct. Overdraft Litig.*, No. 09-MD-2036, 2019 WL 6838631, at *7 (S.D. Fla. Sept. 26, 2019), *aff'd*, 856 F. App'x 238 (11th Cir. 2021).[15]

In addition, Plaintiffs fail to cite any authority that requires a movant seeking to compel arbitration to identify and name every entity bound by the arbitration agreement, when the movant has adequately demonstrated the existence of the agreement and articulated to whom it applies. Plaintiffs cite cases in which a party seeking arbitration named the entities bound by the arbitration agreement, (Pls.' Amex Opp'n 6–7 (first citing Decl. of Chika Kim, *In re Am. Express Anti-Steering Rules Antitrust Litig.*, No. 11-MD-2221 (E.D.N.Y. Mar. 15, 2019), Docket Entry

---

[14]   (*See, e.g.*, Am. Compl. ¶ 238 (defining class members as "merchants who have been unlawfully subjected to the so-called Liability Shift for the assessment of Mastercard, Visa, Discover and/or American Express credit and charge card chargebacks").) The only way class members could have been subjected to the Fraud Liability Shift is if they were bound by the CAAs. (*See* Nanda Decl. ¶¶ 16–17.)

[15]   Plaintiffs argue that the district court's finding in *In re Checking Account Overdraft Litigation*, No. 09-MD-2036, 2019 WL 6838631 (S.D. Fla. Sept. 26, 2019), weighs in favor of their argument that Amex failed to meet its initial burden. (Pls.' Amex Opp'n 8–9.) In support, Plaintiffs argue that the court in that case found the arbitration clause valid only because at the class certification stage, the court had "already found . . . that *all* members of the plaintiff classes are subject to 'common and materially uniform' contracts" with arbitration clauses. (*Id.* (emphasis by Plaintiffs) (quoting *In re Checking Acct.*, 2019 WL 6838631, at *3).) Plaintiffs seem to imply that the fact that "all" class members were bound was key to the court's finding that an arbitration agreement existed, but the Court disagrees with this reading. Rather, this case presents another example of a case in which the production of the agreements, along with "[p]laintiffs' urging" that they were party to the agreements for the sake of establishing their claims, was sufficient to establish the existence of arbitration agreements. *In re Checking Acct.*, 2019 WL 6838631, at *3.

No. 877 ("*In re Amex* Kim Decl."); and then citing *O'Connor v. Uber Techs., Inc.*, 150 F. Supp. 3d 1095 (N.D. Cal. 2015))), but these cases do not stand for the proposition that Amex *must* have similarly named all the bound parties.  Rather, as Amex argues, while some movants seeking to compel arbitration have identified specific parties to the arbitration agreement at issue, other movants were found to have met their initial burden through production of the arbitration agreement, as Amex has done in this case.  (*See* Amex Reply 3.)  For example, in *In re American Express Anti-Steering Rules Antitrust Litigation*, Judge Nicholas G. Garaufis granted Amex's motion to compel arbitration based on the same arbitration clause in the CAAs currently at issue, and he did so without requiring that Amex identify each and every member of the putative class bound by the CAAs.  *See* 433 F. Supp. 3d 395, 407 (E.D.N.Y. 2020); Mem. in Supp. of Mot. to Compel Arbitration, *In re Am. Express*, No. 11-MD-2221 (E.D.N.Y. Mar. 15, 2019), Docket Entry No. 876.  Although the class plaintiffs in that case included CAA-bound merchants in one subclass and merchants not bound by the CAAs in another subclass, Judge Garaufis did not require any proof of the existence of the arbitration agreement as to all members of the CAA-bound subclass beyond that offered by Amex in this case.[16]  *In re Am. Express*, 433 F. Supp. 3d

---

[16]  Plaintiffs correctly observe that in support of Amex's motion to compel arbitration in *In re American Express*, Amex submitted a declaration affirming that the named plaintiffs in the CAA-bound subclass were bound by the CAAs.  (Pls.' Amex Opp'n 6–7 (citing *In re Amex* Kim Decl.).)  The Court notes, however, that in that case, Amex merely accepted the named plaintiffs' allegations that they were Amex-accepting merchants, listed those named plaintiffs in a declaration in support of the motion to compel arbitration, and attached copies of the CAAs as exhibits to that declaration.  *See In re Amex* Kim Decl. ¶¶ 9–19.  This is essentially what Amex now provides in support of its motion to compel arbitration of CAA-bound merchants in this case.  (*See* Nanda Decl.)  Moreover, Judge Garaufis granted Amex's motion to compel arbitration as to the entire CAA-bound subclass — not just as to the named plaintiffs identified by Amex in support of its motion.  *See In re Am. Express*, 433 F. Supp. 3d at 407 ("The court therefore grants Amex's motion to compel arbitration of the Amex Class's claims.").  Accordingly, the Court does not read the decision in *In re American Express* as supporting

at 406–07.  Accordingly, the Court concludes that Amex has met its "initial burden of demonstrating that an agreement to arbitrate was made."  *See Zachman*, 49 F.4th at 101–02.

### ii.  The agreement is valid and applies to Plaintiffs' claims

Because Amex has met its initial burden to show the existence of an arbitration agreement, the burden shifts to Plaintiffs to "show[] the agreement to be inapplicable or invalid." *See Zachman*, 49 F.4th at 102 (alteration in original) (quoting *Harrington*, 602 F.3d at 124).

### 1.  The CAAs apply to Plaintiffs' claims

The Court agrees with Judge Alsup's earlier ruling that the CAAs apply to claims by CAA-bound class members.  (*See* Order Granting Mot. to Transfer 2–3 (holding that forum-selection and choice-of-law provisions of the CAAs applied to Plaintiffs' claims because they met the definition of "Claim" in the CAAs).)  Plaintiffs do not appear to contest this ruling, arguing instead that the CAAs' arbitration provision is unconscionable.  The Court therefore adheres to the law of the case.  *See Musacchio v. United States*, 577 U.S. 237, 245 (2016) ("The law-of-the-case doctrine generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" (quoting *Pepper v. United States*, 562 U.S. 476, 506 (2011))).

### 2.  The CAAs are valid

The Court concludes that the CAAs are valid and neither procedurally nor substantively unconscionable.[17]  Arbitration agreements, like any contract, can be rendered invalid and

---

Plaintiffs' argument that Amex must identify all CAA-bound merchants in order to establish the existence of an arbitration agreement.

[17]  As noted earlier, Amex argues that the Supreme Court's decision in *Italian Colors* governs this dispute, and that this Court should find the CAAs valid and enforceable based on that ruling alone.  (Amex Mem. 10.)  The Court declines to read *Italian Colors* so broadly.  The Supreme Court found the CAAs valid and enforceable in the face of challenges under the Federal

unenforceable if found to be either procedurally or substantively unconscionable.  9 U.S.C. § 2 ("A written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ."); *see, e.g.*, *Am. Fam. Life Assurance Co. of N.Y. v. Baker*, 778 F. App'x 24, 26–28 (2d Cir. 2019) (assessing substantive and procedural unconscionability of arbitration agreement); *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) ("[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996))).  Plaintiffs have failed to establish that any aspect of the CAAs' arbitration provision renders it so unconscionable as to be unenforceable.

First, the arbitration provision is not rendered procedurally unconscionable by the fact that it is distributed to merchants on a take-it-or-leave-it basis.  (*See* Pls.' Transfer Opp'n 8.)  As Amex argues, arbitration agreements are often distributed on such a basis, *see Concepcion*, 563 U.S. at 346–47 ("[T]he times in which consumer contracts were anything other than adhesive are long past."), and this fact alone is not enough to render the arbitration provision procedurally unreasonable under New York law, *see Ragone*, 595 F.3d at 122 ("[Plaintiff] argues that the undisputed fact that she was offered the arbitration agreement 'on a "take it or leave it" basis'

---

Arbitration Act that the CAAs barred "effective vindication" of the plaintiffs' Section 1 rights under the Sherman Act.  *Italian Colors*, 570 U.S. at 235–37.  The plaintiffs there argued that the CAAs eliminated their ability to bring their Section 1 claims on a class wide basis, and that they had "no economic incentive to pursue their antitrust claims individually in arbitration."  *Id.* at 235.  The Supreme Court found that these arguments did not render the CAAs invalid or unenforceable.  *Id.* at 236.  These are not the arguments currently before the Court, and there is no basis to read *Italian Colors* to mean that the CAAs are immune from all future challenges to their validity.

renders it unenforceable.  But it is plain that 'this is not sufficient under New York law to render the [arbitration] provision procedurally unconscionable.'" (second alteration in original) (quoting *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009))).

Second, contrary to Plaintiffs' argument, the CAAs' requirement that New York law govern this dispute does not prevent Plaintiffs from pursuing their statutory remedies under the federal Sherman Act and Clayton Act, because the Supreme Court has already held, in assessing a different challenge to the CAAs, that the agreements do not eliminate a merchant's "right to pursue their statutory remedy" under federal antitrust law.  *See Italian Colors*, 570 U.S. at 236; (Pls.' Transfer Opp'n 9–10).  Plaintiffs cite cases recognizing that federal courts have exclusive jurisdiction over federal antitrust claims, but none of these cases hold or even suggest that a choice-of-law provision can somehow constitute a waiver of federal statutory claims.  (Pls.' Transfer Opp'n 9–10.)  The choice-of-law provision therefore does not render the CAAs substantively unconscionable.

Finally, Plaintiffs' argument that the arbitration provision is substantively unconscionable because it limits their ability to take discovery has no legal support.  (*See id.* at 10–11.)  The discovery rules Plaintiffs complain about are those from the AAA and from Judicial Arbitration and Mediation Services, Inc. ("JAMS"), incorporated by reference into the CAAs.  (*See, e.g.*, American Express Card Acceptance Agreement for 2022, section 7.c, annexed to Nanda Decl. as Ex. I, Docket Entry No. 869-9.)  These rules apply equally to Amex and to merchants bound by the CAAs.  (*Id.*)  Under such circumstances, the Court finds no basis to conclude that the arbitration provision is substantively unconscionable simply for incorporating AAA or JAMS discovery rules that govern most arbitrations, and Plaintiffs offer no authority that warrants such a conclusion.  *See, e.g.*, *Cunningham v. CVS Health Corp.*, No. 23-CV-1328, 2024 WL 2867303,

at \*10 (S.D.N.Y. June 4, 2024) (finding that an arbitration agreement's incorporation of AAA rules limiting discovery, equally applicable to both parties, did not render agreement substantively unconscionable).  Accordingly, the CAAs' arbitration provisions are not unconscionable for any of the reasons argued by Plaintiffs, and the Court concludes that they are valid and enforceable.

For the foregoing reasons, the Court grants Amex's motion to compel arbitration of the claims against it by class members who are bound by CAAs.

### d.  The Court denies Amex's motion to decertify the class

Amex argues that "[o]nce the Court compels arbitration of the claims against Amex brought by CAA-bound class members, it is clear that all of Plaintiffs' class claims against Amex (and only Amex) must be decertified under Rule 23's predominance requirement."  (Amex Mem. 13.)  In support, Amex argues that "in order for Plaintiffs to maintain class claims against Amex, common questions must predominate over individual questions in adjudicating the claims against Amex," but that if "CAA-bound class members are compelled to arbitration," then the predominance requirement would no longer be met.  (*Id.* at 14 (emphasis omitted).)  First, Amex contends that once the CAA-bound merchants are compelled to arbitrate, the Court "cannot adjudicate liability or damages as to Amex without an individualized inquiry into whether class members are bound to a CAA."  (*Id.*)  Second, Amex argues that such inquiries would be required because although "Plaintiffs have alleged that Defendants committed antitrust violations involving detrimental chargebacks imposed on class-member merchants who were parties to the CAA, as well as class-member merchants who were not," "[o]nly chargebacks imposed on the latter group . . . can potentially yield liability against Amex at trial."  (*Id.* at 15–16.)  Third, Amex argues that under such circumstances, Plaintiffs' evidence must measure damages

attributable only to those chargebacks, rather than measuring damages attributable to all chargebacks.  (*See id.* (citing *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)).)  Amex contends that Plaintiffs have erroneously lumped all damages together, resulting in damages sums that are "incurably inflated by chargebacks that, pursuant to the motion to compel, cannot yield liability against Amex."  (*Id.* at 16.)

Plaintiffs argue that Amex has identified "no compelling reason" to revisit the Court's certification decision, especially when the Second Circuit has recognized decertification as an "extreme step."  (Pls.' Amex Opp'n 11–12 (quoting *Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir. 1984)).)  Plaintiffs contend that although Amex argues that common issues no longer predominate over individual inquiries as to the claims against Amex, Amex fails to explain how this result follows from the arbitration agreement.  (*Id.* at 12–13.)  In support, Plaintiffs cite various cases showing that even if individual, case-by-case review of arbitrability is required, class certification need not be impacted.  (*Id.* at 13.)  Plaintiffs also argue that Amex raises the same arguments previously raised against class certification — namely, that Plaintiffs have not adequately distinguished between claims by CAA-bound merchants and claims by remaining merchants.  (*Id.* at 14.)  Plaintiffs argue that the Court already determined that these arguments do not bar certification, and that the Court should again reject these arguments, including Amex's reliance on the Supreme Court's decision in *Comcast*.  (*Id.* at 14–15.)  Accordingly, Plaintiffs argue that Amex has failed to meet the "heavy burden to prove the necessity of . . . the drastic step of decertification."[18]  (*Id.* at 11 (quoting *Gordon v. Hunt*, 117 F.R.D. 58, 61 (S.D.N.Y. 1987)).)

---

[18]  Some district courts in this Circuit have held that a party moving for decertification of a class bears "a heavy burden to prove the necessity of either the drastic step of decertification or

Rule 23(b)(3)'s predominance requirement "demands that common questions of law or fact predominate over individual questions that pertain only to certain class members." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 75, 85 (2d Cir. 2023). "The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). According to the Supreme Court:

> This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common

_____

the less draconian but still serious step of limiting the scope of the class." *Mazzei v. Money Store*, 308 F.R.D. 92, 106 (S.D.N.Y. 2015) (quoting *Gordon v. Hunt*, 117 F.R.D. 58, 61 (S.D.N.Y. 1987)), *aff'd*, 829 F.3d 260 (2d Cir. 2016). Others have observed that a court "may not disturb its prior findings absent some significant intervening event or a showing of compelling reasons to reexamine the question." *See, e.g.*, *Gulino v. Bd. of Educ.*, 907 F. Supp. 2d 492, 504 (S.D.N.Y. 2012), *aff'd*, 555 F. App'x 37 (2d Cir. 2014). Thus, the parties dispute whether Amex has adequately demonstrated the existence of such a "significant intervening event" that warrants decertification, and also whether such a showing is even required in order for the Court to grant decertification. (*See* Pls.' Amex Opp'n 11–12; Amex Reply 5.)

Notwithstanding the above cases suggesting that decertification requires some "significant intervening event," the Second Circuit has never endorsed such a high bar for reconsidering certification of a class, nor has it endorsed a "heavy burden" on the part of the moving party. Rather, more recent case law from the Second Circuit examining the standard for decertification has held that the only necessary consideration is whether "a previously satisfied requirement of Rule 23 is now lacking." *See Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 262 (2d Cir. 2021) (citing *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982)). Other considerations — such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," *Gulino*, 907 F. Supp. 2d at 504 (quoting *Doe v. Karadzic*, 192 F.R.D. 133, 136–37 (S.D.N.Y. 2000)), are merely factors for a district court to evaluate in reaching its decision on a motion for decertification. *See Jin*, 990 F.3d at 262 ("Although an 'intervening event' may often be the impetus for a district court to *sua sponte* decide that the requirements of Rule 23 are no longer met, the metric by which a district court may properly decertify is not whether such an 'intervening event' crosses a threshold of 'significance.' Instead, the district court need only find that a previously satisfied requirement of Rule 23 is now lacking."). Regardless, to the extent a showing of some "intervening event" is necessary, the requirement is adequately met by the fact that the Court grants Amex's motion to compel arbitration. Accordingly, the only remaining question is whether "a previously satisfied requirement of Rule 23 is now lacking." *See id.* (citing *Sirota*, 673 F.2d at 572)

> question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."

*Id.* (alteration in original) (quoting 2 William B. Rubenstein, Newberg on Class Actions § 4:50, at 196–97 (5th ed. 2012)).

"The predominance requirement is satisfied if 'resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof,' and 'these particular issues are more substantial than the issues subject only to individualized proof.'" *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 97 (2d Cir. 2018) (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)). Typically, common issues predominate when liability is determinable on a class-wide basis, even when class members have individualized damages. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001), *abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006); *see also Tyson Foods*, 577 U.S. at 453–54 ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" (quoting 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1778, at 123–24 (3d ed. 2005))).

The Court concludes that compelling arbitration of the individual claims of CAA-bound class members does not affect the analysis governing the Court's initial grant of class certification against Amex, and decertification is therefore unwarranted. First, in assessing whether the predominance requirement had been met such that the class could be certified, the Court was fully aware of the dispute over whether it would be possible "to identify which merchants have a CAA with" Amex, *B&R III*, 2021 WL 234550, at *18–20, and extensively

35

analyzed whether the predominance requirement had been met as to injury-in-fact, causation, and damages, *see id.* at *20–22. The Court concluded that common questions concerning all three issues predominated over individual issues, and this remains true despite the Court's ruling on Amex's motion to compel arbitration.

Second, Amex's argument that Plaintiffs' damages methodology is no longer consistent with their liability case is unpersuasive. Amex complains that Plaintiffs' expert, Dr. Micah Officer, calculated damages that incorporate chargebacks paid for by CAA-bound merchants for transactions involving Amex card products, and that the class must therefore be decertified because this damages methodology is overinclusive. (Amex Mem. 15–17); *see also B&R III*, 2021 WL 234550, at *33 (describing Dr. Officer's methodology and finding it "consistent with Plaintiffs' liability case").) Amex's reliance on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), is misplaced. (*See* Amex Mem. 15.) Amex is correct that in *Comcast*, the Supreme Court explained that the plaintiffs' experts' damages methodology was not in line with the plaintiffs' theory of liability, where the plaintiffs had initially alleged four kinds of detrimental effects resulting from the alleged antitrust violations, but only one effect established viable damages. *See Comcast*, 569 U.S. at 31–32. The Supreme Court held that the damages model presented by the plaintiffs' expert erroneously incorporated damages arising from effects that could no longer give rise to viable antitrust claims, and held that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to" the theory of liability "accepted for class-action treatment." *Id.* at 35–36. The Supreme Court elaborated that "[c]alculations need not be exact," but that "at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with

respect to the alleged anticompetitive effect of the violation.'" *Id.* at 35 (quoting ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010)).

The theory of liability on which Dr. Officer relied to calculate the alleged damages remains viable and appropriate under *Comcast*, even after granting Amex's motion to compel arbitration. As the Court previously held, Plaintiffs' theory is that "Defendants colluded to impose the same fixed Liability Shift date in October of 2015," and that as a result of this collusion, class members "incurred millions of dollars in chargebacks during the two-year class period." *B&R III*, 2021 WL 234550, at *33. Disaggregation of damages arising from certain transactions involving CAA-bound merchants is unnecessary because, when these CAA-bound merchants incurred chargebacks arising from the alleged antitrust conspiracy, those chargebacks contribute to the damages arising from the conspiracy as alleged against *all* Defendants — not just Amex. In finding that the class was ascertainable as to Amex, the Court addressed and rejected (for a second time) Amex's argument that the class could not be certified "because it captured claims based on American Express' conduct that, according to American Express, could not be brought in this Court." *Id.* at *19. The Court specifically reaffirmed that even those class members "who are signatories to the CAA, and whose direct claims against American Express" could not be brought in this Court,[19] could still "maintain their claims against Mastercard, Visa, and Discover . . . based on joint and several liability, when Mastercard, Visa, and Discover are not parties to the CAA." *Id.* (quoting *B&R II*, 2018 WL 1335355, at *9). None of this has

---

[19] In that case, the inability of the claims against Amex to proceed arose from the CAAs' forum-selection clauses requiring transfer of the claims to the Southern District of New York. (Aug. 2020 Decision 54.) However, the reasoning underlying why the claims of CAA-bound merchants can proceed against the other three Defendants applies with equal force when considering the CAAs' arbitration clause as well.

changed following Amex's motion to compel arbitration, and the Court accordingly finds that Dr. Officer's damages calculation is still consistent with Plaintiffs' liability case.

Finally, to the extent further proceedings require individual determination of which class members are bound by the CAA, the need for such determinations also does not defeat class certification.  The Court has already addressed this possibility and affirms once again that because Amex "cannot plausibly argue that there is no objective evidence to identify which merchants have a CAA with [Amex]," the need to identify these merchants does not defeat class certification.  (*Id.* at *20 (citation omitted).)  In arguing that an arbitration agreement exists between Amex and class members, Amex even argues that such identification is possible with reference to its "regular office procedures," and therefore, Amex cannot now argue that the need for case-by-case determinations necessarily defeats class certification.  (*See* Amex Reply 2.)

For these reasons, the Court denies Amex's motion to decertify the class as against Amex.

### III. Conclusion

For the foregoing reasons, the Court denies Discover's motion to compel arbitration; and grants in part and denies in part Amex's motion.  The Court grants Amex's motion to the extent that Amex seeks to compel arbitration against CAA-bound merchants, but declines to decertify the class.

Dated: August 14, 2024
Brooklyn, New York

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge