# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

B & R SUPERMARKET, INC., d/b/a Milam's
Market, GROVE LIQUORS LLC, STROUK
GROUP LLC, d/b/a Monsieur Marcel, and
PALERO FOOD CORP. and CAGUEYES FOOD
CORP., d/b/a Fine Fare Supermarket, *Individually
and on Behalf of All Others Similarly Situated,*

                                    Plaintiffs,

                    v.

VISA INC., VISA U.S.A., INC., MASTERCARD
INTERNATIONAL INC., AMERICAN EXPRESS
COMPANY, and DISCOVER FINANCIAL
SERVICES,

                                    Defendants.

-----------------------------------------------------------------

**FILED UNDER SEAL**

**MEMORANDUM & ORDER**
17-CV-2738 (MKB)

MARGO K. BRODIE, United States District Judge:

        Plaintiffs B & R Supermarket, Inc., doing business as Milam's Market ("B & R

Supermarket"), Grove Liquors LLC, Strouk Group LLC, doing business as Monsieur Marcel

("Monsieur Marcel"), and Palero Food Corp. and Cagueyes Food Corp., doing business as Fine

Fare Supermarket ("Fine Fare Supermarket") (collectively, "Class Representatives"),

commenced this class action against Defendants Visa Inc. and Visa U.S.A., Inc. (collectively

"Visa"), Mastercard International Inc. ("Mastercard"), Discover Financial Services ("Discover"),

and American Express Co. ("Amex"), alleging violations of the Sherman Act, 15 U.S.C. §§ 1, 3,

and state antitrust and consumer protection laws of California, Florida, and New York, and

asserting unjust enrichment claims. (Compl., Docket Entry No. 1; Am. Compl., Docket Entry

No. 291.) Plaintiffs' claims arise out of Defendants' processes for adopting the EMV (Europay,

Mastercard and Visa) standard for card transactions in the United States.[1]  (Am. Compl. ¶ 151.)
Plaintiffs allege that Defendants violated antitrust laws by entering into a conspiracy to: (1) adopt
the same policy via nearly identical rules for shifting billions of dollars in liability for fraudulent
charges, or "chargebacks," from banks to merchants ("Fraud Liability Shift," "Liability Shift," or
"FLS"); and (2) make the Liability Shift effective on the same day and in the same manner for all
four networks, to prevent merchants from steering customers to use cards with more lenient
terms or concessions such as reduced interchange or merchant discount fees.[2]  (*See* Am. Compl.
¶¶ 2, 4, 7, 9).

Currently before the Court is Visa and Mastercard's motion to decertify the Class.[3]  For
the reasons set forth below, the Court denies Visa and Mastercard's motion to decertify the
Class.

---

[1]  EMV technology is a global standard for credit cards that uses computer chips and chip
readers to authenticate (and secure) chip-card transactions.  (*See* Am. Compl. ¶¶ 65, 67.)  It
allows for secure transmittance of "dynamic" card information by creating a unique electronic
signature for each transaction.  (*Id.* ¶ 65.)  Prior to the adoption of EMV technology, payment
cards relied entirely on magnetic stripes, which can only communicate "static" information such
as the card number and expiration date.  (*Id.* ¶¶ 63, 65.)

[2]  Plaintiffs allege that had Defendants not conspired to impose the Liability Shift at the
same time, at least one Defendant would have offered more lenient terms such as no "Liability
Shift component, an exten[sion of the] Liability Shift date, a break on fees, equipment or other
more favorable terms."  (Am. Compl. ¶ 9.)  They allege that "[i]n a truly competitive
environment, at least one of these entities would or should have broken ranks and offered
merchants a break on any number of terms."  (*Id.*)

[3]  (*See* Visa & Mastercard's Mot. to Decertify the Class ("Defs.' Mot."), Docket Entry
No. 806; Visa & Mastercard's Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No.
807; Pls.' Mem. in Opp'n to Defs.' Mot. ("Pls.' Opp'n"), Docket Entry No. 808; Visa &
Mastercard's Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 809.)

## I. Background

The Court assumes familiarity with the facts and extensive procedural history as set forth in prior decisions. *See B & R Supermarket, Inc. v. Visa, Inc.* (*B&R I*), No. 16-CV-1150, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016); *B & R Supermarket, Inc. v. MasterCard Int'l Inc.* (*B&R II*), No. 17-CV-2738, 2018 WL 1335355 (E.D.N.Y. Mar. 11, 2018); *B & R Supermarket, Inc. v. Mastercard Int'l Inc.* (*B&R III*), No. 17-CV-2738, 2021 WL 234550 (E.D.N.Y. Aug. 20, 2020). The Court therefore provides only a summary of the relevant facts and procedural history.

### a. Factual background

Plaintiffs allege that Defendants conspired to violate the relevant antitrust laws by entering into an agreement to (1) adopt the same policy via nearly identical rules for shifting billions of dollars in liability from banks to merchants for fraudulent charges; and (2) make the Liability Shift effective on the same day and in the same manner for all four networks. (*See* Am. Compl. ¶¶ 2, 4, 7, 9.) Plaintiffs allege that the conspiracy harmed competition by preventing merchants from steering customers to use cards with more lenient terms or concessions, such as reduced interchange or merchant discount fees. (*See id.*); *B&R I*, 2016 WL 5725010, at *2.

Prior to the adoption of EMV technology, credit cards used magnetic stripes to communicate relevant information such as the card number and expiration date. (Am. Compl. ¶ 63.) In contrast, EMV technology transmits card information by creating a unique electronic signature for each transaction that is believed to be more secure than the magnetic stripes. (*Id.* ¶¶ 65, 67.)

Prior to October 1, 2015, issuing banks generally absorbed liability for fraudulent transactions. (*Id.* ¶¶ 3, 71–72.) According to Plaintiffs, to facilitate the transition process from magnetic stripes to EMV technology, Defendants conspired to establish October 1, 2015, as an

artificial date by which merchants had to have installed and certified the EMV technology.[4] (*Id.* ¶¶ 2, 97.) On or after October 1, 2015, if a customer presented an EMV chip card to a merchant but the merchant failed to use a certified EMV chip card reader to process the transaction, the merchant became liable for any fraudulent charges incurred. (*See id.* ¶¶ 2–3.)

Plaintiffs contend that merchants had to wait lengthy periods for Defendants to certify their EMV technology. (*Id.* ¶¶ 86–95.) Thus, even if a merchant installed the EMV technology, the merchant could still be subject to liability for fraudulent transactions if Defendants failed to timely certify the merchant's equipment. (*Id.* ¶¶ 82–84.)

Plaintiffs further contend that imposing the Liability Shift on the same date was not necessary for transition to EMV technology, and that in other countries where Defendants introduced the EMV technology prior to its introduction in the United States, Defendants implemented Liability Shifts and transitioned to EMV technology at staggered times rather than on the same day. (*Id.* ¶¶ 100–107.) For example, in Canada, some Defendants gave merchants a six-month extension to upgrade to EMV technology. (*Id.* ¶¶ 111–112.) In other countries, Defendants offered merchants interchange fee concessions to help defray the costs of the Liability Shift or offered to cover certain costs of upgrading to EMV technology. (*Id.* ¶¶ 108–110.) In contrast, in the United States, Defendants implemented the Liability Shift on the same day through their individual networks and did not offer any concessions to the merchants to ease the transfer process. (*Id.* ¶¶ 7 (noting no concessions were offered in the United States), 73–76 (Mastercard), 77–78 (Visa), 79–80 (Discover), 81 (American Express).)

Plaintiffs allege that there was widespread knowledge, including among Defendants, that

---

[4] The certification of the EMV payment system consists of multiple steps and involves "numerous entities," such as PIN pad manufacturers, EMVCo, acquiring banks, and others. (Am. Compl. ¶ 85.)

significant numbers of merchants would not be ready for the Liability Shift and would incur significant costs as a result.  (*Id.* ¶¶ 90–92, 113.)

    **b.  Procedural history**

Plaintiffs commenced this action in March of 2016 in the Northern District of California, before District Judge William Alsup.  (Compl.; Order Reassigning Case, Docket Entry No. 14.) On July 15, 2016, Plaintiffs filed an Amended Complaint,[5] (Am. Compl.), which Defendants moved to dismiss.[6]

On September 30, 2016, Judge Alsup granted in part and denied in part the motions to dismiss the Amended Complaint.  *B&R I*, 2016 WL 5725010, at *13.  Judge Alsup dismissed the claims against all defendants other than Mastercard, Visa, Discover, and Amex.  *Id.* at *6–12. Judge Alsup also granted Monsieur Marcel and Fine Fare Supermarket's motion to intervene against the above-named Defendants, including Amex.  *Id.* at *13.  In a separate order, Judge Alsup severed the claims by B & R Supermarket and Monsieur Marcel against Amex and transferred them to the United States District Court for the Southern District of New York based on the forum selection provisions in Amex's CAAs with merchants.  (Order Granting Mot. to Transfer, Docket Entry No. 282.)

---

[5]  The Amended Complaint named the following additional Defendants: Bank of America, N.A., Capital One Financial Corporation, Chase Bank USA, National Association, Citibank (South Dakota), N.A., Citibank, N.A., PNC Bank, National Association, U.S. Bank National Association, and Wells Fargo Bank, N.A. (collectively, the "Bank Defendants"), and EMVCo.  (Am. Compl.)

[6]  (Bank Defs.' Mot. to Dismiss, Docket Entry No. 301; Amex, Mastercard, Visa, and EMVCo Mot. to Dismiss, Docket Entry No. 303; Discover Mot. to Dismiss, Docket Entry No. 305.)

On March 10, 2017, Plaintiffs moved for class certification. (Pls.' Mot. for Class Certification, Docket Entry No. 425.) In May of 2017, Judge Alsup transferred the case to this Court pursuant to 28 U.S.C. § 1404(a), citing judicial efficiency and Discover's concerns with regard to potential inconsistent liability theories alleged by putative class members in this case and the cases consolidated in the multi-district litigation, *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, No. 05-MD-1720 (E.D.N.Y.), pending before this Court. (Order dated May 4, 2017, Docket Entry No. 518.)

In March of 2018, the Court found that Plaintiffs had satisfied the explicit requirements of Rule 23(a) — numerosity, commonality, typicality, and adequacy of both class representatives and counsel. *B&R II*, 2018 WL 1335355, at *7–10. However, because Plaintiffs had failed to satisfy Rule 23(a)'s implied requirement of ascertainability, the Court denied Plaintiffs' motion for class certification without prejudice. *Id.* at *10–14.

On July 9, 2019, Plaintiffs renewed their motion for class certification, (*see* Pls.' Renewed Mot. for Class Certification, Docket Entry No. 706), and in August of 2020, the Court certified a class consisting of "[m]erchants who incurred one or more unreimbursed chargeback(s) between October 1, 2015 through and including September 30, 2017, pursuant to the Fraud Liability Shift for the assessment of Mastercard, Visa, Discover and/or Amex payment card chargebacks," and excluding from the Class "members of the judiciary and government entities or agencies," *B&R III*, 2021 WL 234550, at *15, *36. In September of 2020, Defendants Visa, Mastercard, and Discover petitioned the Second Circuit for permission to appeal the Court's class certification decision pursuant to Rule 23(f) of the Federal Rules of Civil Procedure. (*See* Copy of 23(f) Pet. for Leave to Appeal, Docket Entry No. 727.) In January of 2021, the Second Circuit denied the petition in a short order stating that "an immediate appeal is

not warranted."  (USCA Mandate, Docket Entry No. 745.)

## II.  Discussion

### a.  Standard of review

After a class is certified pursuant to Rule 23 of the Federal Rules of Civil Procedure, "a district court may decertify a class if it appears that the requirements of Rule 23 are not in fact met."  *Mazzei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016) (quoting *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982)); *see also* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 261–62 (2d Cir. 2021) ("A district court is required to monitor class proceedings and 'reassess [its] class rulings as the case develops.'  As a result, district courts have the authority to *sua sponte* decertify a class if they find that the class no longer meets the requirements of Rule 23 at any time before final judgment is entered." (alteration in original) (first quoting *Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999); then citing Fed. R. Civ. P. 23(c)(1)(C); and then citing *Sirota*, 673 F.2d at 572)).  In adjudicating any class action, "district courts must ensure that a certified class satisfies Rule 23 throughout the litigation, and possess the authority to alter or decertify the class if that is no longer the case."  *Jin*, 990 F.3d at 262 (first citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982); and then citing *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 n.9 (2d Cir. 2007)).  Because "the results of class proceedings are binding on absent class members, the district court has the affirmative 'duty of monitoring its class decisions in light of the evidentiary development of the case.'"  *Mazzei*, 829 F.3d at 266 (first citing Fed. R. Civ. P. 23(c)(3); and then quoting *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983)).  Reevaluating class certification may be appropriate where there is a "significant intervening

event" or there are "compelling reasons" that the Rule 23 requirements are no longer satisfied. *See, e.g.*, *Doe v. Karadzic*, 192 F.R.D. 133, 136–37 (S.D.N.Y. 2000) (citations omitted). However, while "an 'intervening event' may often be the impetus for a district court to . . . decide that the requirements of Rule 23 are no longer met," such an event need not be "significan[t]," and a court "need only find that a previously satisfied requirement of Rule 23 is now lacking." *Jin*, 990 F.3d at 262.  In opposing a motion to certify a class, the plaintiff "retain[s] the burden to demonstrate that the[] requirements [of Rule 23 are] satisfied." *Mazzei*, 829 F.3d at 270 (citing *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 596–600 (2d Cir. 1986)); *Betances v. Fischer*, --- F. Supp. 3d ---, ---, 2023 WL 8699001, at *21 (S.D.N.Y. Dec. 15, 2023) (quoting *Mazzei*, 829 F.3d at 270).

### b.    The Court denies Visa and Mastercard's motion to decertify the Class

Visa and Mastercard argue that the rebuttal report of Plaintiffs' liability expert, Dr. Rosa Abrantes-Metz, introduces a new theory of liability that requires the Court to decertify the Class. (Defs.' Mem. 1–2; *see also* Expert Rep. of Rosa M. Abrantes-Metz, Ph.D. ("Abrantes-Metz Rep."), annexed to Decl. of Rosemary Szanyi ("Szanyi Decl.") as DDX 15, Docket Entry No. 855-15; Rebuttal Expert Rep. of Rosa M. Abrantes-Metz, Ph.D. ("Rebuttal Rep."), annexed to Szanyi Decl. as DDX 16, Docket Entry No. 855-16.)  Visa and Mastercard argue that Dr. Abrantes-Metz has posited a theory of liability that renders small and medium-sized merchants adverse to large merchants and that the Class should therefore be decertified because: (1) the Class Representatives' claims are no longer typical of those of the Class; (2) the Class Representatives are no longer adequate to represent large merchants; (3) individual questions will predominate over Class questions; and (4) Plaintiffs' "new liability theory" is inconsistent with their theory of damages, which precludes class certification under *Comcast Corp. v.*

8

*Behrend*, 569 U.S. 27 (2013). (Defs.' Mem. 12–21.)

### i. Class Representatives are typical of the Class

Visa and Mastercard argue that the certified Class no longer meets the "typicality" requirement under Rule 23(a) because "[e]xpert merits discovery makes clear that the Class [R]epresentatives' theory of liability cannot support a finding that Defendants are liable to large absent class members." (Defs.' Mem. 13.) In support, Visa and Mastercard first contend that Dr. Abrantes-Metz's rebuttal report "demonstrat[es] the divergent interests between large and small merchants" because she suggests that large merchants were in favor of an earlier implementation date for the Liability Shift. (*Id.* at 14.) Visa and Mastercard argue that parts of Dr. Abrantes-Metz's rebuttal report show that "Defendants colluded to maintain October 2015 FLSs because large merchants and issuers wanted Defendants to maintain their dates," while small and medium-sized merchants "would have preferred delays." (*Id.* at 6.) According to Visa and Mastercard, Dr. Abrantes-Metz's report indicates that larger merchants could transition to EMV more easily than smaller merchants could, meaning that large merchants "have rather different incentives than those of small and medium-sized merchants." (*Id.* at 7 (quoting Rebuttal Rep. ¶ 289(b)).) Thus, Visa and Mastercard contend that Dr. Abrantes-Metz's report shows that large merchants benefited from the earlier Liability Shift date, gaining a "competitive advantage" over smaller merchants. (*Id.*) Visa and Mastercard argue that it therefore "makes no sense to hold Defendants liable to these [large] merchants . . . simply because some other merchants preferred delays." (Defs.' Reply 7.) Second, Visa and Mastercard argue that the Class Representatives, as small merchants, "are not in a position to answer mitigation defenses directed at Wal-Mart or other large absent class members that were or could have been ready for EMV." (Defs.' Mem. 16–17 (footnote omitted).) Visa and Mastercard assert that Dr. Abrantes-Metz's report shows that large merchants "preferred to maintain the original FLS dates, even if

9

they experienced some chargebacks," and that Defendants therefore have "unique defenses" against such merchants. (Defs.' Reply 7–8.)

Plaintiffs argue that "[t]he seven paragraphs of Dr. Abrantes-Metz's rebuttal report referenced by" Visa and Mastercard did not change the alleged theory of liability, and that Class Representatives' claims are still typical of the Class. (Pls.' Opp'n 11.) In support, Plaintiffs first contend that Class Representatives and the Class were all harmed by the same conduct because they all incurred chargebacks due to the "contemporaneous imposition of Liability Shift." (*Id.* (quoting *B&R II*, 2018 WL 1335355, at *8).) Plaintiffs further argue that Visa and Mastercard "conflate the *incentives* of some large merchants, who would have preferred a sooner FLS, with the concept that those merchants were *responsible* for the wrongdoing." (*Id.* at 13.) Plaintiffs argue that contrary to Visa and Mastercard's characterization of Dr. Abrantes-Metz's report, "[s]he did not opine that any merchants were part of the conspiracy." (*Id.* at 14 (emphasis omitted).) Rather, Plaintiffs argue that Dr. Abrantes-Metz's report still supports the core of Plaintiffs' claims, namely that "[i]f Defendants colluded on the FLS, merchants — even those who may have wanted an earlier FLS — would have incurred chargebacks if they were not ready for EMV by the deadline, regardless of the size of those merchants." (*Id.*) Second, Plaintiffs argue that Visa and Mastercard offer no legal support for their argument that Class Representatives must be able to "answer mitigation defenses" that might be raised against certain individual Class Members, and contend that regardless, Defendants have waived this argument by failing to raise it during the briefing on Plaintiffs' initial or renewed motions for class certification. (*Id.* at 15–16.)

The typicality prong of Rule 23(a) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P.

23(a)(3). "Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Elisa W. v. City of New York*, 82 F.4th 115, 128 (2d Cir. 2023) (quoting *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022)); *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)) (same). "The commonality and typicality requirements often 'tend to merge into one another, so that similar considerations animate analysis' of both." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)); *see also Elisa W.*, 82 F.4th at 128 ("[W]here the claims of a class stem from a single course of conduct, 'the commonality and typicality requirements of Rule 23(a) tend to merge.'" (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5 (2011))). "The purpose of typicality is to ensure that class representatives 'have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions.'" *Floyd v. City of New York*, 283 F.R.D. 153, 175 (S.D.N.Y. 2012) (quoting *In re NASDAQ Mkt.–Makers Antitrust Litig.*, 169 F.R.D. 493, 510 (S.D.N.Y. 1996)). "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding." *In re Platinum & Palladium Commodities Litig.*, No. 10-CV-3617, 2014 WL 3500655, at *9 (S.D.N.Y. July 15, 2014) (quoting *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002)).

The Court finds that Dr. Abrantes-Metz's references to the involvement of large merchants in Defendants' decision to set the October 2015 Liability Shift date do not undermine the Court's earlier conclusion that Plaintiffs satisfy the typicality requirement. As the Court

previously held, Plaintiffs meet the typicality requirement because they allege that "they were harmed by the same conduct — Defendants' contemporaneous imposition of Liability Shift, and in the same manner — incurring chargebacks as putative class members." *B&R II*, 2018 WL 1335355, at *7–8.  Even if larger merchants were more easily able to transition to EMV or were less affected by the October 2015 Liability Shifts than small or medium-sized merchants, the alleged effect of the Liability Shifts remained the same: an inability to accept cards through a certified EMV-enabled card reader would have required the merchant to bear the cost of any fraudulent transactions, and this cost would never have been imposed if not for Defendants' alleged collusion.  The Court agrees with Plaintiffs that if they can establish such collusion, "it makes no legal difference whether it resulted in outcomes that some merchants (or any other party) would have wanted — unless they were also part of the conspiracy." (*See* Pls.' Opp'n 14 (emphasis omitted).)  Large merchants may have maintained a competitive advantage over small or medium-sized merchants as the Liability Shifts were implemented, but references to some competitive benefits that accrued to large merchants are insufficient to suggest that large merchants were part of the alleged conspiracy, or that they suffered no harm from the earlier, coordinated Liability Shift date.  As the Court previously noted in granting class certification, "Plaintiffs' claim is — and has always been — that in a competitive environment, Defendants would have responded to the overwhelming lack of merchant readiness to implement EMV by offering concessions to merchants, such as delays in their Liability Shift dates and other incentives." *B&R III*, 2021 WL 234550, at *36.  The fundamental nature of the Class's claims against Defendants would not be affected even if some large merchants suffered a smaller injury than other merchants or could have avoided chargebacks by complying with the allegedly anticompetitive requirements.  To the extent these possibilities are relevant to the Class's claims,

they concern the damages to which Class Members may eventually be entitled.

The Court is also not persuaded by Visa and Mastercard's argument that Class Representatives are not typical of the Class because they cannot answer certain "mitigation defenses" that Defendants may have against certain Class Members. (*See* Defs.' Mem. 16.) Visa and Mastercard assert that some large merchants may have "decide[d] that EMV chargebacks were such a relatively low cost as to not justify prioritizing EMV," and that they should not now be allowed to "sue for the consequences of that choice." (*Id.* at 17.) Visa and Mastercard fail, however, to offer any legal support for their contention that a mitigation defense is available to them in the context of the antitrust claims at issue; rather, Visa and Mastercard assume that the Class's claims must fail if they could have avoided chargebacks simply by complying with the allegedly anticompetitive requirements. Moreover, even if Defendants can properly raise a mitigation defense against large merchants who chose not to "prioritiz[e] EMV," the claims of the Class Representatives still remain typical of the claims of absent Class Members, and the interests of these absent Class Members will therefore be adequately protected. Visa and Mastercard rely on *In re Digital Music Antitrust Litigation*, 321 F.R.D. 64 (S.D.N.Y. 2017), to suggest that the availability of "unique defenses" precludes class certification. (Defs.' Mem. 14; Defs.' Reply 7–8.) In that case, the court denied certification of a putative class alleging antitrust violations after finding that "large numbers of the proposed class members engaged in illegal downloading . . . and would therefore be subject to counterclaims on the basis of an unclean hands theory." *In re Digital Music*, 321 F.R.D. at 87–89. The core of the court's analysis was whether the unique "unclean hands" defense would become the "focus of the litigation" if the court were to grant certification. *Id.* at 88 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180

13

(2d Cir. 1990), *abrogated on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017)).

Further, the controlling case on which *In re Digital Music* relied — *Gary Plastic*, 903 F.2d 176

— held only that certification should not be granted when the proposed class representatives (as

opposed to absent class members) were subject to unique defenses, because of the risk that

"absent class members will suffer if their representative is preoccupied with defenses unique to

it." *Gary Plastic*, 903 F.2d at 180.  There is no such risk present in this case, as the "unique

defenses" that Visa and Mastercard highlight pertain to absent Class Members who are large

merchants — not to the Class Representatives.  Although *In re Digital Music* extended *Gary

Plastic*'s reasoning to apply to circumstances when absent class members were subject to certain

unique defenses and counterclaims, this Court is not required to follow that approach and has no

reason to conclude that the mitigation defenses that Visa and Mastercard describe will become

the "focus of the litigation" such that class certification must be denied.[7]  *See Gary Plastic*, 903

F.2d at 180.

The Court therefore concludes that Class Representatives remain typical of the Class, and

decertification is not warranted on this basis.

### ii.    Class Representatives are adequate representatives of the Class

Visa and Mastercard argue that the Class Representatives must "possess the same interest

and suffer the same injury as the class members," and contend that this requirement is no longer

met.  (Defs.' Mem. 17 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).)  In

support, Visa and Mastercard argue that "Class Representatives chose to advance Dr. Abrantes-

---

[7]  Another difference between *In re Digital Music* and this case is that the "unclean
hands" defense raised in that case would potentially have been a defense to liability itself, while
the mitigation defense that Defendants may raise is relevant to damages, rather than to liability.
Accordingly, the issue of liability can still be determined on a Class-wide basis notwithstanding
any damages issues that Defendants may later choose to raise.

Metz's rebuttal liability theory to their own benefit, at the cost of having no workable liability theory as to large absent class members." (*Id.* at 18.) In addition, Visa and Mastercard argue that the Class is conflicted between small and large merchants because "the benefits to large merchant class members flowed from the very effect on smaller retail competitors." (*Id.*) In further support, Visa and Mastercard contend that "[t]his conflict is analogous to the conflict that precluded certification in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*," because the plaintiffs in that case sought to certify a class that included prospective class members who were helped and those who were harmed by the defendants' alleged conspiracy to widen bid-ask spreads on transactions. (*Id.* at 18–19 (citing *In re Foreign Exch. Benchmark Rates Antitrust Litig.* (*Foreign Exchange*), 407 F. Supp. 3d 422 (S.D.N.Y. 2019)).)

Plaintiffs argue that Visa and Mastercard's arguments fail to disturb the Court's settled adequacy determination. First, Plaintiffs dispute Visa and Mastercard's characterization of Dr. Abrantes-Metz's rebuttal report as "advanc[ing]" a new "liability theory." (Pls.' Opp'n 17.) Plaintiffs argue that, even if "some merchants may have preferred an earlier FLS date, or may have benefitted from it in some way, does not change her overall theory." (*Id.*) Rather, "even if some large merchants benefitted from an earlier FLS, they would still have been harmed by the anticompetitive conduct at issue if they . . . incurred one or more unreimbursed chargebacks." (*Id.*) Second, Plaintiffs argue that the case is nothing like *Foreign Exchange* because the plaintiffs there had "directly conflicting incentives to establish whether spread manipulation occurred," (*id.* at 18 (quoting *Foreign Exchange*, 407 F. Supp. 3d at 439)), while in this case "merchants of all sizes are incentivized to show that Defendants conspired to maintain the FLS" on anticompetitive terms, (*id.* at 19).

"In considering Rule 23(a)(4)'s adequacy requirement, the primary factors are whether

the class representatives have any 'interests antagonistic to the interests of other class members' and whether the representatives 'have an interest in vigorously pursuing the claims of the class.'" *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 764 (2d Cir. 2020) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)); *see also Denney*, 443 F.3d at 268 (noting that the analysis of whether a class representative is adequate "is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members"). "To assure vigorous prosecution, courts consider whether the class representative has adequate incentive to pursue the class's claim, and whether some difference between the class representative and some class members might undermine that incentive." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 231 (2d Cir. 2016) (citing *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 170–71 (2d Cir. 2001), *abrogated on other grounds by Dukes*, 564 U.S. 338). "Under Rule 23(a)(4) . . . adequacy is satisfied unless 'plaintiff's interests are antagonistic to the interest of other members of the class.'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 90 (2d Cir. 2015) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)). In addition to the adequate representation requirement of Rule 23(a)(4), "[t]he Due Process Clause . . . requires that the named plaintiff at all times adequately represent the interests of the absent class members." *In re Payment Card Interchange Fee*, 827 F.3d at 231 (quoting *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 812 (1985)); *see also Irvin v. Harris*, 944 F.3d 63, 71 (2d Cir. 2019) (quoting *Shutts*, 472 U.S. at 812).

Nothing in Dr. Abrantes-Metz's rebuttal report undermines the Court's prior conclusion that the Class Representatives are adequate representatives for the Class. First, the Court decided that the Class Representatives were adequate representatives for the Class because "[a]ll . . . class

representatives assert claims arising out of the same conduct and result in the same type of injuries — chargebacks imposed by Defendants as a result of the alleged conspiracy to impose the Liability Shift on the same date." *B&R II*, 2018 WL 1335355, at *8. The Class's claims and injuries remain the same even if one accepts that some large merchants had incentives to support the Liability Shift.[8] Second, as the Court noted in its first class certification decision: "The success of the claims by . . . two groups of Plaintiffs is dependent on the same finding of liability against all Defendants. Accordingly, this difference does not defeat the adequacy of representation by named Plaintiffs." *Id.* at *10. Although the Court was discussing different groups of Class Members (those who are bound by Card Acceptance Agreements with Amex and those who are not), the conclusion also applies if the two groups are small and large merchants. Third, the Court does not agree with Visa and Mastercard that Dr. Abrantes-Metz's rebuttal report introduces a new theory of liability. However, even if the evidence adduced at trial tends to show that certain large merchants benefitted from an earlier Liability Shift date, such evidence does not tend to disprove the elements Plaintiffs must prove with respect to Class-wide liability: that Defendants engaged in (1) a "conspiracy" (2) "in restraint of trade or commerce." 15 U.S.C. § 1; *see also Relevent Sports, LLC v. U.S. Soccer Fed'n,* 61 F.4th 299, 306 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1391 (2024). Evidence that some merchants might have benefitted from an earlier Liability Shift — which is also disputed by portions of Dr. Abrantes-Metz's merits report[9]

---

[8] In addition, any merchants who felt inadequately represented by the Class Representatives or wanted to individually pursue their claims had until August 31, 2022, to opt out of the Class. The ability to have opted out of the Class mitigates concerns about differing interests between remaining merchants, to the extent that any existed.

[9] (*See, e.g.*, Abrantes-Metz Rep. ¶ 178 (quoting an internal Amex email recognizing that a "[m]ajority of [Amex's] merchant base, large and small" would not be ready in time for the Liability Shift); *id.* ¶ 180 (quoting email from 7-Eleven to Discover, requesting a Liability Shift

— therefore may be relevant to the issue of damages, but not the adequacy of the Class Representatives to represent the interests of large merchants.

### iii. The predominance requirement continues to be met

Visa and Mastercard argue that "conflicting interests between small and large merchants" will cause individual questions to predominate. (Defs.' Mem. 19.) In support, Visa and Mastercard contend that "[p]roving entitlement to the vast bulk of damages requires establishing liability to large merchants that were (or could have been) ready for EMV before October 2015 and that, according to Dr. Abrantes-Metz, pressured Defendants to maintain their FLSs." (*Id.*) Thus, Visa and Mastercard argue that Defendants' "proof at trial" will focus on these large merchants and will "predominate over common questions." (*Id.* at 19–20.)

Plaintiffs argue that Visa and Mastercard's predominance argument is "conclusory" and does nothing to "change[] the Court's conclusion that 'common questions predominate over individual ones as to causation and can be answered with common proof.'" (Pls.' Opp'n 19 (quoting *B&R III*, 2021 WL 234550, at *30).) In addition, Plaintiffs assert they will continue to "offer evidence relating to the concerns of merchants of all sizes — including large merchants, in showing that Defendants conspired." (*Id.*)

Rule 23(b)(3)'s predominance requirement "demands that common questions of law or fact predominate over individual questions that pertain only to certain class members." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 75, 85 (2d Cir. 2023). "The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by

---

waiver because 7-Eleven would not be ready for the Liability Shift in time); *id.* ¶ 192 (quoting internal Bank of America email noting that "███████████ is NOT too happy" that their terminals would not be EMV-certified until September); *id.* ¶ 249 (quoting internal Mastercard email noting that Home Depot was threatening to sue over EMV-related conduct).)

representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting *Amchem Prods.*, 521 U.S. at 623). According to the Supreme Court:

> [The predominance requirement] calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."

*Id.* (second alteration in original) (quoting 2 William B. Rubenstein, Newberg on Class Actions § 4:50, at 196–97 (5th ed. 2012)).

"The predominance requirement is satisfied if 'resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof,' and 'these particular issues are more substantial than the issues subject only to individualized proof.'" *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 97 (2d Cir. 2018) (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)). Typically, common issues predominate when liability is determinable on a class-wide basis, even when class members have individualized damages. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001), *abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006); *see also Tyson Foods*, 577 U.S. at 453–54 ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" (quoting 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1778, at 123–24 (3d ed. 2005))).

The Court agrees with Plaintiffs that the relevant inquiry is not whether any given

merchant was, or could be, ready for the Liability Shift prior to October of 2015.  (*See* Pls.'

Opp'n 14 ("The issue is not whether any given merchant was or was not ready for EMV.").)

Rather, Plaintiffs merely need to prove a conspiracy in restraint of trade.  *See B&R III*, 2021 WL

234550, at *36 ("Plaintiffs' claim is — and has always been — that in a competitive

environment, Defendants would have responded to the overwhelming lack of merchant readiness

to implement EMV by offering concessions to merchants, such as delays in their Liability Shift

dates and other incentives."); (*see also* Pls.' Opp'n 14 ("The wrongdoing was engaging in a

conspiracy to not delay the FLS dates when numerous factors, *including* the state of readiness of

merchants, would have compelled a different result in a competitive but-for world.")).  If a

particular merchant was ready for the Liability Shift, that fact is relevant to whether that

merchant suffered an injury-in-fact.  However, the Court has already held that, "in order to show

injury, a merchant class member need only show that it paid a chargeback during the class

period," and further rejected Defendants' argument that the Class contained too many uninjured

Class Members.  *B&R III*, 2021 WL 234550, at *28–29.  Even when class members have

individualized damages, common issues can predominate when liability is determinable on a

class-wide basis.  *See In re Visa Check*, 280 F.3d at 139; *see also Tyson Foods*, 577 U.S. at 453

("When 'one or more of the central issues in the action are common to the class and can be said

to predominate, the action may be considered proper under Rule 23(b)(3) even though other

important matters will have to be tried separately, such as damages . . . .'" (quoting 7AA Wright,

Miller & Kane, Federal Practice and Procedure § 1778, at 123–24)).  The Court declines to

disturb its prior ruling with respect to predominance because Defendants have not shown that

any facts or legal issues regarding large merchants will predominate over common questions.

### iv. Plaintiffs' theory of liability is not inconsistent with their damages calculations

Visa and Mastercard argue that the Supreme Court's decision in *Comcast*, 569 U.S. 27, requires decertification of the Class because Plaintiffs' "new liability theory" is now inconsistent with their damages model.  (Defs.' Mem. 20–21; Defs.' Reply 10.)  First, Visa and Mastercard argue that, "[u]nder *Comcast*, Plaintiffs cannot comingle anticompetitive effects . . . with neutral or pro-competitive effects."  (Defs.' Mem. 20.)  Second, Visa and Mastercard contend that "[t]here is now an unquestionable disconnect between [Plaintiffs'] liability theory and the damages model put forward by Dr. [Micah] Officer," because "Dr. Officer's model sweeps in far more damages than flow from Dr. Abrantes-Metz' liability theory."  (*Id.* at 20–21.)

Plaintiffs first argue that "Defendants' *Comcast* argument . . . starts with the false premise that Plaintiffs have a 'New Liability Theory.'"  (Pls.' Opp'n 19.)  In support, Plaintiffs quote the Court's prior conclusion that "*Comcast* requires consistency between the liability theory and the damages methodology," (*id*. at 19–20 (quoting *B&R II*, 2018 WL 1335355, at *13 n.22)), and contend that "nothing has changed . . . based on seven paragraphs in Dr. Abrantes-Metz's rebuttal report responding to Defendants' experts," (*id.* at 20).  Second, Plaintiffs argue that "Defendants overstate [*Comcast*'s] holding in arguing that . . . Plaintiffs cannot comingle anticompetitive effects . . . with neutral or pro-competitive effects."  (*Id.* (internal quotation marks omitted).)  Third, Plaintiffs argue that "the liability theory has not changed, and is still consistent with the damages theory."  (*Id.* at 22.)  In support, Plaintiffs contend that "[t]he incentives of certain large merchants who may have preferred an earlier FLS date . . . are still consistent with Dr. Officer's damages theory," because the theory of liability is still based on "Defendants' anticompetitive conduct . . . at the heart of the alleged antitrust conspiracy."  (*Id.* (citation omitted).)

21

Because Plaintiffs have not offered a "new liability theory," the Court declines to disturb its prior ruling that Plaintiffs' liability theory is consistent with their damages methodology.  *See B&R III*, 2021 WL 234550, at *14.  As discussed above, the seven disputed paragraphs in Dr. Abrantes-Metz's rebuttal report do not change the underlying theory of liability: that the Defendants conspired to impose the Liability Shift in October of 2015 on consistent terms, which would not have occurred in the absence of an unlawful conspiracy in restraint of trade.  In Plaintiffs' but-for world — if accepted by the jury — the ordinary competitive pressures of the market would have forced Defendants to either delay the Liability Shift or offer certain concessions to merchants, such as discounts on interchange rates or subsidies to encourage adoption of the EMV technology.  Even if one accepts as true that certain large merchants would have preferred an earlier Liability Shift, such a fact does not negate Defendants' liability to (i) the Class or (ii) those large merchants, assuming that such large merchants were nevertheless harmed by the conspiracy (*i.e.*, they suffered unreimbursed chargebacks that would not have occurred in the but-for world).  Because the disputed facts in Dr. Abrantes-Metz's rebuttal report do not affect Defendants' liability, Plaintiffs have not offered a new theory of liability.

The theory of liability on which Dr. Officer relied to calculate the alleged damages remains viable and appropriate under *Comcast*, even if one accepts as true the disputed paragraphs in Dr. Abrantes-Metz's rebuttal report.  As the Court previously held, Plaintiffs' theory is that "Defendants colluded to impose the same fixed Liability Shift date in October of 2015," and that as a result of this collusion, Class Members "incurred millions of dollars in chargebacks during the two-year class period."  *Id.* at *33.  This theory of liability is still sufficient for Plaintiffs to prove liability as to the entire Class, even if some large merchants had

other reasons to prefer an earlier Liability Shift date.  Accordingly, the Court finds that Dr.

Officer's damages methodology is still consistent with Plaintiffs' liability case.

In addition, as discussed above, issues relating to the incentives of large merchants goes

to damages, rather than liability.  The issue of individualized damages as to these large

merchants is also insufficient under *Comcast* to decertify the Class.  In *Tyson Foods*, for

example, the Supreme Court affirmed certification of a class that included some uninjured class

members and found that individualized damages inquiries would not predominate over common

questions.  *See* 577 U.S. at 453–62.  The Second Circuit has read *Comcast* to require that "a

model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must

actually measure damages that result from the class's asserted theory of injury."  *Waggoner v.

Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (quoting *Roach*, 778 F.3d at 407).  Thus, after

*Comcast*, "it remains the 'black letter rule' that a class may obtain certification under Rule

23(b)(3) when liability questions common to the class predominate over damages questions

unique to class members."  *Roach*, 778 F.3d at 408 (quoting *In re Whirlpool Corp. Front-

Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 860–61 (6th Cir. 2013)).  Plaintiffs' case is

consistent with these precedents: class certification was proper — even if certain merchants

stood to potentially benefit in some fashion from the Liability Shift — because "liability

questions common to the class predominate over damages questions unique to class members"

and because Plaintiffs' theory of liability matches their model for determining Class-wide

damages caused by chargebacks that would not have occurred in the but-for world.[10]

---

[10]  The fact that some large merchants might have derived ancillary (and potentially
unquantifiable) benefits from an earlier Liability Shift date does not alter the calculation of
damages in the form of unreimbursed chargebacks that would not have occurred in the but-for
world.  Moreover, Dr. Abrantes-Metz's theory regarding large merchants is fairly tenuous: "large

## III. Conclusion

For the foregoing reasons, the Court denies Visa and Mastercard's motion to decertify the Class.

Dated: August 15, 2024
       Brooklyn, New York

SO ORDERED:


     _____s/ MKB_____
MARGO K. BRODIE
United States District Judge

---

merchants [could] benefit from their merchant competitors carrying a higher cost (either from fraud liability or from immature EMV adoption." (Rebuttal Rep. ¶ 294.) First, this theory assumes that large merchants were EMV-ready, which, as discussed *supra* note 9, is contradicted by other evidence in the record. Second, to the extent a large merchant, such as a national grocery chain, derived a benefit from the small, independent grocer across the street being unprepared for the Liability Shift, only two results are possible: (1) either the large merchant was fully EMV-prepared and did not incur any chargebacks, and is therefore not in the Class, or (2) the large merchant incurred chargebacks, and the offsetting benefit it derived from the independent grocer's unpreparedness is likely to be very small in comparison, to the extent that it can be quantified.