UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

B & R SUPERMARKET, INC., d/b/a Milam's
Market, GROVE LIQUORS LLC, STROUK
GROUP LLC, d/b/a Monsieur Marcel, and
PALERO FOOD CORP. and CAGUEYES FOOD
CORP., d/b/a Fine Fare Supermarket, *individually
and on behalf of all others similarly situated*,

                             Plaintiffs,

                    v.

VISA INC., VISA U.S.A. INC., MASTERCARD
INTERNATIONAL INCORPORATED,
AMERICAN EXPRESS COMPANY, and
DISCOVER FINANCIAL SERVICES,

                           Defendants.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
17-CV-2738 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiffs B & R Supermarket, Inc., doing business as Milam's Market ("B & R

Supermarket"), Grove Liquors LLC, Strouk Group LLC, doing business as Monsieur Marcel

("Monsieur Marcel"), and Palero Food Corp. and Cagueyes Food Corp., doing business as Fine

Fare Supermarket ("Fine Fare Supermarket") (collectively, "Class Representatives"),

commenced this class action against Defendants Visa Inc. and Visa U.S.A. Inc. (collectively

"Visa"), Mastercard International Incorporated ("Mastercard"), Discover Financial Services

("Discover"), and American Express Co. ("Amex"), alleging violations of the Sherman Act, 15

U.S.C. §§ 1, 3, and state antitrust and consumer protection laws of California, Florida, and New

York, and asserting unjust enrichment claims.  (Compl., Docket Entry No. 1; Am. Compl.,

Docket Entry No. 291.)  Plaintiffs' claims arise out of Defendants' processes for adopting the

EMV (Europay, Mastercard and Visa) standard for card transactions in the United States.[1]  (Am. Compl. ¶ 151.)  Plaintiffs allege that Defendants violated antitrust laws by entering into a conspiracy to: (1) adopt the same policy via nearly identical rules for shifting billions of dollars in liability for fraudulent charges, or "chargebacks," from banks to merchants ("Fraud Liability Shift," "Liability Shift," or "FLS"); and (2) make the Liability Shift effective on the same day and in the same manner for all four networks, to prevent merchants from steering customers to use cards with more lenient terms or concessions such as reduced interchange or merchant discount fees.[2]  (*See* Am. Compl. ¶¶ 2, 4, 7, 9.)

Currently before the Court are (1) Visa, Mastercard, and Discover's motion to exclude the opinions of Dr. Rosa Abrantes-Metz,[3] (2) Amex's motion to exclude the testimony of Dr. Abrantes-Metz,[4] (3) Visa, Mastercard, and Discover's motion to exclude the opinions of

---

[1]  EMV technology is a global standard for credit cards that uses computer chips and chip readers to authenticate (and secure) chip-card transactions.  (*See* Am. Compl. ¶¶ 65, 67.)  It allows for secure transmittance of "dynamic" card information by creating a unique electronic signature for each transaction.  (*Id.* ¶ 65.)  Prior to the adoption of EMV technology, payment cards relied entirely on magnetic stripes, which can only communicate "static" information such as the card number and expiration date.  (*Id.* ¶¶ 63, 65.)

[2]  Plaintiffs allege that had Defendants not conspired to impose the Liability Shift at the same time, at least one Defendant would have offered more lenient terms such as no "Liability Shift component, an exten[sion of the] Liability Shift date, a break on fees, equipment or other more favorable terms."  (Am. Compl. ¶ 9.)  They allege that "[i]n a truly competitive environment, at least one of these entities would or should have broken ranks and offered merchants a break on any number of terms."  (*Id.*)

[3]  (Visa, Mastercard & Discover's Mot. to Exclude the Opinions of Dr. Rosa Abrantes-Metz ("VMD AM Mot."), Docket Entry No. 814; Visa, Mastercard & Discover's Mem. in Supp. of VMD AM Mot. ("VMD AM Mem."), Docket Entry No. 815; Pls.' Mem. in Opp'n to VMD AM Mot. ("Pls.' VMD AM Opp'n"), Docket Entry No. 816; Visa, Mastercard & Discover's Reply in Supp. of VMD AM Mot. ("VMD AM Reply"), Docket Entry No. 817.)

[4]  (Amex's Mot. to Exclude the Testimony of Dr. Rosa Abrantes-Metz ("Amex AM Mot."), Docket Entry No. 828; Amex's Mem. in Supp. of Amex AM Mot. ("Amex AM Mem."),

Dr. Micah Officer,[5] (4) Amex's motion to exclude the testimony of Dr. Officer,[6] (5) Visa and Mastercard's motion to exclude Dr. Officer's Automated Fuel Dispenser ("AFD") benchmark opinions,[7] and (6) Plaintiffs' motion to exclude the opinion of Visa and Mastercard's expert Julie Conroy.[8]

For the reasons set forth below, the Court (1) denies Visa, Mastercard, and Discover's motion to exclude the opinions of Dr. Abrantes-Metz, (2) grants in part and denies in part Amex's motion to exclude the testimony of Dr. Abrantes-Metz, (3) denies Visa, Mastercard, and Discover's motion to exclude the opinions of Dr. Officer, (4) grants in part and denies in part Amex's motion to exclude the testimony of Dr. Officer, (5) denies Visa and Mastercard's motion

---

Docket Entry No. 832; Pls.' Mem. in Opp'n to Amex AM Mot. ("Pls.' Amex AM Opp'n"), Docket Entry No. 834; Amex's Reply in Supp. of Amex AM Mot. ("Amex AM Reply"), Docket Entry No. 835.)

[5] (Visa, Mastercard & Discover's Mot. to Exclude the Opinions of Dr. Micah Officer ("VMD Officer Mot."), Docket Entry No. 818; Visa, Mastercard & Discover's Mem. in Supp. of VMD Officer Mot. ("VMD Officer Mem."), Docket Entry No. 830; Pls.' Mem. in Opp'n to VMD Officer Mot. ("Pls.' VMD Officer Opp'n"), Docket Entry No. 831; Visa, Mastercard & Discover's Reply in Supp. of VMD Officer Mot. ("VMD Officer Reply"), Docket Entry No. 833.)

[6] (Amex's Mot. to Exclude the Testimony of Dr. Micah Officer ("Amex Officer Mot."), Docket Entry No. 840; Amex's Mem. in Supp. of Amex Officer Mot. ("Amex Officer Mem.), Docket Entry No. 841; Pls.' Mem. in Opp'n to Amex Officer Mot. ("Pls.' Amex Officer Opp'n"), Docket Entry No. 842; Amex's Reply in Supp. of Amex Officer Mot. ("Amex Officer Reply"), Docket Entry No. 843.)

[7] (Visa & Mastercard's Renewed *Daubert* Mot. to Exclude the AFD Benchmark Opinions of Dr. Micah Officer ("VM AFD Mot."), Docket Entry No. 810; Visa & Mastercard's Mem. in Supp. of VM AFD Mot. ("VM AFD Mem."), Docket Entry No. 811; Pls.' Mem. in Opp'n to VM AFD Mot. ("Pls.' AFD Opp'n"), Docket Entry No. 812; Visa & Mastercard's Reply in Supp. of VM AFD Mot. ("VM AFD Reply"), Docket Entry No. 813.)

[8] (Pls.' Mot. to Exclude the Testimony of Visa & Mastercard's Expert Julie Conroy ("Pls.' Mot."), Docket Entry No. 820; Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), Docket Entry No. 821; Visa & Mastercard's Mem. in Opp'n to Pls.' Mot. ("VM Opp'n"), Docket Entry No. 823; Pls.' Reply in Supp. of Pls.' Mot. ("Pls.' Reply"), Docket Entry No. 825.)

to exclude Dr. Officer's AFD benchmark opinions, and (6) grants in part and denies in part Plaintiffs' motion to exclude the opinion of Visa and Mastercard's expert Julie Conroy.

## I.   Background

The Court assumes familiarity with the facts and extensive procedural history as set forth in prior decisions, *see B & R Supermarket, Inc. v. Visa, Inc.* (*B&R I*), No. 16-CV-1150, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016); *B & R Supermarket, Inc. v. MasterCard Int'l Inc.* (*B&R II*), No. 17-CV-2738, 2018 WL 1335355 (E.D.N.Y. Mar. 11, 2018); *B & R Supermarket, Inc. v. Mastercard Int'l Inc.* (*B&R III*), No. 17-CV-2738, 2021 WL 234550 (E.D.N.Y. Aug. 20, 2020), and as set forth more recently, *see B & R Supermarket, Inc. v. Visa Inc* (*B&R IV*), No. 17-CV-2738, 2024 WL 3823096 (E.D.N.Y. Aug. 14, 2024); *B & R Supermarket, Inc. v. Visa Inc.* (*B&R V*), No. 17-CV-2738, 2024 WL 3949977 (E.D.N.Y. Aug. 15, 2024).

## II.   Discussion

### a.   Standard of review

"The admission of expert testimony is governed primarily by the Federal Rules of Evidence." *United States v. Walker*, No. 18-3506, 2023 WL 3451419, at *1 (2d Cir. May 15, 2023).  Rule 702 of the Federal Rules of Evidence was recently amended, and this new Amendment took effect December 1, 2023.  The rule now provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[9]  "While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, . . . the district court is the ultimate gatekeeper." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (alteration in original) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also Richardson v. Corr. Med. Care, Inc.*, No. 22-210, 2023 WL 3490904, at *2 (2d Cir. May 17, 2023) (same); *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) ("The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702." (citations omitted)).

Prior to permitting a person to testify as an expert under Rule 702, the court must make the following findings: (1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will "assist the

---

[9]  Prior to the Amendment, Rule 702 read:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2011) (amended 2023).  Although the language remains largely similar, the Court is mindful of the purposes of the two amendments, as set forth in the advisory committee's notes.

The purpose of the first amendment was to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."  Fed. R. Evid. 702 advisory committee's note to 2023 amendment.  The amendment was aimed at courts that had erroneously held that "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." *Id.* Rather, the Rule 104(a) preponderance standard is to be applied before a court admits the expert opinion in the first place.  *See id.*  The second amendment served to "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.*

trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005) (quoting Fed. R.

Evid. 702); *see also United States v. Napout*, 963 F.3d 163, 187–88 (2d Cir. 2020) (explaining that

the court is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and

is relevant to the task at hand" (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597

(1993))); *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) (quoting same).  In *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court set forth a list of factors, in addition to the

criteria set forth in Rule 702, that bear on the determination of reliability:

> (1) whether a theory or technique has been or can be tested;
> (2) "whether the theory or technique has been subjected to peer
> review and publication;" (3) the technique's "known or potential
> rate of error" and "the existence and maintenance of standards
> controlling the technique's operation;" and (4) whether a particular
> technique or theory has gained general acceptance in the relevant
> scientific community.

*Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 593–94); *see also United States v.*

*Morgan*, 675 F. App'x 53, 55 (2d Cir. 2017) (quoting same); *Zaremba v. Gen. Motors Corp.*, 360

F.3d 355, 358 (2d Cir. 2004) (similar) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–

50 (1999)).  The *Daubert* inquiry for reliability is a "flexible one" and does not "constitute a

definitive checklist or test," and thus, the *Daubert* factors "neither necessarily nor exclusively

appl[y] to all experts or in every case."  *Kumho Tire*, 526 U.S. at 141, 150 (internal quotation

marks and citations omitted).

The district court is afforded "the same broad latitude when it decides how to determine

reliability as it enjoys [with] respect to its ultimate reliability determination."  *Id.* at 142

(emphasis omitted) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)).  Expert

testimony should be excluded if it is "speculative or conjectural."  *Jones*, 965 F.3d at 162

(quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *Major League*

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (quoting same).  When an

expert's opinion is based on data or methodologies "that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)); *see also Nimely*, 414 F.3d at 396 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." (alteration in original) (quoting *Gen. Elec.*, 522 U.S. at 146)). Nevertheless, "in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion."  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Amorgianos*, 303 F.3d at 267); *see also Adams v. Liberty Mar. Corp.*, 407 F. Supp. 3d 196, 202 (E.D.N.Y. 2019) (same).

### b.  Defendants' motions to exclude the opinion of Dr Abrantes-Metz

Defendants move to exclude the expert opinion of Plaintiffs' economics expert, Dr. Abrantes-Metz.[10]

### i.  Dr. Abrantes-Metz's background and expert opinion

Dr. Abrantes-Metz is an economist specializing in industrial organization, econometrics, and asset pricing.  (Abrantes-Metz Rep. ¶ 1.)  She is a Managing Director at Global Economics Group, Inc., a firm specializing in "the application of economic theories and principles in a variety of contexts, including in litigation involving antitrust, labor, intellectual property, and

---

[10]  (VMD AM Mem.; Amex AM Mem.; *see also* Expert Rep. of Rosa M. Abrantes-Metz, Ph.D. ("Abrantes-Metz Rep."), annexed to Decl. of Rosemary Szanyi ("Szanyi Decl.") as DDX15, Docket Entry No. 855-15; Rebuttal Expert Rep. of Rosa M. Abrantes-Metz, Ph.D. ("Abrantes-Metz Reply"), annexed to Szanyi Decl. as DDX16, Docket Entry No. 855-16.)

also finance, statistics, and valuation." (*Id.* ¶ 3.) She is also an adjunct professor at the Leonard N. Stern School of Business at New York University. (*Id.*) Her work focuses on conspiracies, fraud, and the detection of cartel behavior — including price-fixing conspiracies — through various empirical "screening" methods. (*Id.* ¶¶ 2, 16–25.)

Dr. Abrantes-Metz defines the relevant product market for the alleged antitrust violations as "the network service market for general purpose cards, which includes credit, charge and debit cards, all of which are subject to the liability shift," and she defines "the geographical market" as the United States. (*Id.* ¶¶ 55, 61.) She explains that the "general purpose cards" market itself is "not a relevant antitrust product market because cardholders/consumers are indifferent as to whether the issuers or the merchants are financially responsible for paying for general purpose cards fraud." (*Id.* ¶ 55.) Accordingly, she concludes that "even though networks are multi-sided platforms, the market definition exercise pertinent in this case is the traditional single-side exercise," rather than the two-sided analysis that Visa, Mastercard, and Discover advocate for. (*Id.* ¶ 60; *see also* VMD AM Mem. 29–37.) She explains that a two-sided analysis is inapplicable to the conduct alleged in this case for two reasons: (1) "the alleged conduct is horizontal in nature," and (2) the "competitive constraints" from the two sides of the card transactions market — merchants on one side and cardholders on the other — are "unlikely to represent restraints to a price increase to one side of the platform, and more specifically, to restrain the alleged explicit horizontal agreement among networks." (Abrantes-Metz Rep. ¶ 60.)

In addition, as relevant to Visa, Mastercard, and Discover's challenge, Dr. Abrantes-Metz opines that, taking the alleged conduct leading up to the Liability Shift date as a given, "[t]he market outcomes and competitive dynamics are inconsistent with unilateral and competitive behavior by [Defendants]." (*Id.* ¶ 287.) She reports that if Defendants were "truly competing

with each other, we would expect to see" (i) "variation in the adoption dates reflecting a race by [Defendants] to gain a competitive advantage," (ii) "a delay in the FLS dates when economic conditions seem to have justified so," and (iii) "greater financial incentives offered to merchants to incentivize more rapid adoption of the new technology." (*Id.*) She writes that instead, "the actual market outcomes in this case are consistent with an explicit agreement by" Defendants to (i) "jointly set an effectively common FLS date," (ii) "refuse to delay this date even when the contemporaneous conditions seemed to justify doing so," and (iii) "avoid providing more costly incentives to merchants, even as it became clear most of them would likely miss the target adoption date." (*Id.*) Dr. Abrantes-Metz explains that because issuers typically bear the cost of fraud, merchants themselves had little incentive to become EMV-ready absent an incentive provided by issuers or Defendants. (*Id.* ¶¶ 290–291.) She reports that merchants would have switched to EMV only with either a positive or negative incentive, and that the "success of the negative incentive depended on each network knowing that other [n]etworks would not suddenly switch to a positive incentive, when unilaterally and competitively they would have the incentive to do so." (*Id.* ¶¶ 291–296.)

ii.   **Visa, Mastercard, and Discover's motion to exclude Dr. Abrantes-Metz's opinion**

Visa, Mastercard, and Discover argue that all of Dr. Abrantes-Metz's opinions should be excluded based on her reliance on a single-sided market analysis. (VMD AM Mem. 8–12, 29–37; VMD AM Reply 2–7.) In support, Visa, Mastercard, and Discover assert that opinions based on such a single-sided analysis are "contrary to the law governing transaction platforms" as established by Supreme Court and Second Circuit precedent. (VMD AM Reply 2.) In addition, Visa, Mastercard, and Discover also argue that specific opinions offered by Dr. Abrantes-Metz should be excluded as unreliable and unhelpful. (*Id.* at 2–3.) First, Visa, Mastercard, and

Discover argue that Dr. Abrantes-Metz's opinions on evidence of collusion should be excluded. (VMD AM Mem. 8–28.)  Second, Visa, Mastercard, and Discover argue that Dr. Abrantes-Metz's opinion on anticompetitive effects should be excluded because it is contrary to governing law and otherwise unreliable.  (*Id.* at 28–40.)

### 1.  One-sided market analysis

The Court first addresses Visa, Mastercard, and Discover's broader argument that Dr. Abrantes-Metz's opinions must be excluded because she relies on a single-sided market analysis. Visa, Mastercard, and Discover contend that Dr. Abrantes-Metz's opinions are contrary to governing law because following the Supreme Court's decision in *Ohio v. American Express Co.* (*Amex*), 585 U.S. 529 (2018), and the Second Circuit's decision in *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019), any analysis that does not consider both sides of a transaction platform is "methodologically incorrect, unhelpful to the factfinder, and therefore inadmissible."  (VMD AM Reply 2.)  In support, Visa, Mastercard, and Discover first argue that "the legal requirement to conduct a two-sided analysis stems from the nature of the transaction platform business, not the nature of the alleged restraint."  (*Id.* at 3.)  They argue that even if, as Plaintiffs suggest, the restraints at issue in this case are horizontal rather than vertical, *i.e.*, between competitors rather than non-competing entities, the rationale underlying the Supreme Court's decision in *Amex* requires courts to apply a two-sided analysis in any case assessing the impact of a restraint on a transaction platform.  (*Id.*)  They further argue that since *Amex*, the Second Circuit has affirmed that transaction platforms are among "a subset of two-sided platforms that must *always* receive two-sided treatment."  (*Id.* (quoting *Sabre*, 938 F.3d at 57).) Visa, Mastercard, and Discover argue that this result follows directly from *Amex*'s finding that two-sided transaction platforms "exhibit more pronounced indirect network effects" because they

"cannot make a sale unless both sides of the platform simultaneously agree to use their services." (*Id.* (quoting *Amex*, 585 U.S. at 545).)  Given that the two sides of a transaction platform market would constrain each other, Visa, Mastercard, and Discover argue that Dr. Abrantes-Metz should have considered "both issuer and merchant incentives in deciding on FLS timing," because that is what "a network acting competitively and independently" would do.  (*Id.* at 4.)  Second, Visa, Mastercard, and Discover argue that under *Amex*, Dr. Abrantes-Metz should also have considered the effects of the Liability Shift on cardholders, rather than "assum[ing the effects] away."  (*Id.* at 6–7.)  In support, Visa, Mastercard, and Discover contend that it does not matter whether or not the transaction platform at issue "experience[s] indirect network effects," because the Second Circuit has read *Amex* to require consideration of cardholder effects in all cases involving card transaction platforms.  (*Id.* (quoting *Sabre*, 938 F.3d at 58–59).)  In addition, Visa, Mastercard, and Discover argue that Dr. Abrantes-Metz's own work "presents both economic theory and empirical evidence that issuers . . . pass to cardholders *increases* in issuers' costs," and therefore, when maintaining liability for fraud would have increased issuer costs, Dr. Abrantes-Metz should have "analyze[d] the extent to which issuers would have passed the costs of delayed FLS dates . . . to cardholders."  (*Id.* at 7.)

Plaintiffs agree that Dr. Abrantes-Metz uses a single-sided market analysis and argue that such an analysis is consistent with the relevant governing law.  (Pls.' VMD AM Opp'n 4–11.)  First, Plaintiffs argue that Dr. Abrantes-Metz's methodology is appropriately "based on the specific horizontal restraint at issue in this case."  (*Id.* at 4–6.)  Plaintiffs highlight Dr. Abrantes-Metz's explanation that a two-sided analysis plays no role here because "the collusive agreement imposed on the merchants is, in effect, a price increase on only one side of the platform — the merchants."  (*Id.* at 5.)  They argue that the alleged collusive conduct is "a horizontal agreement

among networks who directly compete, providing a service with no adequate substitute," and so their collective conduct towards merchants, if true, would have no impact on the cardholder side of the market.  (*Id.* at 5–6.)  Second, Plaintiffs argue that the market analyses in *Amex*, *Sabre*, and *In re Payment Card* are inapplicable here because "those cases offer vastly different allegations of unilaterally-imposed vertical restraints, for which a balancing act of effects across the two sides of the platform needed to be considered."  (*Id.* at 6–9.)  For example, Plaintiffs note that in *Amex*, the conduct being challenged was "a single party vertical restraint that did not 'prevent Visa, Mastercard, or Discover from competing'" with Amex.  (*Id.* at 6–7 (quoting *Amex*, 585 U.S. at 551).)  Plaintiffs highlight the Supreme Court's acknowledgment that a "horizontal agreement between competitors is markedly different from a vertical agreement that incidentally affects one particular method of competition."  (*Id.* at 7 (quoting *Amex*, 585 U.S. at 551 n.10).)  Similarly, Plaintiffs argue that *Sabre* also involved vertical restraints that were not *per se* unreasonable.  (*Id.* at 7–8.)  Third, Plaintiffs argue that a two-sided analysis is irrelevant because the rationale underlying a two-sided analysis in cases like *Amex* does not apply to the alleged conduct at issue in this case.  (*Id.* at 8–11.)  In support, Plaintiffs argue that under *Amex*, "whether both sides of a platform must be analyzed is dependent on the relevance of the indirect network effects to the conduct at hand — *i.e.*, whether the effects that occur on one side are paired with interactions with the other side."  (*Id.* at 9–10.)  However, Plaintiffs contend that "[t]he impacts of indirect network effects here are not relevant," because "cardholders [are] always protected from fraud."  (*Id.* at 8, 10.)  Where the two sides of the market are cardholders and merchants (because "[c]ardholders would like more merchants and merchants would like more cardholders"), Plaintiffs contend that the conduct at issue in this case, directed at merchants, is entirely unrestrained by the cardholder side given that cardholders are indifferent

as to who pays for fraud between issuers and merchants.  (*See id.* at 10–11.)

*Amex* and *Sabre* do not, as Visa, Mastercard, and Discover argue, compel the conclusion that a two-sided market analysis is required any time an antitrust challenge touches upon a market, like a transaction platform market, that has two sides.  *Amex* itself contemplated that "it is not always necessary to consider both sides of a two-sided platform."  585 U.S. at 544.  Using the example of the newspaper-advertisement market, the Supreme Court acknowledged that although "the value of an advertisement increases as more people read the newspaper, . . . newspaper readers are largely indifferent to the amount of advertising that a newspaper contains."  *Id.*  In light of "these weak indirect network effects," the Supreme Court wrote, a newspaper-advertisement market could be assessed using a one-sided market analysis even though newspapers "arguably operate a two-sided platform."  *Id.*  Similarly, Dr. Abrantes-Metz explains extensively that "[f]rom the perspective of cardholders, it makes no difference whether the issuers bear the fraud costs, or merchants bear these costs, as either way, cardholders are protected."  (Abrantes-Metz Reply ¶¶ 191–193.)  Further, the Court has no basis to conclude that *Amex*'s requirement of a two-sided analysis applies to *all* cases involving two-sided platforms.  As Plaintiffs note, the *Amex* Court, in a pair of footnotes, declined to accept arguments that the *Amex* plaintiffs raised based on antitrust law governing horizontal agreements.  *See Amex*, 585 U.S. at 543 n.7 (explaining that because "horizontal restraints involve agreements between competitors not to compete in some way, [the Supreme Court] concluded that it did not need to precisely define the relevant market to conclude that these agreements were anticompetitive" (citing *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986))); *id.* at 551 & n.10 ("A horizontal agreement between competitors is markedly different from a vertical agreement that incidentally affects one particular method of competition." (citations omitted)).  Where the

Supreme Court itself differentiated cases of horizontal agreements from the vertical agreement before it, the Court sees no basis to infer that the same legal standards apply to both types of agreements.

The Court also finds that *Sabre* does not stand for as broad a proposition as Visa, Mastercard, and Discover urge. The Second Circuit read *Amex* as stating that "in many or most cases involving two-sided platforms, 'courts must include both sides of the platform' in their definition of the relevant market," but it also acknowledged *Amex*'s caveat that this may not be required when "the impacts of indirect network effects and relative pricing in the market are minor."[11] *Sabre*, 938 F.3d at 56 (quoting *Amex*, 585 U.S. at 544). Visa, Mastercard, and Discover quote the Second Circuit as saying that "[t]here is a subset of two-sided platforms that must *always* receive two-sided treatment: transaction platforms," and argue that this language essentially requires application of a two-sided analysis to Plaintiffs' claims. (VMD AM Reply 3 (quoting *Sabre*, 938 F.3d at 57).) The Second Circuit, however, clarified that transaction platforms are those "where the business 'cannot make a sale to one side of the platform without simultaneously making a sale to the other.'" *Sabre*, 938 F.3d at 57 (quoting *Amex*, 585 U.S. at 535). The platform at issue in *Sabre* was Sabre's "global distribution system" that travel agents

---

[11] The issue of market definition is not currently before the Court, but the Court notes that in cases alleging unlawful horizontal agreements, the Supreme Court has said that market definitions may not even be required. *See Amex*, 585 U.S. at 543 n.7 ("Given that horizontal restraints involve agreements between competitors not to compete in some way, . . . [courts do] not need to precisely define the relevant market to conclude that these agreements were anticompetitive."). As articulated by the Supreme Court, the need for market definition arises from its view that "[v]ertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market." *Id.* However, in cases involving horizontal agreements between competitors, such a showing of market power is not required, and therefore a market definition becomes less useful. Regardless, the Court does not consider, at this stage, Visa, Mastercard, and Discover's argument that Dr. Abrantes-Metz "does not actually perform a proper market definition analysis of her own." (*See* VMD AM Mem. 30.)

"use[d] to search for and book airline flights for their customers." *Id.* at 49.  The product being sold, and for which companies like Sabre charged a fee, was the airline ticket transaction.  *See id.* at 49–50.  Although *Amex* dealt with a similar product — a credit card transaction for which Amex charged a fee — there is no analogous "product" being sold in the present case for which any entity is paying a "fee."  *See Amex*, 585 U.S. at 533–34.  Rather, the challenged conduct is the shift of liability for fraud from issuers to merchants; when merchants bear the cost of chargebacks, they are not purchasing anything, and — more importantly — there is no "sale" to one side of a platform without a "simultaneous[]" sale to another side of a platform.  *See id.* at 535.  Although this case is factually related to the two-sided platforms that Defendants each operate — in which they sell network services for payment cards to cardholders and merchants alike — those sales are not what Plaintiffs challenge, and *Amex* and *Sabre* therefore have limited application to this case.

In addition, the horizontal nature of the agreement at issue in this case undercuts the rationale for application of a two-sided analysis endorsed in *Amex* and *Sabre*.  Specifically, the conduct alleged in this case does not carry the same risk of a "feedback loop of declining demand" that drove the two-sided analysis in *Amex*.  *See* 585 U.S. at 536, 544.  In *Amex*, the Supreme Court instructed courts to consider both sides of a two-sided market where "[r]aising the price on side A risks losing participation on that side, which decreases the value of the platform to side B."  *Id.* at 536.  In other words, the inherent constraint of a two-sided market came from the possibility that the operator of the two-sided platform could lose participation from one side of the market by, for example, raising the price for that side.[12]  The challenged

---

[12]  In addition, the two sides of the platform as considered by the Supreme Court in *Amex* were cardholders and merchants.  In this case, to the extent that the networks are "balancing

conduct in this case, however, would allow Defendants to shift liability to merchants without risking loss in merchant participation, precisely because the Liability Shift allegedly occurred pursuant to a horizontal agreement, *i.e.*, a merchant could not choose to drop one network in favor of another because all the major networks implemented the same policy at the same time. If proven, the two-sided nature of the market does not present the same risk of a "feedback loop of declining demand" that would otherwise place limits on a two-sided platform's conduct towards any one side of the market; merchants do not have the option of avoiding the Liability Shift by ceasing participation, and therefore the value of the network service market to cardholders does not decrease.  (*See* Abrantes-Metz Reply ¶ 192 ("[T]here is no reason to expect cardholder consumption behavior to change when fraud costs are incurred by issuers, versus when those costs are incurred by merchants; from their perspective, cardholders are indifferent as to who pays the cost of fraud.").)  Therefore, these facts do not support extending the rationale underlying *Amex* and *Sabre* to require, in this case, application of a two-sided analysis.

Accordingly, the Court does not exclude any part of Dr. Abrantes-Metz's opinion based on her reliance on a one-sided market analysis.

---

prices" on both sides of the market (where the "price" is who bears the liability for fraudulent transactions), the two sides consist of merchants and issuing banks because cardholders are never liable for fraud.  Therefore, as the Supreme Court has explained, whether a two-sided analysis is necessary depends on whether there are network effects across the two sides of the market.  *See Amex*, 585 U.S. at 536, 544.  Thus, one question is whether having more issuing banks on the other side of the market makes a particular card network more attractive to a merchant.  The existence of Amex and Discover (the sole issuing banks for Amex and Discover cards) demonstrates that merchants are indifferent to the number of *issuing banks* associated with a particular card network — the network effects only extend to merchants' interest in how many *cardholders* are on the other side of the market.  Accordingly, because there are no network effects between merchants and issuing banks, two-sided treatment is also unnecessary for this reason.

### 2.   Dr. Abrantes-Metz's opinion as to evidence of collusion

Visa, Mastercard, and Discover argue that the Court should exclude, for various reasons, Dr. Abrantes-Metz's opinion that Defendants' simultaneous implementation of the Liability Shift is indicative of collusive behavior.  First, Visa, Mastercard, and Discover argue that Dr. Abrantes-Metz's opinions on the timing of Liability Shift dates in other countries are unsupported by any evidence, that Dr. Abrantes-Metz herself disclaimed those opinions in her reply report and at her deposition, and that these opinions therefore cannot be used to support her position that Defendants' conduct is consistent with collusive behavior.  (VMD AM Mem. 12–15.)  In support, Visa, Mastercard, and Discover argue that Dr. Abrantes-Metz's opinion that "staggered or delayed timing of FLSs in other countries showed that Defendants' implementation of FLSs in the U.S. were 'inconsistent with unilateral behavior'" was "based on misreading of evidence or no evidence at all."  (*Id.* at 12–13 (quoting Abrantes-Metz Rep. ¶¶ 226–232, 287, 295).)  They argue that the evidence showed that Liability Shift dates in other countries "were frequently aligned, just as they were in the U.S."  (*Id.* at 13.)  Visa, Mastercard, and Discover further argue that following their opposing expert reports, Dr. Abrantes-Metz "distanced herself . . . from her initial opinions, repeatedly disclaiming the timing of FLSs in other countries as a benchmark by which to assess what happened here."  (*Id.* at 14.)  Second, Visa, Mastercard, and Discover argue that the Court should exclude as unreliable Dr. Abrantes-Metz's opinion that if Defendants had acted unilaterally, then they would have delayed their Liability Shift dates because merchants could have steered customers towards networks with later Liability Shift dates.  (*Id.* at 15.)  In support, Visa, Mastercard, and Discover argue that Dr. Abrantes-Metz did not base this opinion on "any reliable methodology," that her opinion is entirely "speculative," and that this opinion "provides no support for her broader collusion opinion."  (*Id.* at 16–19.)

Visa, Mastercard, and Discover also argue in support that Dr. Abrantes-Metz is unqualified to opine on whether Defendants may have unilaterally had an incentive to implement earlier Liability Shift dates in order to "lock" merchants into "legacy technology" that would limit their ability to steer customers to PIN debit networks. (*Id.* at 19–22.)  They argue that "her admitted lack of technical expertise and demonstrated confusion about other technologies" will not be helpful to the jury, and therefore cannot contribute to her opinion on collusion. (*Id.* at 22.)  Third, Visa, Mastercard, and Discover argue that Dr. Abrantes-Metz selectively disregards relevant evidence that Defendants behaved unilaterally, and that she erroneously purports to know Defendants' motive. (*Id.* at 22–24.)  In support, they contend that her testimony "flows from circular logic" because "she accepts Plaintiffs' claim that there was an agreement, tries to find evidence to explain why an agreement makes sense, and, on the basis that she knows there was an agreement, disregards admittedly contrary economic incentives that fully explain why Defendants did not delay their FLSs." (*Id.* at 24.)  Finally, Visa, Mastercard, and Discover argue that the Court should exclude Dr. Abrantes-Metz's opinion that Defendants' behavior must have been collusive because of the lack of "interchange reductions or possible other financial incentives to merchants to adopt EMV." (*Id.* at 24–28.)  In support, Visa, Mastercard, and Discover argue that it is not possible to show class-wide injury based on a lack of "positive" incentives, and therefore if she were to offer these opinions, they would only "confuse the jury and invite the jury to decide liability on an improper theory." (*Id.* at 24–25.)  Visa, Mastercard, and Discover argue that whether there were any financial incentives offered has "no bearing on an alleged agreement to stick to FLS dates." (*Id.* at 25.)  They also argue that the lack of such incentives cannot be evidence of anticompetitive effect, and that Dr. Abrantes-Metz does not explain how an alleged agreement to maintain the same Liability Shift date would "cause

networks not to offer additional financial incentives if they thought doing so would win them more transactions." (*Id.* at 26–27.)

Plaintiffs argue first that Dr. Abrantes-Metz's opinions regarding the timing of liability shifts in other countries are reliable. (Pls.' VMD AM Opp'n 11–16.) In support, they assert that Visa, Mastercard, and Discover make only vague and conclusory statements about the lack of support for Dr. Abrantes-Metz's opinions, and that she properly supported her statements about the lack of simultaneity in Liability Shift dates in other countries with "significant factual basis." (*See id.* at 12 (citing Abrantes-Metz Rep. ¶¶ 228, 287).) Plaintiffs point to additional evidence in the record showing that "Visa and Mastercard did not have the same fraud liability shift dates in Asia Pacific, Australia, Brazil, Colombia, Europe, Latin America [and] the Caribbean, South Africa, and Venezuela." (*Id.*) They include further evidence that liability shift and EMV compliance dates were often shifted in other countries. (*Id.* at 12–13.) In addition, they argue that Dr. Abrantes-Metz never disclaimed any of her opinions about Liability Shift dates in other countries, but merely clarified that "her work on the FLS timing in other countries is not a benchmark analysis for a but-for world, but rather a set of observations and examples that show the timing of the FLS in other countries is what one would expect to see in a competitive environment." (*Id.* at 15; *see also* Dep. of Rosa M. Abrantes-Metz, Ph.D. ("Abrantes-Metz Dep.") 188:14–19, annexed to Szanyi Decl. as DDX24, Docket Entry No. 855-24 (explaining that she did not use other countries as a "benchmark" because she did not "need to know what happened in other countries to look at the framework of what the competitive pressures were in the United States and how the networks solved those uncertainties through explicit coordination").) Second, Plaintiffs argue that Dr. Abrantes-Metz's opinions regarding merchant steering are reliable and supported by proper evidence. (Pls.' VMD Am. Opp'n 16–23.) In

support, Plaintiffs contend that Visa, Mastercard, and Discover "misread Dr. Abrantes-Metz's opinions and ignore the supporting record." (*Id.* at 16.) They argue that her opinions related to merchant steering are primarily that the "possibility that merchants might become able to steer cardholders away from one network to another" provided a "joint economic incentive to the Networks to explicitly coordinate rather than to act unilaterally and competitively." (*Id.* (quoting Abrantes-Metz Rep. ¶ 297).) Plaintiffs argue that Dr. Abrantes-Metz relies on specific evidence that Defendants were concerned about the possibility of merchant steering and that they therefore had real incentives to collude and avoid this possibility altogether. (*Id.* at 18–20.) Third, Plaintiffs argue that Defendants incorrectly object to Dr. Abrantes-Metz's use of hypothetical mathematical models to rebut the "fraud migration" arguments made by Defendants' experts.[13] (*Id.* at 23–25.) Plaintiffs contend that Defendants' objections are "entirely about outcomes and assumptions and not about the simplified mathematical equation and methodology," and that such hypotheticals are "appropriate for expert opinion." (*Id.* at 24.) Fourth, Plaintiffs argue that all of Defendants' objections to Dr. Abrantes-Metz's deposition testimony that "they apparently foresee as trial testimony" are premature, and therefore cannot be used to preclude admission of her opinion as to collusion. (*Id.* at 27–29.) They argue that objections to her testimony as "declaration of facts, motive and intent" cannot be made at this stage "[w]ithout a specific challenge to expert opinion." (*Id.* at 27.) Rather, they argue that these objections should be brought as a "limiting request either at trial, pretrial conference, or as a motion in limine." (*Id.*)

---

[13] "Fraud migration" is an argument by Defendants' experts that "fraudsters quickly adapt to changes in the security environment to target the weakest links in the system," meaning that unilateral behavior by any one network may lead to "fraud migration" whereby "fraudsters would increasingly concentrate their activities on that weakest network." (*See* Rep. of Dr. Andres V. Lerner ("Lerner Rep.") ¶ 175, annexed to Szanyi Decl. as DDX18, Docket Entry No. 855-18.)

Finally, Plaintiffs argue that Dr. Abrantes-Metz's opinions regarding the possible financial incentives that Defendants could have and may have offered absent the alleged collusion are relevant and a result of "standard economic methodology." (*Id.* at 29–33.)  In support, they argue that Dr. Abrantes-Metz relies on relevant evidence in expressing her view that "additional positive financial incentives would spur the adoption of EMV in the United States given the use of incentives in other countries." (*Id.* at 32.)  They argue that Visa, Mastercard, and Discover "wrongly suggest that withholding the 'carrot' of financial incentives is in the self-interest of each Network; in the absence of collusion in the but-for world, Defendants would have had to pay for these 'carrots' to promote and advance EMV migration." (*Id.* at 33.)

The Court first notes that a majority of Visa, Mastercard, and Discover's objections to Dr. Abrantes-Metz's opinions regarding collusion are not rooted in any specific legal basis for the exclusion of an expert opinion, but rather that they amount to objections to the conclusions that Dr. Abrantes-Metz draws and her assessment of the evidence on which she relies.  Although Visa, Mastercard, and Discover frame these arguments as relying on a lack of evidence to support her conclusions, the underlying challenge relies on a disagreement over how the evidence is to be viewed or the weight to be given to Dr. Abrantes-Metz's assessment of that evidence.  For example, Visa, Mastercard, and Discover contend that Dr. Abrantes-Metz's opinions based on the timing of liability shifts in other countries are based on a "misreading of evidence or no evidence at all," (VMD AM Mem. 13), but Dr. Abrantes-Metz points to specific evidence that Liability Shifts were not simultaneous in making her statement, (*see* Abrantes-Metz Rep. ¶ 228 (including a table showing the different dates for liability shifts in different countries for Visa and Mastercard)).  In reply, Visa, Mastercard, and Discover state only that "[a]ssertions of fact untethered from expert opinion are not helpful to the trier of fact,

particularly when those assertions are wrong." (VMD AM Reply 8.) To the extent that Visa, Mastercard, and Discover take issue with any of the conclusions that Dr. Abrantes-Metz reaches in her reports or in her eventual testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" such opinions. *Amorgianos*, 303 F.3d at 267 (alteration in original) (quoting *Daubert*, 509 U.S. at 596). These qualms do not provide a basis for exclusion of Dr. Abrantes-Metz's opinions regarding collusions, and Defendants will have the opportunity to dispute her conclusions through cross-examination as needed.

To the extent that Visa, Mastercard, and Discover challenge the methodology on which Dr. Abrantes-Metz relies in forming her opinions, the Court concludes that her opinions are supported by a reliable application of her stated methodology to the data she highlights. Although Visa, Mastercard, and Discover contend that Dr. Abrantes-Metz's opinions on collusion rely on "circular logic," (VMD AM Mem. 24), the Court is not persuaded that she assumes the existence of an alleged agreement. Rather, her conclusion that "the evidence is consistent with Defendants having engaged in explicit collusion" rests on observations of "economic incentives to engage in explicit collusion rather than risk a competitive environment for the transition to EMV technology," the "meetings and communications" Defendants had in the relevant period, the coordinated Liability Shift date, the resistance of Defendants to "marketplace pressures to delay the FLS," and various "positive incentives offered in other countries" in advance of the process of EMV migration. (Abrantes-Metz Reply ¶¶ 11–13, 127.) The Court concludes that none of these opinions are so seriously lacking in support that they amount to the "serious flaws in reasoning or methodology [that] warrant exclusion," especially given "the liberal admissibility standards of the Federal Rules of Evidence." *See In re Fosamax*,

645 F. Supp. 2d at 173 (citing *Amorgianos*, 303 F.3d at 267).  To the extent that Visa, Mastercard, and Discover wish to challenge the conclusions that Dr. Abrantes-Metz reaches pursuant to her observations and economic expertise, or her familiarity with the EMV technology itself, they are free to challenge her on cross-examination.  *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (concluding that challenges to expert's training and "other alleged shortcomings . . . were properly explored on cross-examination and went to his testimony's weight and credibility — not its admissibility" (citing *Fernandez v. Chios Shipping Co.*, 542 F.2d 145 (2d Cir. 1976))).

### 3.  Dr. Abrantes-Metz's opinions as to anticompetitive effects

In addition to their challenge to Dr. Abrantes-Metz's use of a one-sided market analysis, Visa, Mastercard, and Discover argue that Dr. Abrantes-Metz's opinions as to anticompetitive effects should be excluded for other reasons.  First, they contend that Dr. Abrantes-Metz uses "no recognized methodology" in providing her opinion on the relevant product market.  (VMD AM Mem. 32.)  In support, they argue that while Dr. Abrantes-Metz references the "Hypothetical Monopolist Test" ("HMT"), "she performs no such test in this case — nor does she apply any other accepted methodology."  Rather, they argue that Dr. Abrantes-Metz merely "'adopt[ed] the logic of HMT on possible substitutes in response to a price increase in the product market,'" and that she "makes no effort to evaluate the boundaries of her proposed product market."  (*Id.* at 32–33 (quoting Abrantes-Metz Rep. ¶ 59).)  Second, Visa, Mastercard, and Discover argue that Dr. Abrantes-Metz's analysis is incomplete because she ignores the benefits of the October 2015 Liability Shift date to large merchants compared to smaller merchants.  (*Id.* at 37–38.)  They contend that Dr. Abrantes-Metz "concludes that large merchants benefitted from the 2015 FLS dates" because they would have more easily been able

to become EMV-ready, but that she then failed to do "any analysis to net out the benefits to large merchants against the cost to small and medium-sized merchants to come up with an opinion as to the overall competitive effects on merchants as a whole." (*Id.* (citation omitted).) Third, Visa, Mastercard, and Discover argue that Dr. Abrantes-Metz "considers only a short-term transitional cost (*i.e.*, FLS cost-shifting on transactions for a limited time period when the issuer but not the merchant had implemented EMV), not the new, longer term market outcome (*i.e.*, overall competitive effects once the parties adjusted to new fraud liability rules by implementing EMV in the longer term)." (*Id.* at 38–39.) They argue that following *Amex*, "antitrust law recognizes that short-term disruptions can appear at first to be anticompetitive when in fact they are demonstrably not so once the market adjusts to an industry disruption." (*Id.* at 39 (citing *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 994 & n.15 (9th Cir. 2020)).) Visa, Mastercard, and Discover argue that the shift to EMV technology was meant to "eliminate — not shift — the costs of counterfeit fraud," that "[t]he FLSs worked as intended," and that "chargebacks incurred as a result of the FLSs peaked within about six months and have fallen steadily since." (*Id.* (emphasis omitted).)

Plaintiffs argue that Dr. Abrantes-Metz properly defined the relevant product market as "the network service market for general purpose cards," and that she appropriately supported this opinion with review of "the DOJ's and FTC's Horizontal Merger Guidelines, the [HMT], a qualitative analysis adopting the logic of HMT," "consideration of competitive constraints in . . . multi-sided platforms, an analysis of the network service market, network interchange fees over time, demand side substitution for merchants, issuers and consumers, and supply side substitution for the networks." (Pls.' VMD AM Opp'n 34 (citing Abrantes-Metz Rep. ¶¶ 55–56, 58–59, 61–122).) Second, Plaintiffs argue that Dr. Abrantes-Metz properly considered the

overall anticompetitive effects of the Liability Shifts, notwithstanding Visa, Mastercard, and Discover's argument that her analysis is "incomplete in evaluating impacts on cardholders and large merchants." (*Id.* at 37–39.) In support, Plaintiffs contend that Dr. Abrantes-Metz's analysis — which considers "whether the costs on merchants imposed by the Networks' collusion had an effect on prices being offered to merchants" — is consistent with Plaintiffs' theory of liability as approved by Judge William Alsup in denying Defendants' motion to dismiss. (*Id.* at 37.) Plaintiffs further argue that contrary to Visa, Mastercard, and Discover's assertions, Dr. Abrantes-Metz did consider whether reductions in costs for issuers would be passed on to cardholders, and concluded that no such benefits would result. (*Id.* at 38.) Plaintiffs argue that Visa, Mastercard, and Discover's dispute as to this aspect of Dr. Abrantes-Metz's opinion is simply a disagreement with her conclusion, and is therefore not a basis for exclusion of her opinion. (*Id.*) In further support of the completeness of her analysis, Plaintiffs argue that Dr. Abrantes-Metz never opined that large merchants "benefitted" from the October 2015 Liability Shift, but only that "some large merchants would have the incentive to support an early FLS to better be able to compete against other merchants." (*Id.* at 39 (first citing Abrantes-Metz Reply ¶¶ 289(b), 294; and then citing Abrantes-Metz Dep. 49:9–22).) Third, Plaintiffs argue that Visa, Mastercard, and Discover incorrectly assert that Dr. Abrantes-Metz's analysis is incomplete for including only a "short-run shift in fraud costs" while failing to account for longer term benefits. (*Id.* at 39 (quoting VMD AM Mem. 40).) In support, Plaintiffs argue that Visa, Mastercard, and Discover ignore Dr. Abrantes-Metz's opinion that the alleged conduct "locked merchants into legacy technology (that does not allow access to PIN debit network services) which reduced competition between Defendants and other Networks in the future." (*Id.* at 39–40 (citing Abrantes-Metz Reply ¶¶ 200, 273, 304).) They further argue that this aspect of

Visa, Mastercard, and Discover's argument "again is not a methodological challenge but simply a difference in how the anticompetitive effects are viewed." (*Id.* at 40.) Plaintiffs contend that this "is not a proper *Daubert* objection and is more appropriately a path for cross-examination." (*Id.* (citing *McCullock*, 61 F.3d at 1044).)

The Court is not persuaded that the methodology underlying Dr. Abrantes-Metz's opinions as to the anticompetitive effects of the October 2015 Liability Shift is so "serious[ly] flaw[ed]" that these opinions must be excluded. *See In re Fosamax*, 645 F. Supp. 2d at 173 (citing *Amorgianos*, 303 F.3d at 267). Contrary to Visa, Mastercard, and Discover's argument that Dr. Abrantes-Metz failed to apply any "recognized methodology" in arriving at her conclusions, (*see* VMD AM Mem. 32), Dr. Abrantes-Metz articulated several different bases for her conclusions. For example, Dr. Abrantes-Metz conducted an extensive demand-side substitution analysis assessing whether "consumers' preferences [among payment methods] may represent a competitive constraint to an increase in prices in the network services market." (Abrantes-Metz Rep. ¶¶ 97–108.) She concluded that given merchants' and cardholders' preferences, "merchants and cardholders will have little incentive to switch to other payment types" even if the price of general purpose cards increases. (*Id.* ¶ 108; *see also* Abrantes-Metz Reply ¶ 213.) Further, in response to criticism that she failed to appropriately apply the HMT, Dr. Abrantes-Metz relied on guidance from the Department of Justice and the Federal Trade Commission to explain that "even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer

substitution and to market definition."[14]  (Abrantes-Metz Reply ¶ 245 (quoting U.S. Dep't of

Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 4.1.3 (2010)).)  The Court

concludes that Dr. Abrantes-Metz's opinions have "a sufficiently 'reliable foundation' to permit

[them] to be considered," *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d

179, 184 (2d Cir. 2001) (quoting *Daubert*, 509 U.S. at 597), and that her proffered testimony is

"the product of reliable principles and methods" such that exclusion is not warranted on the basis

of her chosen methodologies, Fed. R. Evid. 702.

The Court also rejects Visa, Mastercard, and Discover's challenge to Dr. Abrantes-

Metz's opinions based on her purported failure to consider how some "large merchants could

have been better off as a result of the FLSs not being delayed."  (VMD AM Mem. 37.)  The

Court has already addressed these arguments at length in its order denying Visa and Mastercard's

motion to decertify the class.  *See B&R V*, 2024 WL 3949977, at *4–10.  In particular, the Court

rejected the argument that large merchants did not suffer the same harm as small or medium-

sized merchants.  The Court observed that while "[l]arge merchants may have maintained a

competitive advantage over small or medium-sized merchants as the Liability Shifts were

implemented, . . . references to some competitive benefits that accrued to large merchants are

---

[14]   The edition of the Horizontal Merger Guidelines cited by Dr. Abrantes-Metz, available at https://www.justice.gov/atr/file/810276/dl?inline, is now "inactive" following withdrawal by the Department of Justice in December of 2023.  *Horizontal Merger Guidelines (08/19/2010)*, Antitrust Division, U.S. Dep't of Justice https://www.justice.gov/atr/horizontal-merger-guidelines-08192010 (last updated June 17, 2024).  The revised 2023 Merger Guidelines do not include this same language, but do state as follows in discussing tools for carrying out the HMT: "To assess whether the hypothetical monopolist likely would undertake at least a [small but significant and non-transitory increase in price] on one or more products in the candidate market, the [DOJ and FTC] sometimes interpret the qualitative and quantitative evidence using an economic model of the profitability to the hypothetical monopolist of undertaking price increases . . . ."  U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines § 4.3.C (2023), https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf.

insufficient to suggest that large merchants were part of the alleged conspiracy, or that they suffered no harm from the earlier, coordinated Liability Shift date." *Id.* at *5.  Accordingly, the Court concluded that the "fundamental nature of the Class's claims against Defendants would not be affected even if some large merchants suffered a smaller injury than other merchants or could have avoided chargebacks by complying with the allegedly anticompetitive requirements." *Id.*  These conclusions apply equally to the challenge Visa, Mastercard, and Discover now raise in their motion to exclude Dr. Abrantes-Metz's opinion.

As to Visa, Mastercard, and Discover's remaining challenges, the Court concludes that they amount to disputes over "the correctness of [Dr. Abrantes-Metz's] conclusions," which is not the focus of the Court's inquiry in determining whether an expert opinion is admissible under *Daubert* and Rule 702.  *Amorgianos*, 303 F.3d at 266 (citing *Daubert*, 509 U.S. at 595).  To the extent Visa, Mastercard, and Discover wish to challenge Dr. Abrantes-Metz's conclusion that the Liability Shift resulted in long-term harm to competition, any perceived weaknesses in her foundation for these opinions "are fair ground for cross-examination, but they are not a basis for preclusion."  *Vazquez v. City of New York*, No. 10-CV-6277, 2014 WL 4388497, at *12 (S.D.N.Y. Sept. 5, 2014); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (citation omitted)).

> ### iii.   Amex's motion to exclude Dr. Abrantes-Metz's opinion as to Amex's participation in the alleged conspiracy

Amex raises numerous bases for exclusion of Dr. Abrantes-Metz's opinions as to Amex's participation in the alleged conspiracy, arguing that Amex "was pursuing its own unilateral economic interests in adopting a 'follow-the-leader' approach" to the Liability Shift, and that

"Dr. Abrantes-Metz employs a variety of improper approaches and techniques to opine that Amex participated in a conspiracy, all of which make her testimony as to Amex inadmissible under *Daubert*." (Amex AM Mem. 1.)  The Court addresses each of Amex's arguments separately.

### 1.    Factual basis for opinions about Amex

Amex argues that Dr. Abrantes-Metz "offers sweeping conclusions about 'the Networks' or 'the Defendants' based on evidence having nothing at all to do with Amex or based on no evidence at all." (*Id.* at 5.)  It argues that rather than citing evidence involving Amex, there are thirty-two instances in which Dr. Abrantes-Metz cites documents that involve Visa or Mastercard and then draws conclusions about Amex's behavior from that evidence.  (*Id.* at 5–6 & n.2.)  For example, Amex argues that in her opening and reply reports, Dr. Abrantes-Metz claims that "direct communications among high level executives at the Networks . . . show coordination," but that the supporting documentation to which she cites does not involve Amex. (*Id.* at 5 (quoting Abrantes-Metz Rep. ¶ 151).)  Amex includes other examples in which it argues that Dr. Abrantes-Metz cites evidence involving only "Visa and Mastercard [that does] not reference Amex at all." (*Id.* at 5–6.)  In addition, Amex argues that even when Dr. Abrantes-Metz does cite evidence that involves Amex to support her opinions, "she blatantly mischaracterizes the cited materials and offers opinions that are untethered to the facts." (*Id.* at 6.)  In support, Amex points to fifty-one opinions offered by Dr. Abrantes-Metz and argues that the evidence cited for each of these propositions "offers no factual support for the assertion." (*Id.* at 6 & n.3.)  Amex argues, for example, that the documents that Dr. Abrantes-Metz cites as evidence of an alleged conspiracy between Amex and the other Defendants are "instead consistent with Amex adopting and following a unilateral strategy of monitoring the market and

following the leaders." (*Id.* at 7.)  Amex highlights documents "summarizing responses from Visa and Discover to questions Amex had posed to each Network . . . in order to gain clarity on their publicly announced FLS policies." (*Id.*)  Amex argues that although Dr. Abrantes-Metz interprets these documents as showing a "'desire' for alignment among the Networks," "nothing in the documents indicates that Amex was 'explicitly agreeing' to follow the other Networks' FLS dates." (*Id.* at 7–8 & n.4 (quoting Abrantes-Metz Rep. ¶¶ 146–147).)  Rather, Amex argues that these documents were "consistent with Amex's efforts to monitor the market and decide unilaterally whether to follow Visa's lead and do not reflect any agreement with the other Networks." (*Id.* at 8.)  Amex highlights numerous other examples of documents Dr. Abrantes-Metz cites in support of her opinions related to Amex's participation in the conspiracy, and argues that none of the documents are "inconsistent with [Amex's] unilateral interest in monitoring the market and following the market leaders." (*See id.* at 8–17.)

Plaintiffs first argue that "clear authorities" hold that "as long as there is a 'conscious commitment to a common scheme,' liability attaches even where Amex does not have 'full knowledge of *all* the details of [the] conspiracy or its scope.'" (Pls.' Amex AM Opp'n 4 (quoting *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-CV-7789, 2022 WL 294118, at *12 (S.D.N.Y. Feb. 1, 2022)).)  Plaintiffs contend that as a result, "Dr. Abrantes-Metz's opinions have a legal basis for their admissibility" because "Amex is responsible for the collective conduct of Defendants and for its resulting effects." (*Id.*)  Consequently, to the extent Amex argues that Dr. Abrantes-Metz cites documents that do not involve Amex, Plaintiffs contend that Amex need not have been aware of every aspect of the conspiracy in order to be held liable for the conspiracy as a whole. (*Id.*)  In addition, they contend that Amex ignores the other evidence that Dr. Abrantes-Metz relies on that does directly involve Amex. (*Id.* at 4–6.)

Second, Plaintiffs dispute Amex's assertion that Dr. Abrantes-Metz "blatantly mischaracterizes" the evidence referencing Amex.  (*Id.* at 7 (quoting Amex AM Mem. 6).)  They argue that Amex's objections are "merely disagreements as to the interpretation" of these documents.  (*Id.*)  Plaintiffs further argue that the objections Amex raises "go to 'the weight, not the admissibility' of an expert's testimony."  (*Id.* (quoting *McCullock*, 61 F.3d at 1044).)  In addition, Plaintiffs argue that especially when an expert is applying a "soft science" like economics, deference to the expert is "particularly appropriate."  (*Id.* at 8 (quoting *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175, 2014 WL 7882100, at *8 (E.D.N.Y. Oct. 15, 2014)).)  Absent any showing of "bad faith" in interpreting the evidence, Plaintiffs argue that the Court has no basis to exclude Dr. Abrantes-Metz's opinions.  (*Id.* at 8–9.)

As a threshold matter, Plaintiffs correctly note that in order to be held liable for the alleged antitrust conspiracy, Amex "need not know 'all the details of the conspiracy, so long as [Amex] knew its general nature and extent.'"  *See United States v. Curry*, No. 22-50, 2023 WL 8073057, at *5 (2d Cir. Nov. 21, 2023) (quoting *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008)); *United States v. Ghayth*, 709 F. App'x 718, 722 (2d Cir. 2017) (finding that the defendant had joined the conspiracy and was complicit "by reason of [his] knowledge of the plan's general scope, if not its exact limits" (alteration in original) (quoting *Blumenthal v. United States*, 332 U.S. 539, 559 (1947))); *cf. United States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008) (noting that "a conspirator need not be fully informed about his co-conspirators' specific criminal acts provided that he agreed to participate in the broader criminal conspiracy").  Accordingly, not every piece of evidence that Dr. Abrantes-Metz relies on in drawing her conclusions regarding Defendants' participation in the conspiracy must involve all four Defendants.  As Amex argues, however, it remains the Court's role to ensure that an expert's

31

opinion "rests on a reliable foundation." *Napout*, 963 F.3d at 187–88 (quoting *Daubert*, 509 U.S. at 597); *see also* Fed. R. Evid. 702 (requiring proponent of expert testimony to demonstrate to the court that "it is more likely than not that . . . the testimony is based on sufficient facts or data"). Therefore, while Dr. Abrantes-Metz may rely on evidence that references only some Defendants and not Amex, she may not testify that Amex "agreed" to any collusive behavior absent at least some specific evidence that supports — even if such support is weak — the view that Amex did, in fact, collude with Visa, Mastercard, or Discover. *See Napout*, 963 F.3d at 188 (observing that district courts may "exclude expert testimony it view[s] as insufficiently supported by data or facts" and that a "district court has 'broad discretion' to decide 'how to determine reliability' of proposed expert testimony" (quoting *Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017))).

For example, in response to Amex's argument that Dr. Abrantes-Metz's opinions as to Amex's participation are unsupported by any evidence specific to Amex, Plaintiffs highlight her reliance on meeting minutes from a June 19, 2015, meeting of "Amex's EMV Program Steering Committee." (Pls.' Amex AM Opp'n 4–5 (quoting Abrantes-Metz Rep. ¶ 156).) The meeting minutes reflect that Amex was, at the very least, monitoring the start date for "Visa and Mastercard driven FLS," and that if Visa or Mastercard decided to delay their Liability Shift, then Amex would have to respond. (*See* Abrantes-Metz Rep. ¶¶ 156–157; *see also id.* ¶ 157 (quoting meeting minutes stating that "Visa and Master[c]ard extension in Canada was announced a week before FLS was to begin — the team will need to move quickly to be able to respond").) Although the Court does not necessarily view this underlying evidence as strongly "corroborating joinder with the collusion," (Pls.' Amex AM Opp'n 4), Dr. Abrantes-Metz is not offering her opinions as to Amex's conduct entirely without support. While as Amex argues,

this evidence may not be "inconsistent with [Amex's] unilateral interest in monitoring the market and following the market leaders," (*see* Amex AM Mem. 8–17), this does not mean that no other conclusions may be drawn from this evidence.  Even in her report, Dr. Abrantes-Metz does not cite this evidence to support an opinion that Amex colluded or engaged in anticompetitive behavior but rather to support her conclusion that Amex "agreed on a plan to react to liability shift delays from Visa and Mastercard."  (Abrantes-Metz Rep. ¶ 156.)  Such an opinion is supported by the evidence she cites.

Accordingly, the Court declines to issue a blanket ruling as to all of Dr. Abrantes-Metz's opinions on Amex's participation in the conspiracy at this stage.  Consistent with the guidance above, Dr. Abrantes-Metz may testify to Amex's conduct so long as her opinion has some factual basis.  To the extent Amex (or any Defendant) identifies weaknesses in the foundation for her opinions, those weaknesses "are fair ground for cross-examination, but they are not a basis for preclusion."  *Vazquez*, 2014 WL 4388497, at *12; *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (citation omitted)); *Napout*, 963 F.3d at 188 (noting that unless an expert's testimony is "so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," contentions that an expert's assumptions are unfounded "go to the weight, not the admissibility, of the testimony" (quoting *Restivo*, 846 F.3d at 577)).

### 2.   Impermissible legal conclusions

Amex argues that Dr. Abrantes-Metz's opinions that "Amex engaged in a conspiracy with the other three Networks" are not admissible as expert testimony because they constitute "legal conclusion[s]" about "whether a conspiracy existed or anticompetitive conduct actually

occurred." (Amex AM Mem. 17–18 (alteration in original) (quoting *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3*, 313 F. Supp. 2d 213, 241 (S.D.N.Y. 2004)).) Amex contends that several of Dr. Abrantes-Metz's opinions speak to "key legal issue[s] in this case," and that she impermissibly "undertakes to tell the jury what result to reach." (*Id.* at 18 (quoting *Nimley*, 414 F.3d at 397).) Amex cites numerous examples from Dr. Abrantes-Metz's reports and contend that the economics principles that she claims to rely on are "effectively coterminous with the legal definition of a Sherman Act § 1 conspiracy," and that she therefore should not be allowed to share these opinions with a jury. (*Id.* at 18–19 & n.5.)

Plaintiffs argue that "Amex's objections are too general and overstated," and that "Dr. Abrantes-Metz offers the types of opinions that have been found permissible and admissible by a number of courts." (Pls.' Amex AM Opp'n 9.) In support, Plaintiffs note that other courts routinely permit expert testimony "concerning mixed questions of fact and law," and argue that in cases like *U.S. Information Systems*, cited by Amex, the court admitted testimony regarding whether the "climate of a specific market was consistent with conspiracy." (*Id.* (quoting *U.S. Info. Sys.*, 313 F. Supp. 2d at 240).) Specifically, Plaintiffs note that, while these courts have precluded experts from stating outright whether defendants have engaged in anticompetitive conduct, experts can point to whether factors indicating anticompetitive conduct are present in a given market and can "hypothesize that if certain conduct did occur, economists would expect the market to react in a particular way." (*Id.* at 10–11 (quoting *U.S. Info. Sys.*, 313 F. Supp. 2d at 241).) Plaintiffs contend that Dr. Abrantes-Metz's testimony falls within these bounds, and that the Court should therefore admit her opinions. (*Id.* at 11.) In addition, Plaintiffs argue that each of the examples cited by Amex as constituting a "legal conclusion" is permissible expert opinion

on the matter of whether "the evidence is economically consistent with collusion, not whether it

proves collusion" as a matter of law.  (*See id.* at 11–15 (emphasis omitted).)

"As a general rule an expert's testimony on issues of law is inadmissible." *United States*

*v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (citation omitted); *United States v. Prevezon*

*Holdings, Ltd.*, 251 F. Supp. 3d 684, 699 (S.D.N.Y. 2017) (quoting *Bilzerian*, 926 F.2d at 1294);

*see also United States v. Scop*, 846 F.2d 135, 139 (2d. Cir. 1988) (stating that Federal Rule of

Evidence 704 "was not intended to allow experts to offer opinions embodying legal

conclusions").  "[A]lthough an expert may opine on an issue of fact within the jury's province,

he may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian*,

926 F.2d at 1294; *see also Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993) (stating

that testimony "is not objectionable merely 'because it embraces an ultimate issue to be decided

by the trier of fact,'" but that courts should guard against "the admission of opinions which

would merely tell the jury what result to reach" (first quoting Fed. R. Evid. 704; and then quoting

Fed. R. Evid. 704 advisory committee's note to 1972 Proposed Rules)).  In addition, the Second

Circuit has "consistently held . . . that expert testimony that 'usurp[s] the role of the trial judge in

instructing the jury as to the applicable law . . . by definition does not 'aid the jury in making a

decision'; rather, it 'undertakes to tell the jury what result to reach.'" *Nimley*, 414 F.3d at 397

(first quoting *Bilzerian*, 926 F.2d at 1294; and then quoting *United States v. Duncan*, 42 F.3d 97,

101 (2d Cir. 1994)); *SEC v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) ("Expert

testimony may not usurp the province of the judge to instruct on the law . . . ." (first citing

*Bilzerian*, 926 F.2d at 1294; and then citing *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505,

510–11 (2d Cir. 1977))); *see also A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d

1195, 1207 (9th Cir. 2016) (stating that "instructing the jury as to the applicable law is the

distinct and exclusive province of the court" (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004))).

The Court concludes that Dr. Abrantes-Metz may not directly testify as to whether Amex (or any Defendant) did or did not engage in anticompetitive conduct, whether a conspiracy in fact existed, or whether any Defendant violated federal or state antitrust laws. Regardless of underlying expertise, "experts may not testify as to conclusions of law," because "[d]oing so would usurp the role of the court in determining the applicable legal standards." *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012) (first citing *Bilzerian*, 926 F.2d at 1294; and then citing *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)). However, in the Court's view, Dr. Abrantes-Metz's report does not opine on such legal conclusions. The only references to "conspiracy" or "anticompetitive" conduct or concerns in her opening report, for example, are in describing her background, her qualifications, and the allegations underlying this case. (*See generally* Abrantes-Metz Rep.) Amex complains that Dr. Abrantes-Metz uses the words "collusion" or "coordination" to "recast her legal conclusions as economic analysis," (Amex AM Mem. 19), but these are not exclusively legal concepts that Dr. Abrantes-Metz should be forbidden from using in describing her views, so long as she does not use these terms to instruct the jury on applicable legal standards or on what conclusion to reach. *See Nimley*, 414 F.3d at 397. Her use of "coordination" in many of these instances, for example, appears to reference the coordinated date of the Liability Shifts by each of the four Defendants, and Amex offers no basis for exclusion of such factual assertions. (*See, e.g.*, Abrantes-Metz Rep. ¶ 156 (discussing "coordination in the setting of the FLS among Networks").)

Other courts have similarly permitted experts to "explain whether conduct is indicative of collusion." *See U.S. Info. Sys.*, 313 F. Supp. 2d at 240. In *U.S. Information Systems*, for

example, the court collected cases in which courts permitted experts to "testify that the 'climate' of a specific market was consistent with a conspiracy," and concluded that while the expert could not "state that the defendants did or did not engage in anticompetitive conduct," he could "point to factors that would tend to show anticompetitive conduct in a market." *Id.* at 240–41. The court wrote that while the finder of fact would ultimately determine "whether a conspiracy existed or anticompetitive conduct actually occurred," the expert "could hypothesize that if certain conduct did occur, economists would expect the market to react in a particular way." *Id.* at 241. More recently, in another case alleging a violation of section 1 of the Sherman Act, the court agreed with the objecting defendants that the plaintiff's expert could not "testify that defendants' conduct was anticompetitive or unlawful, nor can he provide any type of conclusion about whether a price-fixing conspiracy existed or whether anticompetitive conduct occurred." *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, No. 11-CV-564, 2019 WL 1515231, at *7 (E.D.N.Y. Feb. 21, 2019). Over the defendants' objections, however, the court concluded that the expert could "explain the presence of factors tending to show anticompetitive conduct in the marketplace." *Id.*

These principles and limitations apply equally to any testimony offered by Dr. Abrantes-Metz. She may not tell the jury how "to determine the facts and what weight, if any, to give them," *DPWN Holdings*, 2019 WL 1515231, at *7, nor can she "undertake[] to tell the jury what result to reach," *Nimley*, 414 F.3d at 397 (quoting *Duncan*, 42 F.3d at 101). She may, however, offer her opinions as to whether certain conduct was indicative of collusion or whether market conditions reflected what economists might have expected to see as a result of anticompetitive conduct. *See DPWN Holdings*, 2019 WL 1515231, at *7. To the extent Amex believes that any

part of the testimony by Dr. Abrantes-Metz falls outside of these permissible bounds, it may object to such opinions as they are offered at trial.

### 3.   Opinions as to Amex's intent and state of mind

Amex argues that Dr. Abrantes-Metz's opinions are inadmissible "to the extent she opines on Amex's 'knowledge, motivations, intent, state of mind, or purposes." (Amex AM Mem. 20 (quoting *In re Fosamax*, 645 F. Supp. 2d at 192).) Amex contends that Dr. Abrantes-Metz's expertise does not give her any specialized knowledge of Amex's state of mind, and further that the issue of intent is one for the jury to decide, not an economics expert. (*Id.* at 20–21.) In addition, Amex argues that none of Dr. Abrantes-Metz's opinions as to Amex's intent or state of mind are supported by any sources "stating as a fact that the party" had that intent or state of mind. (*Id.* at 25 (quoting *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, No. 05-MD-1720, 2022 WL 15044626, at *31 (E.D.N.Y. Oct. 26, 2022)).) Amex cites numerous examples from Dr. Abrantes-Metz's reports and argues that each of them is impermissible for lack of an appropriate factual foundation. (*See id.* at 20–25 & n.6.)

Plaintiffs argue that Amex's objections are misplaced because rather than "improperly inferring state of mind," Dr. Abrantes-Metz's opinions "offer statements tied to specific evidence to state facts regarding market behaviors and as a basis for her ultimate opinion regarding Defendants' incentives and coordinated conduct." (Pls.' Amex AM Opp'n 15–17.) They argue that "Dr. Abrantes-Metz disavowed any plan or purpose to opine merely on Amex's intent or state of mind," (*id.* at 17 (citing Abrantes-Metz Dep. 124:10–125:21, 217:25–218:9)), and that other courts have allowed experts to testify as to the existing economic incentives that might guide market behaviors "as long as it is helpful to the trier of fact," (*id.* at 15). Plaintiffs highlight a case in which a district court overruled objections to Dr. Abrantes-Metz's testimony

on similar grounds that her opinions "intruded on the intent and motive of the defendants." (*Id.* at 16 (citing *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2017 WL 1391491 (N.D. Cal. Apr. 12, 2017)).) Plaintiffs observe that the court in *In re Lithium Ion Batteries Antitrust Litigation* held that "opinions about features of defendants' contacts that are indicative of collusion and the features of the cylindrical [lithium ion batteries] market that make it susceptible to successful coordination" were admissible, and further ruled that Dr. Abrantes-Metz's qualifications meant she was "capable of providing the jury with tools they can use to aid their fact-finding obligations, rather than usurping the jury's fact-finding role." (*Id.* (quoting *In re Lithium Ion Batteries*, 2017 WL 1391491, at *9).) Plaintiffs also point to the Court's prior decision on the admissibility of a different expert in the *In re Payment Card* litigation, in which it held that to the extent the defendants "disagree that [the expert's] statement represents a fact rather than an opinion, they may challenge his testimony" at trial, because "[i]t is not always obvious from an expert's report alone whether the expert is relying on a source that states a party's state of mind or improperly inferring state of mind." (*Id.* at 16–17 (quoting *In re Payment Card*, 2022 WL 15044626, at *31 n.12).) Plaintiffs then address each of the examples that Amex cites as being impermissible opinions as to intent or state of mind and argue that those opinions constitute "economic opinions" and are otherwise "well-supported by the statements of Amex and its co-conspirators that reveal Amex's participation in the collusive efforts over the liability shift." (*See id.* at 17–20.)

"Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004); *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MD-1570, 2023 WL 3116763, at *15 (S.D.N.Y. Apr. 27, 2023) ("An expert cannot opine as to another's state of mind, but he may

39

testify to the goals of an organization, provided he has sufficient basis." (first citing *United States v. Rahman*, 189 F.3d 88, 136 (2d Cir. 1999); and then citing *United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 123 (D. Conn. 2008))); *Kewazinga Corp. v. Microsoft Corp.*, No. 18-CV-4500, 2021 WL 4066597, at *15 (S.D.N.Y. Sept. 1, 2021) ("Expert opinions about beliefs, intents, or motives are inadmissible."); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) (noting that "experts may not offer opinions regarding the intent or motive of parties as part of their analysis"); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000) ("The question of intent is a classic jury question and not one for experts . . . ."). "Experts may, however, offer testimony discussing 'ordinary practices and usages' in a particular industry." *Scott*, 315 F.R.D. at 46 (citing *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 471 (S.D.N.Y. 2005)); *see also In re Blech Secs. Litig.*, No. 94-CV-7696, 2003 WL 1610775, at *19 (S.D.N.Y. Mar. 26, 2003) (stating that "it is proper for an expert to testify as to the customs and standards of an industry, and to opine as to how a party's conduct measured up against such standards" (quoting *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), *abrogated on other grounds by Casey v. Merck & Co., Inc.*, 653 F.3d 95 (2d Cir. 2011))). Courts have also permitted experts to testify as to commercial reasonableness. *See Dover v. British Airways, PLC (UK)*, 254 F. Supp. 3d 455, 462 (E.D.N.Y. 2017) (describing expert's testimony about "commercially reasonable alternatives" the defendant could have pursued); *Sting Soccer Operations Grp. LP v. JP Morgan Chase Bank, N.A.*, No. 15-CV-127, 2016 WL 4141118, at *3 (E.D. Tex. Aug. 4, 2016) (finding that expert had "sufficient experience in the banking industry to draw conclusions as to commercial reasonableness"); *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568, 617 (S.D.N.Y. 2013) (favorably citing a case that "rel[ied] on expert testimony . . . for

purposes of commercial reasonableness analysis" (citation omitted)).  Finally, "experts in antitrust cases frequently testify concerning economic incentives, the market behaviors they are likely to induce, and the market events or conditions that may contribute to monopsony power." *Sitts v. Dairy Farmers of Am., Inc.*, No. 16-CV-287, 2020 WL 3467993, at *7 (D. Vt. June 24, 2020) (citing *DPWN Holdings*, 2019 WL 1515231, at *7).  Thus, while an expert "may not ascribe a particular motivation to [d]efendants or their representatives or call their credibility into question, he may explain why a particular action would be inconsistent with normal market incentives." *Id.*

The Court excludes in part Dr. Abrantes-Metz's opinions regarding Amex's intent and state of mind.  Where Dr. Abrantes-Metz does not support her statements concerning Amex's intent or state of mind with a source stating, as a fact, that Amex (or any Defendant) had that state of mind, the Court excludes that opinion.  For example, Amex points to Dr. Abrantes-Metz's assertion that "the experiences abroad also taught networks that such competitive conduct introduces costs in the form of merchant incentives, and competitive risks that the *Networks in the United States did not seem to want to face*."  (Abrantes-Metz Rep. ¶ 295 (emphasis added).) Dr. Abrantes-Metz may rely on her expertise to opine that "competitive conduct introduces costs in the form of merchant incentives," (*id.*), but she may not state that networks in the United States did or did not want something without a supporting source.  Similarly, she may not opine that continued coordination or "diligence" on the part of Defendants in "[holding] the cartel together" was "a source of relief for Defendants," unless she can support her opinion that Defendants were "relieved."  (*See* Abrantes-Metz Reply ¶ 123.)  Regardless of whether such an inference is reasonable to make, it is the province of the jury to make such inferences from the evidence presented, and Dr. Abrantes-Metz may not use her expertise to offer such

characterizations of Defendants' motivations or reactions unless she is citing a source that states these motivations or reactions as facts.  *See United States v. DiDomenico*, 985 F.2d 1159, 1165 (2d Cir. 1993) (stating that the "plain language" of Federal Rule of Evidence 704(b) "means that the expert cannot expressly 'state the inference,' but must leave the inference, however obvious, for the jury to draw" (quoting *United States v. Alvarez*, 837 F.2d 1024, 1031 (11th Cir. 1988))).

She may, however, offer statements describing Defendants' intent, knowledge, or state of mind if she adequately supports such statements with direct sources.  For example, in her opening report, Dr. Abrantes-Metz writes that an email from an Amex employee shows that he "was aware of potential anti-trust concerns with the liability shifts."  (Abrantes-Metz Rep. ¶ 248.)  In support, she quotes the email, highlighting a portion that reads as follows:

> The fact that all schemes ended up with the same FLS dates was that each network made its own business decision to match Visa's FLS announcement.  Visa announce[d] their FLS in August 2011.  Master[c]ard followed suit in January 2012.  Discover, in March 2012.  And then [Amex] in June 2012.  The details of the policies are different in some ways . . . .  In this way, there was no way that anti-trust or collusion issues could be raised — each network made its own decision about FLS dates and the nuances of each network's version of the FLS. . . .

(*Id.* (emphasis omitted).)  Amex argues that this source shows "the opposite" of what Dr. Abrantes-Metz asserts, but the Court reads Dr. Abrantes-Metz's statement differently.  Her statement is not that Amex was aware it was committing an antitrust violation, but merely that they were "aware of potential anti-trust concerns."  (*Id.*)  The quoted email adequately demonstrates an awareness that certain behavior surrounding the Liability Shifts could be viewed as collusive or violative of antitrust laws, and Dr. Abrantes-Metz says nothing more based on this source.

In accordance with the above guidance, Dr. Abrantes-Metz must refrain from testifying, without direct factual support, to any of Defendants' intent, motivation, or state of mind.  Where

she relies on a source that states as a fact Defendants' intent, motivation, or state of mind, or a source that clearly demonstrates knowledge of some fact on the part of Defendants, she may "referenc[e] this fact . . . as the *basis* for [her] ultimate opinion." *In re Payment Card*, 2022 WL 15044626, at *31 (quoting *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09-CV-686, 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011)). If, at trial, Amex or any Defendant disagrees that Dr. Abrantes-Metz's statement falls within these permissible bounds, they may challenge her testimony at that time.

### c.   Defendants' motions to exclude the testimony and opinions of Dr. Officer

Defendants — Visa, Mastercard, and Discover, collectively, and Amex, separately — move to exclude the merits testimony and opinions of Dr. Officer. In addition, Visa and Mastercard move to exclude Dr. Officer's opinions related to the timeline for the transition to EMV for AFDs (*i.e.*, gas station pumps that accept credit and debit cards) and whether the timeline for the AFD transition to EMV is an appropriate benchmark for what would have happened in the but-for world without Defendants' alleged collusion with respect to the transition to EMV for brick-and-mortar merchants (the "AFD Benchmark"). For the following reasons, the Court does not exclude Dr. Officer's opinions and testimony.

### i.   Dr. Officer's background and expert opinions

Dr. Officer is a professor of finance at Loyola Marymount University in Los Angeles, California.[15]  (Officer Rep. ¶ 6.)  He has also taught graduate and undergraduate classes in finance at the University of California, Los Angeles, and at the University of Southern

---

[15]  (Expert Rep. of Micah S. Officer in Supp. of Pls.' Renewed Mot. for Class Cert. ("Officer AFD Rep."), annexed to Szanyi Decl. as DDX1, Docket Entry No. 855-1; Rebuttal Expert Rep. of Micah S. Officer in Supp. of Pls.' Renewed Mot. for Class Cert. ("Officer AFD Reply"), annexed to Szanyi Decl. as DDX2, Docket Entry No. 855-2; Expert Rep. of Micah S. Officer ("Officer Rep."), annexed to Szanyi Decl. as DDX3, Docket Entry No. 855-3; Rebuttal Expert Rep. of Micah S. Officer, annexed to Szanyi Decl. as DDX6, Docket Entry No. 855-6.)

California.  (*Id.*)  Dr. Officer received an M.S. in applied economics in 1999 and a Ph.D. in finance in 2002, both from the University of Rochester.  (*Id.* ¶ 7.)  Dr. Officer has been an editor and reviewer for the *Journal of Financial Economics*, the *Journal of Law and Economics*, the *European Economic Review*, and the *Journal of Accounting and Economics*.  (C.V. of Dr. Micah S. Officer, annexed to Decl. of George C. Aguilar as PX296, Docket Entry No. 857-29.)  He has published more than twenty-five articles in peer-reviewed journals involving quantitative analyses of large datasets.  (*Id.*)

In his four reports, Dr. Officer has consistently opined that — absent Defendants' collusion — (1) Defendants would have faced competitive pressures in the marketplace to delay their respective Liability Shift dates, (2) they would in fact have delayed their Liability Shift dates, and (3) Plaintiffs therefore would have avoided the chargebacks that were imposed upon them between October of 2015 and the Liability Shift date that would have prevailed in a competitive environment (the "but-for world").  (*See, e.g.*, Officer Rep. ¶ 26.)  Because the but-for world is, by definition, unobservable, Dr. Officer offers the AFD liability shift as a benchmark to estimate how long Defendants would have delayed the point-of-sale Liability Shift in a competitive environment.  (*See, e.g.*, Officer AFD Rep. ¶¶ 55–56.)  Although Dr. Officer concedes that certain differences exist between the AFD and point-of-sale markets, (*see, e.g.*, *id.* ¶¶ 17–21, 29), Dr. Officer's opinion is that the markets are similar enough in important enough ways for the AFD market to be a helpful benchmark for making predictions about what *might have happened* in the point-of-sale market absent Defendants' alleged collusion, (*id.* ¶ 30).

Using the AFD market as a benchmark, Dr. Officer estimates that, in the but-for world, Defendants would have delayed the point-of-sale Liability Shift from October of 2015 to October of 2017.  (*Id.* ¶¶ 54–56.)  Using October of 2017 as the point at which merchants

unprepared to accept EMV-certified payment cards would have started incurring legitimate chargebacks, Dr. Officer used data from Defendants to calculate the amount of damages incurred by the Class between October of 2015 and October of 2017 (*i.e.*, during the Class period).  (*See* Officer Rep. ¶¶ 52–68.)

Preemptively responding to Defendants' counterarguments, Dr. Officer recognized that "some fraction of . . . chargebacks would have occurred anyway even absent the liability shift event, as, for example, chargebacks for some other reason."  (*Id.* ¶ 69.)  That is, "one could argue that some of the FLS chargebacks between October 2015 and October 2017 would have been charged back to merchants under *non-liability shift* reason codes even if the Defendants had not changed their chargeback policies."  (*Id.* (emphasis added).)  To control for this possibility, Dr. Officer assessed whether Liability Shift chargebacks were taking the place of non-liability shift chargebacks by examining whether there was a decline in non-liability shift chargebacks after the Liability Shift.  (*Id.* ¶ 70.)  Across the four networks, Dr. Officer found that, with a few exceptions, there was not a statistically significant difference in the usage of the non-liability shift chargeback codes between the two periods.  (*Id.* ¶¶ 80–87, 96–103, 123–130.)  This finding suggested to Dr. Officer that Liability Shift chargebacks were not "substituting" for otherwise-valid chargebacks that would have been imposed in the absence of the liability shift.  (*Id.*)  However, for a few "reason codes," Dr. Officer found statistically significant differences.  (*Id.* ¶¶ 88, 104.)  For each of these reason codes, Dr. Officer looked at the networks' materials regarding the reason codes and concluded it was "implausible" that the reason code would be "substituted" for a Liability Shift reason code.  (*Id.* ¶¶ 89, 105.)

ii.   **Visa, Mastercard, and Discover's motion to exclude Dr. Officer's testimony and opinions**

Visa, Mastercard, and Discover argue that the Court should exclude Dr. Officer's

opinions because (1) "he is not qualified as an expert economist," to conduct his AFD

Benchmark analysis, and (2) "he did not apply well-established economic principles" to his

analysis of the AFD Benchmark.  (VMD Officer Mem. 1.)  First, Visa, Mastercard, and Discover

argue that "Dr. Officer does not have the training or experience to render him qualified to offer

economic-based opinions about the likely timing of" point-of-sale Liability Shifts.  (*Id.* at 6.)  In

support, Visa, Mastercard, and Discover contend that Dr. Officer "lacks the educational

credentials and knowledge of antitrust principles necessary to qualify as an expert in economics."

(*Id.* at 8.)  Second, Visa, Mastercard, and Discover argue that Dr. Officer is not qualified to offer

opinions about two-sided platforms because he "has no knowledge of the economic literature

regarding two-sided transaction platforms."  (*Id.* at 9.)  In support, Visa, Mastercard, and

Discover contend that "Dr. Officer did not evaluate competition on both sides of [the] payment

networks when constructing his but-for world," therefore "render[ing] him unqualified to offer

any opinion about a but-for world in this case."  (*Id.* at 9–10.)  Third, Visa, Mastercard, and

Discover argue that Dr. Officer is not qualified to use antitrust economics principles to select and

apply a reliable benchmark because Dr. Officer purportedly conceded that he was unfamiliar

with the "large body of well-established economic literature that talks about how to use a

benchmark . . . in an antitrust case."  (*Id.* at 11–14 (quoting Dep. of Dr. Micah S. Officer 42:2–

12, annexed to Szanyi Decl. as DDX23, Docket Entry No. 855-23).)  Fourth, Visa, Mastercard,

and Discover argue that Dr. Officer's damages model is inconsistent with Plaintiffs' new theory

of liability.  (*Id.* at 14–15.)  Fifth, Visa, Mastercard, and Discover argue that Dr. Officer's

damages calculations are unreliable because they (1) include reimbursed chargebacks, (*id.* at 16–

18); (2) fail to exclude chargebacks to government entities, (*id.* at 18); and (3) fail to exclude cross-border chargebacks, (*id.* at 19–20).  Finally, Visa, Mastercard, and Discover argue that Dr. Officer's "substitution" analysis is unreliable because it relies on his interpretations of Defendants' chargeback codes.  (*Id.* at 20–23.)

Plaintiffs argue that Dr. Officer possesses the relevant experience and qualifications. (Pls.' VMD Officer Opp'n 6–16.)  In support, Plaintiffs note that Defendants previously challenged Dr. Officer's conclusions and methodology, but failed to argue that Dr. Officer was unqualified to assert such opinions and, to the contrary, "Defendants appear[ed] to acknowledge that Dr. Officer is an economic expert."  (*Id.* at 7.)  Plaintiffs also contend that "Dr. Officer's history of scholarship and experience as an expert witness in a complex antitrust case applying in-depth economic theory and insight establishes more than is required under Rule 702 to qualify as an expert to offer opinions on the but-for world in this case."  (*Id.* at 8.)  Regarding Dr. Officer's AFD benchmark, Plaintiffs argue that Defendants' arguments amount to objections to methodology, rather than qualifications, and contend that the Court has already found Dr. Officer's benchmark methodology admissible under Rule 702.  (*Id.* at 14–15.)  Although Plaintiffs do not respond to Defendants' argument that Dr. Officer conceded he was unfamiliar with the literature around antitrust benchmarks, Plaintiffs contend that "Dr. Officer thoroughly supported his benchmark through the discovery record, statements in the public record, and his own knowledge, experience, and training in assessing economic and competitive responses and behavior."  (*Id.* at 12–13.)  Finally, Plaintiffs argue that Dr. Officer's damages calculations are reliable and supported.  (*Id*. at 16–20.)

Although "a district court may properly conclude that witnesses are insufficiently qualified despite the relevance of their testimony because their expertise is too general or too

deficient," "[t]he admission and qualification of experts pursuant to Federal Rule of Evidence 702 is in the broad discretion of the district court." *Stagl v. Delta Airlines*, 117 F.3d 76, 81 (2d Cir. 1997) (citing *Boucher*, 73 F.3d at 21). Even if a proposed expert lacks such specific training or experience, "he may still have 'practical experience' or 'specialized knowledge' qualifying him to give opinion testimony under Rule 702." *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 328 (S.D.N.Y. 2022) (citing *McCullock*, 61 F.3d at 1043). In such cases, the court must "'compar[e] the area in which the witness has superior knowledge, skill, experience, or education' with the actual 'subject matter of the witness's testimony.'" *Karavitis v. Makita U.S.A., Inc.*, 722 F. App'x 53, 55 (2d Cir. 2018) (quoting *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994)). "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Hamraz v. Diversified Maint. Sys., LLC*, No. 18-CV-1864, 2023 WL 5200282, at *3 (E.D.N.Y. Aug. 14, 2023) (quoting *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007)); *In re Zyprexa Prods.*, 489 F. Supp. 2d at 282 (citing *Stagl*, 117 F.3d at 80). "Assertions that the witness lacks particular educational or other experiential background, 'go to the weight, not the admissibility, of [the] testimony.'" *In re Zyprexa Prods.*, 489 F. Supp. 2d at 282 (alteration in original) (quoting *McCullock*, 61 F.3d at 1044).

The Court is unpersuaded by Visa, Mastercard, and Discover's arguments that Dr. Officer is unqualified to offer opinions about the but-for world in this case. As a professor with a Ph.D. in finance, Dr. Officer has training and experience in a closely-related field, has published research and articles on issues related to economics and competition, and has provided expert testimony in other antitrust cases. (*See* Officer Rep. ¶¶ 6–10); *see also Hilaire v. DeWalt*

*Indus. Tool Co.*, 54 F. Supp. 3d 223, 236 (E.D.N.Y. 2014) ("[W]here an expert possesses qualifications in a 'general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.'" (quoting *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 425 (E.D.N.Y. 2011))).  Defendants may cross-examine Dr. Officer about his qualifications because they "go to the weight, not the admissibility, of [his] testimony," *In re Zyprexa Prods.*, 489 F. Supp. 2d at 282 (quoting *McCullock*, 61 F.3d at 1044), but the Court will not exclude Dr. Officer's testimony on the basis that he is unqualified to opine about the but-for world.[16] The Court reaches the same conclusion with respect to Dr. Officer's qualifications to select the AFD benchmark.  Dr. Officer's unfamiliarity with the economic literature surrounding benchmarking in antitrust cases may prove fertile ground for cross-examination, but Visa, Mastercard, and Discover have not shown that Dr. Officer lacks the requisite "knowledge, skill, experience, training, or education" to select an appropriate benchmark in this case.  Fed. R. Evid. 702.

   In addition, the Court adheres to its prior ruling that Dr. Officer's methodology is sufficiently reliable to be presented to the jury.  *See B&R III*, 2021 WL 234550, at *11 ("The Court finds that [Dr.] Officer's opinions based on his observations of Defendants' behavior in the AFD market to predict Defendants' likely behavior in the but-for world are admissible under Rule 702.").  Defendants have already argued that Dr. Officer's AFD benchmark is unreliable, *see, e.g.*, *id.* ("Defendants argue that 'Officer does not come close to doing the work necessary to

---

[16]   In addition, Dr. Officer is not unqualified to opine about the but-for world because he is unfamiliar with the literature surrounding two-sided markets.  (*See* VMD Officer Mem. 9–10.) As discussed above, (*see supra* section II.b.ii.1), a two-sided market analysis is not necessary in this case.

use AFDs as a benchmark to predict a but-for world for [point-of-sale] terminals . . . .'" (citation omitted)), and the Court rejected this argument because it found that Dr. Officer relied on "established and reliable methods in the field of economics to reach his conclusions and applie[d] them in a reliable way to the facts of this case," *id.*  None of Visa, Mastercard, and Discover's renewed arguments about Dr. Officer's qualifications or the reliability of his methodology undermine the Court's prior conclusion.

The Court finds that Dr. Officer's damages model is not so unreliable that it would be unhelpful to the jury.[17]  As the Supreme Court has acknowledged, calculating damages in antitrust cases is often an inexact science: "[I]n the absence of more precise proof, the jury could conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, . . . that defendants' wrongful acts had caused damage to the plaintiffs."  *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946).  Thus, *Bigelow* has come to stand for the proposition that antitrust plaintiffs need only produce a "just and reasonable estimate of the damage based on relevant data."  *In re Payment Card*

---

[17]  In addition, Dr. Officer's damages model is not inconsistent with Plaintiffs' theory of liability for the reasons stated in the Court's prior decision:

> The theory of liability on which Dr. Officer relied to calculate the alleged damages remains viable and appropriate under *Comcast* [*Corp. v. Behrend*, 569 U.S. 27 (2013)], even if one accepts as true the disputed paragraphs in Dr. Abrantes-Metz's rebuttal report.  As the Court previously held, Plaintiffs' theory is that "Defendants colluded to impose the same fixed Liability Shift date in October of 2015," and that as a result of this collusion, Class Members "incurred millions of dollars in chargebacks during the two-year class period."  This theory of liability is still sufficient for Plaintiffs to prove liability as to the entire Class, even if some large merchants had other reasons to prefer an earlier Liability Shift date.  Accordingly, the Court finds that Dr. Officer's damages methodology is still consistent with Plaintiffs' liability case.

*B&R V*, 2024 WL 3949977, at *9–10 (citation omitted).

*Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 254–55 (E.D.N.Y. 2022) (quoting *Bigelow*, 327 U.S. at 264); *see also AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 335 (N.D.N.Y. 2021) ("'The actual amount of an antitrust plaintiff's damages need not be proven to the same degree of certainty as proving some quantum of damages,' given the difficulty (and, at times, impossibility) of accurately constructing a hypothetical world untainted by the defendant's challenged conduct." (alterations omitted) (quoting *Drug Mart Pharm. Corp. v. Am. Home Prod. Corp.*, 472 F. Supp. 2d 385, 424 (S.D.N.Y. 2007))); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 32 (E.D.N.Y. 2020) ("[G]iven the inherent difficulty of identifying a but-for world, antitrust damages need not be measured with certainty." (internal quotation marks and citation omitted)).  Although Dr. Officer appears to concede that his calculations may include some *reimbursed* chargebacks and some chargebacks incurred by government entities that have been excluded from the Class — neither of which should be counted as damages — the Court understands that Dr. Officer does not intend to present those amounts to the jury as damages.  Rather, there is uncertainty regarding the exact percentage of reimbursed chargebacks, which Dr. Officer found to be between ███████ depending on the payment processor, (Officer Rep. ¶¶ 136–144), and Dr. Officer may "testify regarding the reimbursement rates he observed, providing guidance to the jury as to any appropriate damages reductions," (Pls.' VMD Officer Opp'n 18).  Similarly, Dr. Officer may explain to the jury the difficulty associated with identifying government entities in the data and can provide guidance to the jury as to how to properly discount damages to exclude government entities.  *See In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 659–61 (2d Cir. 2016) (explaining that an expert was not required to disaggregate different types of price inflation because the plaintiffs' theory of liability did not rely on this distinction); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F.

Supp. 2d 512, 575 (S.D.N.Y. 2011) ("[I]t is well-established that the computation of damages is a quintessential fact issue for the jury, and that a jury need not accept an expert's damage calculations wholesale."), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016); *see also LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-CV-7242, 2002 WL 1585551, at *5 (S.D.N.Y. July 16, 2002) (noting that "an expert witness should be used to help the jury with issues that go beyond common understanding," and collecting examples, such as "the appropriate royalty rate to apply to profits; . . . future profit margins; and . . . future revenue growth rates"). Moreover, Defendants may cross-examine Dr. Officer regarding reimbursed chargebacks and the potential inclusion of chargebacks incurred by government entities excluded from the Class, and the jury may further refine its damages calculations accordingly.  In sum, Visa, Mastercard, and Discover are correct insofar as Dr. Officer may not present to the jury evidence of these "damages" (*e.g.*, chargebacks incurred by government entities) which, as a matter of law, cannot be considered by the jury in calculating damages because, for example, government entities are excluded from the Class.  If Dr. Officer were to do so, his opinion would be likely to confuse the jury and would be unhelpful.  However, the record demonstrates that Dr. Officer does not intend to present reimbursed chargebacks and chargebacks to government entities as damages — but any uncertainty surrounding the amounts of these chargebacks may be borne by the Defendants. *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." (alteration omitted) (quoting *Bigelow*, 327

U.S. at 265)).  Accordingly, the Court does not exclude Dr. Officer's damages calculations as unreliable.[18]

Finally, Dr. Officer's substitution analysis does not render his damages calculations unreliable.  Although Dr. Officer's assessment of Visa's and Mastercard's rules to determine whether certain "reason codes" were plausible substitutes for Liability Shift chargebacks was subjective, that fact alone does not render it unreliable.  Subjective decision-making about which variables to include or how to control for other variables is a daily part of the scientific and statistical process.  *See, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, No. 10-CV-6950, 2022 WL 814074, at *9 (S.D.N.Y. Mar. 17, 2022) (discussing the expert's exclusion of certain variables and finding that the "decision to exclude production variables [was] well-reasoned" and that the "choice to exclude the . . . variables [went] to the weight of his testimony rather than its admissibility"); *Reed Const. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 400–01 (S.D.N.Y. 2014) (recognizing a degree of "subjectivity" in an expert's selection of variables, but noting that "[n]ormally, failure to include variables will affect the analysis' probativeness, not its

_____

[18] Visa, Mastercard, Discover, and Plaintiffs dispute whether chargebacks from foreign-issued credit cards used in the United States ("cross-border chargebacks") should be excluded from Plaintiffs' damages calculations.  (VMD Officer Mem. 19–20; Pls.' VMD Officer Opp'n 19–20.)  Visa, Mastercard, and Discover appear to contend that, even if Defendants had delayed their Liability Shift for domestic point-of-sale chargebacks, they would have maintained the original liability shift date for cross-border chargebacks, as they did for the AFD liability shift and for cross-border liability in Canada.  (VMD Officer Mem. 19.)  Whether cross-border liability may appropriately be included in Plaintiffs' damages calculations involves an underlying question of fact best resolved by the jury: whether Defendants would in fact have maintained a cross-border liability shift in October of 2015, even if they had delayed the domestic liability shift to October of 2017.  If the jury finds that Defendants *would not* have delayed cross-border liability, then cross-border chargebacks should be excluded from Plaintiffs' damages calculations.  If, however, the jury finds that Defendants *would* have delayed cross-border liability, then cross-border chargebacks may properly be included in Plaintiffs' damages calculations.  This issue will be addressed in pre-trial conferences, jury instructions, and jury questionnaires, should this case proceed to trial.

admissibility" (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J.,

concurring))), *aff'd*, 638 F. App'x 43 (2d Cir. 2016).  Dr. Officer is qualified to make those

judgment calls and, to the extent that Defendants disagree with them, they go to the weight of his

testimony, not its admissibility.  *See SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d. 450, 467

(S.D.N.Y. 2023) ("While cast as an argument about methodology, defendants' gripes appear to

be mere disagreements with [the expert's] categorizations and conclusion."); *see also Napout*,

963 F.3d at 188 ("[C]ontentions that [an expert's] assumptions are unfounded go to the weight,

not the admissibility, of the testimony." (quoting *Restivo*, 846 F.3d at 577)).

### iii.   Amex's motion to exclude Dr. Officer's damages calculations

Amex moves to preclude Dr. Officer from offering testimony and opinions concerning

the amount of damages allegedly owed by Amex, and argues that such testimony should be

excluded because "Dr. Officer has only a single damages model that applies to all Defendants

and that includes damages based on chargebacks to merchants who are parties to a [Card

Acceptance Agreement ("CAA")] with Amex."  (Amex Officer Mem. 1.)  In support, Amex

contends that:

> The principle of joint and several liability does not correct this flaw:
> that principle means only that there can be recovery against Amex
> for the other Defendants' chargebacks under claims by non-CAA
> merchants that *can* proceed against Amex — there still cannot be
> *any* recovery against Amex under claims by CAA merchants that
> *cannot* proceed against Amex.   Thus, Dr. Officer's damages
> numbers include millions of dollars attributable to chargebacks for
> which there cannot be recovery from Amex, and he has no way to
> tailor those numbers to chargebacks for which there can be recovery.

(*Id.* at 1–2.)  Amex argues that the Court should exclude this testimony under Rules 702, 402,

and 403 of the Federal Rules of Evidence, or that the Court should issue a limiting instruction

under Rule 105.  (*Id.* at 7–14.)

Plaintiffs argue that Amex's motion is unsupported by authority and contend that "there is no requirement under *Daubert*, Rule 702, or otherwise, for Dr. Officer's damages analysis to have segregated between merchants who may or may not be within the reach of Amex's arbitration agreement."  (Pls.' Amex Officer Opp'n 2; *see also id.* at 6–9.)  In addition, Plaintiffs argue that Amex's motion is procedurally improper and should instead be raised in a motion for summary judgment.  (*Id.* at 9–10.)

Amex misunderstands the purpose of Dr. Officer's testimony.  Dr. Officer's testimony about chargebacks that Amex imposed on CAA-bound merchants would not establish damages *owed by Amex*, but would instead establish damages attributable to the conspiracy.  Therefore, CAA-bound merchants would be able to recover those damages from Visa, Mastercard, and Discover under a theory of joint-and-several liability because, as co-conspirators, they would be liable for the full amount of damages caused by the conspiracy, even if CAA-bound merchants cannot recover from Amex.  *See United States v. Smith*, 513 F. App'x 43, 46 (2d Cir. 2013) ("[T]he district court did not abuse its discretion in holding [the defendant] jointly and severally liable for the full amount of losses suffered by victims of the conspiracy."); *Kashi v. Gratsos*, 790 F.2d 1050, 1054–55 (2d Cir. 1986) (noting that "[p]roof of a civil conspiracy . . . exposes [a] defendant to joint and several liability for the victim's losses" (citations omitted)); *Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 211 (S.D.N.Y. 2010) ("[A]ntitrust conspirators are jointly and severally liable."); *cf. In re Eur. Gov't Bonds Antitrust Litig.*, No. 19-CV-2601, 2022 WL 768680, at *17 (S.D.N.Y. Mar. 14, 2022) ("Because antitrust liability is joint and several, a [p]laintiff injured by one [d]efendant as a result of a conspiracy has standing to represent a class of individuals injured by any of the [d]efendant's co-conspirators." (emphasis omitted) (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 508 (S.D.N.Y.

1996))).  Therefore, Dr. Officer's testimony is both helpful and relevant to the issue of damages attributable to the conspiracy.

However, Amex is correct that Dr. Officer's testimony cannot be used to establish the damages owed by Amex to CAA-bound merchants because CAA-bound merchants cannot recover from Amex.  Accordingly, the Court will issue a limiting instruction informing the jury that they cannot consider Dr. Officer's testimony for establishing the amount of damages owed by Amex to CAA-bound merchants.  *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 571–72 (S.D.N.Y. 2007) ("Court[s] . . . routinely rel[y] upon limiting instructions to 'remind[] the jury of its role and of the limits of expert testimony [and] clarify the extent of their consideration of such testimony.'  Further, the Second Circuit has recognized a 'strong presumption that juries follow limiting instructions.'"  (third and fourth alterations in original) (footnotes omitted)).  However, the jury may consider Dr. Officer's testimony about damages attributable to the conspiracy in conjunction with other evidence that independently establishes what proportion of the Class may appropriately recover from Amex for its role in the conspiracy.[19]  Stated differently, the jury may consider Dr. Officer's testimony for purposes of establishing damages owed by Amex to *non*-CAA-bound merchants if his testimony is

---

[19]  For example, assume Dr. Officer establishes by a preponderance of the evidence that the damages attributable to the conspiracy amount to $1.4 billion.  Further assume that other admissible evidence establishes by a preponderance of the evidence that five percent of the Class is not bound by a CAA.  In such a case, the jury could use Dr. Officer's testimony for the purpose of establishing the amount of damages owed by Amex: the five percent of the Class not bound by any CAA would be entitled to recover five percent of $4.2 billion (treble damages), or $210 million, from all four jointly and severally liable Defendants.  The remaining ninety-five percent of the Class would be entitled to recover $3.99 billion, jointly and severally, from Visa, Mastercard, and Discover, but not Amex.  (Whether Visa, Mastercard, and Discover may, in turn, seek contribution from Amex is a separate issue not before the Court.)

supplemented by other evidence establishing what proportion of the Class is not bound by a

CAA.

### iv.   Visa and Mastercard's motion to exclude Dr. Officer's AFD benchmark opinions

In a renewed *Daubert* motion, Visa and Mastercard argue that the Court should exclude

Dr. Officer's AFD benchmark for four reasons.  First, Visa and Mastercard argue that Dr.

Officer's "cost-benefit" analysis is unreliable because Dr. Officer purportedly could not identify

benefits of collusion in either the AFD or point-of-sale markets.  (VM AFD Mem. 4–8.)  Second,

Visa and Mastercard argue that Dr. Officer's AFD benchmark opinions are not based on an

established methodology in economics.  (*Id.* at 8–10.)  In support, they argue that although Dr.

Officer initially claimed to rely on Professor Paul Samuelson's research on "revealed

preferences" in developing his AFD benchmark opinions, he purportedly disclaimed any such

reliance at his deposition.  (*Id.*)  Third, Visa and Mastercard argue that Dr. Officer's AFD

benchmark is "speculative or conjectural" because "Dr. Officer admitted at his merits deposition

that he did not even analyze the economic factors that caused Defendants to delay their AFD

FLSs, or assess whether those same factors reasonably applied to the [point-of-sale] segment."

(*Id.* at 11.)  Fourth, Visa and Mastercard argue that Dr. Officer's comparison of the AFD and

point-of-sale Liability Shift timelines lacks support in the record.  (*Id.* at 15–17.)

Plaintiffs argue first that "Dr. Officer has consistently established the costs and benefits

associated with a traditional economic approach in analyzing motive, opportunity, and behavior."

(Pls.' AFD Opp'n 2.)  Second, Plaintiffs argue that Dr. Officer applied a "widely accepted

methodology of comparison using a similar market with similar decisions, which was close in

time and likely free of collusion, to generate a but-for world to define class-wide damages."  (*Id.*

at 7.)  Third, Plaintiffs argue that Visa and Mastercard's arguments about factors Dr. Officer

purportedly failed to consider are a "classic path for cross-examination before the trier of fact." (*Id.* at 13.)  Finally, Plaintiffs argue that Visa and Mastercard's arguments about Dr. Officer's comparison of the AFD and point-of-sale liability shift timelines are "immaterial" and "merely confirm[] the reasonableness of Dr. Officer's conclusions." (*Id.* at 14.)

The Court has already ruled that Dr. Officer's AFD benchmark is admissible.  In its decision on Plaintiffs' renewed motion for class certification, the Court found that:

> [Dr.] Officer's opinions based on his observations of Defendants' behavior in the AFD market to predict Defendants' likely behavior in the but-for world are admissible under Rule 702.  While other experts in the field might ultimately disagree as to the similarity between the two markets, [Dr.] Officer relies on established and reliable methods in the field of economics to reach his conclusions and applies them in a reliable way to the facts of this case.

*B&R III*, 2021 WL 234550, at *11 (citations omitted).  The issues raised by Visa and Mastercard go to the weight of Dr. Officer's testimony, not its admissibility, because Visa and Mastercard's contentions — even if true — do not fundamentally undermine the Court's conclusion that Dr. Officer applied "established and reliable methods in the field of economics to reach his conclusions and applie[d] them in a reliable way to the facts of this case." *Id.*; *see also Silva v. Heil, Inc.*, 692 F. Supp. 3d 29, 36 (E.D.N.Y. 2023) ("[O]nly serious flaws in reasoning or methodology will warrant exclusion." (quoting *In re Fosamax*, 645 F. Supp. 2d at 173)).

First, even if Dr. Officer could not identify any benefits to collusion (a contention that Plaintiffs dispute), this fact does not render Dr. Officer's opinion unreliable or unhelpful.  For example, even if collusion had no apparent benefits because Visa and Mastercard do not bear the costs of fraud, Dr. Officer explained how the "costs" side of the equation changed enough such that Defendants could have concluded the costs of collusion exceeded its benefits in the AFD market.  (*See* Officer AFD Rep. ¶¶ 14, 20–22.)  Regardless, Visa and Mastercard's premise is

flawed because Amex and Discover bear the costs of fraud unless they can shift it to merchants.[20]

Second, Dr. Officer did not have to rely on Professor Samuelson's scholarship on revealed preferences in order to reliably develop his AFD benchmark opinion because using a benchmark to make predictions about the unobservable but-for world is a widely accepted approach in antitrust economics. *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 84 (S.D.N.Y. 2017) ("Experts often use benchmarks as a comparison for evidence under examination." (citing *Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 130 (S.D.N.Y. 2014))); *In re NASDAQ Mkt.-Makers*, 169 F.R.D. at 521–22 (explaining how benchmarking methodologies "are widely accepted means of measuring damages in antitrust cases," and collecting cases). Accordingly, it is irrelevant whether Dr. Officer relied on Professor Samuelson's research in developing his opinion. Having reviewed Dr. Officer's reports, the Court sees no reason to depart from its conclusion that Dr. Officer's analysis reflects a reliable application of a reliable methodology to the facts of this case. *See B&R III*, 2021 WL 234550, at *11.

Third, evidence in the record undermines Visa and Mastercard's argument that Dr. Officer's AFD benchmark is "speculative or conjectural." (VM AFD Mem. 11.) Visa and Mastercard's contention is based on Dr. Officer's purported admission that he "did not . . . analyze the economic factors that caused Defendants to delay their AFD FLSs." (*Id.*) However, Dr. Officer cites evidence demonstrating Defendants were aware that large proportions of merchants in both the AFD and point-of-sale markets were unprepared for the liability shift.

---

[20]   Unlike Visa and Mastercard, Amex and Discover are both the network and the issuing bank. Thus, liability that would have fallen on Amex or Discover as the issuing bank could be shifted to the merchants under the Liability Shift.

(Officer AFD Rep. ¶¶ 18–19 & n.14.)  This reason is alone a sufficient basis for any of the networks to have delayed their liability shifts in a competitive marketplace.  In addition, Dr. Officer's testimony recognizes that the "technical challenges involved in upgrading AFDs to be EMV-compliant" were part of the justifications that Defendants "gave for initially allowing an *additional* two years for fuel retailers to upgrade their payment technology."  (Officer AFD Reply ¶ 32.)

Finally, Dr. Officer's opinion about the timing of the liability shifts in the AFD and point-of-sale markets depended on an assumption that EMV upgrade challenges remained constant between 2011 and 2016.  (*Id.*)  Although Visa and Mastercard present evidence that EMV upgrade challenges did *not* remain constant, (VM AFD Mem. 16–17), this evidence goes to the weight of Dr. Officer's testimony, not its admissibility.  Visa and Mastercard have not shown that his analysis was "based on assumptions that are so unrealistic or contradictory as to suggest bad faith." *Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 254 (2d Cir. 2021) (quoting *Boucher*, 73 F.3d at 21).  Dr. Officer candidly concedes that there were significant differences between the AFD and point-of-sale markets, (*see, e.g.*, Officer AFD Rep. ¶¶ 17–21, 29), and such differences affect the weight of Dr. Officer's testimony — but the markets are not so dissimilar as to amount to an apples-to-oranges comparison, *see Electra*, 987 F.3d at 254 ("Although expert testimony should be excluded if it is . . . in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." (quoting *Boucher*, 73 F.3d at 21)).  Accordingly, the Court adheres to its conclusion that Dr. Officer's AFD benchmarks satisfies the requirements of Rule 702.

### d. Plaintiffs' motion to exclude the opinion of Visa and Mastercard's expert Julie Conroy

Plaintiffs move to exclude the entire testimony of Visa and Mastercard's expert Ms. Julie Conroy. (*See* Pls.' Mem.; Expert Rep. of Julie Conroy ("Conroy Rep."), annexed to Decl. of Michael J. Nicoud ("Nicoud Decl.") as Ex. 1, Docket Entry No. 861-1.)

### i. Conroy's background and expert opinion

Conroy is a financial services security professional who currently serves as the "Head of Risk Insights & Advisory" at the Aite-Novarica Group ("Aite").[21] (VM Opp'n 3.) She has worked at Aite for over a decade and has "conducted a number of in-depth studies that have analyzed the course of the U.S. migration to EMV, as well as other areas of the payments industry with a focus on security, innovation, and fraud detection and prevention." (Conroy Rep. 3.) Her work has also included a study of "implementation of EMV in other countries" and "how the U.S. migration should and likely would be different." (*Id.*) Her research on these topics has been cited in numerous media outlets, including *The Wall Street Journal*, *U.S. News and World Report*, *American Banker*, *SmartMoney*, and NPR. (*Id.* at 4; VM Opp'n 4.) Conroy has an M.A. in International Policy from the Monterey Institute of International Studies and a B.A. in Business Administration from Michigan State University Honors College, and she has spent her career working with financial institutions, payments processors, and risk management companies. (Conroy Rep. 4.)

---

[21] Aite is "an independent research and consulting firm" that offers consulting services to "a broad range of participants in the financial services industry," including payment networks, merchants, banks, and government entities. (VM Opp'n 3–4; *see also* Conroy Rep. 3 ("The Aite Group provides research, consulting services, and advice to a wide range of entities concerning the payment industry, including payment networks and processors, financial institutions, technology vendors, professional services firms, and government agencies, among others.").)

Conroy was retained by Mastercard in 2018, (Dep. of Julie Conroy ("Conroy Dep.") 31:1–5, annexed to Nicoud Decl. as Ex. 2, Docket Entry No. 861-2), to provide overviews of (1) the payment card industry in the United States; (2) EMV technology and the migration to EMV technology in countries outside the United States; (3) the transition to EMV in the United States across the payment card industry (*i.e.*, major payment card networks, issuing banks, acquiring banks, and merchants); and (4) differences in the migration to EMV at point-of-sale and AFDs, (Conroy Rep. 1).  In her report, Conroy offers five primary opinions.  First, she opines that contrary to Plaintiffs' experts' opinions, "[t]here were fundamental disparities in the networks' approaches to EMV migration and the role that liability shifts played in creating incentives for how EMV was to be implemented."  (*Id.* at 2.)  Based on her work with issuers, merchants, processors, and payment networks, her experience is that "industry participants on both sides of the payment platforms" complained that "the networks were not aligned and that the lack of alignment on key issues . . . complicated EMV implementation."  (*Id.*)  In support, she points to differences in the networks' respective Liability Shifts, such as their announcement dates, whether the FLSs applied to fraud resulting from lost or stolen cards, and whether merchants having difficulties with EMV implementation would be eligible for relief.  (*Id.* at 41–44.)  Second, she reports that differences between EMV implementation in the United States and in other countries are "fully explainable" by "specific factors in effect when the U.S. EMV implementation occurred and lessons learned from countries that came before the U.S."  (*Id.* at 2, 16–17.)  Third, she writes that Target's data breach in December of 2013 "was a key turning point for the U.S. [EMV] migration and substantially strengthened the reasons for networks to maintain their liability shift dates compared to the pre-Target breach reasons for a potential delay."  (*Id.* at 2.)  In her view, the breach "underscored the vulnerability of the U.S. payment

card ecosystem," and resulted in industry participants wishing for a quicker transition to EMV. (*Id.* at 2, 49.)  Fourth, she reports that in her experience, any further delay in EMV migration would have led many merchants to "simply further kick[] the can down the road and not start[] their EMV work any sooner relative to the delayed FLSs."  (*Id.* at 3.)  She explains that in her experience, merchants were unaware of the "volume of counterfeit fraud" and therefore if the Liability Shift had been delayed, they likely would have continued to defer their transition.  (*Id.* at 3, 41, 51–52.)  Finally, Conroy responds to Plaintiffs' experts' argument that the three-year delay in the AFD Liability Shifts shows that the networks would have, acting independently, delayed their other point-of-sale Liability Shifts further.  (*Id.* at 3.)  She explains that the point-of-sale and AFD industries "are different in fundamental ways as it relates to EMV implementation and counterfeit fraud," (*id.*), and that in particular, factors like "the availability of effective alternative tools to combat counterfeit fraud at AFDs[] and the vastly greater costs to upgrade AFDs to EMV" make AFDs an inappropriate benchmark for how EMV migration should have occurred across the point-of-sale industry, (*id.* at 87).

### ii. The Court grants in part and denies in part Plaintiffs' motion to exclude Conroy's opinion

Plaintiffs raise numerous arguments for the exclusion of the entirety of Conroy's expert opinion.  First, they argue that her opinion is not the product of reliable principles and methods because her "report is lifted — often word for word — from prior work produced years ago in a different context for her employer, Aite."  (Pls.' Mem. 7.)  They assert that this work was "generated years ago in other contexts" and "primarily by authors other than Ms. Conroy."  (*Id.* at 8.)  As a result, Plaintiffs argue that her opinion does not use a reliable methodology because she assumed the conclusions and then "reverse-engineer[ed]" the theory.  (*Id.* (alteration in original) (quoting *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 341 F. Supp. 3d

213, 241 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020)).)  Second, Plaintiffs argue that in

addition to her unreliable methodology, Conroy does not base her opinions on "sufficient facts or

data connected to this matter."  (*Id.* at 9.)  In support, Plaintiffs point to several examples of

Conroy's opinions that they assert are "vague assertion[s]" for which she identifies no specific

source other than her "conversations, experience, or understandings."  (*See, e.g.*, *id.* at 9–10.)

Plaintiffs argue that the Court must exclude Conroy's opinion where it relies on "generic

industry data [that] is not tethered to the relevant facts and circumstances of the present case."

(*Id.* at 12–13 (alteration in original) (quoting *Multimedia Pat. Tr. v. Apple Inc.*, No. 10-CV-2618,

2012 WL 5873711, at *9 (S.D. Cal. Nov. 20, 2012)).)  Even when she did rely on evidence

relevant to this case, Plaintiffs contend that the evidence is far too minimal.  For example,

Plaintiffs argue that Conroy "only interviewed a single person;" "only relied on three court

documents, four depositions, two expert reports, and a limited selection of documents produced

in this case;" and "made clear that she ignored key pieces of evidence available to her."  (*Id.*)

Finally, Plaintiffs argue that Conroy has no basis for her opinion that "[n]othing about the delays

of the AFD liability shift supports a conclusion that networks, acting in competition with each

other, would or should have been expected to delay their [point-of-sale] liability shifts."  (*Id.* at

16 (quoting Conroy Rep. 87).)  In support, they argue that Conroy copied these parts of her

report from a paper written for Aite by another individual.  (*Id.* at 17 (citing Thad Peterson, *EMV

in U.S. Petroleum Retail: What's Going to Happen?* ("Peterson's AFD Paper"), annexed to

Nicoud Decl. as Ex. 10, Docket Entry No. 861-10).)  Plaintiffs thus describe Conroy's AFD-

related opinions as hearsay that this Court should exclude.  (*Id.* at 17–18.)  Plaintiffs argue that

those portions of her AFD opinion that are not drawn from this paper are added without adequate

support to "fit Visa and Mastercard's narrative."  (*Id.* at 19–23.)

Visa and Mastercard first argue that Conroy's opinion is based on reliable principles and methodology, and that courts routinely admit a qualified expert's analysis even where it is based on "a variety of industry reports and websites, as well as [her] own experience, to reach conclusions." (VM Opp'n 10 (quoting *Medidata Sols., Inc. v. Veeva Sys., Inc.*, No. 17-CV-589, 2022 WL 585715, at *2 (S.D.N.Y. Feb. 24, 2022)).)  They argue that Conroy appropriately supplements such permissible sources with her own analysis, and therefore that her opinion is not "reverse-engineered" as Plaintiffs argue.  (*Id.* at 12–13.)  Second, Visa and Mastercard argue that Conroy bases her opinion on sufficient facts and data related to this case.  (*Id.* at 13–19.)  In particular, they highlight that Conroy relies on sufficient facts and data to support her opinions related to PIN debit networks' reaction to EMV implementation as well as her opinions on the timelines of EMV migration in the United States.  (*Id.* at 13–18.)  In support, Visa and Mastercard argue that Plaintiffs erroneously take a "sentence-by-sentence approach" to assessing Conroy's report and that such an approach is contrary to governing law.  (*Id.* at 14.)  They further argue that Conroy appropriately relies on "her prior work and other industry reports about the U.S. EMV migration" because they are relevant to the facts of this case.  (*Id.* at 15.)  Finally, Visa and Mastercard contend that Plaintiffs "misapply the hearsay rule" to Conroy's AFD-related opinions.  (*Id.* at 19–23.)  In support, they argue that she is permitted to rely on Peterson's AFD Paper, among other sources, and that Plaintiffs true challenge is simply to the conclusions Conroy draws.  (*Id.* at 19–21.)  In addition, they argue that Plaintiffs' challenge to Conroy's opinion regarding AFD Liability Shifts are simply a result of a "disagreement over how to read a webpage," and that this does not warrant exclusion of her report.  (*Id.* at 22–23.)

"Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are 'of a type reasonably relied upon by experts in the

particular field in forming opinions or inferences upon the subject.'"  *Daubert*, 509 U.S. at 595.

In addition, where an expert's "factual basis, data, principles, methods, or their application are

called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a

reliable basis in the knowledge and experience of [the relevant] discipline.'"  *Kumho Tire*, 526

U.S. at 149 (quoting *Daubert*, 509 U.S. at 592).   "[A]lthough an expert is permitted to support

his opinions by reference to his experience, he must demonstrate that this experience is a

sufficient basis for these opinions."  *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d

328, 378 (S.D.N.Y. 2023) (alteration in original) (quoting *Pension Comm. of Univ. of Montreal

Pension Plan v. Banc of Am. Sec., LLC*, 716 F. Supp. 2d 220, 227 (S.D.N.Y. 2010)).   "Simply

rehashing evidence about which an expert has no personal knowledge is impermissible under

Rule 702."  *Id.* at 379 (quoting *Sharkey v. J.P. Morgan Chase & Co.*, 978 F. Supp. 2d 250, 252

(S.D.N.Y. 2013)).   Thus, an expert may rely upon the work of others "to formulate an opinion,

[but] must apply some methodology apart from quoting and concluding therefrom."  *Id.*; *see also

United States v. Mejia*, 545 F.3d 179, 196 (2d Cir. 2008) ("The expert may not . . . simply

repeat[] hearsay evidence without applying any expertise whatsoever, a practice that allows [its

proponent] to circumvent the rules prohibiting hearsay." (internal quotation marks and citation

omitted)); *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009)

("[A]n expert who simply regurgitates what a party has told him provides no assistance to the

trier of fact through the application of specialized knowledge." (citing *Mejia*, 545 F.3d at 197–

98)).   "When an expert is no longer applying his extensive experience and a reliable

methodology, *Daubert* teaches that the testimony should be excluded."  *Mejia*, 545 F.3d at 197

(quoting *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003)).   "Instead, the expert must

form his own opinions by 'applying his extensive experience and a reliable methodology' to the

inadmissible materials." *Id.* (quoting *Dukagjini*, 326 F.3d at 58).  With respect to expert testimony that does "not rely on anything like a scientific method," the commentary to Rule 702 notes that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted."  Fed. R. Evid. 702 advisory committee notes to 2000 amendments.  Accordingly, "the expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded."  *Id.*

The Court excludes Conroy's testimony as to what merchants would or would not have done had the networks delayed their respective liability shifts.  Conroy's testimony as to the expected behavior of merchants if the networks had delayed their liability shifts either lacks citations to evidentiary support or is unsupported by the citations she provides.  Although Conroy's experience and qualifications qualify her to testify as to the mechanics of EMV migration, card payment fraud, and the conduct of Defendants, Conroy lacks the qualifications to opine on merchant behavior in the but-for world and fails to provide sufficient evidentiary support that would allow her to reliably draw such conclusions based on her expertise and qualifications.  Accordingly, the Court excludes Conroy's testimony about merchant behavior that falls into three categories.  First, the Court excludes testimony lacking evidentiary support.  For example, Conroy opines that "it is my opinion that if the networks had delayed their liability shifts, whether by 6 months, 12 months, or 24 months, there would have been many merchants that would have waited until after the new date to implement EMV," (Conroy Rep. 41), but fails to provide any evidence to substantiate such a conclusion.[22]  *See Better Holdco*, 666 F. Supp. 3d

---

[22]  To the extent that Conroy relies on observed merchant behavior with respect to AFD liability shift delays to draw conclusions about merchant behavior in the but-for world with a

at 378 ("[A]lthough an expert is permitted to support [her] opinions by reference to [her] experience, [she] must demonstrate that this experience is a sufficient basis for these opinions." (first alteration in original) (quoting *Pension Comm.*, 716 F. Supp. 2d at 227)).  Second, the Court excludes testimony where the underlying evidentiary record is "simply inadequate to support the conclusions reached."   *See Amorgianos*, 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." (citation omitted)); *see also* Fed. R. Evid. 702 advisory committee notes to 2000 amendments (noting that a court must find that "proffered expert testimony . . . is properly grounded, well-reasoned, and not speculative").  For example, Conroy opines that "[i]t was also understood that some merchants would decide that EMV was never necessary for their businesses — as has occurred in other countries," (Conroy Rep. 41), but the citations Conroy provides for this statement do not support this conclusion.  The sources Conroy provides discuss the views of "Italian banks," "U.S. card issuers," and "most observers," but not the views of merchants themselves.  (*See id.* at 41 n.154.)  Third, the Court excludes testimony that "simply repeat[s] hearsay evidence without applying any expertise whatsoever."  *Mejia*, 545 F.3d at 196.  For example, Conroy quotes a Visa executive purportedly explaining that "many merchants that had not yet turned on EMV had done so by deliberate choice for a number of reasons (*i.e.*, 'implementing encryption at the same time and have slowed down their implementation'; 'decision to delay implementation until after peak season'; 'didn't start work early enough')."

---

delay in the point-of-sale liability shift, the Court finds that Conroy cannot reliably draw such conclusions about the point-of-sale market because they are undermined by her testimony reflecting the substantial differences between AFD EMV migration and point-of-sale EMV migration.  (*See* Conroy Rep. 87–102.)

(Conroy Rep. 55.)  Without any basis to establish that the unnamed Visa executive is qualified to opine on merchant behavior, Conroy may not convey such views to the jury simply because she is an expert on EMV migration.[23]  *See Daubert*, 509 U.S. at 595 ("Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'")

Where Conroy's opinions are adequately supported by the evidence she cites, however, her testimony is permissible.  For example, Conroy may offer opinions that are based on specific findings from the merchant surveys conducted by Aite and its affiliates in 2013, 2014, and 2016, where those opinions are not speculative and do not draw conclusions about the but-for world. (*See, e.g.*, Conroy Rep. 70–71 (relying on merchant surveys in 2014 to conclude, *inter alia*, that "[t]hree years after Visa's initial announcement of its EMV roadmap, more than one-third (34%) of merchants surveyed were still unaware of the U.S. EMV migration," and that "[o]f those merchants that were aware of EMV, over a third indicated that they either did not intent to convert or were undecided").)  In addition, she may rely on her experience in the payments industry and her studies examining Liability Shifts and EMV migration in other countries to offer her views on the differences between EMV migration in the United States and EMV

---

[23]  (*See also* Conroy Rep. 51 ("According to one executive with whom I have spoken at a large U.S. processor, many of its small to midsize merchant customers weren't especially concerned with EMV implementation prior to the liability shifts, in spite of this processor's educational efforts.  Small and midsize merchant clients didn't necessarily think that they would be impacted by fraud and the resulting chargebacks, and took a wait-and-see approach to possible fraud (*i.e.*, I'll invest in EMV if I start to incur fraud losses).").)

migration in the other countries surveyed.[24]  (*See id.* at 16–37.)  It is not necessary that Conroy

have conducted these empirical studies herself to rely on them for the purpose of offering her

expert opinion, so long as the basis for these studies is adequately established.  *See Arista*

*Records*, 46 F. Supp. 3d at 385 ("[A]n expert may rely on assistants or the opinions of other

experts in formulating their own expert opinions." (citing *Dura Auto Sys. of Ind. v. CTS Corp.*,

285 F.3d 609, 612 (S.D.N.Y. 2014))); *Malletier*, 525 F. Supp. 2d at 664 ("It is true that experts

are permitted to rely on opinions of other experts to the extent that they are of the type that

would be reasonably relied upon by other experts in the field." (citing Fed. R. Evid. 703)); *see*

*also In re Payment Card*, 638 F. Supp. 3d at 262 ("While an expert may not uncritically rely on

data supplied by a party, requiring experts to empirically analyze the studies they rely on would

essentially obviate the rule that an expert may rely on the opinions of other experts." (citing

*Forte v. Liquidnet Holdings*, 675 F. App'x 21, 24 (2d Cir. 2017))).  For these same reasons, the

Court concludes that Conroy may rely on reports prepared by other experts, including Peterson's

AFD Paper, as the basis for her expert opinions even if she did not "confirm the accuracy of the

sources cited" herself.  (*See* Pls.' Reply 10.)  Plaintiffs offer no basis for requiring that an expert

must verify the accuracy of all materials relied on, especially where these materials "are of the

type that would be reasonably relied upon by other experts in the field."  *See Malletier*, 525 F.

Supp. 2d at 664 (citing Fed. R. Evid. 703).

        In accordance with the above, Conroy must limit her testimony to opinions that rely on

specific evidence that supports the view expressed and may not offer unfounded opinions such as

---

[24]  Plaintiffs also briefly argue that Conroy suffers from a "Visa bias" because of her past consulting work with Visa.  (Pls.' Mem. 14–15.)  The Court declines to address this argument, because, as it has previously held, "[c]ross-examination is sufficient to address the issue of bias." *In re Payment Card*, 638 F. Supp. 3d at 299 (alteration in original) (quoting *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 324 (E.D.N.Y. 2013))).

those regarding merchant behavior in the but-for world, absent direct evidence that supports such conclusions.  To the extent that Plaintiffs believe that Conroy's testimony at trial falls beyond these permissible bounds and lacks a reliable foundation, they may object at that time.

## III.   Conclusion

For the foregoing reasons, the Court (1) denies Visa, Mastercard, and Discover's motion to exclude the opinions of Dr. Abrantes-Metz, (2) grants in part and denies in part Amex's motion to exclude the testimony of Dr. Abrantes-Metz, (3) denies Visa, Mastercard, and Discover's motion to exclude the opinions of Dr. Officer, (4) grants in part and denies in part Amex's motion to exclude the testimony of Dr. Officer, (5) denies Visa and Mastercard's motion to exclude Dr. Officer's AFD benchmark opinions, and (6) grants in part and denies in part Plaintiffs' motion to exclude the opinion of Visa and Mastercard's expert Julie Conroy.

Dated: September 13, 2024
        Brooklyn, New York

                                SO ORDERED:


                                _____/s MKB_____
                                MARGO K. BRODIE
                                United States District Judge