UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

B & R SUPERMARKET, INC., d/b/a Milam's
Market, GROVE LIQUORS LLC, STROUK
GROUP LLC, d/b/a Monsieur Marcel, and
PALERO FOOD CORP. and CAGUEYES FOOD
CORP., d/b/a Fine Fare Supermarket, *Individually
and on Behalf of All Others Similarly Situated,*

                         Plaintiffs,

                 v.

VISA INC., VISA U.S.A., INC., MASTERCARD
INTERNATIONAL INC., AMERICAN EXPRESS
COMPANY, and DISCOVER FINANCIAL
SERVICES,

                       Defendants.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
17-CV-2738 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiffs B & R Supermarket, Inc., doing business as Milam's Market ("B & R

Supermarket"), Grove Liquors LLC, Strouk Group LLC, doing business as Monsieur Marcel

("Monsieur Marcel"), and Palero Food Corp. and Cagueyes Food Corp., doing business as Fine

Fare Supermarket ("Fine Fare Supermarket") (collectively, "Class Representatives"),

commenced this class action against Defendants Visa Inc. and Visa U.S.A., Inc. (collectively

"Visa"), Mastercard International Inc. ("Mastercard"), Discover Financial Services ("Discover"),

and American Express Co. ("Amex"), alleging violations of the Sherman Act, 15 U.S.C. §§ 1, 3,

and state antitrust and consumer protection laws of California, Florida, and New York, and

asserting unjust enrichment claims.  (Compl., Docket Entry No. 1; Am. Compl., Docket Entry

No. 291.)  Plaintiffs' claims arise out of Defendants' processes for adopting the EMV (Europay,

Mastercard and Visa) standard for card transactions in the United States.[1]  (Am. Compl. ¶ 151.)
Plaintiffs allege that Defendants violated antitrust laws by entering into a conspiracy to: (1) adopt
the same policy via nearly identical rules for shifting billions of dollars in liability for fraudulent
charges, or "chargebacks," from banks to merchants ("Fraud Liability Shift," "Liability Shift," or
"FLS"); and (2) make the Liability Shift effective on the same day and in the same manner for all
four networks, to prevent merchants from steering customers to use cards with more lenient
terms or concessions such as reduced interchange or merchant discount fees.[2]  (See Am. Compl.
¶¶ 2, 4, 7, 9).

Currently before the Court are Visa and Mastercard's, Discover's, and Amex's motions
for summary judgment.[3]  For the reasons set forth below, the Court (1) denies Visa and
Mastercard's motion, (2) denies Discover's motion, and (3) denies Amex's motion.

---

[1]  EMV technology is a global standard for credit cards that uses computer chips and chip
readers to authenticate (and secure) chip-card transactions.  (See Am. Compl. ¶¶ 65, 67.)  It
allows for secure transmittance of "dynamic" card information by creating a unique electronic
signature for each transaction.  (Id. ¶ 65.)  Prior to the adoption of EMV technology, payment
cards relied entirely on magnetic stripes, which can only communicate "static" information such
as the card number and expiration date.  (Id. ¶¶ 63, 65.)

[2]  Plaintiffs allege that had Defendants not conspired to impose the Liability Shift at the
same time, at least one Defendant would have offered more lenient terms such as no "Liability
Shift component, an exten[sion of the] Liability Shift date, a break on fees, equipment or other
more favorable terms."  (Am. Compl. ¶ 9.)  They allege that "[i]n a truly competitive
environment, at least one of these entities would or should have broken ranks and offered
merchants a break on any number of terms."  (Id.)

[3]  (Visa & Mastercard's Mot. for Summ. J. ("VM Mot."), Docket Entry No. 798; Visa &
Mastercard's Mem. in Supp. of VM Mot. ("VM Mem."), Docket Entry No. 799; Pls.' Mem. in
Opp'n to VM Mot. ("Pls.' VM Opp'n"), Docket Entry No. 800; Visa & Mastercard's Reply in
Supp. of VM Mot. ("VM Reply"), Docket Entry No. 801; Visa & Mastercard's Stmt. of Material
Facts in Supp. of VM Mot. ("VM 56.1"), Docket Entry No. 802; Pls.' Resp. to VM 56.1 &
Additional Stmt. of Material Facts ("Pls.' VM 56.1 Resp."), Docket Entry No. 803; Visa &
Mastercard's Resp. to Pls.' Additional Stmt. of Material Facts ("VM 56.1 Resp."), Docket Entry
No. 804; Visa & Mastercard's Reply in Supp. of VM 56.1 ("VM 56.1 Reply"), Docket Entry

## I. Background

The Court assumes familiarity with the facts and extensive procedural history as set forth in prior decisions, *see B & R Supermarket, Inc. v. Visa Inc.* (*B&R I*), No. 16-CV-1150, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016); *B & R Supermarket, Inc. v. MasterCard Int'l Inc.* (*B&R II*), No. 17-CV-2738, 2018 WL 1335355 (E.D.N.Y. Mar. 11, 2018); *B & R Supermarket, Inc. v. Mastercard Int'l Inc.* (*B&R III*), No. 17-CV-2738, 2021 WL 234550 (E.D.N.Y. Aug. 20, 2020), and as set forth more recently, *see B & R Supermarket, Inc. v. Visa Inc* (*B&R IV*),  No. 17-CV-2738, 2024 WL 3823096 (E.D.N.Y. Aug. 14, 2024); *B & R Supermarket, Inc. v. Visa Inc.* (*B&R V*), No. 17-CV-2738, 2024 WL 3949977 (E.D.N.Y. Aug. 15, 2024); *B & R Supermarket, Inc. v. Visa Inc* (*B&R VI*), No. 17-CV-2738, 2024 WL 4252031 (E.D.N.Y. Sept. 13, 2024).

## II. Discussion

### a. Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Radwan v.*

---

805.)

> (Amex's Mot. for Summ. J. ("Amex Mot."), Docket Entry No. 819; Amex's Mem. in Supp. of Amex Mot. ("Amex Mem."), Docket Entry No. 824; Pls.' Mem. in Opp'n to Amex Mot. ("Pls.' Amex Opp'n"), Docket Entry No. 836; Amex's Reply in Supp. of Amex Mot. ("Amex Reply"), Docket Entry No. 838; R. 56.1 Stmt. of American Express in Supp. of Amex Mot. ("Amex 56.1"), Docket Entry No. 827; Pls.' Resp. to Amex 56.1 ("Pls.' Amex 56.1 Resp."), Docket Entry No. 837; Amex's Resp. to Pls.' Additional Stmt. of Disputed Material Facts ("Amex 56.1 Resp."), Docket Entry No. 839.)
>
> (Discover's Mot. for Summ. J. ("Discover Mot."), Docket Entry No. 795; Discover's Mem. in Supp. of Discover Mot. ("Discover Mem."), Docket Entry No. 795-1; Pls.' Mem. in Opp'n to Discover Mot. ("Pls.' Discover Opp'n"), Docket Entry No. 795-3; Discover's Reply in Supp. of Discover Mot. ("Discover Reply"), Docket Entry No. 795-5; Discover's Stmt. of Undisputed Material Facts ("Discover 56.1"), Docket Entry No. 795-2; Pls.' Resp. to Discover 56.1 & Additional Stmt. of Disputed Material Facts ("Pls.' Discover 56.1 Resp."), Docket Entry No. 795-4; Discover's Resp. to Pls.' Additional Stmt. of Disputed Facts ("Discover 56.1 Resp."), Docket Entry No. 795-6.)

*Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).  The court must

"constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th

at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir.

2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the

party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir.

2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  The role of the court "is not

to resolve disputed questions of fact but only to determine whether, as to any material issue, a

genuine factual dispute exists."  *Kee v. City of New York*, 12 F.4th 150, 166–167 (2d Cir. 2021)

(quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).  A genuine issue of fact

exists when there is sufficient "evidence on which the jury could reasonably find for the

[nonmoving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The "mere

existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*  The

court's function is to decide whether, "after resolving all ambiguities and drawing all inferences

in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant."  *Miller v.

N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing

*Anderson*, 477 U.S. at 248; and then citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127,

129 (2d Cir. 2013)).  The moving party, however, need not *prove* a negative; rather, where "the

burden of proof at trial would fall on the nonmoving party, the moving party 'can shift the initial

burden by pointing to a lack of evidence to go to the trier of fact on an essential element of the

nonmovant's claim.'"  *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022)

(quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)); *see also Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving

party support its motion with affidavits or other materials *negating* the opponent's claim."); *El-*

*Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016) ("[T]he movant's burden will be satisfied if he

can point to an absence of evidence to support an essential element of the nonmoving party's

claim." (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.

1995))).

> **b.   Defendants' motions for summary judgment**

Defendants move for summary judgment on several grounds.  Visa and Mastercard argue

that Plaintiffs (1) have failed to demonstrate antitrust standing through proof of injury or

damages, (2) lack antitrust standing under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977),

(3) have failed to present evidence of two-sided harms as required under *Ohio v. Am. Express

Co.* (*Amex*), 585 U.S. 529 (2018), (4) have failed to present sufficient evidence of market

definition and anticompetitive effect as required under the rule of reason, and (5) have failed to

present sufficient evidence of a conspiracy.  (VM Mem.)  Discover and Amex move for

summary judgment as to this last basis alone, arguing that Plaintiffs have failed to present

sufficient evidence of Discover's and Amex's participation in any conspiracy.  (Discover Mem.;

Amex Mem.)  The Court discusses each of these bases in turn.

> **i.   Antitrust standing**

Visa and Mastercard first argue that Plaintiffs "cannot prove injury-in-fact." (VM Mem.

58.)  In support, Visa and Mastercard contend:

> > Even if Plaintiffs had direct evidence of an agreement not to delay
> > and that agreement were a *per se* violation . . . Plaintiffs still would
> > need to prove that in the absence of that agreement, at least one
> > Defendant would have delayed its FLS.  Otherwise, there can be no
> > proof of injury-in-fact.

(*Id.*)  In further support, Visa and Mastercard argue that, "[g]iven Plaintiffs' theory, they must

adduce evidence from which a reasonable jury could find that it is more likely than not that, in

accordance with Visa's own self-interest in a but-for world, Visa would have delayed its FLS,"

because "[a]bsent sufficient evidence about Visa, under Plaintiffs' theory, no jury could find that any other Defendant would have delayed its FLS." (*Id.*) Second, Visa and Mastercard argue that Plaintiffs have failed to segregate between recoverable damages to merchants who could not be ready for the FLS in time and unrecoverable damages to merchants who were, or could have been, ready in time. (*Id.* at 60–63.)

Plaintiffs argue that there is sufficient evidence in the record for a reasonable jury to conclude that one or more of the networks would have delayed its liability shift in the but-for world. (Pls.' VM Opp'n 66–68.) Regarding damages, Plaintiffs argue that "Defendants' suggestion that Plaintiffs must disaggregate certain conduct is wrong." (*Id.* at 69.) In support, Plaintiffs note that "the Court has previously held that 'Plaintiffs are not required to offer evidence of how merchants would have responded to the Liability Shift in the but-for world in order to establish injury or damages.'" (*Id.* (quoting *B&R III*, 2021 WL 234550, at *26)). In addition, Plaintiffs argue that there is no need to disaggregate damages because "[c]omparing a world where there was no agreement between Defendants regarding the FLS dates (the but-for world), and what actually happened, all of the chargebacks flow from the anticompetitive aspect of October 2015 FLSs." (*Id.* at 70 (emphasis omitted).)

"Section 4 of the Clayton Act provides for a private right of action and treble damages to '[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws.'"[4] *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th

---

[4] Private parties are granted the right to sue for violations of the Sherman Act by section 4 (damages) and section 16 (injunctive relief) of the Clayton Act. 15 U.S.C. §§ 15, 26; *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109–13 (1986) (stating that sections 4 and 16 of the Clayton Act "provide[] a vehicle for private enforcement of the antitrust laws"); *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006) (noting that "the Clayton Act's Sections 4 (damages) and 16 (injunctive relief) permit private citizens to

103, 114 (2d Cir. 2021) (quoting 15 U.S.C. § 15(a)).  However, "the Supreme Court has

recognized that 'Congress did not intend the antitrust laws to provide a remedy in damages for

all injuries that might conceivably be traced to an antitrust violation.'"  *Id.* at 114–15 (quoting

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* (*AGC*), 459 U.S.

519, 534 (1983)).  The antitrust standing requirement arises from the Supreme Court's

recognition of this principle.  *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 258 (2d

Cir. 2023) ("The antitrust standing requirement 'originates in the Supreme Court's recognition

that . . . Congress did not intend the antitrust laws to provide a remedy in damages for all injuries

that might conceivably be traced to an antitrust violation.'" (internal quotation marks omitted)

(quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436–37 (2d Cir. 2005))).

The Supreme Court has identified several factors that courts should consider in assessing

the availability of relief for an antitrust violation: "a causal connection between an antitrust

violation and harm to the [plaintiffs]"; "improper motive"; whether the Sherman Act was enacted

to protect the type of injury at issue; "the directness or indirectness of the asserted injury"; the

speculative nature of the damages; and "the potential for duplicative recovery or complex

apportionment of damages."  *AGC*, 459 U.S. at 537–46; *see also Gatt Commc'ns, Inc. v. PMC*

*Assocs. L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (listing similar factors).  The Second Circuit has

applied these factors using a two-step inquiry: "To establish antitrust standing, a plaintiff must

show (1) antitrust injury, which is injury of the type the antitrust laws were intended to prevent

---

sue under the federal antitrust laws" (citations omitted)); *see also In re Google Digit. Advert.*
*Antitrust Litig.*, 627 F. Supp. 3d 346, 405 (S.D.N.Y. 2022) (observing that while "the Sherman
Act originally permitted only the United States to seek injunctive and equitable relief," the
"Clayton Act was adopted to permit enforcement by broader categories of plaintiffs," including
"states" and "private parties" (citing *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 39 (D.D.C.
2021))).

and that flows from that which makes defendants' acts unlawful, and (2) that he is a proper plaintiff in light of four efficient enforcer factors." *In re Platinum*, 61 F.4th at 258–59 (quoting *Schwab*, 22 F.4th at 115); *see also Gatt*, 711 F.3d at 76 (observing that the Second Circuit "has distilled [the *AGC*] factors into two imperatives: we require a private antitrust plaintiff plausibly to allege (a) that it suffered 'a special kind of "antitrust injury,"' and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws" (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121–22 (2d Cir. 2007))). "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement[, the court] must dismiss it as a matter of law." *Gatt*, 711 F.3d at 75–76 (first alteration in original) (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc)).

The antitrust injury requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." *Id.* at 76 (quoting *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 342 (1990)); *see also US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 284 (S.D.N.Y. 2015) (same). To establish antitrust injury, a plaintiff must sufficiently allege facts showing "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *In re Platinum*, 61 F.4th at 258 (quoting *Schwab*, 22 F.4th at 115); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 220 (S.D.N.Y. 2019) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The Second Circuit has laid out the following three-step process for determining whether a plaintiff has adequately alleged antitrust injury:

> First, the party asserting that it has been injured by an illegal anticompetitive practice must "identify[] the practice complained of

and the reasons such a practice is or might be anticompetitive." *Port Dock*, 507 F.3d at 122.  Next, we identify the "actual injury the plaintiff alleges." *Id.*  This requires us to look to the ways in which the plaintiff claims it is in a "worse position" as a consequence of the defendant's conduct.  [*Brunswick*, 429 U.S. at 486.]  Finally, we "compar[e]" the "anticompetitive effect of the specific practice at issue" to "the actual injury the plaintiff alleges." *Port Dock*, 507 F.3d at 122.  It is not enough for the actual injury to be "causally linked" to the asserted violation.  *Brunswick*, 429 U.S. at 489.  Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful." *Daniel*, 428 F.3d at 438 (internal quotation marks omitted).

*Gatt*, 711 F.3d at 76 (second alteration added) (footnote omitted).  Given the need to "distinguish the question of whether an antitrust violation occurred from whether plaintiffs have standing to pursue" a claim, courts may "assum[e] the existence of a violation in addressing the issue of standing." *Daniel*, 428 F.3d at 437; *see also Gatt*, 711 F.3d at 76 n.9 (observing the difficulty a court faces when assessing antitrust standing, because it must "posit[] a rationale for the antitrust laws' prohibition of conduct that may, in fact, not be prohibited").

The Supreme Court's decision in *Atlantic Richfield*, 495 U.S. 328, highlights the requirement that the anticompetitive effect of the unlawful practice be the source of a plaintiff's injury and clarifies that a causal link between the asserted violation and the alleged injury, alone, is insufficient.  In *Atlantic Richfield*, competitor plaintiffs challenged a vertical agreement between an oil company and its retailers to set a maximum price for gasoline.  *Id.* at 331–32, 336–37.  The plaintiffs' alleged injury was that, as competitors not restrained by these regulations, they would have had to lose money by charging lower prices to compete with an artificially capped price.  *Id.* at 337–38.  The Supreme Court noted that the type of agreement challenged had already been found illegal in a prior case, *Albrecht v. Herald Co.*, 390 U.S. 145 (1968), but that the basis of its illegality under the antitrust laws was that the agreement would

"limit[] the ability of small dealers to engage in nonprice competition," thus discouraging dealers from competing to "furnish services essential to the value which goods have for the consumer or to furnish services and conveniences which consumers desire and for which they are willing to pay." *Atl. Richfield*, 495 U.S. at 335–36 (quoting *Albrecht*, 390 U.S. at 152–53). In essence, the arrangement discouraged capped retailers from competing to offer superior services, and this harm to competition hurt consumers — not fellow competitors — which is what made it a cognizable antitrust injury. *See id.*; *see also Gatt*, 711 F.3d at 77 (noting that the challenged scheme would be unlawful "only because of the harm it may cause — increased prices — to purchasers" of the product).

Although Visa and Mastercard frame their dispute over injury-in-fact as a standing argument, what they seek is for the Court to resolve a disputed issue of fact as to whether Plaintiffs have suffered an injury — something the Court cannot do on a motion for summary judgment. Visa and Mastercard are correct that Plaintiffs cannot show injury-in-fact if they cannot show that Defendants would have delayed their liability shifts in the but-for world, but Visa and Mastercard's argument is circular and challenges the merits of the underlying alleged antitrust violation. Stated differently, it will always be true that a plaintiff cannot show injury-in-fact if the plaintiff cannot show a violation of the antitrust laws. Accordingly, and for the reasons discussed below in section II.b.v, the Court denies Visa and Mastercard's' motion for summary judgment on this basis. In addition, Visa and Mastercard do not direct their arguments at any of the *AGC* factors. *See Gatt*, 711 F.3d at 76 (observing that the Second Circuit "has distilled [the *AGC*] factors into two imperatives: we require a private antitrust plaintiff plausibly to allege (a) that it suffered 'a special kind of "antitrust injury,"' and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the

antitrust laws" (quoting *Port Dock,* 507 F.3d at 121–22)).  Although "[a]ntitrust standing is a threshold, pleading-stage inquiry," *id.* at 75; *see also Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016) ("[A]ntitrust standing is a threshold inquiry resolved at the pleading stage."), Visa and Mastercard's arguments regarding injury-in-fact go to the sufficiency of Plaintiffs' evidence, not the sufficiency of Plaintiffs' allegations.[5]  Accordingly, the Court is unpersuaded by Visa and Mastercard's arguments that this disputed question of fact can be resolved on summary judgment without invading the province of the jury.

### ii.   *Illinois Brick* **standing**

Visa and Mastercard argue that Plaintiffs cannot recover for any injury resulting from chargebacks because, under the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), federal antitrust law does not permit an "indirect payor" to recover for alleged overcharges resulting from antitrust violations.  (VM Mem. 13–14.)  They further argue that under the Second Circuit's decision in *Paycom Billing Services, Inc. v. Mastercard International, Inc.*, 467 F.3d 283 (2d Cir. 2006), "merchants are indirect payors with respect to fraud chargebacks," and *Illinois Brick* therefore "barred the merchant [in *Paycom*] from pursuing fraud chargebacks as damages" from the networks.  (*See id.* at 14–16.)  In further support, Visa and Mastercard argue that their Liability Shift rules did not require issuers to pass chargebacks on to acquirers, and in turn on to merchants.  (*Id.* at 15–16.)  Visa and Mastercard contend that by virtue of the discretion available to issuers, and the choice by some issuers to pass on costs, "Plaintiffs are indirect payors of all FLS chargebacks on Visa and Mastercard transactions." (*Id.*)

---

[5]  In addition, Defendants did not argue that Plaintiffs lack antitrust standing in their motions to dismiss.  *See B&R I*, 2016 WL 5725010.

Plaintiffs first argue that the Supreme Court's decision in *Apple Inc. v. Pepper*, 587 U.S. 273 (2019), demonstrates that *Illinois Brick*'s limitation on antitrust standing does not apply to the facts of this case.  (Pls.' VM Opp'n 13–15.)  In support, they argue that, unlike in *Illinois Brick*, the merchants in this case "are not consumers at the bottom of a vertical distribution chain who are attempting to sue manufacturers at the top of the chain."  (*Id.* at 14 (quoting *Apple*, 587 U.S. at 281).)  Second, Plaintiffs contend that even if *Illinois Brick* applies, Plaintiffs are direct purchasers because notwithstanding whether some issuers "*chose to absorb the chargeback fees*," "Plaintiffs were contractually responsible for chargebacks."  (*Id.* at 15–16.)  They further argue that Visa and Mastercard's reliance on *Paycom* is misplaced given that it predates *Apple* and *Amex*.  (*Id.* at 18–19.)  Third, Plaintiffs contend that even if the Court finds that they are not direct purchasers, chargebacks fall into *Illinois Brick*'s "cost-plus contract" exception to the direct purchaser rule.  (*Id.* at 20.)

In *Illinois Brick*, the Supreme Court limited standing to those who are the "direct purchasers" from antitrust violators.[6]  431 U.S. 720.  In *Apple*, the Supreme Court reaffirmed the

---

[6]  Because *Illinois Brick* and the direct-purchaser rule amount to a complete bar to recovery in damages for indirect purchasers, it has come to be treated by courts as a standing rule.  *See, e.g.*, *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990) (treating *Illinois Brick* as a standing rule); *Simon v. KeySpan Corp.*, 694 F.3d 196, 201 (2d Cir. 2012) ("Generally, only direct purchasers have standing to bring civil antitrust claims." (citing *Illinois Brick*, 420 U.S. 720)); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 102 (E.D.N.Y. 2012) ("Because [the plaintiff] is an indirect purchaser and no exception to the *Illinois Brick* rule applies here, [the plaintiff] lacks standing to sue for damages under federal law[.]"); *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 480 (S.D.N.Y. 2012) ("The Supreme Court's decision in [*Illinois Brick*] established that '[g]enerally only direct purchasers have standing to bring civil antitrust claims.'" (second alteration in original) (quoting *Simon*, 694 F.3d at 201–02)); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 505 (S.D.N.Y. 1996) (referring specifically to "*Illinois Brick* standing").

validity of the *Illinois Brick* rule.  587 U.S. at 277–79.[7]

As the Court explained in a related decision denying Visa and Mastercard's motion for summary judgment under *Illinois Brick* in related litigation ("MDL 1720"), the Supreme Court has made clear that only the direct *purchaser* has standing.  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.* (*Interchange Fees V*), No. 05-MD-1720, 2024 WL 1014159, at *7–9 (E.D.N.Y. Feb. 22, 2024).[8]  In MDL 1720, a class of merchant plaintiffs sued Visa,

---

[7] In *Illinois Brick*, the State of Illinois and a coalition of local government entities asserted antitrust claims against Illinois Brick and other manufacturers alleging a price-fixing conspiracy that had artificially and unlawfully inflated the prices of concrete blocks used in projects funded by the state entities, such as schools and housing developments.  431 U.S. at 726–27.  It was undisputed that Illinois and the local governmental entities were not the direct purchasers of concrete block.  *Id.* at 726.  Rather, the defendants "s[old] the block primarily to masonry contractors, who submit[ted] bids to general contractors for the masonry portions of construction projects.  The general contractors in turn submit[ted] bids for these projects to customers such as . . . the State of Illinois and 700 local governmental entities in the Greater Chicago area."  *Id.*  Illinois and the local governmental entities were "thus indirect purchasers of concrete block," because the block "passe[d] through two separate levels in the chain of distribution before reaching" the governmental entities.  *Id.*  The Court held that, as an indirect purchaser, Illinois was barred from recovering from Illinois Brick.  *Id.* at 728–29.

In *Apple*, the Supreme Court decided whether iPhone owners who purchased apps from Apple's "App Store" were direct purchasers of those apps from Apple.  587 U.S. at 276–77.  Apple argued that iPhone owners were not direct purchasers from Apple because the app developers set the consumers' purchase price.  *Id.* at 277–78.  The Supreme Court's "straightforward conclusion" was that "under *Illinois Brick*, the iPhone owners were direct purchasers who may sue Apple" because it was "undisputed that the iPhone owners bought the apps directly from Apple."  *Id.* at 278–79.  The Court reiterated that the "bright-line rule of *Illinois Brick* . . . means that indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue."  *Id.* at 280.  As an example, "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A.  But B may sue A if A is an antitrust violator.  And C may sue B if B is an antitrust violator."  *Id.*  According to the Supreme Court, this is "the straightforward rule of *Illinois Brick*."  *Id.*

[8] For consistency with the related *In re Payment Card Interchange Fee & Merchant Discount Litigation*, the Court refers to decisions in that action by the short titles defined in those decisions.  *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, --- F. Supp. 3d. ---, ---, 2024 WL 2816049, at *2 (E.D.N.Y. May 28, 2024) (defining *Interchange Fees I–V*).

Mastercard, and a group of card-issuing banks for antitrust violations arising out of Visa's and Mastercard's card acceptance rules. *Id.* at *2–6. The plaintiffs alleged that these violations allowed the defendants to impose supracompetitive interchange fees on card transactions. *Id.* In seeking summary judgment, Visa and Mastercard argued — as they do in this case — that merchants lack antitrust standing under *Illinois Brick* because merchants do not directly pay the challenged fees. *Id.* at *9–10. The Court rejected this argument, finding a triable issue of fact as to the merchants' direct purchaser status. First, the Court reasoned that a threshold inquiry is identifying the product being purchased, and found that the relevant product is "card-acceptance services." *Id.* at *11. Second, because the product in question is a service, unlike a tangible good such as concrete blocks, multiple intermediaries may facilitate the service without being considered purchasers of the service. *Id.* Thus, the Court explained that the direct purchaser is not always the same entity as the direct payor.[9] *Id.* at *12 ("[T]he Court concludes that the identity of the direct payor may be probative of the identity of the direct purchaser, but it does not accept [the] contention that only direct payors have standing under *Illinois Brick*."). Stated differently, the identity of the direct payor is often a good proxy for the identity of the direct purchaser, but when the payor and purchaser differ, it is the purchaser who has standing. *Id.* ("If the payor and purchaser are separate entities, the Court is bound by the Supreme Court's decision to confer standing on the purchasers."). Accordingly, in deciding the defendants' motion to enforce the Settlement Agreement, the Court understood the Second Circuit's references to the

---

[9] *See also Interchange Fees V*, 2024 WL 1014159, at *12 ("For example, where a credit-card cardholder purchases a good on Amazon and then defaults on his credit-card obligations to Chase, it is the Issuer (Chase) who pays the merchant (Amazon). Because Chase has paid Amazon the amount owed to it, Amazon is indifferent whether the cardholder ever satisfies his obligations to Chase for the amount of the purchase. There is no question, however, that the cardholder is the direct purchaser from Amazon, notwithstanding the fact that Chase paid for the product on the cardholder's behalf.").

"direct payors of the challenged fees," *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 716 (2d Cir. 2023), to be a proxy for the relevant inquiry: the direct purchaser of card-acceptance services, in part because no party is *purchasing* interchange fees. Rather, the fees are the price paid for the service being purchased.

For the same reasons, the Court denies Visa and Mastercard's motion for summary judgment on this basis. Just as no merchants in MDL 1720 purchased interchange fees, no party in this case "purchases" chargebacks. (*See also* Pls.' VM Opp'n 14 ("No party 'purchased' an FLS overcharge from Defendants, then 'sold' that overcharge to merchants. Issuers and acquirers cannot 'purchase' more (or fewer) FLS charges based on their economic preferences. This reality makes the *Illinois Brick* doctrine inapplicable.").) In this case, chargebacks constitute a component of the price that merchants (and issuers) pay for card-acceptance (or card-issuance) services. *See Interchange Fees V*, 2024 WL 1014159, at *17 ("As a threshold matter, it is not clear to the Court that any party is a 'direct purchaser' of chargebacks. Instead, chargebacks — like interchange and network fees — appear to be a component of the price paid for card-acceptance services."). In addition, because the direct purchaser and payor might be different entities, Visa and Mastercard's arguments that acquirers *directly pay* chargebacks do not address the relevant inquiry. *See id.* at *12 ("If the payor and purchaser are separate entities, the Court is bound by the Supreme Court's decision to confer standing on the purchasers."). Rather, the relevant inquiry is whether merchants are direct purchasers of card-acceptance services. As the Court has already found, there is at least a triable question of fact as to whether merchants directly purchase card-acceptance services. *Id.* at *18 (finding triable question of fact with respect to chargebacks as to whether merchants are direct purchasers of card-acceptance services). Plaintiffs in this case have likewise presented evidence that merchants are the direct

purchasers of card-acceptance services.  (*See, e.g.*, Pls.' VM 56.1 Resp. ¶ 461 (explaining how merchants purchase card-acceptance services).)  Accordingly, because Plaintiffs have raised a triable question of fact as to Plaintiffs' direct purchaser status, the Court denies summary judgment on this basis.

### iii.   Applicable antitrust standard of review

Visa and Mastercard argue that "any alleged agreement among Defendants not to delay FLSs must be evaluated under the rule of reason," and that the Court cannot conclude that the alleged conduct constitutes a *per se* violation of federal antitrust laws.  (VM Mem. 18–21.)  In support, Visa and Mastercard first argue that the *per se* standard applies only where the challenged conduct has no "redeeming virtue" and only has a "pernicious effect on competition." (*Id.* at 18 (quoting *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 315 (2d Cir. 2008)).)  Visa and Mastercard contend that even if the alleged agreement not to delay the Liability Shifts had an effect on price, the adoption of EMV had some positive effects, such as "contribut[ing] to reducing counterfeit payment card fraud."  (*Id.* at 19–20.)  Second, Visa and Mastercard argue that the *per se* rule is appropriate only for alleged restraints with which courts have "considerable experience," and that this is not such a case.  (*Id.* at 20–21.)  Third, Visa and Mastercard argue that courts can still consider procompetitive justifications in evaluating horizontal restraints and that "Plaintiffs' experts admitted that they cannot rule out that Defendants kept their FLSs in October 2015 due to competition."  (*Id.* at 21.)

Plaintiffs argue that horizontal price-fixing conspiracies, such as that alleged in this case, are "*per se* unlawful" under Second Circuit law.  (Pls.' VM Opp'n 21 (quoting *United States v. Apple, Inc.*, 791 F.3d 290, 313–14 (2d Cir. 2015)).)  In support, Plaintiffs first point to fundamental factual differences between this case and those that Visa and Mastercard rely on in arguing that the "redeeming value" of any alleged agreement makes the *per se* rule inappropriate.

(*Id.* at 22.)  Second, Plaintiffs contend that Visa and Mastercard mischaracterize Plaintiffs'

experts' views in order to suggest that the coordinated Liability Shift could have been the result

of competition and that the EMV shift had procompetitive benefits.  (*Id.* at 23.)  Third, Plaintiffs

argue that, notwithstanding Visa and Mastercard's argument that the *per se* rule is appropriate

only for alleged restraints with which courts have had "considerable experience," the Supreme

Court has also recognized that this concern is limited to circumstances in which "the economic

impact of certain practices is not immediately obvious."  (*Id.* at 25 (emphasis omitted) (quoting

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87(2007)).)  Plaintiffs

contend that this is not such a case, because the "impact of this agreement is clear: it prevented

the Networks from having to compete with each other for the business of merchants."  (*Id.*)

Finally, Plaintiffs argue that even if the Court declines to apply the *per se* rule, the Court should

apply "quick look" review rather than the rule of reason, because "an observer with even a

rudimentary understanding of economics could conclude that the arrangements in question

would have an anticompetitive effect."  (*Id.* at 25–26 (quoting *Cal. Dental Ass'n v. FTC*, 526

U.S. 756, 770 (1999)).)

The Sherman Act prohibits every "contract, combination . . . , or conspiracy, in restraint

of trade or commerce."  15 U.S.C. § 1.  The Supreme Court has "long recognized that in the view

of the common law and the law in this country when the Sherman Act was passed, the phrase

'restraint of trade' is best read to mean 'undue restraint.'"  *NCAA v. Alston*, 594 U.S. 69, 81

(2021).  To prove a Sherman Act violation under Section 1, a plaintiff must establish (i) the

existence of a contract, combination, or conspiracy that (ii) unreasonably restrains trade.  *1-800

Contacts, Inc. v. FTC*, 1 F.4th 102, 114 (2d Cir. 2021).

To determine whether a challenged restraint is unreasonable, courts assess the restraint

under one of three standards: First, some restraints are so patently unreasonable as to be deemed unreasonable *per se*. *Alston*, 594 U.S. at 89 ("[S]ome agreements among competitors so obviously threaten to reduce output and raise prices that they might be condemned as unlawful *per se* or rejected after only a quick look."). The anticompetitive effects of these restraints are unambiguous, and courts need not carefully evaluate market realities to determine that such restraints are unreasonable. *Id.* These agreements "lack . . . any redeeming virtue" and may be condemned "without elaborate inquiry." *1-800 Contacts*, 1 F.4th at 114–15 (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)). This designation is used sparingly and typically applies only to agreements between competitors to fix prices or divide markets. *Id.*; *N. Pac. Ry.*, 356 U.S. at 5.

Second, some restraints are plainly anticompetitive — such that "an observer with even a rudimentary understanding of economics" would see how the restraint harms competition, *Cal. Dental*, 526 U.S. at 770 — but do not fit squarely within the proscribed "*per se*" categories of price fixing or market allocation. In these cases, courts may determine unreasonableness in the "twinkling of an eye" with what is known as a "quick look." *Alston*, 594 U.S. at 88 (quoting *NCAA v. Bd. of Regents of Univ. of Okla.* (*NCAA v. Oklahoma*), 468 U.S. 85, 110 n.39 (1984)).[10] A quick look, however, is only appropriate where courts have gained enough experience with a particular type of restraint to conclude that its anticompetitive effects almost certainly outweigh any procompetitive justifications. *Id.* at 89.

---

[10]  The quick look approach is also described as "an abbreviated version of the rule of reason" analysis. *United States v. Apple, Inc.*, 791 F.3d 290, 329–30 (2d Cir. 2015). That is, a court will still apply the three-step burden shifting framework, except that the plainly anticompetitive nature of the challenged conduct relieves the plaintiff of her burden to show an actual anticompetitive effect at the first step. *Id.* at 330. Unlike *per se* condemnation, however, the court will assess the defendant's procompetitive justifications for the challenged conduct. *Id.*

Third, and finally, courts most often assess challenged restraints under the "rule of reason." Determining whether a restraint is undue for purposes of the Sherman Act "presumptively" calls for a rule of reason analysis. *Id.* at 81 (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)). The rule of reason requires a court to "conduct a fact-specific assessment of 'market power and market structure'" to assess a challenged restraint's "actual effect on competition." *Amex*, 585 U.S. at 541 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)). The goal is for a court to "distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Id.* (quoting *Leegin*, 551 U.S. at 886). The purpose of antitrust law is to protect consumers, markets, and competition — not to protect one competitor from another. *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) ("It is axiomatic that the antitrust laws were passed for 'the protection of *competition, not competitors*.'" (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962))). Accordingly, a plaintiff must make a prima facie showing that "the challenged action had an actual adverse effect on *competition as a whole* in the relevant market." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir 1998) (emphasis added) (quoting *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993)).

Because antitrust cases "presumptively" call for rule of reason analyses, *Alston*, 594 U.S. at 81, departure from the rule of reason is only warranted if the challenged agreements fall into a proscribed *per se* category (*i.e.*, agreements among horizontal competitors to fix prices, restrict output, or divide markets) or if the anticompetitive effects are so plainly evident that an observer with even a "rudimentary understanding of economics" could see how the challenged restraints harm competition (*i.e.*, the "quick look" analysis). In addition, before applying the *per se* rule,

the Supreme Court has instructed that a court must make two further inquiries to assure itself that application of the *per se* rule is warranted.  First, the Supreme Court has instructed that courts should be loath to depart from the rule of reason until they have developed "considerable experience with the type of restraint at issue."  *Alston*, 594 U.S. at 89 (quoting *Leegin*, 551 U.S. at 886).  Second, courts should consider that not all horizontal price-fixing arrangements are unlawful, for example, where the restraint is necessary for the product to exist at all.  *See, e.g.*, *NCAA v. Oklahoma*, 468 U.S. at 101 ("[W]hat is critical is that this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all."); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.* (*Broadcast Music*), 441 U.S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all.").

The Court finds that departure from the rule of reason is warranted because Defendants' alleged conspiracy falls into the proscribed *per se* category of a horizontal agreement between competitors that had the effect of raising prices.  Although the liability shift is only one component of the price paid by merchants for card-acceptance services,[11] courts have found that agreements that raise an aspect of price are still subject to *per se* condemnation.  *See, e.g.*, *Apple*, 791 F.3d at 327 ("[I]t is well established that *per se* condemnation is not limited to agreements that literally set or restrict prices.  Instead, any conspiracy 'formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity . . . is illegal

---

[11]  The liability shift increases the cost of a transaction in expectation.  Prior to the liability shift, the cost of a transaction was the interchange fee plus the acquirer's or processor's fee.  After the liability shift, the cost of a transaction was the interchange fee plus the acquirer's or processor's fee *plus* the chance that the merchant would bear liability for the transaction being fraudulent.  On average, this makes accepting credit card transactions more costly than prior to the liability shift.

*per se*,' and the precise 'machinery employed . . . is immaterial.'" (quoting *United States v. Socony–Vacuum Oil*, 310 U.S. 150, 223 (1940))); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 643, 647–48 (1980) (per curiam) (noting that the Supreme Court has held "agreements to be unlawful *per se* that had substantially less direct impact on price" than a conspiracy "to eliminate short-term trade credit formerly granted on beer purchases"); *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 346 (1982) (holding that agreement to set maximum prices constituted price fixing because "[a]ny combination which tampers with price structures is engaged in an unlawful activity" (quoting *Socony–Vacuum Oil*, 310 U.S. at 221)); *United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022) (noting that "bid rigging — which is simply another 'form of horizontal price fixing' — is a *per se* violation of the Sherman Act").

Contrary to Visa and Mastercard's arguments, courts have developed "considerable experience" with horizontal agreements on price. *Alston*, 594 U.S. at 89 (quoting *Leegin*, 551 U.S. at 886). Although the precise contours or mechanisms of the way defendants agree to set prices may vary from case to case, the fact that the alleged price fixing in this case takes the form of a liability shift does not make it so novel that the Court is unfamiliar "with the type of restraint at issue." *Id.* In addition, the Court is unpersuaded by Visa and Mastercard's argument that their alleged conspiracy was necessary to make the product available at all. (*See* VM Mem. 19–20 (quoting *Broadcast Music*, 441 U.S. at 23).) First, to the extent that the product is credit-card transactions or card-acceptance services, those existed long before Defendants ever contemplated shifting liability for fraudulent transactions to merchants. Second, to the extent that Visa and Mastercard contend their conspiracy was necessary to implement EMV, this argument is belied by evidence in the record showing that Visa and Mastercard were able to transition to EMV in other countries with staggered liability shift dates and without conspiring to fix an artificially

premature liability shift date.  (*See, e.g.*, Pls.' VM 56.1 Resp. ¶¶ 342 (Canada), 354–357 (Japan, Argentina, and Australia).)

Finally, there is an open question whether "*Amex . . .* require[s] a rule of reason analysis for assessing alleged competitive harms in two-sided transactions markets." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.* (*Interchange Fees IV*), --- F. Supp. 3d. ---, ---, 2024 WL 278565, at *9 (E.D.N.Y. Jan. 8, 2024).  However, at least one court has found that *Amex* does not require rule of reason analysis in all cases involving two-sided transaction platforms.  *See In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 637 (N.D. Ill. 2020) (explaining that *Amex* would not foreclose a claim that a horizontal restraint between competitors in a two-sided market could be anticompetitive *per se*).  In discussing the MDL 1720 defendants' arguments under *Amex*, the Court also suggested that "the Supreme Court would not demand application of the rule of reason if confronted with evidence that two (or more) transactions platforms (*e.g.*, Uber and Lyft) conspired to fix prices or divide markets." *Interchange Fees IV*, 2024 WL 278565, at *9 n.14.  As discussed below, because the Court has found that a two-sided analysis under *Amex* is unnecessary in this case, the Court also concludes that *Amex* does not mandate a rule of reason analysis.

Accordingly, these considerations do not weigh against application of the *per se* rule and the Court finds that Defendants' conduct, if proven, constitutes a horizontal agreement on price subject to *per se* analysis.

### iv.   Applicability of *Amex*

Because the Court has concluded that Defendants' conduct constitutes a horizontal agreement to fix an aspect of price, for which *per se* liability attaches, the Court need not consider whether Plaintiffs have offered adequate evidence of anticompetitive effect.  However,

the Court finds that even under the rule of reason, Plaintiffs would not have to show anticompetitive effect across both sides of a two-sided market.

Visa and Mastercard argue that Plaintiffs cannot meet their burden under the rule of reason because they have failed to show evidence of "actual detrimental effects" in a "two-sided market" as required by the Supreme Court in *Amex*, and by the Second Circuit in *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019).  (VM Mem. 17–18, 22 (quoting *Amex*, 585 U.S. at 542, 546).)  In support, Visa and Mastercard argue that under the rule of reason, Plaintiffs were required to define "a legally permissible antitrust market [and] to analyze competitive effects in that market."  (*Id.* at 23.)  Visa and Mastercard argue that instead, Plaintiffs "rely exclusively on Dr. Abrantes-Metz" who took a one-sided approach and "failed to analyze whether benefits on the other side of [card transaction] platforms — *e.g.*, reductions in issuer-side fraud costs — counterbalanced cost increases on the merchant-side."  (*Id.* at 23–24.)  Visa and Mastercard therefore argue that Plaintiffs' claims fail as a matter of law under *Amex* and *Sabre*.

Plaintiffs argue that *Amex* does not apply to this case because in *Amex*, "both sides correctly acknowledge[d] that Amex's antisteering provisions [were] *vertical* restraints."  (Pls.' VM Opp'n 27 (quoting *Amex*, 585 U.S. at 541).)  Plaintiffs contend that because they are alleging horizontal restraints among competitors, rather than vertical restraints as in *Amex*, they are not required to define a two-sided market, nor are they required to show anticompetitive effects in such a market.  (*Id.* at 27–28.)  In addition, Plaintiffs argue that *Sabre* similarly addressed circumstances "markedly different" from those present here, because no party argued that the alleged restraints were *per se* unreasonable.  (*Id.* at 28–29 (emphasis omitted).)

In *Amex*, the Supreme Court addressed challenges to Amex's anti-steering provisions in its contracts with merchants who accepted Amex card products. *See Amex*, 585 U.S. at 537–39. The Supreme Court concluded that in antitrust cases involving certain kinds of two-sided transaction platforms — like card transaction platforms — it is necessary to consider both sides of that two-sided market. *Id.* at 544–46. A significant part of the rationale for this requirement was that "[d]ue to indirect network effects, two-sided platforms cannot raise prices on one side without risking a feedback loop of declining demand." *Id.* at 544. The Supreme Court itself contemplated, however, that "it is not always necessary to consider both sides of a two-sided platform." *Id.* Using the newspaper-advertisement market as an example, the Supreme Court acknowledged that although "the value of an advertisement increases as more people read the newspaper, . . . newspaper readers are largely indifferent to the amount of advertising that a newspaper contains." *Id.* In light of "these weak indirect network effects," the Supreme Court explained that a newspaper-advertisement market could be assessed using a one-sided market analysis even though newspapers "arguably operate a two-sided platform." *Id.* The following year, in *Sabre*, the Second Circuit read *Amex* as stating that "in many or most cases involving two-sided platforms, 'courts must include both sides of the platform' in their definition of the relevant market," but it also acknowledged *Amex*'s caveat that this may not be required when "the impacts of indirect network effects and relative pricing in the market are minor." *Sabre*, 938 F.3d at 56 (quoting *Amex*, 585 U.S. at 544). The Second Circuit further interpreted *Amex* as stating that "transaction platforms" constitute a "subset of two-sided platforms that must *always* receive two-sided treatment," and described transaction platforms as those in which "the business 'cannot make a sale to one side of the platform without simultaneously making a sale to the other.'" *Id.* at 57 (quoting *Amex*, 585 U.S. at 535). The platform at issue in *Sabre* was

24

Sabre's "global distribution system" that travel agents "use to search for and book airline flights for their customers." *Id.* at 49. The product being sold, and for which companies like Sabre charged a fee, was the airline ticket transaction. *See id.* at 49–50. The Second Circuit concluded that *Amex*'s requirements applied to the case before it, and concluded that "the relevant market must, as a matter of law, include both sides of the platform." *Id.* at 57, 69.

The Court concludes that *Amex* and *Sabre* do not require a two-sided market analysis in the present case. In deciding Defendants' *Daubert* motions, the Court explained why, even though this case involves two-sided transactions platforms, it does not require a two-sided analysis under *Amex* and *Sabre*. *B&R VI*, 2024 WL 4252031, at *6–7. The Court concluded that a two-sided analysis was unnecessary for at least three reasons. First, because the challenged conduct involves a conspiracy with respect to liability shifts, the conspiracy does not implicate the "simultaneous" sale of transactions to both sides of the market — which is a necessary prerequisite to two-sided analysis under *Amex* and *Sabre*. *Id.* at *6; *see also Amex*, 585 U.S. at 535; *Sabre*, 938 F.3d at 57. Although the networks are in the business of selling transactions to merchants and cardholders, the challenged conduct in this case does not involve those transactions. Instead, "the challenged conduct is the shift of liability for fraud from issuers to merchants; when merchants bear the cost of chargebacks, they are not purchasing anything, and — more importantly — there is no 'sale' to one side of a platform without a 'simultaneous[]' sale to another side of a platform." *Id.* (quoting *Amex*, 585 U.S. at 535). Second, the Supreme Court noted in *Amex* that a two-sided analysis is unnecessary where there are "weak indirect network effects." 585 U.S. at 544; *id.* ("A market should be treated as one sided when the impacts of indirect network effects . . . are minor."). In this case, to the extent the market is two sided, the two sides are issuers and merchants, because cardholders are not liable for fraud. The

Court found that there are weak indirect network effects because merchants are indifferent to how many issuers are on the other side of the network.  *B&R VI*, 2024 WL 4252031, at *6–7.  As networks, Amex and Discover have essentially only one issuing bank each (themselves),[12] while Visa and Mastercard have thousands of issuing banks.  However, merchants' decisions on whether to accept a particular network's cards are not based on how many issuing banks offer that network's cards.  Instead, merchants' decisions to accept a particular network's cards are based on how many *cardholders* have that network's cards.  *See Amex*, 585 U.S. at 535 ("A credit card, for example, is more valuable to cardholders when more merchants accept it, and is more valuable to merchants when more cardholders use it.").  Thus, a merchant would decline to accept a network's cards if there were insufficient cardholders to make card acceptance worthwhile, regardless of whether there were one or a thousand issuing banks offering that card.  Third, the Court found that "the horizontal nature of the [conspiracy] at issue in this case undercuts the rationale for application of a two-sided analysis endorsed in *Amex* and *Sabre.*"  *B&R VI*, 2024 WL 4252031, at *7.  "[B]ecause the Liability Shift allegedly occurred pursuant to a horizontal agreement," "a merchant could not choose to drop one network in favor of another because all the major networks implemented the same policy at the same time."  *Id.*  As such, there is no "risk of a 'feedback loop of declining demand' that drove the two-sided analysis in *Amex*."  *Id.* (quoting *Amex*, 585 U.S. at 536, 544).

None of Visa and Mastercard's arguments in support of summary judgment undermine the Court's prior conclusion that a two-sided analysis is unnecessary in this case.  Accordingly,

---

[12]  The Court acknowledges that banks other than Amex issue Amex-branded cards, but the number of third-party issuing banks is small and does not alter the Court's analysis.  *See, e.g.*, Emily Sherman & Holly Johnson, *Understanding Third-Party American Express Cards*, https://www.creditcards.com/card-advice/american-express-third-party-cards/ (Mar. 30, 2022).

and for the reasons discussed above, Plaintiffs may prove their case with evidence of harm to merchants alone and the Court denies Visa and Mastercard's motion on this basis.[13]

## v. Sufficient evidence of a conspiracy

In each motion for summary judgment, Defendants argue that Plaintiffs have not adduced sufficient evidence of an agreement among Defendants to support Plaintiffs' conspiracy claims. (*See* VM Mem. 30–57; Amex Mem. 8–21; Discover Mem. 11–22.)

Section 1 of the Sherman Act prohibits every "contract, combination . . . , or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  The Sherman Act applies only to conduct that stems from "tacit or express" agreement, not from independent decision making, *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 306 (2d Cir. 2023) (quoting *Apple*, 791 F.3d at 314–15) — that is, even competitors who make the same decisions or set the same prices do not violate the antitrust laws where such parallel conduct "does not result from an agreement," *Apple*, 791 F.3d at 315.  "Identifying the existence and nature of a conspiracy requires determining whether the evidence 'reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.'"  *Id.* (alteration in original) (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).  This evidence can consist of direct evidence that the defendants entered

---

[13]  With respect to Visa and Mastercard's argument that Plaintiffs fail to define an appropriate two-sided market, the Court notes that in cases alleging unlawful horizontal agreements, the Supreme Court has said that market definitions may not even be required.  *See Amex*, 585 U.S. at 543 n.7 ("Given that horizontal restraints involve agreements between competitors not to compete in some way, . . . [courts do] not need to precisely define the relevant market to conclude that these agreements were anticompetitive.").  As articulated by the Supreme Court, the need for market definition arises from its view that "[v]ertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market."  *Id.*  However, in cases involving horizontal agreements between competitors, such a showing of market power is not required, and therefore a market definition becomes less useful.

into an agreement or circumstantial evidence creating an inference that a conspiracy existed. *Relevent Sports*, 61 F.4th at 306; *Apple*, 791 F.3d at 315.  Parallel action on the part of competitors is insufficient to prove the existence of a conspiracy, and a plaintiff must offer additional evidence, often referred to as "plus factors," to prove the existence of a conspiracy. *Apple*, 791 F.3d at 315.  This additional evidence may include evidence of a common motive to conspire, of high-level communications between the co-conspirators, or that the parallel acts were against the individual self-interest of the co-conspirators.  *Id.* (quoting *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)); *see also In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 62 (2d Cir. 2012) (same).

To survive a motion for summary judgment, a plaintiff needs to offer evidence that "tends to exclude the possibility" that the defendants were acting independently.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (quoting *Monsanto*, 465 U.S. at 764); *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010) ("[F]or purposes of a summary judgment motion, a Section 1 plaintiff must offer evidence that 'tend[s] to rule out the possibility that the defendants were acting independently.'" (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007))).  "[T]he quality of the evidence required to satisfy *Matsushita*'s 'tends to exclude' standard varies with the economic 'plausibility' of the alleged agreement."  *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 99 (2d Cir. 2018) (quoting *Publ'n Paper*, 690 F.3d at 63).  "[W]here a plaintiff's theory of recovery is implausible, it takes strong direct or circumstantial evidence to satisfy *Matsushita*'s tends to exclude standard."  *Id.* (quoting *Publ'n Paper*, 690 F.3d at 63)*.*  In contrast, "broader inferences are permitted, and the tends to exclude standard is more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake."  *Id.* (quoting *Publ'n Paper*, 690

F.3d at 63).  "[W]hen the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief, 'the question of what weight should be assigned to [those] inferences remains within the province of the fact-finder at a trial.'"  *Publ'n Paper*, 690 F.3d at 61 (alteration in original) (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987)).

### 1.   Evidence of Visa's & Mastercard's participation in the conspiracy

Visa and Mastercard argue that all four Defendants had independent, non-collusive reasons that would explain why they did not delay their Liability Shift dates and that this warrants summary judgment in their favor.  (*See* VM Mem. 32–42.)  First, for example, they argue that Visa considered delaying the Liability Shift, but decided against it for its own unilateral reasons.  They argue that in 2013, Visa considered delaying its Liability Shift due to regulatory uncertainties following litigation over the Durbin Amendment.  (*See id.* at 33–34.)  However, after Target experienced a "massive data breach" in December of 2013, Visa and Mastercard assert that "Visa reversed course" and "reaffirm[ed] its [original FLS date] at the end of January 2014," in large part due to "media and consumer outcry."  (*Id.* (alteration omitted).)  They argue that later, in 2015, Visa again considered a delay —this time, due to lack of merchant readiness — but had to "balance[] merchant-side concerns against the fact that 'top issuers may balk and a delay could jeopardize Visa's competitive position'" with respect to issuers.  (*Id.* at 35 (alterations omitted) (quoting VM 56.1 ¶¶ 69–78).)  In addition, Visa and Mastercard argue that Visa concluded in 2015 that most merchants "with the largest amount of counterfeit fraud" were "making good progress" towards being EMV ready, and that further delays would create the "'perverse incentive' of rewarding merchants that could have, with diligence, been ready for EMV, while penalizing those . . . that had been diligent."  (*Id.* (quoting VM 56.1 ¶ 76).)  Second, Visa and Mastercard argue that Mastercard also had its own reasons for deciding against

delaying its Liability Shifts.  They argue that Mastercard was never "seriously considering to delay, even if Visa did so," and that even after it learned that Visa was considering a delay, "Mastercard planned to use Visa's expected delay against Visa by proceeding with Mastercard's implementation as planned."  (*Id.* at 37–38.)  They further contend that while Visa was considering a delay in 2015 due to lack of merchant readiness, the evidence shows that Mastercard publicly stated at the time that it had no intent to delay its Liability Shift.  (*Id.* at 38–39.)  Third, Visa and Mastercard argue that Plaintiffs' experts' theories also recognize the existence of independent, non-collusive reasons that Defendants' maintained their Liability Shift dates.  (*Id.* at 40–42.)

In addition, Visa and Mastercard contend that because the evidence is consistent with unilateral, non-collusive conduct, Plaintiffs must come forward with "more persuasive evidence to support [their] claim than would otherwise be necessary."  (*Id.* at 42–57 (quoting *Anderson News*, 899 F.3d at 102).)  Visa and Mastercard argue that Plaintiffs have failed to do so, and that none of the "plus factors" that Plaintiffs identify as "supporting an inference of collusion" are supported by Plaintiffs' evidence.  (*Id.* at 43.)  In particular, they argue that Plaintiffs offer insufficient evidence to support their claims that: (1) Liability Shifts were delayed in other countries in a manner inconsistent with Liability Shifts domestically, (2) Liability Shift delays would have steered merchants to the delaying networks; (3) networks operating independently would have delayed Liability Shifts to account for merchant readiness; and (4) "networks participated in industry groups and communicated about EMV."  (*Id.* at 43–48.)  Visa and Mastercard also argue that Plaintiffs offer no direct evidence of an agreement not to delay the Liability Shifts, and that all evidence that Plaintiffs describe as "direct . . . could just as easily be

characterized as evidence of competition." (*Id.* at 48–56 (quoting *Anderson News*, 899 F.3d at 111).)

Plaintiffs argue that they are "entitled to 'broader inferences' of conspiratorial conduct where, as here, the conspiracy alleged is 'economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive.'" (Pls.' VM Opp'n 33 (internal quotation marks omitted) (quoting *Publ'n Paper*, 690 F.3d at 63).) In support, they argue that the conspiracy helped Defendants "avoid a potential loss of market share while not having to compete for merchants or pay for meaningful positive incentives." (*Id.* at 58.) As a result, they argue that it is irrelevant whether Defendants have presented evidence that permits an inference of independent, non-collusive action, as such evidence is more appropriately presented at trial to counter Plaintiffs' evidence. (*Id.* at 57.) Plaintiffs contend that Visa and Mastercard therefore cannot rely on disputed characterizations of the record evidence or on Plaintiffs' expert reports in support of their summary judgment motions, because Plaintiffs are not required, at this stage, to refute every plausible competitive or non-collusive explanation for Defendants' conduct. (*See id.* at 59–65.) Plaintiffs also argue that in light of the "broader inferences" to which they are entitled, "there is abundant evidence that 'reasonably tends to prove that the [Defendants] . . . had a conscious commitment to a common scheme designed to achieve an unlawful objective' and 'tends to exclude the possibility' that Defendants were acting independently." (*Id.* at 32 (quoting *Apple*, 791 F.3d at 315); *see also id.* at 33–57 (summarizing evidence).)

The Court notes that Plaintiffs correctly assert that to survive summary judgment and to satisfy *Matsushita*'s tends-to-exclude standard, Plaintiffs are not required to disprove or eliminate "the possibility of independent action." *Publ'n Paper*, 690 F.3d at 63; *see also*

*Anderson News*, 899 F.3d at 98 ("This '[does] not mean that the plaintiff must disprove all nonconspiratorial explanations for the defendants' conduct'; rather, the evidence need be sufficient only 'to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not.' (alteration in original) (quoting *Publ'n Paper*, 690 F.3d at 63)).  Stated differently, Plaintiffs do not have to *disprove* independent action, but must only show evidence tending to exclude it.  *See Anderson News*, 899 F.3d at 98.  The Court's focus, therefore, is not on whether Defendants can offer explanations for the alleged conduct that are consistent with independent, unilateral conduct.  Instead, the Court must look to whether Plaintiffs' evidence would permit a jury to reasonably infer that Defendants engaged in a conspiracy.

The Court also concludes that Plaintiffs are entitled to "broader inferences" of collusive conduct based on the evidence they present, because the conspiracy they allege "is economically sensible for the alleged conspirators to undertake."  *See Publ'n Paper*, 690 F.3d at 63.  Plaintiffs allege that Defendants agreed not to delay their Liability Shifts and to implement their Liability Shifts at the same time, so that merchants would not have the option of dropping one network in favor of another and Defendants would therefore not have to compete for merchant acceptance in the period following the Liability Shifts.  The benefit to Amex and Discover is more obvious because, following the Liability Shift, merchants — rather than Amex and Discover — were liable for fraudulent charges.  In the case of Visa and Mastercard, the benefit of the alleged conspiracy takes the form of continued acceptance of cards operating on their networks, notwithstanding the shift of chargeback liability from issuing banks to merchants (*i.e.*, if Visa's or Mastercard's Liability Shift dates were earlier than those of other networks, then merchants may have dropped acceptance of Visa and Mastercard card products in favor of other networks to avoid the risk of paying chargebacks on Visa and Mastercard transactions).  This aspect of the

32

alleged conspiracy is "economically sensible" with respect to all four Defendants.  In addition, the coordinated Liability Shifts meant that no network had to expend resources offering "positive" incentives to merchants to adopt EMV, such as reduced interchange fees or financial assistance in acquiring the required technology.  (*See, e.g.*, Expert Rep. of Dr. Abrantes-Metz ("Abrantes-Metz Rep.") ¶ 293, annexed to Decl. of Rosemary Szanyi ("Szanyi Decl.") as DDX 15, Docket Entry No. 855-15; *id.* ¶ 291 ("The success of the negative incentive depended on each network knowing that other Networks would not suddenly switch to a positive incentive, when unilaterally and competitively they would have the incentive to do so.").)  This is not a case in which the conduct alleged "made no practical sense [and] was 'speculative.'"  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468 (1992) (quoting *Matsushita*, 475 U.S. at 588, 590, 595).  Accordingly, "broader inferences" of collusive conduct are permitted from Plaintiffs' evidence.  *See Publ'n Paper*, 690 F.3d at 63.

The Court is not persuaded that Plaintiffs have offered any "direct evidence" of an agreement among Defendants, given that direct evidence requires an explicit showing of an agreement that requires no inferences to conclude that a conspiracy exists.  *See City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 391 (2d Cir. 2024) ("Direct evidence of a conspiracy is 'explicit' and can show one exists without any inferences." (quoting *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011)));[14] *see also id.* ("An example of direct evidence would be 'a recorded phone call in which two competitors agreed to fix prices at a certain level,' or 'an admission by an employee of one of the conspirators, that officials of

---

[14] Plaintiffs contend that "even direct evidence 'can sometimes require a factfinder to draw inferences to reach a particular conclusion.'"  (Pls.' VM Opp'n 34 (quoting *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 64 (2d Cir. 2012)).)  More recently, however, the Second Circuit held otherwise in *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 391 (2d Cir. 2024).

the defendants had met and agreed explicitly on the terms of a conspiracy to raise price.'" (first quoting *Citigroup*, 709 F.3d at 136; and then quoting *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010))).  None of the evidence offered by Plaintiffs rises to such a level.

Drawing all reasonable inferences in favor of Plaintiffs as the nonmovants, however, the record contains sufficient indirect or circumstantial evidence of an agreement.  *See id.* (explaining that antitrust plaintiffs "can allege such an agreement in two ways: by direct evidence, and by indirect or circumstantial evidence").  As a threshold matter, Plaintiffs have sufficiently demonstrated evidence of parallel conduct, because the undisputed evidence shows that all four networks implemented their Liability Shifts in October of 2015, with all four deciding against delays for any reason.  (Pls.' VM 56.1 Resp. ¶¶ 310–314, 314–324.)  Although evidence of "parallel conduct — even 'conscious parallelism' — is generally insufficient" to survive summary judgment on its own, Plaintiffs provide sufficient evidence of "plus factors" that suggest "an antecedent agreement, rather than 'parallel conduct that could just as well be independent action.'"  *City of Pontiac*, 92 F.4th at 391 (quoting *Twombly*, 550 U.S. at 553–54, 557).

Much of the evidence Plaintiffs characterize as direct evidence meets the standard for circumstantial evidence that allows an inference of conspiracy.  First, for example, Plaintiffs offer as evidence statements made by Visa's former CEO, Charles Scharf, to investment analysts in March of 2014.  (*See* VM 56.1 ¶¶ 179–183.)  Among these statements is Scharf's response to a Barclays analyst's question about "incentives beyond . . . the liability shift."  (*Id.* ¶ 183.)  In responding, Scharf stated:

> And the approach that we have taken, *and we have done this along with the other networks*, is to try and get the — not to try — we have gotten the acquirers in a room, the merchants in a room, the issuers in a room, trade groups in a room and we are all trying to work

34

together towards getting *much more specific about what we all want to get done by when* so that we, the industry, define much more broadly than we ever defined it before is actually solving our own problems and making sure that our products are still the best products that exist out there.

(*Id.* (emphasis added).)  Such statements — although not direct evidence of a conspiracy — allow an inference that the networks discussed the date by when the Liability Shifts would be imposed and agreed to maintain that date.  The Court agrees with Plaintiffs that Scharf's statements would not be rendered "innocuous" even if they were made in reference to the Payment Security Taskforce, (*see* Pls.' VM Opp'n 37), an industry group that Defendants argue was created to develop "an integrated industry roadmap for payments security," (VM 56.1 ¶ 63).  The parties dispute the true purpose of the Payment Security Taskforce, but do not dispute that it was a joint industry group in which all Defendants participated and through which they communicated with each other.[15]  (*See, e.g.*, Pls.' VM 56.1 Resp. ¶¶ 63–65.)  Second, Plaintiffs also offer as evidence Scharf's CEO self-evaluation form drafted in 2014, which reflects that he "[g]ained agreement on liability shift dates and chip and choice positioning."  (*Id.* ¶ 465.)  The parties dispute whether the "agreement" was among networks, (*see id.*; *see also* VM Reply 18–19), but the conflicting evidence and differing party positions create only triable issues of fact as to whether Scharf helped reach any such agreement around Liability Shift dates.  Although this evidence does not constitute direct evidence of a conspiracy, it does "provide a basis to infer that a conspiracy arose."  *City of Pontiac*, 92 F.4th at 391.  Third, Plaintiffs point to an internal email from an Amex executive following a call with the Payment Security Taskforce, explaining that

---

[15]  The Payment Security Taskforce was a group established by Visa and Mastercard in 2014 "as a senior executive level, cross-industry effort focused on improving U.S. electronics payments security."  (Pls.' VM 56.1 Resp. ¶ 426.)  Amex and Discover were also members of the Payment Security Taskforce.  (*Id.* ¶ 65.)  Unlike the Merchant Advisory Group, (*id.* ¶ 480), it does not appear that merchants had any input or representation on the Payment Security Taskforce, (*see generally id.* ¶¶ 426–450).

"[t]hey were loud and clear that everyone should hold firm to the FLS dates for October 2015."

(Pls.' VM 56.1 Opp'n ¶ 449.)  Visa and Mastercard question the strength of this evidence,

arguing that "[n]o evidence shows that Visa or Mastercard made the statement — or that Amex

or Discover agreed," (VM Reply 22), but these are issues of fact concerning the strength of

Plaintiffs' evidence.  The email, at a minimum, permits the inference that through the Payment

Security Taskforce, the networks had an opportunity to communicate regarding Liability Shift

dates and that Amex took seriously the direction to "hold firm" to a Liability Shift in October of

2015.  Fourth, Plaintiffs point to an exchange between Visa and Mastercard executives,

following which a Mastercard executive informed colleagues that Visa and Mastercard had

spoken "regarding deferral of the EMV liability shift dates" and "agreed that [they] would give

each other a heads up if an announcement was imminent."  (Pls.' VM 56.1 Resp. ¶ 377.)

Although Defendants contend that such a "heads up" arrangement "is consistent with what the

Second Circuit has found to be 'reasonable (and probably prudent)' efforts to gather information

to 'monitor competitors,'" (VM Mem. 55 (quoting *Anderson News*, 899 F.3d at 105–06)), and

that a "heads up" would not have even been necessary had Visa and Mastercard already agreed

not to delay their Liability Shifts, (*id.*), evidence of this "heads up" arrangement still permits the

inference that Visa and Mastercard had agreed to coordinate their dates, even if the dates

themselves were undetermined.  This type of evidence, along with several of the other examples

discussed above, suggest the type of "[i]nformation exchange" that courts have viewed as "a

facilitating practice that can help support an inference of a price-fixing agreement." *Todd v.*

*Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001); *see also In re Platinum*, 61 F.4th at 277 ("[A]

horizontal price-fixing agreement may be inferred on the basis of conscious parallelism, when

such interdependent conduct is accompanied by circumstantial evidence and plus factors."

(quoting *Todd*, 275 F.3d at 198)).

Plaintiffs also supplement their indirect evidence with "plus factors" that the Court concludes adequately demonstrates circumstantial evidence of a conspiracy such that summary judgment is not warranted.  First, Plaintiffs offer evidence suggesting that Defendants had a motive to maintain the same Liability Shift date in October of 2015 due to the risk of merchants steering towards any network that decided to delay its shift.  (*See* Pls.' VM Opp'n 47–48.)  In support, Plaintiffs point to a Visa presentation from 2012 that warns of "more aggressive steering to online debit networks who do not mandate liability shift," which at a minimum suggests that Defendants had a reason to be concerned that merchants might steer away from networks with earlier Liability Shift dates.  (*See* Pls.' VM 56.1 Opp'n ¶ 297 (emphasis omitted).)  Similarly, Plaintiffs point to internal Mastercard communications that indicate a concern that merchants would steer consumers towards "regional networks that aren't yet ready for EMV transactions." (Pls.' VM Opp'n 48 (quoting Pls.' VM 56.1 Opp'n ¶ 303).)  Such materials support an inference that Defendants had a motive to maintain their Liability Shift dates.  Second, the Court finds persuasive Plaintiffs' contention that "it was against the Networks' economic self-interest to not compete for the business of merchants on dimensions including incentives, PIN-mandates, and most importantly, delays."  (*Id.* at 49–51.)  A reasonable jury could conclude, on this evidence, that had merchants been operating independently and in their individual interest, they would have offered positive incentives to merchants to steer them away from competitor networks.[16]

---

[16]  Continued participation in a conspiracy when doing so would be contrary to independent (but not collective) self-interest is probative of the existence of tacit, horizontal agreement among the participants.  *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1411 (4th & 5th eds. 2018–2023) ("The presence of interdependence means that there would be a motive for conspiracy, that an agreement would benefit the alleged conspirators, and that an act could offend the actor's self-

(*See id.*)  Finally, Plaintiffs point again to the communication between Visa and Mastercard executives agreeing to give each other a "heads up" prior to any announcements around Liability Shift dates and Defendants' participation in the Payment Security Taskforce to argue that there existed a high level of "inter-firm communications, directly between the Networks."[17]  (*See id.* at 51–57.)

Such evidence adequately satisfies all three of the "plus factors" — (i) common motive to conspire, (ii) evidence that the parallel acts were against the apparent economic self-interest of the individual alleged conspirators, and (iii) evidence of a high level of interfirm communications — that, when taken together with evidence of parallel conduct, "would permit a factfinder to infer a conspiracy."  *Anderson News*, 899 F.3d at 104 (quoting *Publ'n Paper*, 690 F.3d at 62); *Publ'n Paper*, 690 F.3d at 62 (requiring that when "parallel pricing forms the basis for a price-fixing claim, a plaintiff must show . . . 'plus factors'" such as "a common motive to conspire; evidence that the parallel acts were against  the apparent economic self-interest of the individual alleged conspirators; or evidence of a 'high level of interfirm communications'").  Accordingly, Plaintiffs' evidence "tends to exclude the possibility" that Defendants were acting independently, *Matsushita*, 475 U.S. at 588, and the Court therefore denies Visa and Mastercard's motion for summary judgment.

---

interest unless its rivals act similarly. . . .  Interdependence is consistent with the existence of a conspiracy but does not itself prove the traditional agreement.  It is a *necessary* condition for inferring any conspiracy from parallelism alone, but is not *sufficient* to infer a traditional conspiracy."); *id.* ¶ 1425a ("[A] conspiracy may be inferred if a defendant's action would have been contrary to its self-interest in the absence of advance agreement.").

[17]  The Court discusses evidence of Discover's and Amex's participation in the conspiracy in greater detail below, as relevant to their motions for summary judgment.  (*See infra* section II.b.v.2–3.)

### 2.    Evidence of Discover's participation in the conspiracy

Discover argues that summary judgment is warranted because "Plaintiffs have provided no evidence, direct or circumstantial, that Discover's decision to set and then maintain its FLS was the product of an unlawful agreement with the other networks."  (Discover Mem. 2.)  In support, Discover first argues that "Plaintiffs fail to identify any direct evidence of Discover's participation in the alleged conspiracy," because "[n]o such evidence exists in the case record." (*Id.* at 12–16 (emphasis omitted).)  Second, Discover argues that "Plaintiffs likewise have no circumstantial evidence of Discover's involvement in any conspiracy to set or maintain its FLS that 'tends to exclude the possibility' that the alleged conspirators acted independently." (*Id.* at 16 (internal quotation marks omitted) (quoting *Matsushita*, 475 U.S. at 588).)  Discover contends that Plaintiffs' evidence shows only "unilateral decision making and conscious parallelism," rather than conspiracy, and that Discover acted in its independent economic interest.  (*Id.* at 16–20.)  Finally, Discover argues that its trade association activities are insufficient evidence of collusion.  (*Id.* at 21–22.)

Plaintiffs argue that they have presented sufficient evidence, both direct and indirect, to survive Discover's motion for summary judgment.  (Pls.' Discover Opp'n.)  In support, Plaintiffs first argue that the Court has already identified direct evidence of Discover's involvement in the conspiracy.  (*Id.* at 5 (citing *B&R I*, 2016 WL 5725010, at *9.))  Second, Plaintiffs contend that they have provided other direct evidence of Discover's involvement, including an internal email from an Amex executive claiming that the Payment Security Taskforce was "loud and clear that everyone should hold firm" to the established liability shift date.  (*Id.* at 5–6 (emphasis omitted) (quoting Pls.' Discover 56.1 Resp. ¶ 418).)  Third, Plaintiffs argue that their evidence establishes multiple "plus factors," including (1) Discover's motive to conspire, (*id.* at 13–14); (2) that

refusing to compete on EMV migration was against Discover's individual self-interest, (*id.* at 14–20); and (3) that Discover's trade association activities are suggestive of collusion, (*id.* at 20–25).

Drawing all inferences in favor of Plaintiffs as the nonmovants, the Court finds that Plaintiffs have offered enough evidence to raise a triable question of fact as to Discover's involvement in the conspiracy.  As discussed above, *see supra* section II.b.v.1, the conspiracy is "economically sensible for the alleged conspirators to undertake," and *Matsushita*'s tends-to-exclude standard is, therefore, "more easily satisfied."  *Anderson News*, 899 F.3d at 99 (quoting *Publ'n Paper*, 690 F.3d at 63).  In addition, "broader inferences," from Plaintiffs' evidence "are permitted."  *Id.*

As with Visa and Mastercard, Plaintiffs have not offered direct evidence of Discover's involvement in the alleged conspiracy.  Although Judge William Alsup found that statements in Plaintiffs' Complaint were "*plausibly suggestive* of an impermissible conspiracy involving Discover," *see B&R I*, 2016 WL 5725010, at *9 (emphasis added),[18] the discovery record before the Court fails to demonstrate "direct 'smoking gun' evidence," *Citigroup*, 709 F.3d at 136 (quoting *Todd*, 275 F.3d at 198).  Direct evidence would consist, for example, of "a recorded phone call in which two competitors agreed to fix prices at a certain level."  *City of Pontiac*, 92 F.4th at 391 (quoting *Citigroup*, 709 F.3d at 136).  The only evidence Plaintiffs provide as "direct evidence" falls short of this standard.  Plaintiffs highlight the June 11, 2014 email, discussed above, in which an Amex executive informed her colleagues that the Payment Security Taskforce was "loud and clear that everyone should hold firm" to the liability shift dates in

---

[18]   The case was transferred from the United States District Court for the Northern District of California to the undersigned on May 5, 2017.  (*See* Notice of Case Transfer, Docket Entry No. 519.)

October of 2015.  Although it is undisputed that Discover was a member of this taskforce, (Pls.'
Discover 56.1 Resp. ¶¶ 401–402), and that Discover was invited to participate in the June 11,
2014 call referenced by the Amex executive, (*id.* ¶¶ 401, 403–404), the email does not
demonstrate that Discover *agreed* with the other networks to "hold firm" to their liability shift
dates.  *See City of Pontiac*, 92 F.4th at 391 ("Direct evidence of a conspiracy is 'explicit' and can
show one exists without any inferences." (quoting *Burtch*, 662 F.3d at 225)); *Iowa Pub. Emps.'
Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 317 (S.D.N.Y.
2018) ("Direct evidence of a conspiracy is evidence that is explicit and requires no inferences to
establish the proposition or conclusion being asserted." (quoting *Burtch*, 662 F.3d at 225)).
However, this email — combined with Discover's participation in the Payment Security
Taskforce — is strong circumstantial evidence from which a jury could reasonably infer that
Discover was a participant in the conspiracy.

Although Plaintiffs have not offered direct evidence of Discover's involvement, the Court
finds that Plaintiffs have offered "sufficient indirect, circumstantial evidence" to support their
allegation that Discover participated in the conspiracy to set or maintain its FLS.  *City of
Pontiac*, 92 F.4th at 391 ("The gun need not be smoking, however, if [the plaintiffs] allege
sufficient indirect, circumstantial evidence.").  First, Plaintiffs point to a Discover document
demonstrating that Discover was involved in conversations with the other networks regarding
delaying the liability shift for transit systems.[19]  (Pls.' Discover 56.1 Resp. ¶ 377
("[C]onfidentially — we know that all brands (including [Discover]) are currently in discussions

---

[19]  Although the parties' Rule 56.1 statements do not specify what exactly is meant by
"transit," the Court understands this to be a reference to the automated ticketing machines that
dispense transit cards and tickets, such as for the Metropolitan Transportation Authority subway
and the Long Island Rail Road.

about moving the [liability shift] date later for transit specifically.").)  If the networks explicitly discussed aligning on a liability shift for transit systems, it requires only a small inferential step to reason that the networks might also have done so with respect to point-of-sale liability. Second, Plaintiffs offer an internal Discover presentation from August of 2013 which discussed several implications of the Durbin Amendment and suggested that one option was to "begin negotiations with [Visa] and [Mastercard] to extend fraud liability shift dates." (*Id.* ¶ 230.)  The document further stated: "Note, as part of this option[,] it is not recommended to announce a revised FLS until all brands agree." (*Id.*)  Although the document does not establish that Discover actually approached Visa and Mastercard to align on an extension to the liability shift, the fact that Discover executives considered it an option lends itself to the reasonable inference that Discover may actually have done so.  Third, Plaintiffs offer evidence that Discover had no intention to compete with the other networks with respect to the EMV migration — contrary to Discover's independent self-interest to compete vigorously to earn market share.  For example, one Discover document from January 9, 2014, stated that the EMV migration "should not be an area for the payments networks to seek . . . a competitive advantage." (*Id.* ¶ 368 (emphasis omitted).)  The same document stated that Discover "look[ed] forward" to "working with the other payment networks to deploy EMV on a level playing field, without disadvantaging individual companies." (*Id.* (emphasis omitted).)  Finally, Plaintiffs offer evidence that almost constitutes direct evidence of an agreement.  An internal Discover document from April of 2014 stated: "The four major payment networks have aligned on the fraud liability shift dates for POS and automated fuel dispensers." (*Id.* ¶ 380 (emphasis omitted).)  Although this document could be innocently describing a non-collusive coincidence that the four networks happened to align on October of 2015 for their liability shifts, drawing all reasonable inferences in favor of Plaintiffs

requires the inference that Defendants proactively aligned on the same dates for their fraud liability shifts.

Plaintiffs have thus provided evidence of three "plus factors" — "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *City of Pontiac*, 92 F.4th at 391 (quoting *Citigroup*, 709 F.3d at 136).  In other words, Plaintiffs' evidence "tends to exclude the possibility," that Discover was acting independently. *Matsushita*, 475 U.S. at 588.  Accordingly, the Court denies Discover's motion for summary judgment.

### 3.    Evidence of Amex's participation in the conspiracy

Amex argues that summary judgment is warranted because "Plaintiffs have not adduced any direct evidence of conspiracy as to Amex," and "cannot point to any 'plus factors' that reflect circumstantial evidence of conspiracy."  (Amex Mem. 9.)  In support, Amex first argues that Plaintiffs fail to provide the "the type of 'smoking gun' evidence necessary in a direct-evidence case."  (*Id.* at 11.)  Amex contends that Plaintiffs' allegedly direct evidence consists only of "two documents drafted by Amex employees summarizing responses from Visa and Discover to questions Amex had posed to each Network . . . regarding their respective FLS policies," and argues that "nothing in the documents indicates that Amex was 'explicitly agreeing' to follow the other Networks' FLS dates."  (*Id.*)  Second, Amex argues that Plaintiffs have failed to produce any circumstantial evidence (*i.e.*, "plus factors") that would allow the jury to infer a conspiracy from Defendants' parallel conduct.  (*Id.* at 12–20.)  For example, Amex contends that its interfirm communications "simply corroborate[] Amex's strategy of monitoring the other Networks' approach to FLS dates and unilaterally deciding to follow Visa's and

43

Mastercard's lead." (*Id.* at 14.)  Amex also contends that its involvement in trade organizations does not permit an inference of conspiracy. (*Id.* at 15–16.)  In addition, Amex disputes that it had an incentive to collude because "[e]ach network had a unilateral interest in reducing fraud in its transactions." (*Id.* at 20 (quoting Amex 56.1 ¶ 16).)  Third, Amex argues that summary judgment is warranted because Plaintiffs' damages evidence cannot facilitate a damages award against Amex that is free from "speculation or guesswork." (*Id.* at 21 (quoting *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1124 (E.D. Cal. 2002)).)  In support, Amex reiterates the disaggregation arguments it raised in support of its motion to exclude Dr. Micah Officer's testimony. (*Id.* at 23 ("The problem with using . . . Dr. Officer's . . . damages totals to compute a damages award against Amex is that they are based on chargebacks imposed on class members who have no claims against Amex in this case." (citing Amex's Mem. of Law in Supp. of Mot. to Exclude the Testimony of Dr. Micah Officer 5 n.2, Docket Entry No. 841)).)

Plaintiffs argue that they have presented sufficient evidence, both direct and indirect, to survive Amex's motion for summary judgment. (Pls.' Amex Opp'n.)  In support, Plaintiffs first argue that the Court has already identified direct evidence of Amex's involvement in the conspiracy. (*Id.* at 4 (citing *B&R I*, 2016 WL 5725010, at *6).)  Second, Plaintiffs contend that they have provided other direct evidence of Amex's involvement, including an internal email from an Amex executive claiming that the Payment Security Taskforce was "loud and clear that everyone should hold firm" to the established liability shift date. (*Id.* at 5–6 (quoting Pls.' Amex 56.1 Resp. ¶ 262).)  Third, Plaintiffs argue that their evidence establishes multiple "plus factors," including (1) Amex's motives to conspire, (*id.* at 12–14); (2) that refusing to compete on EMV migration was against Amex's individual self-interest, (*id.* at 14–18); and (3) that Amex's inter-firm communications are suggestive of collusion, (*id.* at 18–22).  Finally, Plaintiffs argue that the

Court already rejected Amex's arguments about damages and that the "jury does not have to 'adjust' damages as to Amex," because Amex can be held jointly and severally liable. (*Id.* at 23–25.)

Drawing all reasonable inferences in favor of Plaintiffs as the nonmovants, the Court finds that Plaintiffs have offered enough evidence to raise a triable question of fact as to Amex's involvement in the conspiracy. As an initial matter, the Court agrees with Amex that Plaintiffs have not presented direct evidence of Amex's involvement in a conspiracy. As discussed above, the Amex "loud and clear" email does not constitute direct evidence of a conspiracy because the email does not demonstrate that Amex *agreed* with the other networks to "hold firm" to their liability shift dates. Instead, the email supports the reasonable inference that the Payment Securities Taskforce was a mechanism for Defendants to illegally coordinate their liability shifts and monitor compliance with an agreement to "hold firm" on the October 2015 liability shift dates. The Court finds, however, that Plaintiffs have offered sufficient circumstantial evidence of Amex's participation in the conspiracy. For example, although the networks had publicly announced their plans for EMV migration, (*see* Pls.' Amex 56.1 Resp. ¶ 123), Amex sought — and received — confidential information from Visa and Discover via a "questionnaire." (*Id.* ¶¶ 281–283; *see, e.g.*, *id.* ¶ 283 ("In response to Amex's questionnaire, Discover told Amex that it wanted parity with the other Networks.").) In addition, Amex shared its proprietary EMV and liability shift plans with the other networks. (*Id.* ¶ 356 ("[W]e attend EMV Migration meetings with . . . Visa, MC, Discover . . . and share information on our plans for migration to EMV in the US. At this point, we've made a commitment to share with them our Fraud Liability Shift (FLS) policies for the US." (emphasis omitted)).) Although Amex defends this conduct as "legitimate monitoring behavior," (Amex Mem. 15), Amex also appears to have recognized that the "FLS

Policy [is] proprietary to Amex and should not be shared with the other networks," (Pls.' Amex 56.1 Resp. ¶ 356), and that doing so could have antitrust implications, (*id.* ("I'll approach our Anti-Trust lawyers for further advice [on sharing information with the other networks].")).  Inter-firm communications constitute a "plus factor" where the defendant "fail[s] to offer a compelling rationale for why it would disclose such information."  *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 328 F. Supp. 3d 217, 228 (S.D.N.Y. 2018) (quoting *In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351, 369 (S.D.N.Y. 2011)); *see also id.* ("Information sharing among competitors without a legitimate purpose is . . . good evidence of a conspiracy.").  As in *In re Currency Conversion*, "Amex has failed to offer a compelling rationale for why it would disclose such information."  773 F. Supp. 2d at 369.  In this case, Amex had no reason to share with its competitors proprietary information about its undisclosed plans when it had already publicly disclosed its EMV migration specifications.  Such conduct looks more like *illegitimate* "monitoring behavior" designed to prevent defections from a conspiracy.  *See Todd*, 275 F.3d at 198 ("Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement."); *In re Currency Conversion*, 773 F. Supp. 2d at 369 ("The nature and timing of the communications also support an inference of the existence of a conspiracy involving Amex.").

As a second plus factor, Amex had motive to conspire because, like Discover, as both the issuer and network, Amex stood to benefit substantially by shifting fraud liability to merchants. (Pls.' Amex 56.1 Resp. ¶ 322.)  As a third plus factor, maintaining Amex's liability shift was at least arguably against Amex's unilateral self-interest.  Although Amex benefited from transferring liability to merchants, Amex had competing interests to compete for merchant acceptance and merchant satisfaction.  Because Amex is accepted at fewer merchant locations

than Visa or Mastercard,[20] Amex could potentially have enticed new merchant customers by offering a liability shift delay or other concessions.  (*Cf. id.* ¶ 111 ("[B]ecause . . . all networks are aligned . . . merchants will have no alternatives or recourse to not fall under the [EMV] liability shift policy." (emphasis omitted)); *see also id.* ¶ 112 (recognizing a need for merchant-friendly terms to avoid merchant cancellations).)  In addition, as the "premium payment brand," (*id.* ¶ 323), with average interchange fees higher than Visa and Mastercard,[21] Amex had incentives to maintain customer (*i.e.*, merchant) satisfaction, which it could have done by acceding to merchant demands for a liability shift delay or liability shift waivers.  (*See, e.g.*, *id.* ¶ 338 (quoting an internal Amex email: "[o]ur EMV policy is aligned with the other networks, but [an Amex executive] is apparently interested in doing something for small merchants *that might differentiate us in the marketplace*, *i.e.*, absorb certain chargebacks, provide incentives for merchants to convert to an EMV terminal" (emphasis added)); *id.* ¶ 345 (noting that Amex received FLS exception requests from Apple, Best Buy, McDonald's and 7-Eleven).)

Plaintiffs have thus provided evidence of three "plus factors" — "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications."  *City of Pontiac*, 92 F.4th at 391 (quoting *Citigroup*, 709 F.3d at 136).  In other words, Plaintiffs' evidence "tends to exclude the possibility" that Amex was acting

---

[20]  *See Amex*, 585 U.S. at 537–38 (noting that "while 3.4 million merchants at 6.4 million locations accept Amex, nearly three million more locations accept Visa, MasterCard, and Discover").

[21]  *See also Amex*, 585 U.S. at 539 (noting that, due to Amex's high rewards business model, "Amex must charge merchants higher fees than its rivals").

independently.  *Matsushita*, 475 U.S. at 588.  Accordingly, the Court denies Amex's motion for summary judgment as to evidence of Amex's involvement in the conspiracy.

As to Amex's damages arguments,[22] the Court addressed these arguments in its decision on Amex's motion to exclude the testimony and opinions of Dr. Officer.  *B&R VI*, 2024 WL 4252031, at *20–21.  Plaintiffs are not required to disaggregate damages as to CAA-bound and non-CAA-bound merchants, because all damages are attributable to the conspiracy.  *Id.*  All four Defendants can be held jointly and severally liable as to Amex's chargebacks incurred by non-CAA-bound merchants, while Visa, Mastercard, and Discover can be held jointly and severally liable as to all of Amex's chargebacks incurred by CAA-bound merchants.  *Id.* at *20–21 & n.19. Because the damages are attributable to the conspiracy, Plaintiffs need not disaggregate damages to survive summary judgment against Amex.  However, as the Court noted, the jury may not rely solely on Dr. Officer's testimony to establish damages owed by Amex to non-CAA-bound merchants because Dr. Officer does not distinguish between CAA-bound and non-CAA-bound merchants.  *Id.* at *20–21.  As such, Plaintiffs may only establish damages owed by Amex to non-CAA-bound merchants through other admissible evidence tending to show what proportion of the Class is or is not bound by a CAA.  *Id.* at *21.  Accordingly, the Court denies Amex's motion for summary judgment as to its damages arguments.

---

[22]  Amex argues that Plaintiffs' failure to "disaggregate" damages against Amex means that the jury would be required to impermissibly speculate as to a damages award against Amex. (Amex Mem. 21–24.)  In support, Amex contends that "the no-speculation-or-guesswork-rule" means that "damage studies are inadequate when only some of the conduct complained of is found to be wrongful and the damage study cannot be disaggregated."  (*Id.* at 21 (quoting *Litton Sys., Inc. v. Honeywell, Inc.*, No. 90-CV-4823, 1996 WL 634213, at *4 (C.D. Cal. July 24, 1996)).)  In further support, Amex also contends that "Plaintiffs cannot give the jury any reliable way to formulate a damages award against Amex that represents only the damages recoverable from Amex."  (*Id.* at 24.)

## III.  Conclusion

For the foregoing reasons, the Court (1) denies Visa and Mastercard's motion, (2) denies

Discover's motion, and (3) denies Amex's motion.

Dated:  September 25, 2024
        Brooklyn, New York

                              SO ORDERED:


                              _____/s MKB_____
                              MARGO K. BRODIE
                              United States District Judge