**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| ———————————————— X | | |
| B & R SUPERMARKET, INC., d/b/a MILAM'S MARKET, a Florida corporation, et al., Individually and on Behalf of All Others Similarly Situated, | : : : : : | Case No. 1:17-cv-02738-MKB-JAM <br> <u>CLASS ACTION</u> |
| Plaintiffs, | : : | |
| v. | : : | |
| VISA, INC., et al., | : : | |
| Defendants. | : : | |
| ———————————————— X | | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**<u>PRELIMINARY APPROVAL OF SETTLEMENT WITH DISCOVER AND AMEX</u>**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................................1

II.     PROCEDURAL HISTORY ................................................................................................3

        A.      Initial Filing in the Northern District and Transfer to this Court ...........................3

        B.      Class Certification.................................................................................................4

        C.      Discovery..............................................................................................................7

        D.      Summary Judgment, *Daubert* Motions, Motions to Decertify the Class,
                Motions to Compel Arbitration, and Motions Directed at Orders on the
                Same .....................................................................................................................8

        E.      Mediation and Settlement....................................................................................10

III.    THE COURT WILL LIKELY BE ABLE TO GRANT FINAL APPROVAL OF
        THE PROPOSED SETTLEMENT ...................................................................................11

        A.      The Procedural 23(e)(2) Factors Support the Settlement......................................13

                1.      Plaintiffs Are Adequate Class Representatives..........................................13

                2.      Class Counsel Adequately Represent the Class .........................................15

                3.      The Settlement Was Reached as Result of Arm's-Length
                        Negotiations by Experienced and Well-Informed Counsel, Assisted
                        by a Mediator ..........................................................................................17

        B.      The Substantive 23(e)(2) Factors Support the Settlement ...................................19

                1.      The Settlement Provides Adequate Relief for the Class.............................19

                        a.      The Costs, Risks, and Delay of Trial and Appeal Favor the
                                Settlement ......................................................................................19

                                (1)     The Complexity, Expense, and Likely Duration of
                                        the Litigation Favors Settlement ......................................20

                                (2)     The Risks of Establishing Liability...................................22

                                (3)     The Risks of Establishing Damages...................................25

                                (4)     The Risks of Maintaining the Class Through the
                                        Trial ...............................................................................26

(5)     The Stage of the Proceedings Factor Strongly Weighs in Favor of Approval of the Settlement ..............27

(6)     The Ability of Defendants to Withstand a Greater Judgment Is Outweighed by the Valuable Cooperation Agreements Secured by the Settlement ........28

(7)     The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of All the Attendant Risks of Litigation ..................29

b.     Effectiveness of Distributing Relief to the Class ..........................35

c.     The Proposed Attorneys' Fees Award and Class Representative Service Awards Are Reasonable ..........................38

d.     The Releases in the Settlement Are Appropriate ..........................40

e.     Any Agreement Required To Be Identified Under Rule 23(e)(3) ..................................................................41

2.     The Proposed Settlement Treats Class Members Equitably ....................41

3.     The Reaction of the Class to the Settlement, to the Extent It Can Be Assessed at this Stage, Supports the Settlement ................................42

IV.     THE SETTLEMENT NOTICE PLAN IS CONSISTENT WITH WHAT WAS ORDERED FOR CLASS NOTICE, AND IS REASONABLE ....................................43

A.     The Settlement Notice Plan Is Consistent with What Was Ordered for Class Notice and Is Reasonable ..........................................................43

B.     The Court Should Exercise Its Discretion to Approve the Settlement Without a Second Opt-Out Period, in Light of the Class Notice Already Provided ..............................................................................44

V.     THE PROPOSED SCHEDULE OF EVENTS IS FAIR AND REASONABLE ............46

VI.     CONCLUSION ..........................................................................47

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
No. 14-CV-7126 (JMF), 2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018).........................40

*B & R Supermarket, Inc. v. Mastercard Int'l Inc.*,
No. 17-cv-02738 (MKB), 2018 WL 1335355 (E.D.N.Y. Mar. 14, 2028)................*passim*

*Bodon v. Domino's Pizza, LLC*,
No. 09-CV-2941, 2015 WL 588656 (E.D.N.Y. Jan. 16, 2015) ......................................30

*Caccavale v. Hewlett-Packard Co.*,
No. 2:20-cv-0974, 2024 WL 4250337 (E.D.N.Y. Mar. 13, 2024)...................... 11, 12, 13

*Caccavale v. Hewlett-Packard Company*,
No. 20-CV-974-NJC-ST, 2025 WL 882220 (E.D.N.Y. Mar. 14, 2025)............. 16, 17, 22

*Charron v. Pinnacle Grp. N.Y. LLC*,
874 F. Supp. 2d 179 (S.D.N.Y. 2012) ...........................................................................43

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974).................................................................................*passim*

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007)............................................................................................14

*Cotton v. Hinton*,
559 F.2d 1326 (5th Cir. 1977)........................................................................................20

*Cruz Guerrero v. Montefiore Health Sys. Inc.*,
No. 22-CV-9194 (KHP), 2025 WL 100889 (S.D.N.Y. Jan. 15, 2025) ...........................39

*Cymbalista v. JPMorgan Chase Bank, N.A.*,
No. 20 CV 456 (RPK)(LB), 2021 WL 7906584 (E.D.N.Y. May 25, 2021) .............*passim*

*Denny v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)............................................................................. 14, 44, 45

*Fleisher v. Phoenix Life Ins. Co.*,
No. 11-cv-8405, 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015)....................................28

*Flores v. CGI Inc.*,
No. 22-CV-350 (KHP), 2022 WL 13804077 (S.D.N.Y. Oct. 21, 2022).........................12

*Flores v. Mamma Lombardi's of Holbrook, Inc.*,
104 F. Supp. 3d 290 (E.D.N.Y. 2015).........................................................................28

*Godson v. Eltman, Eltman, & Cooper, P.C.*,
 328 F.R.D. 35 (W.D.N.Y. 2018) ..................................................................................29

*Goidel v. Aetna Life Ins. Co.*,
 No. 21-CV-7619 (VSB), 2024 WL 4441806 (S.D.N.Y. Oct. 8, 2024) ..................... 17, 19

*Guevoura Fund Ltd. v. Sillerman*,
 No. 1:15-CV-07192-CM, 2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ........................18

*Hall v. ProSource Techs., LLC*,
 No. 14-CV-2502, 2016 WL 1555128 (E.D.N.Y. Apr. 11, 2016)....................................30

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
 No. 06-MD-1775 JG VVP, 2015 WL 5918273 (E.D.N.Y. Oct. 9, 2015) ........................40

*In re AOL Time Warner, Inc.*,
 No. 02 CIV. 5575 (SWK), 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)..................... 35, 42

*In re Citigroup, Inc. Sec. Litig.*,
 965 F. Supp. 2d 369 (S.D.N.Y. 2013) ...........................................................................29

*In re Currency Conversion Fee Antitrust Litig.*,
 263 F.R.D. 110 (S.D.N.Y.2009)....................................................................................33

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
 No. 05-cv-10240, 2007 WL 2230177 (S.D.N.Y. July 27, 2007) ....................................36

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
 343 F. Supp. 3d 394 (S.D.N.Y. 2018) ...........................................................................28

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
 279 F.R.D. 151 (S.D.N.Y. 2011)....................................................................................18

*In re Glob. Crossing Sec. & ERISA Litig.*,
 225 F.R.D. 436 (S.D.N.Y. 2004)....................................................................................22

*In re GSE Bonds Antitrust Litig.*,
 414 F. Supp. 3d 686 (S.D.N.Y. 2019) ..................................................................... 14, 20

*In re Initial Pub. Offering Sec. Litig.*,
 671 F. Supp. 2d 467 (S.D.N.Y. 2009) ...........................................................................34

*In re Lithium Ion Batteries Antitrust Litig.*,
 No. 13-MD-02420 YGR (DMR), 2020 WL 7264559 (N.D. Cal. Dec. 10, 2020)............35

*In re Lloyd's Am. Tr. Fund Litig.*,
 No. 96 Civ.1262 RWS, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ........................36

*In re Luckin Coffee Inc. Sec. Litig.*,
No. 1:20-cv-01293-JPC-JLC, 2021 WL 11114633 (S.D.N.Y. Oct. 26, 2021)................46

*In re Med. X-Ray Film Antitrust Litig.*,
No. CV-93-5904, 1998 WL 661515 (E.D.N.Y. Aug. 7, 1998)......................................35

*In re Namenda Direct Purchaser Antitrust Litig.*,
462 F. Supp. 3d 307 (S.D.N.Y. 2020) ...................................................................*passim*

*In re Namenda Indirect Purchaser Antitrust Litig.*,
No. 1:15-cv-06549-CM-RWL, slip op. (S.D.N.Y. Mar. 23, 2023), ECF No. 967 ..........39

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998)......................................................................... 27, 33

*In re Packaged Ice Antitrust Litig.*,
No. 08-MDL-01952, 2011 WL 6209188 (E.D. Mich. Dec. 13, 2011)...........................29

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
330 F.R.D. 11 (E.D.N.Y. 2019) ............................................................................*passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
986 F. Supp. 2d 207 (E.D.N.Y. 2013) ............................................................................33

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-md-1720 (MKB) (JO), 2019 WL 6875472
(E.D.N.Y. Dec. 16, 2019) .......................................................................... 30, 33, 34, 36

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-md-1720, 2024 WL 3236614 (E.D.N.Y. June 28, 2024)............................*passim*

*In re Signet Jewelers Ltd. Sec. Litig.*,
No. 1:16-CV-06728-CM-SDA, 2020 WL 4196468 (S.D.N.Y. July 21, 2020) ...............18

*In re Sumitomo Copper Litig.*,
189 F.R.D. 274 (S.D.N.Y. 1999).....................................................................................20

*In re Tenaris S.A. Sec. Litig.*,
No. 18-CV-7059(KAM)(SJB), 2024 WL 1719632 (E.D.N.Y. Apr. 22, 2024)).........34, 39

*In re Vitamin C Antitrust Litig.*,
No. 06-md-1738, 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) .....................................20

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005) .............................................................................36

*Lenorowitz v. Mosquito Squad Franchising, LLC*,
No. 3:20-CV-1922 (OAW), 2024 WL 5038238 (D. Conn. Dec. 9, 2024) .......................11

*Levitt v. Rodgers*,
    257 F. App'x 450 (2d Cir. 2007) ...................................................................12

*Low v. Trump University, LLC*,
    881 F.3d 1111 (9th Cir. 2018) .....................................................................45

*Marin v. 310 Bowery Grp. LLC*,
    No. 24 CIV.1340, 2025 WL 893731 (S.D.N.Y. Mar. 24, 2025)....................................28

*Mikhlin v. Oasmia Pharm. AB*,
    No. 19-cv-4349 (NGG) (RER), 2021 WL 1259559 (E.D.N.Y. Jan. 6, 2021) ...... 18, 25, 41

*Moses v. New York Times Co.*,
    79 F.4th 235 (2d Cir. 2023)............................................................... 11, 17, 41

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972).........................................................................30

*Nichols v. Noom, Inc.*,
    No. 20-cv-3677 (KHP), 2022 WL 2705354 (S.D.N.Y. July 12, 2022)............................39

*Pearlstein v. Blackberry Ltd.*,
    No. 13 Civ. 7060 (CM), 2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022)............. 18, 39, 40

*Rankins v. Arca Cont'l S.A.B. de C.V.*,
    No. 20-CV-1756 (ENV) (TAM), 2024 WL 4986411 (E.D.N.Y. Oct. 30, 2024) ............17

*Schutter v. Tarena Int'l, Inc.*,
    No. 21-CV-3502 (PKC), 2024 WL 4118465 (E.D.N.Y. Sept. 9, 2024)....................*passim*

*Sjunde AP-Fonden v. Gen. Elec.*
    Co., No. 17-CV-8457 (JMF), 2025 WL 89271 (S.D.N.Y. Jan. 14, 2025) .......................46

*Strougo v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003) ...........................................................25

*Sykes v. Harris*,
    No. 09-cv-8486, 2016 WL 3030156 (S.D.N.Y. May 24, 2016) ......................................21

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015).........................................................................15

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
    No. 01-CV-11814, 2004 WL 1087261 (S.D.N.Y. May 14, 2004)..................................29

*Thompson v. Metro. Life Ins. Co.*,
    216 F.R.D. 55 (S.D.N.Y. 2003)....................................................................42

*Vasquez v. A+ Staffing LLC*,
    746 F. Supp. 3d 26 (E.D.N.Y. 2024)................................................................................27

*Viafara v. MCIZ Corp.*,
    No. 12 Civ. 7452 RLE, 2014 WL 1777438 (S.D.N.Y. May 1, 2014)..............................29

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005).....................................................................................*passim*

*Ying v. All-Ways Forwarding of N.Y. Inc.*,
    No. 20-CV-6242 (ENV)(MMH), 2025 WL 968586 (E.D.N.Y. Mar. 31, 2025) ........ 29, 40

*Zaslavskiy v. Weltman, Weinberg & Reis Co.*,
    No. 18-CV-4747, 2022 WL 1003589 (E.D.N.Y. Jan. 5, 2022) ......................................41

*Zhu v. Wanrong Trading Corp.*,
    No. 18-CV-417 (ENV)(MMH), 2024 WL 4351357 (E.D.N.Y. Sept. 30, 2024)........ 11, 12

*Zimmerman v. Paramount Glob.*,
    No. 22-CV-9355 (VSB), 2025 WL 763734 (S.D.N.Y. Mar. 11, 2025) ....................36, 42

## STATUTES, RULES & OTHER AUTHORITIES

Federal Rule of Civil Procedure
    Rule 23 ...................................................................................................... 11, 36, 41

4 *Newberg and Rubenstein on Class Actions* §13:18 (6th ed.) ..................................................11

Plaintiffs B & R Supermarket, Inc. (d/b/a Milam's Market) ("B & R"), Grove Liquors LLC ("Grove"), Strouk Group LLC (d/b/a Monsieur Marcel) ("Strouk"), and Palero Food Corp. and Cagueyes Food Corp. (d/b/a Fine Fare Supermarket) ("Fine Fare, and collectively, "Plaintiffs") respectfully submit this memorandum in support of Plaintiffs' Motion for Preliminary Approval of Settlement with Discover Financial Services ("Discover") and American Express Company ("Amex") (together and collectively with non-settling defendants Visa, Inc. and Visa U.S.A., Inc. ("Visa") and Mastercard International Incorporated ("Mastercard"), "Defendants" or the "Networks").[1]

## I.     INTRODUCTION

After more than nine years of litigation since this case was first filed on March 8, 2016, Plaintiffs have accomplished much: generated and reviewed a gargantuan evidentiary record, engaged in expert discovery with their own two experts and Defendants' seven experts, beat motions to dismiss, certified the claims on behalf of the Class (defined herein), defeated motions for summary judgment, *Daubert* motions, and motions to decertify the Class.  And now, most importantly, Plaintiffs have reached settlements of the action as against Discover (the "Discover Settlement") and Amex (the "Amex Settlement") (together, the "Settlement") that provide for significant monetary contributions from each of them to fully resolve the claims against them: $12.2 million from Discover, and $20 million from Amex, for a total of $32.2 million.  Further, both the Discover Settlement and the Amex Settlement provide for material cooperation with Plaintiffs in their continuing litigation against Visa and Mastercard.  These cooperation agreements are particularly valuable given that Visa and Mastercard account for approximately 90% (by dollar

---

[1] Plaintiffs and Defendants are referred to collectively as the "Parties."  Throughout this brief, all citations and footnotes are deemed omitted and all emphasis is deemed added, unless otherwise noted.

amount) of the Fraud Liability Shift ("FLS") chargebacks incurred by the Class during the Class

Period (defined herein).[2]

The Settlement was reached deep into this litigation, with the Parties having completed fact

and expert discovery and summary judgment—they were fully informed regarding the facts and

the law. Moreover, both the Discover Settlement and the Amex Settlement were reached with the

assistance of a well-respected former judicial officer serving as a mediator.

The Settlement uses the same definition of Class that the Court has already certified, and

there are no changes to the claims or definitions that warrant revision of that decision. Moreover,

after the extensive notice program was completed, and the opt-out period for the Class expired,

less than 350 exclusion requests were received, just a small fraction of the approximately 400,000

merchants in the Class.

The Settlement represents an excellent outcome for the Class that appropriately weighs the

potential rewards of further litigation against Discover and Amex with the risks and costs of taking

the case further. The Settlement provides for meaningful and significant contributions to a gross

settlement fund from Discover and Amex, particularly in light of their relative market share, and

the relative proportion of FLS chargebacks attributable to each of them. Discover and Amex have

denied and continue to deny all of Plaintiffs' claims in the action, but have agreed to enter into the

Discover Settlement and the Amex Settlement to avoid the further risk, expense, inconvenience,

and distraction of burdensome and protracted litigation.

---

[2] The stipulations of settlement with Amex and Discover are largely identical, including the
language of the releases (except that Amex's release excludes "any claims against Amex by class
members who are bound by a valid Card Acceptance Agreement and who were compelled to
arbitrate by the Court's August 14, 2024 Memorandum and Order." One other substantive
difference, is that while both Amex and Discover have agreed to cooperate in further litigation, the
scope of that cooperation differs between the agreements.

Class Counsel respectfully submit that the Settlement is an excellent result in the best interests of the Class, that is fair, reasonable and adequate, and merits preliminary approval under Federal Rule of Civil Procedure 23.

## II.    PROCEDURAL HISTORY

### A.    Initial Filing in the Northern District and Transfer to this Court

This lawsuit was initially filed with two plaintiffs, B & R and Grove, on March 8, 2016, in the U.S. District Court for the Northern District of California (the "California District Court") (the "Initial Complaint"). Dkt. No. 1 at 1. The Initial Complaint alleged claims against each of the Defendants as well as a number of issuing banks, and EMVCo, LLC ("EMVCo") as co-conspirators. *Id.* These defendants filed several motions to dismiss the Initial Complaint. Dkt. Nos. 228, 231. Amex filed a motion to compel arbitration and transfer the claims against Amex to the U.S. District Court for the Southern District of New York, citing provisions in the Card Acceptance Agreement ("CAA") signed by merchants accepting Amex. Dkt. No. 229. After a hearing on defendants' motions on June 23, 2016, the California District Court gave Plaintiffs leave to file an amended complaint and deemed the motions to dismiss moot. Dkt. No. 281. The California District Court also granted Amex's motion to transfer the claims against it to the Southern District of New York on the basis of a forum-selection clause in Amex's CAA. Dkt. No. 282. The California District Court held that it was "transfer[ing] the claims without prejudice to a possible intervention here by named plaintiffs with claims against American Express ***not*** subject to a forum selection clause." *Id.* at 3 (emphasis in original).

Plaintiffs filed an amended complaint (the "Amended Complaint"), along with a motion to intervene to add Strouk, rue21, and Fine Fare as plaintiffs. Dkt. Nos. 290, 291. Plaintiffs proposed the addition of Fine Fare specifically because it, unlike B & R and Grove, did not accept Amex. Dkt. No. 290 at 3. Three motions to dismiss the Amended Complaint were filed: one by the issuing

bank defendants; one by Amex, EMVCo, Mastercard, and Visa; and one by Discover. Dkt. Nos. 301, 303, 305.

The California District Court denied the motions to dismiss in part and granted them in part. Dkt. No. 346. The California District Court granted the motion to dismiss as to EMVCo and the issuing bank defendants. *Id.* at 19. The California District Court denied the motion to dismiss as to Visa, Mastercard, and Amex, and the motion to dismiss as to Discover. *Id.* at 14, 16. It also denied the motions to dismiss Plaintiffs' state law claims, except that it granted the motion to dismiss with respect to Plaintiffs' claims under Sections 349 and 350 of the New York General Business Law. *Id.* at 20-21.

The California District Court also permitted intervention for Strouk and Fine Fare, but denied intervention for rue21. *Id.* at 21.

On May 4, 2017, the California District Court transferred this action to this Court "for the convenience of the parties and in the interest of justice," pursuant to 28 U.S.C. §1404(a). Dkt. No. 518. The California District Court's transfer order recognized potential efficiencies to be gained and the ability to police potential concerns regarding the pursuit of inconsistent liability theories in relation to the multi-district litigation, *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, No. 05-md-01720-MKB-JAM (E.D.N.Y. initiated October 20, 2005) (the "Interchange Action"), that is pending in this Court.

### B.     Class Certification

Plaintiffs first moved for class certification on March 10, 2017, while the case was pending in the California District Court. Dkt. No. 425. Following transfer to this Court, the parties supplemented this briefing in this Court, to reflect differences in Second Circuit authority where applicable. Dkt. Nos. 588, 589. The Court held a hearing on the motion on November 29, 2017. Minute Entry dated Nov. 29, 2017; Dkt. No. 622. The Court issued an order on March 11, 2018,

finding that Plaintiffs had satisfied Rule 23(a)'s explicit requirements of numerosity, commonality, typicality, and adequacy of both class representatives and counsel. Dkt. No. 644 at 12-19; *B & R Supermarket, Inc. v. Mastercard Int'l Inc.*, No. 17-cv-02738 (MKB), 2018 WL 1335355, at *7-10 (E.D.N.Y. Mar. 14, 2028) (*B&R II*). The Court denied the motion for class certification, finding that Plaintiffs had not satisfied Rule 23(a)'s implied requirement of ascertainability because Plaintiffs had proposed four different potential end dates for the class. *B&R II*, 2018 WL 1335355, at *13-14.

Plaintiffs filed a renewed motion for class certification on July 16, 2018. Dkt. Nos. 653, 706. In Plaintiffs' renewed motion they argued for a two-year class period, based on the argument that September 30, 2017 "reflects the most likely alternate FLS date, but-for Defendants' collusion." Dkt. No. 706-1 at 1; Dkt. No. 707-1 at 1. Plaintiffs argued that the evidence demonstrated that without Defendants' collusion, "the [n]etworks would have delayed the FLS by two years, starting with an announcement of a delay by Visa, and with the other [n]etworks following closely behind." Dkt. No. 725 at 10; Dkt. No. 744 at 10 (alterations in original).

On August 28, 2020, the Court entered an order granting the renewed motion for class certification, certifying the following class: "Merchants who incurred one or more unreimbursed chargeback(s) between October 1, 2015 through and including September 30, 2017 [(the "Class Period")], pursuant to the Fraud Liability Shift for the assessment of Mastercard, Visa, Discover and/or Amex payment card chargebacks (the 'Class'). Excluded from the class are members of the judiciary and government entities or agencies." Dkt. No. 725 at 9-10; Dkt. No. 744 at 9-10.

On September 11, 2020, Defendants filed two petitions for permission to appeal the Court's class certification order: one filed by Visa, Mastercard, and Discover; and one filed by Amex. Dkt.

Nos. 726, 728. The Second Circuit denied the consolidated petition on January 20, 2021, concluding that "an immediate appeal is not warranted." Dkt. No. 745.

On May 6, 2021, the Court appointed Robbins LLP as Class Counsel. Dkt. No. 762. Class Counsel filed a motion for approval of proposed class notice and notice plan on May 19, 2022 ("Class Notice Plan"). Dkt. No. 774-1. The Court approved this plan on June 3, 2022. Dkt. No. 775. The Court concluded that the Class Notice Plan "which includes direct mail, email, a media plan, an online website and information center, and a tollfree direct phone communication center—constitutes the best practicable notice under the circumstances as well as valid, due, and sufficient notice to all persons entitled thereto and complies fully with the requirements of Federal Rule of Civil Procedure 23(d) and the due process requirements of the United States Constitution." *Id.* at 2.

From June 28, 2022, through July 1, 2022, Epiq Class Action and Claims Solutions, Inc. ("Epiq" or the "Administrator"), as the previously approved class notice administrator, carried out the individual notice portion of the Class Notice Plan. Declaration of Cameron R. Azari, Esq. on Implementation and Adequacy of Notice Plan ("Notice Plan Decl."), ¶9.[3] The individual notice portion consisted of mailing over 1 million postcard notices and emailing over 110,000 email notices. *Id.*, ¶¶9, 13. Together, the individual notice efforts reached approximately 96.6% of identified Class Members. *Id.*, ¶16.

This individual notice effort was supplemented with a media plan running from July 1, 2022, through July 31, 2022, that included targeted internet advertising including more than 249.6

---

[3] The Notice Plan Decl. is Attachment 1 to the Declaration of Cameron R. Azari, Esq. Regarding Settlement Notice Plan and Distribution Plan ("Azari Decl."), which is Exhibit 5 to the Declaration of George C. Aguilar in Support of Plaintiffs' Motion for Preliminary Approval of Settlement with Discover and Amex ("Aguilar Decl."), filed herewith.

million impressions nationwide; a publication notice in numerous ethnic newspapers in Korean, Chinese, Russian, Japanese, and Vietnamese; internet search engine sponsored listings displayed more than 50,000 times; an informational release issued over PR Newswire's U.S. Newsline in English and Hispanic Newsline in Spanish to approximately 5,000 general media outlets, and specifically targeted to "Small Business" influencers; a dedicated Case Website (www.FraudLiabilityShiftLitigation.com) that has registered more than 25,000 unique visitor sessions; and the establishment of a toll-free telephone number and postal mailing address. *Id.*, ¶¶17-31. At the conclusion of the Class Notice Plan, Class Counsel received only 334 exclusion requests,[4] though the Class is estimated to consist of approximately 400,000 merchants, and notice was directly mailed to over one million merchants. *Id.*, ¶¶9, 32; Aguilar Decl., ¶14.

### C.    Discovery

The Parties have completed both fact and expert discovery and have generated a gigantic discovery record. Aguilar Decl., ¶3. Defendants made dozens of productions in response to Plaintiffs' discovery requests, producing hundreds of thousands of documents each—and in Visa's case, producing more than 700,000 documents. *Id.* Plaintiffs also subpoenaed dozens of third parties, including primarily acquirers, and received hundreds of thousands of documents in response. *Id.* In total, Plaintiffs received 1.97 million documents, spanning tens of millions of pages. *Id.* Plaintiffs devoted significant attorney resources to reviewing and analyzing these documents. *Id.* Plaintiffs responded to requests for admission from Discover and Mastercard and responded to and propounded interrogatories to/from each of the Defendants. *Id.* Plaintiffs also

---

[4] Of the 334 exclusion requests, 108 were received on or before the August 31, 2022 deadline to request exclusion and 226 were received after the deadline. Notice Plan Decl., Attachment 8. Those received after the deadline were primarily received two days later on September 2, and the rest were received on September 6, 2022. *Id.* Thus, Class Counsel have treated all of these 334 exclusion requests as timely.

took, attended, or defended seventy-one depositions, some of which were multiple days long due to coordination with the Interchange Action for purposes of discovery. *Id.*

The Parties' expert discovery efforts were equally robust. *Id.*, ¶4. Plaintiffs had two experts: Dr. Micah Officer and Dr. Rosa M. Abrantes-Metz. Dr. Officer is a Professor of Finance at Loyola Marymount University, has been an editor and reviewer for the *Journal of Financial Economics*, the *Journal of Law and Economics*, the *European Economic Review*, and the *Journal of Accounting and Economics*, and has published dozens of peer-reviewed articles involving quantitative analysis of large datasets. Dkt. No. 942 at 43-44; Dkt. No. 946 at 43-44. Dr. Abrantes-Metz is an economist specializing in industrial organization, econometrics, and asset pricing, who is a Managing Director at BRG,[5] and who focuses her work on "conspiracies, fraud, and the detection of cartel behavior – including price-fixing conspiracies – through various empirical 'screening' methods." Dkt. No. 942 at 7-8; Dkt. No. 946 at 7-8. Defendants retained seven expert witnesses of their own, and Class Counsel analyzed each of their reports with the help of Plaintiffs' own experts. Aguilar Decl., ¶4.

**D.      Summary Judgment, *Daubert* Motions, Motions to Decertify the Class, Motions to Compel Arbitration, and Motions Directed at Orders on the Same**

Following the close of expert discovery, Defendants filed numerous motions including: three motions for summary judgment (one from Amex, one from Discover, and one from Visa and Mastercard); five *Daubert* motions (two directed at Dr. Abrantes-Metz, and three directed at Dr. Officer); a motion to decertify the Class from Visa and Mastercard; a renewed motion to compel arbitration and to decertify the Class as to claims against Amex from Amex; and a motion to

---

[5] Dr. Abrantes-Metz was previously a Managing Director and Principal at Global Economics Group, from 2011-2020 (as referenced in the Court's *Daubert* order) and a Principal at The Brattle Group from 2020-2023.

compel arbitration from Discover. Dkt. Nos. 793, 795, 798-819, 824, 827-869. At the same time, Plaintiffs filed a motion to exclude the testimony of Visa and Mastercard's expert Julie Conroy. Dkt. Nos. 820-21, 823, 825.

On August 14, 2024, the Court denied Discover's motion to compel arbitration and granted Amex's renewed motion to compel arbitration to the extent it sought to compel arbitration, but denied it with respect to Amex's request to decertify the Class. Dkt. No. 936. On August 15, 2024, the Court denied Visa and Mastercard's motion to decertify the Class. Dkt. Nos. 937, 940. On September 13, 2024, the Court issued orders as to each of the six *Daubert* motions filed by the Parties. Dkt. Nos. 942, 946. The order denied the motions by Visa, Mastercard, and Discover, granted in part and denied in part Amex's motions to exclude the testimony of Dr. Officer and Dr. Abrantes-Metz, and granted in part and denied in part Plaintiffs' motion to exclude the opinion of Visa and Mastercard's expert Julie Conroy. Dkt. Nos. 942 at 3-4; 946 at 3-4. On September 25, 2024, the Court denied each of the three motions for summary judgment filed by Defendants. Dkt. No. 950.

Defendants then filed several motions and an appeal directed at these orders. Discover filed a motion for reconsideration of the Court's September 27, 2024 summary judgment order. Dkt. Nos. 954, 954-1, 957-1, 961. The Court denied this motion on February 12, 2025. Dkt. No. 968. Visa and Mastercard filed a motion seeking to certify the motion for summary judgment decision for interlocutory appeal, and Discover moved to join the motion in its entirety. Dkt. Nos. 953, 953-1, 956-1, 957-2, 962. The Court denied this motion on March 18, 2025. Dkt. No. 971. Amex filed a notice of appeal from the Court's August 14, 2024 order "insofar as that Order refused American Express Company's request for a stay pending arbitration of all proceedings on claims brought by plaintiffs that are bound by Amex's standard card acceptance agreement." Dkt. No.

941.  Plaintiffs and Amex fully briefed that appeal, but subsequently filed a motion to adjourn oral argument and to hold the appeal in abeyance, which was granted on April 30, 2025.  Aguilar Decl., ¶5.

### E.    Mediation and Settlement

Plaintiffs and Discover attended a full-day in-person mediation on December 6, 2024, in New York, NY, utilizing the Hon. Layn R. Phillips (Ret.) of Phillips ADR Enterprises, P.C. as the mediator (the "Mediator").  Aguilar Decl., ¶6.  At the conclusion of this mediation, as the result of a mediator's proposal, Plaintiffs and Discover reached agreement on a settlement in principle.  *Id.* Over the next few weeks, Plaintiffs and Discover negotiated and drafted a stipulation of settlement, which was executed on February 10, 2025.  *Id.*  Plaintiffs and Discover thereafter negotiated and executed an amended stipulation of settlement on June 6, 2025 (the "Discover Stip.").  Aguilar Decl., ¶6 & Ex. 1.  The Discover Settlement provides that Discover will pay $12.2 million to the Gross Settlement Fund (as defined in the Discover Stip.).  Discover Stip., ¶¶36, 65.  The Discover Settlement also provides for several forms of cooperation from Discover in further litigation against the remaining Defendants.  *Id.*, ¶¶56-57.

Similarly, Plaintiffs and Amex attended a full-day in-person mediation on March 28, 2025, in New York, NY, again utilizing the Mediator.  Aguilar Decl., ¶7.  Again, through a mediator's proposal, Plaintiffs and Amex were able to reach a settlement in principle at the conclusion of the day of mediation.  *Id.*  Thereafter, Plaintiffs and Amex negotiated and drafted a stipulation of settlement, which was executed on May 16, 2025 (the "Amex Stip.").  Aguilar Decl., ¶7 & Ex. 2. The Amex Settlement provides that Amex will pay $20 million to the Gross Settlement Fund (as defined in the Amex Stip.).  Amex Stip., ¶¶23, 65.  The Amex Settlement also provides for certain terms of cooperation from Amex with Plaintiffs' litigation against the remaining Defendants.  *Id.*, ¶¶56-57.

III.    **THE COURT WILL LIKELY BE ABLE TO GRANT FINAL APPROVAL OF THE PROPOSED SETTLEMENT**

To grant preliminary approval of the Settlement, the Court must "determine whether 'giving notice is justified by the parties' showing that the court *will likely be able to*: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal.'" *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 28 (E.D.N.Y. 2019) ("*Payment Card 2019 Prelim*") (emphasis in original).  Here, the Class in the proposed Settlement is defined by "the Court's class certification Order dated August 28, 2020," with no changes.  Discover Stip., ¶4; Amex Stip., ¶6.  The Class has also remained unchanged through two failed motions to decertify the Class.  Dkt. Nos. 936, 937, 940.  Thus, the Court's inquiry can be focused on the first prong.  *See, e.g.*, *Lenorowitz v. Mosquito Squad Franchising, LLC*, No. 3:20-CV-1922 (OAW), 2024 WL 5038238, at *1 (D. Conn. Dec. 9, 2024) (recognizing in preliminary approval context that "[h]ere, the class is certified; thus, the court narrows its focus to the first prong."); 4 *Newberg and Rubenstein on Class Actions* §13:18 (6th ed.) (recognizing that "[i]f the [C]ourt has certified a class prior to settlement, it does not need to re-certify it for settlement purposes"); Fed. R. Civ. P. 23 advisory committee's notes to 2018 amendments ("Subdivision (e)(1) … If the [C]ourt has already certified a class, the only information ordinarily necessary is whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted.").

To determine whether the Court can approve the proposal under Rule 23(e)(2), the Court assesses whether the settlement is "fair, reasonable and adequate."  *Caccavale v. Hewlett-Packard Co.*, No. 2:20-cv-0974, 2024 WL 4250337, at *8 (E.D.N.Y. Mar. 13, 2024) (citing Fed. R. Civ. P. 23(a) and *Moses v. New York Times Co.*, 79 F.4th 235, 242 (2d Cir. 2023)).  This is a "determination within the sound discretion of the court."  *Zhu v. Wanrong Trading Corp.*, No. 18-

CV-417 (ENV)(MMH), 2024 WL 4351357, at *3 (E.D.N.Y. Sept. 30, 2024) (citing *Levitt v. Rodgers*, 257 F. App'x 450, 453 (2d Cir. 2007)).  Within "the Second Circuit, '[t]here is a strong judicial policy in favor of settlements, particularly in the class action context.'"  *Id.* (citing *Flores v. CGI Inc.*, No. 22-CV-350 (KHP), 2022 WL 13804077, at *2 (S.D.N.Y. Oct. 21, 2022)).

Courts conduct the assessment of whether a settlement is "fair, reasonable and adequate" through two sets of factors: "both the Rule 23(e) factors and the *Grinnell* factors—to the extent that they differ."  *Caccavale*, 2024 WL 4250337, at *9 (citing *Payment Card 2019 Prelim*, 330 F.R.D. at 29); *see also City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (setting forth *Grinnell* factors), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).  The Rule 23(e)(2) factors the Court considers are whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's-length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims;
>>
>> (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-md-1720, 2024 WL 3236614, at *11 (E.D.N.Y. June 28, 2024) ("*Payment Card 2024*").  Factors (A) and (B) are "procedural in nature," and "examine the conduct of the litigation and of the negotiations leading

- 12 -

up to the proposed settlement," while (C) and (D) "guide the substantive review of a proposed settlement" and seek to assess "the relief that the settlement is expected to provide to class members." *Schutter v. Tarena Int'l, Inc.*, No. 21-CV-3502 (PKC), 2024 WL 4118465, at *6 (E.D.N.Y. Sept. 9, 2024) (cleaned up).

Additionally, courts have found that the Rule 23(e)(2) factors do "not otherwise address the following *Grinnell* factors: the ability of the defendants to withstand a greater judgment; the range of reasonableness of the settlement fund in light of the best possible recovery; and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Caccavale*, 2024 WL 4250337, at *9 (citing *Payment Card 2019 Prelim*, 330 F.R.D. at 30 n.22). Thus "courts continue to analyze these factors in combination with the Rule 23(e)(2) factors." *Id.* Both the procedural and substantive factors weigh strongly in favor of approval, and thus, the Court can conclude it will likely be able to grant final approval of the Settlement.

### A.    The Procedural 23(e)(2) Factors Support the Settlement

The Court has previously recognized on several occasions that both Plaintiffs and Class Counsel are adequate. These conclusions are even stronger now, after Plaintiffs and Class Counsel have secured additional litigation victories and achieved the Settlement. Moreover, the Settlement was reached after many years of litigation, by informed and experienced counsel, with the assistance of a well-respected mediator. The circumstances plainly demonstrate the Settlement was reached at arm's-length.

### 1.    Plaintiffs Are Adequate Class Representatives

A "[d]etermination of adequacy typically entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiffs' attorneys are qualified, experienced, and able to conduct the litigation." *Payment Card 2024*, 2024 WL

3236614, at *15 (cleaned up) (citing *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007)).

"Plaintiffs' interests are considered congruent with other class members when plaintiffs and class members have suffered the same injury because they share the same 'interest in vigorously pursuing the claims of the class.'" *Cymbalista v. JPMorgan Chase Bank, N.A.*, No. 20 CV 456 (RPK)(LB), 2021 WL 7906584, at *5 (E.D.N.Y. May 25, 2021) (citing *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019) (quoting *Denny v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)).  Here, Plaintiffs suffered unreimbursed FLS chargebacks in the same manner as the rest of the Class and thus share the same interest in vigorously pursuing these claims, as they have for nearly a decade now.  *See also Payment Card 2019 Prelim*, 330 F.R.D. at 32 (recognizing class representatives were adequate where they "represent a diverse array of business locations and interests, but seek the same type of redress for the same type of harms").

The Court's prior decisions regarding the adequacy of Plaintiffs in context of class certification further demonstrate their adequacy for purposes of settlement.  *See Schutter*, 2024 WL 4118465, at *7 (recognizing that "[g]iven the similarity of the analyses regarding adequacy under Rule 23(e)(2)(A) and Rule 23(a)(4), the Court finds that the class representatives and Class Counsel provided adequate representation to the putative classes under Rule 23(e)(2)(A)").

 In the Court's March 2018 class certification order, it held that "Plaintiffs had satisfied the explicit requirements of Rule 23(a)," including "adequacy of both class representatives and counsel."  Dkt. No. 725 at 7; Dkt. No. 744 at 7 (citing *B&R II*, 2018 WL 1335355, at *7-10).  In concluding that Plaintiffs were adequate class representatives, the Court recognized that "[a]ll named putative class representatives assert claims arising out of the same conduct and resulting in

the same type of injuries—chargebacks imposed by Defendants as a result of the alleged conspiracy to impose the Liability Shift on the same date." *B&R II*, 2018 WL 1335355, at *8.

The Court also rejected the argument that there was a conflict between class members because some have signed a CAA, containing an arbitration clause, and some have not, holding that this "difference does not defeat the adequacy of representation by named Plaintiffs.  Neither does it warrant creation of subclasses." *Id.* at *9-10.  The Court concluded again, in connection with denying Visa and Mastercard's motion to decertify the Class on August 15, 2024, that Plaintiffs' claims were still typical of the Class and that they are adequate representatives.  Dkt. Nos. 937 at 11-18; Dkt. No. 940 at 11-18.  The Court also recognized that "any merchants who felt inadequately represented by the Class Representatives or wanted to individually pursue their claims had until August 31, 2022, to opt out of the Class … mitigat[ing] concerns about differing interest between remaining merchants, to the extent that any existed." Dkt. No. 937 at 17 n.8; Dkt. No. 940 at 17 n.8.  Barely any merchants did, with less than 350 out of 400,000 merchants opting out.  Notice Plan Decl., ¶32; Aguilar Decl., ¶14.  There have been no changes in this litigation that would disrupt any of these conclusions, nor any other reason to conclude that Plaintiffs have not adequately represented the Class.  *See also Payment Card 2024*, 2024 WL 3236614, at *15 (recognizing that "adequacy is satisfied unless 'plaintiff's interests are antagonistic to the interest of other members of the class'") (citing *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 90 (2d Cir. 2015)).

### 2.    Class Counsel Adequately Represent the Class

As for Class Counsel, "'Rule 23(a)(4) requires that plaintiffs demonstrate that class counsel is qualified, experienced, and generally able to conduct the litigation.'"  *In re Payment Card 2024*, 2024 WL 3236614, at *19.  "Courts find class counsel qualified when they are experienced and

'knowledge[able] in the area of complex class actions.'" *Cymbalista*, 2021 WL 7906584, at *5 (alteration in original) (citing *Payment Card 2019 Prelim*, 330 F.R.D. at 33).

Class Counsel are well-suited to represent the Class given that they focus their practice on complex, representative litigation, and have decades of experience litigating class actions and other complex litigation across the country. Aguilar Decl., ¶8 & Ex. 3 (Robbins LLP Firm Resume); *see Schutter*, 2024 WL 4118465, at *5 (recognizing adequacy of class counsel where they had "successfully litigated dozens of class actions in recent decades"). The Court recognized in 2018 that Class Counsel's "resume shows an extensive record of class action litigation," and that "[in connection with class certification,] no objections have been raised to the adequacy of the proposed lead counsel." *B&R II*, 2018 WL 1335355, at *10.[6] In a May 6, 2021 order, following class certification, the Court appointed Robbins LLP as Class Counsel, noting that it had "previously found Plaintiffs' counsel, Robbins LLP, adequate under Federal Rule of Civil Procedure 23(a)(4)." Dkt. No. 762 at 1-2 (citing Dkt. Nos. 644 at 19, 725 at 7).

Class Counsel have ably litigated the case on behalf of the Class. Plaintiffs have engaged in significant fact and expert discovery, generating and analyzing a massive evidentiary record. Aguilar Decl., ¶¶3-4; *see infra* Section II.C. Class Counsel's efforts have led to obtaining class certification, defeating Defendants' motions for summary judgment and efforts to decertify the Class, and almost entirely defeating Defendants' *Daubert* motions, among other accomplishments. Dkt. Nos. 725, 744, 936, 937, 940, 942, 946, 950. Most importantly, Class Counsel have obtained the Settlement for the Class. All of these facts support the conclusion that Class Counsel have adequately represented the Class. *See, e.g.*, *Caccavale v. Hewlett-Packard Company*, No. 20-CV-

---

[6] The Court's March 2018 order specifically referred to "Robbins Arroyo," which was a prior name of Class Counsel Robbins LLP.

974-NJC-ST, 2025 WL 882220, at *6 (E.D.N.Y. Mar. 14, 2025) (recognizing that "Class Counsel have engaged in extensive discovery efforts throughout the litigation" and "have also 'overcome motions to dismiss, a judicial order to show cause with respect to standing, and a request for interlocutory appeal,'" demonstrating that "Class Counsel can adequately represent the proposed class"), *report and recommendation adopted*, No. 2:20-cv-974 (NJC)(ST), 2025 WL 882221 (E.D.N.Y. Mar. 21, 2025); *Rankins v. Arca Cont'l S.A.B. de C.V.*, No. 20-CV-1756 (ENV) (TAM), 2024 WL 4986411, at *6 (E.D.N.Y. Oct. 30, 2024) (concluding counsel was adequate given their "experience and efforts in this case to investigate and substantiate the alleged violations"), *report and recommendation adopted*, No. 1:20-CV-1756-ENV-TAM, 2024 WL 5007394 (E.D.N.Y. Dec. 6, 2024); *Goidel v. Aetna Life Ins. Co.*, No. 21-CV-7619 (VSB), 2024 WL 4441806, at *4 (S.D.N.Y. Oct. 8, 2024) (recognizing that "Plaintiffs' counsel has also demonstrated their skill through their work on this case, which involved substantial discovery and resulted in a successful mediated settlement").

### 3. The Settlement Was Reached as Result of Arm's-Length Negotiations by Experienced and Well-Informed Counsel, Assisted by a Mediator

While the Court "may not presume a settlement agreement's fairness based solely on its arm's-length negotiation," it "must also consider whether the parties negotiated the proposed settlement at arm's length." *Caccavale*, 2025 WL 882220, at *6 (citing Fed. R. Civ. P. 23(e)(2)(B) and *Moses*, 79 F.4th at 243). That the Settlement was reached after more than nine years of litigation, including completed fact and expert discovery, class certification, *Daubert* motions, and summary judgment motions, is strong evidence of the arm's-length nature of the settlement. *See id*. (concluding that negotiations were arm's-length where "the Parties had already engaged in three years of litigation …, discovery…, and settlement negotiations"). Class Counsel have a well-developed understanding of the factual and legal landscape of the action, and have concluded, with

that understanding, that the Settlement is in the best interests of the Class and an excellent result. Aguilar Decl., ¶9. Class Counsel were also assisted by two highly qualified experts, who have authored multiple reports. *Id.*, ¶4. Further, both the Discover and Amex Settlements were reached as the result of a proposal from the Mediator, accepted by both sides. *Id.*, ¶¶6-7.

The Mediator's involvement strengthens the conclusion that the Settlement was negotiated at arm's-length. *Cymbalista*, 2021 WL 7906584, at *6 (holding that "[t]he participation of a former judicial officer as a mediator lends credibility to the negotiation process and supports the assertion that a settlement was reached without collusion and at arm's length"); *Mikhlin v. Oasmia Pharm. AB*, No. 19-cv-4349 (NGG) (RER), 2021 WL 1259559, at *5 (E.D.N.Y. Jan. 6, 2021) (finding arm's-length negotiation where "the parties exchanged mediation briefs addressing the merits of the case and attended a day-long mediation session").

This is especially true where, as here, the Mediator is a well-known and respected former judicial officer, who has mediated numerous large and complex cases. *See, e.g.*, https://phillipsadr.com/our-team/layn-phillips/; *Pearlstein v. Blackberry Ltd.*, No. 13 Civ. 7060 (CM) (KHP), 2022 WL 4554858, at *7 (S.D.N.Y. Sept. 29, 2022) (approving a settlement, in part, because it was facilitated by the "extensive mediation efforts" of a "highly regarded mediator," Judge Phillips); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 1:16-CV-06728-CM-SDA, 2020 WL 4196468, at *3 (S.D.N.Y. July 21, 2020) (approving a settlement following mediation before, and a mediator's proposal by, Judge Phillips); *Guevoura Fund Ltd. v. Sillerman*, No. 1:15-CV-07192-CM, 2019 WL 6889901, at *2 (S.D.N.Y. Dec. 18, 2019) (approving a settlement after an all-day mediation with Judge Phillips); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011) (finding that a settlement "was the product of prolonged, arms-length negotiation . . . facilitated by a respected mediator," Judge Phillips).

Though under *Moses*, courts may no longer presume that a settlement is fair based solely on its arm's-length negotiation, the utilization of a mediator is still a strong sign in support of concluding the settlement is fair. *See Payment Card 2024*, 2024 WL 3236614, at *20 (recognizing that after *Moses* signs of an arm's-length negotiation, including involvement of a mediator, could still be a factor supporting the approval of a settlement); *see also Goidel*, 2024 WL 4441806, at *4 (recognizing that "Courts have [] recognized a presumption of fairness when a settlement is reached with the assistance of a mediator" and collecting cases concluding the same). Moreover, every aspect of this Settlement suggests it was a good-faith, non-collusive, hard-fought negotiated result, after nearly a decade of zealous advocacy on behalf of each of the Parties. *See Payment Card 2024*, 2024 WL 3236614, at *20 (concluding that all signs demonstrated the settlement was arm's-length given certain factors, including "this litigation's extensive procedural history").

## B.     The Substantive 23(e)(2) Factors Support the Settlement

### 1.     The Settlement Provides Adequate Relief for the Class

"In assessing whether a settlement provides adequate relief for the class under Rule 23(e)(2)(C), the Court is directed to consider: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." *Payment Card 2024*, 2024 WL 3236614, at *21 (citing Fed. R. Civ. P. 23(e)(3)).

#### a.     The Costs, Risks, and Delay of Trial and Appeal Favor the Settlement

"Under this Rule 23(e)(2) factor, courts may need to forecast the likely range of possible classwide recoveries and likelihood of success in obtaining such results." *Id.* This subfactor overlaps with "several *Grinnell* factors, including: (1) the complexity, expense, and likely duration

- 19 -

of the litigation; (ii) the risks of establishing liability; [(iii) the risks of establishing damages]; [iv] the risks of maintaining the class action through the trial; and [v] the range of reasonableness of the settlement fund in light of the best possible recovery and in light of all the attendant risks of litigation." *Id.* Plaintiffs also discuss "the ability of Defendants to withstand a greater judgment" and the "stage of the proceedings" *Grinnell* factors here as they tie closely to these other factors.

### (1) The Complexity, Expense, and Likely Duration of the Litigation Favors Settlement

This factor favors settlement "when litigation is likely to be 'complex, expensive, or drawn out.'" *Payment Card 2024*, at *21 (citing *GSE Bonds*, 414 F. Supp. 3d at 693). Moreover, "'[c]lass action suits' in general 'have a well-deserved reputation as being most complex.'" *Id.* (citing *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). "In particular, '[n]umerous federal courts have recognized that '[f]ederal antitrust cases are complicated, lengthy, and bitterly fought,' 'as well as costly.'" *Id.* (citing *GSE Bonds*, 414 F. Supp. 3d at 693 (second alteration in original) (first quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005); then quoting *In re Vitamin C Antitrust Litig.*, No. 06-md-1738, 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012)); *see also In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 312 (S.D.N.Y. 2020) (recognizing that "[i]n general, antitrust trials require the expenditure of significant time and resources by both the parties and the court, and this case would have been no exception").

There is no doubt here that further litigation would be complex, expensive, and drawn out. This complex antitrust case involves numerous difficult issues, some of which were previewed in Defendants' motions for summary judgment, including Amex and Discover's own individual motions and their *Daubert* motions. These issues include *Illinois Brick* arguments, claims that Plaintiffs' liability expert has analyzed the market incorrectly from a one-sided perspective, claims

of "follow the leader" behavior as distinguished from conspiratorial conduct, damages calculations, and complex factual issues relating to EMV certification, preparation, and merchant readiness. Aguilar Decl., ¶10. These are just some of the issues Plaintiffs will have to contend with in further litigation. *See, e.g.*, *Payment Card 2024*, 2024 WL 3236614, at *22 (recognizing that "[p]rior to this motion for preliminary approval of the Settlement, the parties filed numerous *Daubert* motions and motions for summary judgment … which the Court decided in multiple, lengthy decisions" and that "[t]hese complex issues would need to be relitigated at trial, and would likely be raised again on appeal") (citing *Sykes v. Harris*, No. 09-cv-8486, 2016 WL 3030156, at *12 (S.D.N.Y. May 24, 2016) ("[E]ven if [Class] Plaintiffs were to prevail at trial, post-trial motions and the potential for appeal could prevent the class members from obtaining any recovery for several years, if at all")); *see also Namenda Direct Purchaser*, 462 F. Supp. 3d at 312 (recognizing in an antitrust action that "whichever side lost at trial surely would have appealed (most likely after filing extensive post-trial motions). Given the size and complexity of the case, this process would likely [] have included a petition for *certiorari* as well").

Further litigation would mean preparing for trial with Amex and Discover (in addition to Visa and Mastercard). Pre-trial, trial, and post-trial briefing and preparation alone would entail significant efforts. Aguilar Decl., ¶10. As issuers themselves, the motivations of Amex and Discover include different considerations than those driving Visa and Mastercard, thus adding another layer of complexity to a trial with them as defendants. *Id.* Amex and Discover also each have their own expert witness, which would further add to the complexity at trial and beyond. *Id.* Given the history of this litigation, having two additional defendants at trial would also increase the likelihood of post-trial appeals, and the number of issues involved in any such appeals. *Id.*

Moreover, Amex also adds particular complexity to further litigation given: a) its pending appeal in the Second Circuit, stayed while this Settlement undergoes the approval process, and b) that it is the only one of the four Defendants to have successfully moved to arbitrate certain claims. As the Court has seen, Amex has raised arguments throughout these proceedings that the presence of merchants with a CAA pose difficulties for the litigation—Plaintiffs fully expect those arguments would continue through to trial and on its appeal.  Aguilar Decl., ¶11; *see, e.g.*, Dkt. No. 644 at 16-17 (Amex's arguments regarding overbreadth of class); Dkt No. 936 at 38 (rejecting Amex's argument that determining which "class members are bound by the CAA" justified decertifying the class); Dkt. No. 950 at 48 & n.22 (rejecting Amex's argument that "Plaintiffs' failure to 'disaggregate' damages against Amex means that the jury would be required to impermissibly speculate as to a damages award against Amex").

This factor weighs strongly in favor of the Court finding that it is likely to be able to grant final approval of the Settlement.

### (2)     The Risks of Establishing Liability

To analyze this factor "the court need only assess the risks of litigation against the certainty of recovery under the proposed settlement."  *Caccavale*, 2025 WL 882220, at *7 (cleaned up). "The Court need not 'adjudicate the disputed issues or decide unsettled questions' to assess such risks."  *Id.* (citing *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004)). Further, "[c]ourts approve settlements where plaintiffs would have faced significant legal and factual obstacles to proving their case."  *Global Crossing*, 225 F.R.D. at 459.

Here, Plaintiffs acknowledge that some of the risks of establishing liability have diminished given Plaintiffs' repeated success against Defendants' motions, including numerous *Daubert* motions and motions for summary judgment.  *See Payment Card 2024*, 2024 WL 3236614, at *23 (concluding that this factor was "likely to weigh against final approval" where "Plaintiffs' claims

ha[d] survived numerous *Daubert* and summary judgment motions").  However, there are still significant risks to establishing liability at trial.

Given that the Court has concluded Plaintiffs have not "offered any 'direct evidence' of an agreement among Defendants," Plaintiffs' case will need to be proven with circumstantial evidence.  Dkt. No. 950 at 33.  Plaintiffs will need to develop a case at trial with circumstantial evidence sufficient to show parallel conduct plus the existence of "plus factors" demonstrating the conspiracy.  *See id*. at 34-38 (recognizing that on summary judgment Plaintiffs sufficiently demonstrated parallel conduct and "evidence [t]hat adequately satisfies all three of the [following] 'plus factors' – (i) common motive to conspire, (ii) evidence that the parallel acts were against the apparent economic self-interest of the individual alleged conspirators, and (iii) evidence of a high level of interfirm communications").

Defendants, however, will attempt to prove at trial that their conduct demonstrates "'unilateral decision making and conscious parallelism,' rather than conspiracy."  *Id*. at 39 (citing Dkt. No. 795-1, Discover Mem., at 16-20); *see also id.* at 43-44 (citing Dkt. No. 824, Amex Mem., at 14 ("Amex contends that its interfirm communications 'simply corroborate[] Amex's strategy of monitoring the other Networks' approach to FLS dates and unilaterally deciding to follow Visa's and Mastercard's lead")).  Additionally, Defendants' competing versions of the evidence will be supported at trial by their seven experts (including one for Amex and one for Discover).  Aguilar Decl., ¶4.

There are substantial risks inherent in a jury trial.  While Plaintiffs' evidence was sufficient to defeat Defendants' motions for summary judgment, Defendants will ask jurors to draw different inferences at trial from this evidence.  *E.g.*, Dkt. No. 950 at 41-43 (assessing evidence and concluding that "this document could be innocently describing a non-collusive coincidence," but

"drawing all reasonable inference in favor of Plaintiffs requires the inference that Defendants proactively aligned on the same dates for their fraud liability shifts").

For example, Defendants have argued that "Plaintiffs cannot fairly ignore … evidence [regarding the Target data breach]" that was "announced on December 18, 2013, [and] 'shook the industry.'"  Dkt. No. 725 at 47-48; Dkt. No. 744 at 47-48 (ellipsis and first insertion in original). Defendants assert that this breach "served as a turning point for merchants who had been pushing back on the costs of EMV migration" and that "state and federal legislators and other government offices pressured the networks to respond to the Target breach by accelerating, not delaying, EMV adoption."  Dkt. No. 799 at 8; Dkt. No. 870 at 8.

Both Discover and Amex also will make arguments at trial that they were merely following the leader based on their relative size within the market.  Discover argued that "if Discover implemented an FLS on a timeline that was different from other networks, merchants may not have complied."  Dkt. No. 795-1 at 20; Dkt. No. 888 at 20.  It asserts that its "decision was the result of the explicit desires of merchants and other industry players … and the real concern that as the smallest market player, Discover would be left out of the EMV transition if it did not implement EMV on a timeline consistent with the larger networks."  Dkt. No. 795-1 at 19-20; Dkt. No. 888 at 19-20.  Similarly, Amex argues that "[o]nce Amex knew that Visa and Mastercard would proceed with its FLS in October 2015, Amex likewise unilaterally decided to proceed with its FLS in October 2015, as it understood that waiting longer than that would have been costly and would have invited fraud to migrate to Amex."  Dkt. No. 824 at 1; Dkt. No. 891 at 1.

Similarly, both Discover and Amex will argue that their FLS date was a product of learning from their prior experiences in other markets.  Discover has argued that its "decision was also informed by its prior experience[s] … each of which presented a unique concern about the risks

- 24 -

Discover faced if it did not follow the industry." Dkt. No. 795-1 at 20; Dkt. No. 888 at 20. Amex similarly argued that it "chose October 16, 2015 … consistent with the approach taken in rolling out EMV technology earlier in several other markets, where the Networks had also picked the same or similar FLS dates." Dkt. No. 824 at 4-5; Dkt. No. 891 at 4-5.

Though Plaintiffs have developed a strong case against each of the Defendants, serious risks remain. These are just some of the arguments and risks Plaintiffs would face litigating this matter through to a trial and any appeals. Accordingly, this factor weighs in favor of the Court finding that it is likely to be able to grant final approval of the Settlement.

### (3) The Risks of Establishing Damages

Even after establishing liability at trial, Plaintiffs would face considerable risks in establishing damages, as in any antitrust case. "'[T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal.'" *Payment Card 2019 Prelim*, 330 F.R.D. at *39 (citing *Wal-Mart Stores*, 396 F.3d at 118). At trial the "parties would present expert testimony on the issue of damages, which makes it 'virtually impossible to predict' which side's testimony would be found more credible, as well as 'which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions." *Mikhlin*, 2021 WL 1259559, at *6 (citing *Strougo v. Bassini*, 258 F. Supp. 2d 254, 259-60 (S.D.N.Y. 2003)).

Plaintiffs' damages analysis, supported by Plaintiffs' expert Dr. Officer, has been challenged by Defendants in numerous ways. Dr. Officer concluded that a two-year delay of the FLS by all four Networks was the most likely outcome in the but-for world. *E.g.*, Dkt. No. 725 at 30; Dkt. No. 744 at 30. In contrast, Defendants argued that "Plaintiffs Have No Evidence to Support a Two-Year Delay Instead of a Delay of Six-Months or Less." Dkt. No. 803 at p. 115-16; Dkt. No. 906 at p. 115-16. Similarly, Dr. Officer's damages model includes cross-border

transactions (transactions for which the card was issued outside the U.S., but used for a purchase within the U.S.), but Defendants argued that any delay would not have included cross-border transactions. Dkt. No. 803 at 119-21; Dkt. No. 906 at 119-21. Defendants also challenge Dr. Officer's damages model with respect to his assumptions regarding reimbursed chargebacks, the presence of governmental entities in his analysis, and his assessment of the Networks' chargeback rules. *See* Dkt. No. 942 at 50-53; Dkt. No. 946 at 50-53. Defendants' experts also challenge Dr. Officers' assumptions and conclusions and will offer their own competing assumptions and conclusions at trial. Aguilar Decl., ¶12; *see Namenda Direct Purchaser*, 462 F. Supp. 3d at 314 (recognizing that [t]he jury's reaction to this testimony [from the parties' damages experts,] was uncertain").

Further, Amex presents a further risk to establishing damages at trial. The Court has concluded that "Dr. Officer's testimony cannot be used to establish the damages owed by Amex to CAA-bound merchants because CAA-bound merchants cannot recover from Amex." Dkt. No. 942 at 56; Dkt. No. 946 at 56. Thus, Plaintiffs will have to offer "other evidence that independently establishes what proportion of the Class may appropriately recover from Amex for its role in the conspiracy." Dkt. No. 942 at 56; Dkt. No. 946 at 56. This additional hurdle creates further risk for establishing damages at trial as to Amex.

This factor weighs strongly in favor of the Court finding that it is likely to be able to grant final approval of the Settlement.

### (4)    The Risks of Maintaining the Class Through the Trial

Defendants have already tried, in two separate motions, to decertify the class. Dkt. Nos. 936, 937, 940. Though their efforts failed, they may well try again. *See Payment Card 2024*, 2024 WL 3236614, at *23 (recognizing that the "Court has the authority to reconsider" but in that case "none of the Defendants [had] indicated an intention to move for decertification of the class").

Indeed, courts have recognized that "decertification is always possible as a case progresses and additional facts are developed." *Wal-Mart Stores*, 396 F.3d at 119 n.24; *In re NASDAQ Mkt.- Makers Antitrust Litig.*, 187 F.R.D. 465, 476-77 (S.D.N.Y. 1998) (recognizing that "there is no guarantee that this class would not be decertified before or during trial"). This factor favors approval given Defendants' repeated challenges to class certification, or is at worst, neutral. *See Namenda Direct Purchaser*, 462 F. Supp. 3d at 314 (recognizing this factor was neutral where the defendant "could have appealed class certification, among other issues, had Plaintiffs won at trial" though any such "appeal was dampened by the fact that [defendant's] 23(f) petition seeking interlocutory relief from the class certification order was denied").

### (5)    The Stage of the Proceedings Factor Strongly Weighs in Favor of Approval of the Settlement

Courts consider the stage of proceedings and the amount of discovery "to ensure 'that counsel for plaintiffs have weighed their position based on a full consideration of the possibilities facing them and the risks of maintaining the class action through trial.'" *Vasquez v. A+ Staffing LLC*, 746 F. Supp. 3d 26, 56 (E.D.N.Y. 2024). Plaintiffs' Counsel are extremely well informed here, having litigated this matter for over nine years, reviewed and analyzed millions of pages of documents, briefed numerous motions including several motions for summary judgment, and having reviewed dozens of expert reports from Plaintiffs' own two experts and Defendants' seven experts. On top of all of this, "the parties reached the proposed [a]greement through a mediation session held before a neutral mediator." *Vasquez*, 746 F. Supp. 3d at 56. This factor weighs strongly in favor of the Court finding that it is likely to be able to grant final approval of the Settlement.

(6)    **The Ability of Defendants to Withstand a Greater
Judgment Is Outweighed by the Valuable Cooperation
Agreements Secured by the Settlement**

Amex and Discover are large companies, and Plaintiffs do not contend that they would be
unable to withstand a greater judgment.  However, courts note that "[t]his factor is 'typically
relevant only when a settlement is less than what it might otherwise be but for the fact that the
defendant's financial circumstances do not permit a greater settlement." *Schutter*, 2024 WL
4118465, at *12 (quoting *Namenda Direct Purchaser*, 462 F. Supp. 3d at 314).  When that situation
is not present, courts generally do not give much consideration to this factor, and "this factor,
standing alone, does not suggest that the settlement is unfair." *Fleisher v. Phoenix Life Ins. Co.*,
No. 11-cv-8405, 2015 WL 10847814, at *9 (S.D.N.Y. Sept. 9, 2015).  If this were not the case,
"as one court in this Circuit has noted, 'then only the most massive settlement awards could be
deemed reasonable in cases against large corporations.'" *In re Facebook, Inc., IPO Sec. &
Derivative Litig.*, 343 F. Supp. 3d 394, 413 (S.D.N.Y. 2018) (concluding that this factor was
"neutral" even though Facebook could "clear[ly]" "withstand a judgment in excess of $35
million"), *aff'd sub nom. In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020).  Further, "a
defendant's 'ability to pay is much less important than the other *Grinnell* factors, especially where
the other factors weigh in favor of approving a settlement.'" *Marin v. 310 Bowery Grp. LLC*, No.
24 CIV.1340, 2025 WL 893731, at *9 (S.D.N.Y. Mar. 24, 2025) (quoting *Flores v. Mamma
Lombardi's of Holbrook, Inc.*, 104 F. Supp. 3d 290, 303 (E.D.N.Y. 2015)).

Here this factor weighs in favor of the Settlement because both Amex and Discover have
agreed to valuable cooperation, which will assist Plaintiffs in their continued litigation against the
two remaining defendants, who are responsible for approximately 90% of the chargebacks at issue
in this litigation.  Aguilar Decl., ¶13; Amex Stip., ¶56-57; Discover Stip., ¶56-57.  "A defendant's
cooperation 'tends to offset the fact that they would be able to withstand a larger judgment.'"

*Cymbalista*, 2021 WL 7906584, at *10. These cooperation agreements further demonstrate the appropriateness of the Settlement. *See In re Packaged Ice Antitrust Litig.*, No. 08-MDL-01952, 2011 WL 6209188, at *11 (E.D. Mich. Dec. 13, 2011) (recognizing that "of significant value is the fact that the Settlement Agreement … can serve as a further source of cooperation against the non-settling Defendant as to the nationwide conspiracy allegations" and citing cases recognizing the same).

Accordingly, this factor weighs in favor of the Court finding that it is likely to be able to grant final approval of the Settlement.

### (7) The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of All the Attendant Risks of Litigation

"The range of reasonableness of the settlement in light of the best possible recovery, and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation, are two *Grinnell* factors that are often combined for the purposes of analysis." *Payment Card 2024*, 2024 WL 3236614, at *26. "'In considering the reasonableness of the settlement fund, a court must compare 'the terms of the compromise with the likely rewards of litigation.'" *Id.* at *26 (citing *Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35, 58 (W.D.N.Y. 2018) (quoting *In re Citigroup, Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 384 (S.D.N.Y. 2013)). "In order to calculate the 'best possible' recovery, the [C]ourt must assume complete victory on both liability and damages as to all class members on every claim asserted against each defendant in the [a]ction." *Id.* (citing *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814, 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004)). Determining if a settlement amount is reasonable "'does not involve the use of a mathematical equation yielding a particularized sum.'" *Ying v. All-Ways Forwarding of N.Y. Inc.*, No. 20-CV-6242 (ENV)(MMH), 2025 WL 968586, at *10 (E.D.N.Y. Mar. 31, 2025) (quoting *Viafara v. MCIZ Corp.*, No. 12 Civ. 7452 RLE, 2014 WL

1777438, at *7 (S.D.N.Y. May 1, 2014)).  Instead, "[t]he range of reasonableness is a 'range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Payment Card 2024*, 2024 WL 3236614, at *26 (citing *Wal-Mart Stores*, 396 F.3d at 119 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

"'Courts in this district have held that 'the question … is not whether the settlement represents the highest recovery possible … but whether it represents a reasonable one in light of the many uncertainties the class face.'" *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB) (JO), 2019 WL 6875472, at *29 (E.D.N.Y. Dec. 16, 2019) ("*Payment Card 2019 Final*") (citing *Hall v. ProSource Techs., LLC*, No. 14-CV-2502, 2016 WL 1555128, at *8 (E.D.N.Y. Apr. 11, 2016) (quoting *Bodon v. Domino's Pizza, LLC*, No. 09-CV-2941, 2015 WL 588656, at *6 (E.D.N.Y. Jan. 16, 2015)), *aff'd sub nom. Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704 (2d Cir. 2023).  Class Counsel believe the settlement amount achieved here represents an excellent outcome, considering the risks of the litigation, the relative market size of the settling defendants and the relative amount of the chargebacks associated with them, the cooperation agreements secured, and the vast difference in estimated damages between Plaintiffs and Defendants.  Aguilar Decl., ¶15.

Plaintiffs and Defendants have widely differing estimates of damages.  Plaintiffs' damages expert, Dr. Officer, concluded that "the total dollar amount of damages suffered by members of the certified class of Plaintiffs is $1,454,485,686."  Dkt. No. 803 at 131; Dkt. No. 906 at 131.  Of this amount, Amex accounts for $118,273,655, and Discover accounts for $29,775,524.  Aguilar Decl., ¶13.

In contrast, Visa's experts provided alternative chargeback calculations for different scenarios, across all four Defendants, ranging from $24,649,294 to $1,424,068,666.[7]  *Id.*  These alternative scenarios include chargeback amounts for a three-, six-, twelve-, eighteen-, or twenty-four-month delay of the Fraud Liability Shift; along with three different scenarios: 1) a delay of only domestic debit FLS charges, 2) a delay of domestic credit and debit FLS charges, with no delay of cross-border FLS charges; and 3) a delay of credit and debit charges including a delay of cross-border FLS charges.  *Id.*  The lowest of these figures is $24,649,294, associated with a three-month delay of only debit transactions.  *Id.*  Discover and Amex account for $2,752,648, and $0 (N/A) of this amount, respectively (the lowest figure provided for Amex alone is $16,300,000 for a three-month delay of credit and debit transactions, without cross-border).  *Id.*  The highest figure is $1,424,068,666 associated with a two-year delay of credit and debit transactions, including cross-border.  *Id.*  Discover and Amex account for $29,775,524, and $89,800,000 of this amount, respectively.  *Id.*  Visa's experts also provided a figure for a six-month delay of the debit and credit transactions, without cross-border charges (in Visa and Mastercard's summary judgment motion they argued, among other things, that the Court should limit damages to six months and exclude cross-border chargebacks) amounting to $392,390,199 ("Defendants' MSJ Alternative").  *Id.*; Dkt. No. 799 at 4, 64-66; Dkt. No. 870 at 4, 64-66.  Discover and Amex account for $8,083,840, and $34,000,000 of this amount, respectively.  Aguilar Decl., ¶13.

---

[7] Plaintiffs do not purport to be making, adopting, or agreeing with any damages arguments on behalf of Defendants, or claiming that these arguments represent the entirety of their position. Nevertheless, these alternative calculations come from Visa's previously disclosed expert reports and reflect Class Counsel's current understanding of certain of Defendants' damages estimates and arguments.  Though these estimates were provided by Visa's experts, Plaintiffs believe these to be the most useful benchmarks for the Court's analysis for each of the four Defendants at this time.

Accounting for *only* the total chargebacks associated with each Defendant, and not taking into account any adjustments such as absorption rates, government entities, or opt-outs—each of which would *lower* Plaintiffs' potential recovery at trial—Plaintiffs provide the following estimates of their recovery percentages.  Plaintiffs' recovery from the Settling Defendants—$32.2 million—accounts for 2.21% of Plaintiffs' best-case estimate for single damages recoverable from Defendants at trial, 8.21% of what would be recoverable under Defendants' MSJ Alternative, and 130.63% of Visa's lowest provided damages estimate for a three-month delay of FLS charges for domestic debit transactions only.

The amount recovered from Discover—$12.2 million—accounts for 40.97% of Plaintiffs' best-case estimate for damages attributable to Discover's chargebacks, 150.92% of what would be recoverable under Defendants' MSJ Alternative, and 443.21% of Visa's lowest provided damages estimate for Discover's chargebacks, for a three-month delay of FLS charges for domestic debit and credit transactions only.  The amount recovered from Amex—$20 million—accounts for 16.91% of Plaintiffs' best-case estimate for damages attributable to Amex's chargebacks, 58.82% of what would be recoverable under Defendants' MSJ Alternative, and 122.70% of Visa's lowest provided damages estimate for Amex's chargebacks, for a three-month delay of FLS charges for domestic debit and credit transactions only (notably, the lowest included figure in Visa's experts' calculations of chargebacks, for a three-month delay of only debit transactions, leads to a zero dollar estimate ("NA") for Amex).  Again, these estimates are conservative, given that they do not account for the various adjustments that will be urged by Defendants, such as absorption rates by acquirers, chargebacks associated with government entities, and opt-outs, that would be heavily litigated at trial.  If Plaintiffs were to adjust for these amounts for these factors, the percentage recovery rates would be even higher.

This "settlement amount compares favorably with settlements reached in other antitrust class actions, especially given the lack of prior governmental investigation and the disparity between the parties' damages calculations." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 230 (E.D.N.Y. 2013) (citing *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 123 (S.D.N.Y.2009) (settlement of $336 million and injunctive relief "represent an extraordinarily significant recovery" in light of the fact that "Plaintiffs did not have the benefit of a Government investigation")), *rev'd and vacated on other grounds*, 827 F.3d 223 (2d Cir. 2016); *NASDAQ*, 187 F.R.D. at 478 (antitrust settlement of $1.027 billion approved where plaintiffs' and defendants' damages estimates were vastly disparate); *see also Payment Card 2019 Final*, 2019 WL 6875472, at *28 (recognizing plaintiffs' economist expert provided estimated damages for plaintiffs at between $463-754 billion, while "[d]efendants' expert would have estimated damages" at $1.21-3.66 billion). Moreover, "'the fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.'" *Payment Card 2019 Prelim*, 330 F.R.D. at 49 (citing *Grinnell*, 495 F.2d at 455). Indeed, "[t]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* (citing *Grinnell*, 495 F.2d at 455 n.2).

Even with the most Plaintiff-friendly estimate of total damages possible, which does not account for numerous adjustments that Defendants would heavily litigate at trial, *see, e.g.*, Dkt. No. 942 at 52; Dkt. No. 946 at 52 (noting that "[i]n sum, Visa, Mastercard, and Discover are correct insofar as Dr. Officer may not present to the jury evidence of these 'damages' (*e.g.*, chargebacks incurred by government entities)"), the 2.2% recovery from the two Defendants responsible for only approximately 10.18% of the FLS chargebacks at issue is still an excellent result for this

action.  Aguilar Decl., ¶13.  The result is even more favorable when measured against Defendants' MSJ Alternative.  If the Settlement is measured by this yardstick, the recovery here is 8.2% of the entirety of the chargebacks identified by Dr. Officer for all four Defendants.  The amounts recovered from Amex and Discover amount to 58.82% and 150.92%, respectively, of chargebacks attributable to each of these settling Defendants, under Defendants' MSJ Alternative.

Further, not only do the Amex and Discover Settlements each appropriately value the claims against the two far smaller Defendants, the Amex Settlement also takes into account the additional arguments and challenges presented by Amex.  This includes that Amex is the sole Defendant who successfully moved for arbitration, and that Amex also has a pending appeal in the Second Circuit, both of which inject uncertainty and risk into the litigation.

Courts regularly approve settlements with recoveries in the range achieved here.  For example, in *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 483 (S.D.N.Y. 2009), the court found the settlement amount reasonable and granted final approval where plaintiffs achieved a "$586 million settlement [that] represents two percent of the aggregate expected recovery."  Like here, the court recognized that "while the proposed settlement is being compared—justifiably or not—to the expected recovery amount as calculated by plaintiffs' damages expert, plaintiffs note that the expected recovery is based largely on assumptions, 'any of which, if wrong, could doom any recovery at all or certainly drastically reduce any recovery even if successful at trial.'"  *Id.* at 484; *Payment Card 2019 Final*, 2019 WL 6875472, at *28-30 (recognizing that "Judge Gleeson found that the figure agreed to … 'represent[ed] approximately 2.5% … of the largest possible estimate of actual damage to merchants" and that "the percentage … is now likely even less" yet still finding settlement "fair, reasonable, and adequate"); *see also In re Tenaris S.A. Sec. Litig.*, No. 18-CV-7059(KAM)(SJB), 2024 WL 1719632, at *8 (E.D.N.Y. Apr. 22, 2024) (recognizing

that the "proposed settlement amount … represents 4.02-5.01% of the total estimated 'best-case' recovery" and was thus "significantly higher than the 2.4-2.9% average settlement recovery rate for similar securities class actions between December 2011 and December 2022); *In re Med. X-Ray Film Antitrust Litig.*, No. CV-93-5904, 1998 WL 661515, at *6 (E.D.N.Y. Aug. 7, 1998) (finding 17% of "best possible recovery" within range of reasonableness and recognizing that "[t]his court has previously approved settlements that represent a far smaller percentage of the best possible recovery than that proposed here," including "less than 2%" and "6.4-11%"); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-02420 YGR (DMR), 2020 WL 7264559, at *20 (N.D. Cal. Dec. 10, 2020) (characterizing "11.7 percent of the single damages" as an "excellent" result for an antitrust class action), *aff'd*, 2022 WL 16959377 (9th Cir. Nov. 16, 2022).

Not only is the Settlement amount well within the range of reasonableness, Plaintiffs are still litigating against the two Defendants responsible for (by far) the bulk of chargebacks in terms of total dollar amounts. The Settlement includes valuable agreements for cooperation from Discover and Amex, which further increases the value of the Settlement. Between the Settlement amount and the cooperation agreements, the "concrete benefits of this Settlement outweigh the possibility of a higher recovery after trial." *In re AOL Time Warner, Inc.*, No. 02 CIV. 5575 (SWK), 2006 WL 903236, at *13 (S.D.N.Y. Apr. 6, 2006) (recognizing that the "benefit of the Settlement will … be realized far earlier than a hypothetical post-trial recovery" where it included a "substantial, immediate recovery" that was accruing interest in escrow).

Thus, the Settlement amount is well within the range of reasonableness that would permit the Court to conclude it is likely to grant final approval of the Settlement.

**b.    Effectiveness of Distributing Relief to the Class**

"This factor requires courts to look at 'the method of processing class-member claims.'" *Payment Card 2019 Prelim*, 330 F.R.D. at 40 (citing Fed. R. Civ. P. 23(e)(2)(C)(ii)). "'A claims

processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding.'" *Id.* (citing Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment). "'To warrant approval, the plan of allocation must also meet the standards by which the settlement is scrutinized – namely it must be fair and adequate… An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *Id.* (ellipsis in original) (quoting *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005)). Moreover, "numerous courts have held … that a plan of allocation need not be perfect.'" *Id.* (cleaned up) (citing *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05-cv-10240, 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007) (collecting cases)).

Plaintiffs' proposed Plan of Administration and Distribution ("Distribution Plan") is attached to the Aguilar Decl. as Exhibit 4 and sets forth that distribution will be made to eligible class members through a *pro rata* formula. Aguilar Decl., ¶16. "Courts frequently approve plans involving *pro rata* distribution." *In re Payment Card 2019 Final*, 2019 WL 6875472, at *20 (collecting cases); *see also In re Lloyd's Am. Tr. Fund Litig.*, No. 96 Civ.1262 RWS, 2002 WL 31663577, at *19 (S.D.N.Y. Nov. 26, 2002) ("pro rata allocations provided in the Stipulation are not only reasonable and rational, but appear to be the fairest method of allocating the settlement benefits"), *aff'd sub nom. Adams v. Rose*, 2003 WL 21982207 (2d Cir. Aug. 20, 2003). Plaintiffs developed the Distribution Plan with the assistance of an experienced claims administrator, Epiq, whose work has been recognized in other complex actions. *See, e.g.*, *Zimmerman v. Paramount Glob.*, No. 22-CV-9355 (VSB), 2025 WL 763734, at *5 (S.D.N.Y. Mar. 11, 2025) (recognizing that distribution plan was "overseen by Epiq … an experienced claims administrator"). Not only is Epiq an experienced claims administrator, they are also the claims administrator in the

Interchange Action. Azari Decl., ¶¶5.a, 43.[8]  Thus, the Class will benefit from Epiq's experience with many data and claims issues from the Interchange Action that, while not identical, share many commonalities with this matter.  Azari Decl., ¶43.  Moreover, Plaintiffs also utilized the assistance of their damages expert, Dr. Officer, who has extensively analyzed Defendants' chargeback data, in creating the Distribution Plan.  Aguilar Decl., ¶16.

The Distribution Plan provides that distributions will be not be made until Plaintiffs' claims are also resolved against Visa and Mastercard, in order to increase efficiency of the distribution. Distribution Plan at 2-3.  When distributions are made under the plan, they will be made "on a *pro rata* basis to eligible members of the Class who timely submit a valid claim." *Id.* at 3.  Eligible Class members' "[p]ayments will be determined on a *pro rata* basis based on the dollar amount of FLS Chargebacks incurred by eligible class members, as compared to the total dollar amount of FLS Chargebacks incurred by all eligible class members that submit valid claims." *Id.*  The Distribution Plan also includes a minimum payment, in an amount to be determined when the data from the claims process is available (and with the Court's approval), that will serve to ensure merchants with smaller chargeback damages can meaningfully participate in the Settlement, and to reduce the administrative burden associated with smaller claims.  *Id.* at 3-4.  Plaintiffs' Counsel intend to distribute as much of the Net Settlement Fund (as defined in the Discover Stip., §XI; Amex Stip., §XI) to merchants as is possible, but in the event that a further distribution cannot be economically made, the proposed Distribution Plan envisions a *cy pres* distribution to a group that would be for the benefit of members of the class, with the Court's approval.   Distribution Plan at 4.

---

[8] Similarly, Plaintiffs also seek the appointment of Huntington National Bank as the escrow agent for the Settlement.  Huntington National Bank currently serves as the escrow agent for the Interchange Action.

Plaintiffs' Counsel will work with the Administrator to ensure that the burden on claimants is minimal, taking into account the need to verify legitimate claims, while not overburdening members of the Class. Azari Decl., ¶44. The Administrator will utilize standard procedures for detecting illegitimate claims, including fraudulent submissions by automated systems. *Id.*, ¶45. The Administrator will also implement an audit procedure, and larger claims will require further verification. Azari Decl., ¶¶44-46; Distribution Plan at 4. Further, in an effort to reduce the burden on claimants, and to improve efficiency of the distribution, Class Counsel and the Administrator will endeavor to pre-populate claims for those claimants with the largest amounts in chargeback damages, if and to the extent it is administratively feasible. Azari Decl., ¶44; Distribution Plan at 4-5. The degree to which this will be possible will depend upon the data available and the number and relative complexity of valid claims made. Azari Decl., ¶44. Additionally, to the extent claimants dispute the amounts they are owed, they will be able to seek a review of their eligibility. Azari Decl., ¶44; Distribution Plan at 5.

Thus, the proposed Distribution Plan, which will be further developed as Class Counsel and the Claims Administrator continue to litigate the action and analyze the data of Defendants, third parties, and eventually claimants, is an effective and standard method of distributing relief to the Class.

### c.    The Proposed Attorneys' Fees Award and Class Representative Service Awards Are Reasonable

Class Counsel will apply for an award of attorneys' fees not to exceed 33.3% of the Gross Settlement Fund (as defined in the Discover Stip., §XI; Amex Stip., §XI) plus accrued interest, and seek the partial reimbursement of expenses incurred during the course of this litigation, not to

exceed $2 million.[9]   Aguilar Decl., ¶17.  Class Counsel will also seek the Court's approval of $25,000 initial service awards for the named Plaintiffs as class representatives.[10]  *Id.*   Class Counsel will make appropriately supported submissions in support of these requests, with ample time for Class members to weigh in prior to any settlement hearing.  *Id.*

Class Counsel's fee and expense request is appropriate given the excellent results achieved, and the scope of this litigation, which has already been ongoing for more than nine years, and has progressed through every stage before trial.  Moreover, "[d]istrict courts within the Second Circuit routinely approve attorneys' fees awards of one third or 33 1/3% as reasonable." *Tenaris S.A. Sec. Litig.*, 2024 WL 1719632, at *10 (collecting cases); *see also Pearlstein*, 2022 WL 4554858, at *9-10 (holding that "Class Counsel's request for one-third of the gross settlement fund is reasonable within this circuit" and approving fee request of $55 million of $165 million common fund and $4.2 million in expenses, plus accrued interest, and collecting cases awarding 33 1/3% in fees); *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15-cv-06549-CM-RWL, slip op. at 1 (S.D.N.Y. Mar. 23, 2023), ECF No. 967 (approving $18.8 million fee, amounting to 33 1/3% of the gross settlement fund, plus $5.9 million in expenses) (Aguilar Decl., Ex. 6); *Nichols v. Noom, Inc.*, No. 20-cv-3677 (KHP), 2022 WL 2705354, at *10 (S.D.N.Y. July 12, 2022) (awarding $18.7 million of $56 million fund and recognizing that "[a] fee equal to one-third of a settlement fund is routinely approved in this Circuit"); *see also Cruz Guerrero v. Montefiore Health Sys. Inc.*, No. 22-CV-9194 (KHP), 2025 WL 100889, at *10 (S.D.N.Y. Jan. 15, 2025) (recognizing that "Courts

---

[9] Class Counsel have incurred far more in litigation expenses, but for purposes of this Settlement will only seek an amount up to $2 million.

[10] Class Counsel may seek further service awards for the class representatives at a later date, if and as appropriate.

in this Circuit routinely find that a percent of fund award is appropriate and that a one-third percentage is fair and reasonable" and collecting cases stating the same).

The timing of the payment of an attorney fee award is also reasonable (Amex Stip., ¶59; Discover Stip., ¶59), given that Class Counsel will continue to be incentivized to work on this case to obtain a favorable result for the Class from the remaining Defendants, and that Class Counsel have undertaken this litigation for over nine years without any payment of fees or expenses. Aguilar Decl., ¶17; *see, e.g.*, *Ying*, 2025 WL 968586, at *8 (recognizing that "courts have held that payment to attorneys before disbursements to claimants 'does not undercut that case where, as here, the majority of other factors weigh significantly' in favor of final settlement approval" (quoting *Schutter*, 2024 WL 4118465, at *9)).

Similarly, Class Counsel's request for service awards for the named Plaintiffs as class representatives is commensurate with their long involvement in this case, hours of dedication and service to the interests of the Class, and the recognition of the appropriateness of such awards in numerous other cases. Aguilar Decl., ¶17; *e.g.*, *Pearlstein*, 2022 WL 4554858, at *11 (awarding $100,000 to two lead plaintiffs and recognizing "[t]he award amount is consistent with similar awards granted in this district"); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2018 WL 6250657, at *4 (S.D.N.Y. Nov. 29, 2018) (awarding $100,000 to two plaintiffs and $50,000 to six others); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 JG VVP, 2015 WL 5918273, at *6 (E.D.N.Y. Oct. 9, 2015) (approving $90,000 service awards).

### d.    The Releases in the Settlement Are Appropriate

Another factor considered by courts is the appropriateness of the bargained for releases. *See, e.g.*, *Payment Card 2019 Prelim*, 330 F.R.D. 11 at 42-47; *Payment Card 2024*, 2024 WL 3236614, at *34-35.  Here, the releases are appropriate because they explain that they extend "to

the fullest extent permitted by law," and are limited to claims, causes of action, etc. that are "arising out of the factual predicates of the Action."  Discover Stip., ¶32; Amex Stip., ¶32; *see Payment Card 2024*, 2024 WL 3236614, at *34 (recognizing with approval that release "contain[ed] the 'de-facto severability clause' described by the Second Circuit: 'this release shall extend to, but only to, the fullest extent permitted by federal law'" and was "constrained by the 'identical factual predicate' test").  Further, the Amex Settlement makes clear that the claims of any merchants with a CAA, whose claims were compelled to arbitration, are not being released.  Amex Stip., ¶32.

### e. Any Agreement Required To Be Identified Under Rule 23(e)(3)

There are no such agreements to be disclosed here.  Aguilar Decl., ¶19.

### 2. The Proposed Settlement Treats Class Members Equitably

"'Equitable treatment' pursuant to Rule 23(e)(2)(D) 'include[s] whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.'"  *Payment Card 2024*, 2024 WL 3236614, at *36 (citing Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment).  Further, "'[i]t bears emphasis that Rule 23(e)(2)(D) requires that class members be treated ***equitably***, not identically.'"  *Id.* (emphasis in original) (citing *Moses*, 79 F.4th at 245).  "Where[, like here,] settlement funds are distributed *pro rata*, courts routinely find that this factor weighs in favor of approval."  *Id.* (citing *Zaslavskiy v. Weltman, Weinberg & Reis Co.*, No. 18-CV-4747, 2022 WL 1003589, at *8 (E.D.N.Y. Jan. 5, 2022), *report and recommendation adopted*, No. 18-CV-4747 (E.D.N.Y. Jan. 25, 2022); *Mikhlin*, 2021 WL 1259559, at *8; *Namenda Direct Purchaser*, 462 F. Supp. 3d at 316 (noting that the settlement "allocate[d] funds among [c]lass members on a *pro rata* basis, which courts uniformly approve as equitable")).  Here, all Class members are treated equitably through the *pro rata* distribution, and thus this factor also weighs in favor of granting final approval.

3.    **The Reaction of the Class to the Settlement, to the Extent It Can Be Assessed at this Stage, Supports the Settlement**

To the extent possible at this point, the Court can look to certain indications of the reaction of the Class to the Settlement.  *See, e.g.*, *Payment Card 2019 Prelim*, 330 F.R.D. at 29 ("consider[ing] this factor to the limited extent possible at the preliminary approval stage").  Here there are two positive indications of the reaction of the Class.  First, the "named Plaintiffs favor the Settlement, and their approval is probative of the Class's reaction at this time since notice has not yet been issued." *Zimmerman*, 2025 WL 763734, at *6.  Additionally, "[c]ourts have found this factor to weigh in favor of approval where the majority of class members have not objected to or opted out of a settlement." *Schutter*, 2024 WL 4118465, at *10 (cleaned up).  Here, while notice of the settlement has not yet been disseminated, the Class was certified, and the period for opt-outs to the Class expired on August 31, 2022.    Notice Plan Decl., ¶32.  The provided Notice was extensive, as discussed above in Section II.B, and the individual notice portion alone reached over 96.6% of the identified Class.  *Id.*, ¶16.  Despite this widespread notice, and that Plaintiffs estimate that the Class consists of approximately 400,000 members, less than 350 opted out of the Class, or less than 0.1% of the Class.  *Id.*, ¶32; Aguilar Decl., ¶14.   This low rate of opt-outs demonstrates strong support for the action.  *See, e.g.*, *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 62 (S.D.N.Y. 2003) ("find[ing] there have been remarkably few objections" and "support" for the settlement weighing in favor of approval where "less than 0.1% of the [eligible] class members have opted out of the settlement"); *AOL Time Warner*, 2006 WL 903236, at *10 (recognizing "small number of objections and low percentage of opt-outs here strongly favor[ed] the Settlement" when "these opt-outs amount[ed] to less than 0.2%" of the class).

Accordingly, this factor also weighs strongly in favor of the Court finding that it is likely to be able to grant final approval of the Settlement.

IV.    **THE SETTLEMENT NOTICE PLAN IS CONSISTENT WITH WHAT WAS ORDERED FOR CLASS NOTICE, AND IS REASONABLE**

A.    **The Settlement Notice Plan Is Consistent with What Was Ordered for Class Notice and Is Reasonable**

Rule 23(c)(2)(B) requires the court to "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  "The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Payment Card 2019 Prelim*, 330 F.R.D. at 58-59 (citing *Wal-Mart Stores*, 396 F.3d at at 113-14).  "[N]otice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceeding." *Id.* (citing *Wal-Mart Stores*, 396 F.3d at 114).  In addition, notice "is adequate if it may be understood by the average class member." *Id.*  "There are no rigid rules for determining whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements." *Id.* (citing *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 191 (S.D.N.Y. 2012), *aff'd sub nom. Charron v. Wiener*, 731 F.3d 241)).

"Courts in this Circuit have explained that a Rule 23 Notice will satisfy due process when it 'describe[s] the terms of the settlement generally,' 'inform[s] the class about the allocation of attorneys' fees, and provide[s] specific information regarding the date, time, and place of the final approval hearing.'" *Id.* (alterations in original) (citing *Charron*, 874 F. Supp. 2d at 191).

Class Counsel, together with the Administrator, have devised a settlement notice program ("Settlement Notice Plan") and prepared mail and publication notices that fully satisfy these requirements.  Indeed, notice to the Class has already been approved once, following class certification.  Dkt. No. 775.  The Court held that "the manner of notice proposed—which includes direct mail, email, a media plan, an online website and information center, and a tollfree direct

phone communication center—constitutes the best practicable notice under the circumstances as well as valid, due, and sufficient notice to all persons entitled thereto and complies fully with the requirements of Federal Rule of Civil Procedure 23(c) and the due process requirements of the United States Constitution." *Id.* at 2. The same conclusion can be reached here, where Plaintiffs' Settlement Notice Plan is built on the same foundation and includes all of the same features. Azari Decl., ¶18. The Settlement Notice Plan is designed and expected to reach at least 80% of the Class. *Id.* The proposed notices state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the Class that has already been certified; (iii) the basic terms of the settlement agreements; (iv) that a Class member may enter an appearance through an attorney if the member so desires; (v) the time and manner for objecting to the Settlement; (vi) the binding effect of a class judgment on members and the terms of the releases; (vii) the claim filing process and a description of the Distribution Plan; and (viii) the requests for an award of attorneys' fees, reimbursement of costs and an award to the Class representatives. The proposed notices further direct Class members to the case website and provide contact information for the Administrator. *Id.*, ¶40. Thus, the proposed notice is appropriate and should be approved.

## B. The Court Should Exercise Its Discretion to Approve the Settlement Without a Second Opt-Out Period, in Light of the Class Notice Already Provided

Approval of the Settlement without a second opportunity for the Class to opt-out is appropriate given that the Class Notice fairly apprised the Class of what would happen if they chose not to opt out. "The decision whether to approve a settlement that does not allow a new opportunity to elect exclusion is confided to the court's discretion." *Denney*, 443 F.3d at 271.

On June 28, 2022, Epiq began an extensive notice campaign to potential Class members to inform them of the pendency of this action as a class action as well as their right to request to opt-out from the Class and the procedures for doing so. *See* Dkt. No. 775; Notice Plan Decl., ¶¶9, 13.

Epiq sent over 1.1 million Postcard Notices via mail, and over 100,000 email notices, to potential Class members through the direct portion of the Class Notice Plan. Notice Plan Decl., ¶¶9, 13. A comprehensive media plan further supplemented the Class Notice Plan. *Id.*, ¶¶17-31.

The Second Circuit has repeatedly rejected the argument that due process requires that members of a Rule 23(b)(3) class be given a second opportunity to opt out of a class when such class members already received extensive notice and ample opportunity to do so—as they did here. *See Wal-Mart Stores*, 396 F.3d at 114-15 (holding requirements of due process and Rule 23 were satisfied because the class "had been given notice of the action, the opportunity to opt out [following class certification], notice of the proposed settlement, and the opportunity to object" and objector "was required to opt out at the class notice stage if it did not wish to be bound by the Settlement"); *Denney*, 443 F.3d at 271 (recognizing that "[r]equiring a second opt-out period as a blanket rule would disrupt settlement proceedings because no certification would be final until after the final settlement terms had been reached").

Here, the Class Notice made clear the consequences of not opting out, even if it did not explicitly state that a second opportunity to opt out would not be provided. The Long Notice read: "What happens if I do not do anything?" … "By doing nothing … [r]egardless of whether the plaintiffs win or lose at trial or whether they settle, *you will not be able to sue*, or continue to sue the Defendants … [*y]ou will also be legally bound by all of the Orders* the Court issues *and Judgments* the Court makes *in this lawsuit*." Dkt. No. 774-4 at 5. The Postcard Notice contained nearly identical explanatory language. Dkt. No. 774-3. Accordingly, a reasonable Class member understood that they were required to opt out, or forfeit certain rights. Thus, the lack of an additional opt-out opportunity is appropriate under the circumstances. *See, e.g.*, *Low v. Trump University, LLC*, 881 F.3d 1111, 1117-20 (9th Cir. 2018) (holding that "[t]he most reasonable

- 45 -

reading of the notice suggests that class members had a single opt-out opportunity that expired if not exercised by the deadline" recognizing language similar to the notices here); *see also In re Luckin Coffee Inc. Sec. Litig.*, No. 1:20-cv-01293-JPC-JLC, 2021 WL 11114633, at *19 n.6 (S.D.N.Y. Oct. 26, 2021) (recognizing that "[as] this Class was previously certified and, in connection therewith, Class Members had the opportunity to exclude themselves from the Class, the Court has exercised its discretion not to allow a second opportunity for exclusion in connection with the settlement proceedings"); *see also Sjunde AP-Fonden v. Gen. Elec.* Co., No. 17-CV-8457 (JMF), 2025 WL 89271, at *2 (S.D.N.Y. Jan. 14, 2025) (denying request for a second opt-out and recognizing that "the Notice of Pendency expressly advised class members choosing to remain in the class that they would 'be bound by all past, present, and future orders and judgments' … and 'may not pursue a lawsuit on [their] own behalf'").

The Court should exercise its discretion to approve the Settlement without a second opportunity to opt-out.

## V.    THE PROPOSED SCHEDULE OF EVENTS IS FAIR AND REASONABLE

As set out in the Proposed Order, Plaintiffs propose the following schedule:

| Event | Timeline |
|---|---|
| Completion of the Settlement Notice Plan to the Class | Within 60 days of the Court's entry of the Preliminary Approval Order ("Order Date"). |
| Submission of motion for attorneys' fees, expenses and service awards for the class representatives | Within 70 days of the Order Date. |
| Deadline for Class Members to object to the settlement | Within 100 days of the Order Date. |
| Plaintiffs' notice to the Court confirming completion of Settlement Notice Plan | Within 115 days of the Order Date. |

| Submission of motion and memorandum in support of final approval of the settlement and any responses by the parties to any objections filed by any Class members | Within 125 days of the Order Date. |
|---|---|
| Fairness Hearing | On a date to be set by the Court, but no earlier than 140 days from the Order Date. |

This schedule is fair to Class members. It gives Class Members 40 days to review the preliminary approval papers and Settlement before deciding whether to object.  And it gives 30 days for Class Members to consider Class Counsel's application for fees, expenses, and Class representative service awards before deciding whether to object to any or all of them.  Accordingly, Plaintiffs respectfully request that the Court issue the Proposed Order establishing the schedule set forth therein.

## VI.    CONCLUSION

The motion for preliminary approval should be granted.

Dated: June 13, 2025

Respectfully submitted,

**ROBBINS LLP**

*s/ George C. Aguilar*
GEORGE C. AGUILAR (*pro hac vice*)
MICHAEL J. NICOUD (*pro hac vice*)
JACOB W. OGBOZO (*pro hac vice*)
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
gaguilar@robbinsllp.com
mnicoud@robbinsllp.com
jogbozo@robbinsllp.com

**DEVINE GOODMAN & RASCO, LLP**
JOHN W. DEVINE
2800 Ponce De Leon Boulevard, Suite 1400
Coral Gables, FL 33134
Telephone: (305) 374-8200
Facsimile: (305) 374-8208
jdevine@devinegoodman.com

- 47 -

**LAW OFFICES OF
  THOMAS G. AMON**
THOMAS G. AMON
420 Lexington Avenue, Suite 1402
New York, NY 10170
Telephone: (212) 810-2430
Facsimile: (212) 810-2427
tamon@amonlaw.com

*Class Counsel and Attorneys for Plaintiffs B & R
Supermarket, Inc. (d/b/a Milam's Market), Grove
Liquors LLC, Strouk Group LLC (d/b/a Monsieur
Marcel), and Palero Food Corp. and Cagueyes
Food Corp. (d/b/a Fine Fare Supermarket)*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 13, 2025, I caused a true and correct copy of the foregoing

Memorandum in Support of Plaintiffs' Motion for Preliminary Approval of Settlement with

Discover and Amex to be served via e-mail on the parties listed on the attached service list.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on June 13, 2025.

*s/ George C. Aguilar*
GEORGE C. AGUILAR

**ROBBINS LLP**
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
gaguilar@robbinsllp.com

*B & R Supermarket, Inc., et al.  v. Visa, Inc., et al.,*
Case No. 1:17-cv-02738-MKB-VMS

**PLAINTIFFS' COUNSEL**

| FIRM | EMAIL ADDRESSES | ATTORNEYS FOR: |
|---|---|---|
| George C. Aguilar<br>Michael J. Nicoud<br>Jacob W. Ogbozo<br>ROBBINS LLP<br>5060 Shoreham Place, Suite 300<br>San Diego, CA 92122<br>Telephone: (619) 525-3990<br>Facsimile: (619) 525-3991<br><br>John W. Devine<br>DEVINE GOODMAN & RASCO, LLP<br>2800 Ponce De Leon Blvd., Suite 1400<br>Coral Gables, FL  33134<br>Telephone:  (305) 374-8200<br>Facsimile: (305) 374-8208<br><br>Thomas G. Amon<br>LAW OFFICES OF<br>   THOMAS G. AMON<br>420 Lexington Avenue, Suite 1402<br>New York, NY 10170<br>Telephone: (212) 810-2430 | gaguilar@robbinsllp.com;<br>mnicoud@robbinsllp.com;<br>jogbozo@robbinsllp.com;<br>jdevine@devinegoodman.com;<br>tamon@amonlaw.com | Class Counsel and<br>Attorneys for Plaintiffs<br>B & R Supermarket,<br>Inc. (d/b/a Milam's<br>Market), Grove Liquors<br>LLC, Strouk Group<br>LLC (d/b/a Monsieur<br>Marcel), and Palero<br>Food Corp. and<br>Cagueyes Food Corp.<br>(d/b/a Fine Fare<br>Supermarket) |

**DEFENSE COUNSEL**

| FIRM | EMAIL ADDRESSES | ATTORNEYS FOR: |
|---|---|---|
| Damaris Hernández<br>Peter T. Barbur<br>Rebecca Spendley<br>CRAVATH, SWAINE<br>   & MOORE LLP<br>825 Eighth Avenue<br>New York, NY  10019 | dhernandez@cravath.com;<br>pbarbur@cravath.com;<br>rspendley@cravath.com | Defendant American<br>Express Company |

***B & R Supermarket, Inc., et al.  v. Visa, Inc., et al.,***
**Case No. 1:17-cv-02738-MKB-VMS**

| FIRM | EMAIL ADDRESSES | ATTORNEYS FOR: |
|---|---|---|
| Jeanifer Ellen Parsigian<br>Dana L. Cook-Milligan<br>WINSTON & STRAWN LLP<br>101 California St., 35th Floor<br>San Francisco , CA  94111<br><br>James F. Herbison<br>WINSTON & STRAWN LLP<br>35 West Wacker Drive, 39th Floor<br>Chicago, IL  60601<br><br>Jeffrey L. Kessler<br>Eva W. Cole<br>Johanna R. Hudgens<br>WINSTON & STAWN LLP<br>200 Park Avenue<br>New York, NY 10166 | jparsigian@winston.com;<br>dlcook@winston.com;<br>jherbison@winston.com;<br>jkessler@winston.com;<br>ewcole@winston.com;<br>jhudgens@winston.com | Defendant Discover<br>Financial Services |
| Kenneth A. Gallo<br>Craig A. Benson<br>Lina T. Dagnew<br>PAUL, WEISS, RIFKIND,<br>WHARTON<br>    & GARRISON LLP<br>2001 K Street, NW<br>Washington, DC 20006<br><br>Brette Tannenbaum<br>Yahonnes Cleary<br>PAUL, WEISS, RIFKIND,<br>  WHARTON & GARRISON LLP<br>1285 Avenue of the Americas<br>New York, NY 10019 | kgallo@paulweiss.com;<br>cbenson@paulweiss.com;<br>ldagnew@paulweiss.com;<br>btannenbaum@paulweiss.com;<br>ycleary@paulweiss.com | Defendant Mastercard<br>International<br>Incorporated |

*B & R Supermarket, Inc., et al.  v. Visa, Inc., et al.,*
**Case No. 1:17-cv-02738-MKB-VMS**

| FIRM | EMAIL ADDRESSES | ATTORNEYS FOR: |
|---|---|---|
| Matthew A. Eisenstein<br>Karen C. Otto<br>Mike Rubin<br>Rosemary Szanyi<br>ARNOLD & PORTER<br>  KAYE SCHOLER LLP<br>601 Massachusetts Ave., NW<br>Washington, DC 20001<br><br>Robert J. Vizas<br>Sharon D. Mayo<br>ARNOLD & PORTER<br>  KAYE SCHOLER LLP<br>Three Embarcadero Center,<br>10th Floor<br>San Francisco, CA  94111 | matthew.eisenstein@arnoldporter.com;<br>karen.otto@arnoldporter.com;<br>michael.rubin@arnoldporter.com;<br>rosemary.szanyi@arnoldporter.com;<br>robert.vizas@arnoldporter.com;<br>sharon.mayo@arnoldporter.com | Defendant Visa Inc.<br>and Visa U.S.A. Inc. |